# EXHIBIT A

## TO THE MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'MOTION TO DISMISS

## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| SIKORSKY AIRCRAFT CORPORATION, *et al.*, | ) ) ) | CIVIL ACTION NO. 3:10 CV 00954 (CSH) |
| Plaintiffs, | ) ) | |
| vs. | ) ) | |
| LLOYDS TSB GENERAL LEASING NO. 20 LIMITED, *et al.*, | ) ) ) | |
| Defendants. | ) ) x | |

## APPENDIX: UNREPORTED CASES CITED IN MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTIONS TO DECLINE AND DISMISS FOR LACK OF JURISDICTION

## UNREPORTED CASES

*Atlantic Maritime Enter. Corp. v. Hong Kong Borneo Service Co.*,
　　1990 WL 484929 (D. Conn.

*Atochem North America, Inc. v. Fisons PLC*,
　　1990 WL 31897 (E.D. Pa.)

*Bank Meridian, N.A. v. Motor Yacht "It's 5 O'Clock Somewhere,"*
　　2010 WL 3169367 (D.S.C.)

*Barrett v. Penn Warranty Corp.*,
　　2004 WL 1195487 (Conn. Super. May 10, 2004)

*Boeing Co. v. Egyptair*, 2007 WL 1315716 (2d Cir.)

*Bumble Bee Foods LLC v. Refriammonia*,
　　2010 WL 1905030 (D.P.R. May 10, 2010)

*Dolphin Direct Equity Partners, LP v. Interactive Motorsports & Entertainment Corp.*,
　　2009 WL 577916 (S.D.N.Y. Mar. 2, 2009

*Frederiksson v. Sikorsky Aircraft Corp.*,
　　2009 WL 2952225 (D. Conn.)

*ING Groep, NV v. Stegall*,
　　2004 WL 3178077 (D. Colo.)

*Intellectual Capital Partner v. Ins. Credit Partners LLC*,
　　2009 WL 1974392 (S.D.N.Y. July 8, 2009)

*K. Bell & Assocs. v. Lloyd's Underwriters*,
　　1998 WL 274346 (S.D.N.Y. 1998)

*Leather Form S.R.L. v. Knoll, Inc.*,
　　2005 WL 3312064 (S.D.N.Y.),
　　*aff'd*, 205 Fed. Appx. 861 (2d Cir. 2006)

*Mitchell v. Patterson*,
　　2005 WL 1671528 (Conn. Super. Ct. June 21, 2005)

*RJM Aviation Assoc., Inc. v. GP Aviation Serv., LLC*,
　　2008 WL 918538 (D. Conn.)

*State v. Maximus, Inc.*,
　　2009 WL 1142570 (Conn. Super.)

Not Reported in F.Supp., 1990 WL 484929 (D.Conn.)
**(Cite as: 1990 WL 484929 (D.Conn.))**

**C** Only the Westlaw citation is currently available.

United States District Court, D. Connecticut.
ATLANTIC MARITIME ENTERPRISES CORPO-
RATION
v.
HONG KONG BORNEO SERVICES CO., LTD.
**Civ. No. B-88-674 (EBB).**

Feb. 2, 1990.

RULING ON MOTION TO DISMISS FOR LACK
OF IN PERSONAM JURISDICTION

ELLEN B. BURNS, Chief Judge.

**\*1** The plaintiff, Atlantic Maritime Enterprises, ("At-
lantic"), brought this suit on December 1, 1988 for
failure to perform charter obligations against the de-
fendant, Hong Kong Borneo Services,[FN1] ("Hong
Kong Borneo"). The dispute between Atlantic and
Hong Kong Borneo arises out of negotiations (al-
leged to have resulted in the formation of a contract)
between the plaintiff's brokers in New York, Interna-
tional Chartering Services, Inc., and Pinney, Inc.,
("Pinney"), a ship brokerage company in Connecti-
cut.

The defendant has moved for an order to dismiss the
action pursuant to Rule 12(b)(2) of the Federal Rules
of Civil Procedure for lack of *in personam* jurisdic-
tion, or in the alternative, for dismissal on the
grounds of *forum non conveniens*. The plaintiff as-
serts that *in personam* jurisdiction exists on the basis
of the Connecticut long-arm statute, C.G.S. § 33-
411(b) and (c).

After reviewing the original memoranda, the court
ordered the parties to submit memoranda addressing
the question of whether Pinney was acting as an
agent for the defendant in conducting negotiations
with the plaintiff. Limited discovery on the agency
question was permitted and supplemental briefs were
filed. Subsequently, on January 10, 1990, a hearing
was held regarding the question of the court's per-
sonal jurisdiction over the defendant. The issue is
now ripe for decision.

For the reasons stated below, the defendant's motion
to dismiss for lack of *in personam* jurisdiction is
granted.

*Background*

In mid-January, 1988, Atlantic and Hong Kong Bor-
neo entered into negotiations for the chartering of a
vessel then being built in the Republic of South Ko-
rea. The plaintiff charterer was represented in the
negotiations by its agent, Joern L. Brunvall, a ship
broker with International Chartering Services, Inc., a
New York Corporation. The defendant shipowner
was represented by its agent, Rodskog Brokers Ltd., a
Hong Kong brokerage firm, which in turn was repre-
sented by Stephen Pinney, a ship broker with Pinney,
Inc., of Stamford, Connecticut. Pinney had contacted
Rodskog regarding Atlantic's possible interest in
chartering one of the defendant's vessels in response
to a worldwide request for such proposals made by
Rodskog. The negotiations that followed were con-
ducted between January and February of 1988, and
consisted of numerous telephone calls and telex
communications between Mr. Pinney in Connecticut
and Mr. Brunvall in New York. On February, 3,
1988, the parties allegedly orally reached an agree-
ment, or fixture in the parlance of the trade, the terms
of which were commemorated in a telex sent by
Brunvall to Pinney on that date. Under the agree-
ment, a Liberian or Panamanian Corporation chosen
by the plaintiff was to charter one of two vessels,
(Hull Number 626 or 627), for a period of twenty-
four months, with the plaintiff having an option to
lease the ship for an additional twelve months. The
charter also provided the plaintiff with an option to
purchase the vessel for $24,000,000 at the end of two
years. As a condition of the agreement, the plaintiff
was to provide the defendant a performance bond in
the form of an irrevocable letter of credit in the
amount of $1,500,000, the details of which were left
for future negotiations. The subsequent negotiations
collapsed, however, and by letter dated February 23,
1988, the defendant informed the plaintiff that it
would not honor the terms of the alleged charter. The
instant lawsuit was commenced shortly thereafter.

*Discussion*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1990 WL 484929 (D.Conn.)
**(Cite as: 1990 WL 484929 (D.Conn.))**

I. *In Personam Jurisdiction*

**\*2** As a preliminary matter, the court notes that the party asserting *in personam* jurisdiction bears the ultimate burden of establishing, by a preponderance of the evidence, that such jurisdiction exists. *Marine Midland Bank, N.A. v. Miller,* 664 F.2d 899, 904 (2nd Cir.1981); 2A Moore's Federal Practice ¶ 12.07 [2.-2] at 12-55-56 (2nd ed. 1989). In determining a motion to dismiss for lack of *in personam* jurisdiction, the district court may proceed either upon written submissions or through an evidentiary hearing. If the court proceeds upon written submissions, as it does here, the party claiming jurisdiction need only make a *prima facia* showing through pleadings, affidavits and supporting materials that jurisdiction exists. The court will construe these documents in the light most favorable to the plaintiff, and resolve all doubts in its favor. *Id.*

This case is brought under the admiralty and maritime jurisdiction of the court under 28 U.S.C. 1333. Accordingly, the Due Process clause of the Fifth Amendment must be satisfied in order for the court to exercise personal jurisdiction over the defendant. *Pacific Atlantic Trading Company, Inc. v. M/V Main Express,* 758 F.2d 1325, 1327 (9th Cir.1985); *Trade Arbed v. Singapore Star,* 1989 A.M.C. 29, 31 (D.Conn.1988). In addition, the state long-arm statute must be applied to determine the defendant's amenability to suit in the forum. *Id.* Plaintiff asserts that jurisdiction in this case may be founded upon either C.G.S. § 33-411(b) or (c) of the Connecticut long-arm statute. The court shall address each of these provisions in turn.

II. *C.G.S. § 33-411(b)* [FN2]

Section § 33-411(b) of the Connecticut General Statutes provides that:

Every foreign corporation which transacts business in the state *in violation of section 33-395 or 33-396,* shall be subject to suit in this state upon any cause of action arising out of such business.[FN3] (emphasis added).

Under this statute, whether a foreign corporation is transacting business in Connecticut under § 33-

411(b), and is thus subject to the registration requirements contained in § 33-396, is a determination that must be made upon all of the facts. *Eljam Mason Supply, Inc. v. Donnelly Brick Co.,* 152 Conn. 483 (1965); *Alfred M. Best, Co. v. Goldstein,* 124 Conn. 597 (1938). In *Eljam,* the plaintiff, a New York corporation in the building supply business, entered into a contract with a Connecticut brick manufacturing company in which they agreed that the plaintiff would serve as the defendant's exclusive distributor in New York. The contract was executed in New York, all of the plaintiff's orders for supplies were placed in New York, and all but two deliveries were made to the plaintiff's New York yard or to New York locations designated by them. The plaintiff did not maintain any salesmen, offices, bank accounts, telephones or post office boxes in Connecticut.

*Best* also involved the activities of a New York corporation, a publishing company, whose only presence in Connecticut was through business solicitations made by one of its travelling salesmen. Although the Best Company maintained an office in Hartford, and was listed in the telephone directory, all of the business solicited by its agent in Connecticut was subject to final approval by the parent corporation in New York.

**\*3** In both *Eljam* and *Best,* the Connecticut Supreme Court concluded that the activities of the foreign corporation described above did not amount to a transaction of business within the meaning of § 33-396.[FN4] In reaching these conclusions, the court focused on "the situs of the contract, the presence of corporate officers and agents in Connecticut, and the extent of business activities in Connecticut" as relevant to its determination of the applicability of § 33-396. *Sawyer Savings Bank v. American Trading Company, Inc.,* 176 Conn. 185, 190 (1978).

After considering these same factors, the court finds that the plaintiff has missed the boat in claiming that personal jurisdiction over the defendant exists in this case. The defendant's activities in Connecticut were not so extensive "as to become amenable to the provisions of our statutes requiring the taking out of a license and filing a copy of its charter" with the secretary of state. *Best, supra* at 604. Nor does the defendant maintain any offices or have any employees in the United States, let alone in Connecticut. It has no bank accounts or telephone listings here. Further-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1990 WL 484929 (D.Conn.)
**(Cite as: 1990 WL 484929 (D.Conn.))**

more, it does not appear that the alleged charter contract was consummated within this state.[FN5] Under these circumstances, the court finds that the defendant was not transacting business in Connecticut in violation of § 33-396. Absent a violation of the registration requirements contained in this statute, the court finds that it lacks personal jurisdiction over the defendants under § 33-411(b).[FN6]

Notwithstanding the defendant's lack of physical presence in Connecticut, the plaintiff argues that Pinney acted as an agent for the defendant in locating a charterer, and that Pinney's activities in soliciting and negotiating the contract constitute the transaction of business for jurisdictional purposes. The court disagrees.

In determining whether agency exists for jurisdictional purposes, the court must look to the "realities of the relationship rather than the formalities of agency law." *Cutco Industries, Inc. v. Naughton,* 806 F.2d 361, 366 (2nd Cir.1986). As the court observed in *Mayer v. Josiah Wedgwood & Sons, Ltd.:*

The agency provision of section 302 [of the New York long-arm statute] has not been strictly construed. A formal agency relationship is not necessary for jurisdiction. Instead, a more flexible concept of agency is used. [A]gent ... include[s] any person who, with the consent of the nondomiciliary and under some measure of his control, acts in New York for the benefit of the nondomiciliary.

601 F.Supp. 1523, 1530 (S.D.N.Y.1985) (citations omitted). Even applying this flexible test for agency, however, the court finds that Pinney's relationship with the defendant was too attenuated to consider his activities in Connecticut as having been undertaken on the defendant's behalf.

Pinney's function in this transaction was solely as an independent broker, one of over one hundred such brokers solicited by Rodskog worldwide to assist in its efforts to locate a charterer for its ship. "The business of ship brokerage is well recognized and carries with it no implication of agency." *Klishewich v. Mediterranean Agencies, Inc.,* 42 F.R.D. 624, 627 (E.D.N.Y.1966). Pinney's only interest in the deal was the one-time possibility of earning a commission. Pinney dealt exclusively with Rodskog; he had no direct contact with the defendants. Although the

plaintiff disputes this fact, there is evidence to suggest that the defendant was not even aware of Pinney's involvement in facilitating the deal. While it has been held that an agency relationship may exist even where the representative is not acting exclusively on behalf of the principal, *See Larina Shipping v. Hideca* 1974 A.M.C. 2191 (S.D.N.Y.1974), this is not a case in which the defendant selected or expressly acknowledged Pinney as its agent. Nor did the defendant authorize him to exercise any discretion or independence in negotiating the deal, although such discretion is the *sine qua non* of an agency relationship. While it is true that during the charter negotiations, Pinney exchanged over one hundred phone calls and fifty telexes between New York and Connecticut, and prepared a report on the background, holdings and financial stability of the plaintiff, in his own words, he served essentially as a "mailbox," conveying messages between the defendant's agents in Hong Kong, and the plaintiff's agent in New York. Under these circumstances, the court finds the plaintiff's attempts to characterize Pinney as an agent of the defendant to be unavailing. *See Walter v. Hotel Brunswick,* 3 Conn.Cir. 398 (1965).

**\*4** Assuming, *arguendo,* that Pinney was functioning in the capacity of an agent, his activities in the transaction described above were undertaken on behalf of Rodskog, not the defendant. Furthermore, the "one-shot" nature of this deal would not amount to the type of "purposeful activity" necessary to establish the transaction of business in Connecticut for which registration with the secretary of state is required under the § 33-411(b) of the Connecticut long-arm statute. For all of the reasons stated above, the court finds that it lacks personal jurisdiction over the defendant under § 33-411(b).

### III. *§ 33-411(c)*

In the alternative, the plaintiff contends that the court may exercise personal jurisdiction over the defendant under § 33-411(c) of the Connecticut long-arm statute. This section of the statute provides, in relevant part, that:

Every foreign corporation shall be subject to suit in this state, *by a resident of this state or by a person having a usual place of business in this state,* ... on any cause of action arising as follows: (1) Out of any contract made in this state or to be performed in this

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1990 WL 484929 (D.Conn.)
**(Cite as: 1990 WL 484929 (D.Conn.))**

state; or (2) out of any business solicited in this state by mail or otherwise if the corporation has repeatedly so solicited business, ... (4) out of tortious conduct in this state, whether arising out of repeated activity or single acts, and whether arising out of misfeasance or nonfeasance. (emphasis added).

Even assuming that Pinney acted as the defendant's agent, however, this argument has no wind in its sails.

A prerequisite to the application of § 33-411(c) is that the plaintiff must be a "resident" or "a person having a usual place of business" in the state of Connecticut. Here, however, the plaintiff is a New York corporation. Although its only New York office, located in White Plains, was closed on January 1, 1987, its principal, Peter Pappas, continues to conduct much of the company's business from the offices of Astron Management Corporation in New York. Moreover, the plaintiff's Certificate of Incorporation on file with the New York County Clerk's office indicates that its offices are located in New York City. At oral argument, however, the plaintiff indicated that Mr. Pappas resides in Connecticut and frequently conducts the company's business from his home. Plaintiff contends, therefore, that Pappas's home constitutes Atlantic's usual place of business for purposes of § 33-411(c). The plaintiff offers no support for this "wherever I pull into port is my usual place of business" construction of the statute, however, and the court concludes that it has no basis in the law. Accordingly, the court finds that it lacks jurisdiction under this subsection of the statute.

*Conclusion*

For the reasons stated above, the court finds that it lacks personal jurisdiction over the defendant under either § 33-411(b) or (c) of the Connecticut long-arm statute. Accordingly, the defendant's Rule 12(b)(2) motion to dismiss for lack of *in personam* jurisdiction is granted.

**\*5** SO ORDERED

> FN1. The plaintiff erroneously named the Hong Kong Borneo Shipping Company, LTD., a dissolved Hong Kong shipping firm, as the defendant in this case. The plaintiff has requested leave of the court to

amend its complaint and insert the defendant's proper name, which leave is hereby granted.

> FN2. Although "far-reaching" in scope, *Eutectic Corp. v. Curtis Noll Corp.,* 342 F.Supp. 761 (D.Conn.1972), § 33-411(b) of the Connecticut long-arm statute was not intended to reach the constitutionally permissible limits of jurisdiction over foreign corporations as construed by the Supreme Court in *International Shoe v. State of Washington,* 326 U.S. 310 (1945). *Marvel Products, Inc. v. Fantastics,* 296 F.Supp. 783, 785 (D.Conn.1969). As such, the court need only determine whether the defendant's activities in Connecticut amount to a transaction of business in the state in violation of § 33-395 or § 33-396. A foreign corporation found to be transacting business in violation of these statutes will, by definition, also satisfy the "minimum contacts" analysis of *International Shoe.*

> Section 33-411(b) has been interpreted by Connecticut courts with reference to the "nearly identical" New York statute, N.Y.C.P.L.R. § 302(a)(1), which provides for jurisdiction over "any nondomiciliary" who "transacts any business within the state" as to a cause of action arising from the transaction of such business. *See Bross Utilities Service Corp. v. Aboubshait,* 489 F.Supp. 1366, 1372 (D.Conn.1980). Accordingly, the court will make reference, where appropriate, to cases applying the New York long-arm statute.

> FN3. Section 33-396 provides, in relevant part, that:

> (a) No foreign corporation except an insurance or surety or indemnity company shall transact business in this state until it has procured a certificate of authority so to do from the secretary of state, ...

> (b) A foreign corporation shall not be denied a certificate of authority by reason of the fact that the laws of the state under which it is organized governing its or-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1990 WL 484929 (D.Conn.)
**(Cite as: 1990 WL 484929 (D.Conn.))**

ganization and internal affairs differ from the laws of this state.

Section 33-395 pertains specifically to the authority of utilities, cemetery corporations, and corporations with condemnation authority to transact business in Connecticut, and is therefore not applicable to the defendant in this case.

FN4. In both *Eljam* and *Best,* the foreign corporations were plaintiffs, and the question before the court was whether they were subject to the provisions of § 33-412 requiring them to obtain a certificate of authority to transact business in Connecticut as a prerequisite to bringing suit in the state. The court found that they were not.

FN5. The alleged agreement was made in a telephone conversation between Mr. Pinney and Mr. Brunvall on February 3, 1988, the terms of which were recapitulated in a telex from Brunvall to Pinney of the same date, and confirmed by telex by Pinney to Brunvall the next day. *See* Plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Dismiss the Complaint, p. 5.

FN6. The plaintiff is certainly correct in pointing out that different considerations apply in the determination of whether a foreign corporation is transacting business requiring it to obtain a certificate of authority under § 33-396, and whether it is transacting business for the purposes of service of process. *Eljam Mason Supply, Inc. v. Donnelly Brick Co., supra.* Furthermore, the law is clear that "although certain activities may not constitute doing business in [Connecticut], they would suffice to subject the foreign corporation to service of process." *Id.* This is not to say, however, that plaintiff need only demonstrate that the defendant transacted business in the state under this reduced standard in order to establish jurisdiction under § 33-411(b). The statute clearly requires that only those foreign corporations transacting business in violation of the registration requirements are amenable to suit under this provision.

D.Conn.,1990.
Atlantic Maritime Enterprises Corp. v. Hong Kong Borneo Services Co., Ltd.
Not Reported in F.Supp., 1990 WL 484929 (D.Conn.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp., 1990 WL 31897 (E.D.Pa.)
**(Cite as: 1990 WL 31897 (E.D.Pa.))**

**C**Only the Westlaw citation is currently available.

United States District Court, E.D. Pennsylvania.
ATOCHEM NORTH AMERICA, INC. (formerly
Pennwalt Corporation),
v.
FISONS PLC and Fisons Corporation.
**CIV. A. No. 90-0791.**

March 20, 1990.

Mark A. Klugheit, Jennifer M. Anderson, Jeffrey W. Soderberg, Dechert, Price & Rhoads, Philadelphia, Pa., for plaintiff.

Drinker, Biddle & Reath, Francis P. Newall, Philadelphia, Pa., for Fisons plc and Fisons Corp.

MEMORANDUM OPINION AND ORDER

WEINER, Senior District Judge.

**\*1** In 1988, defendants Fisons plc and Fisons Corporation (collectively referred to as "Fisons") acquired from plaintiff Atochem North America, Inc., formerly known as Pennwalt Corporation ("Atochem" or "Pennwalt"), Pennwalt's Pharmaceutical Group pursuant to a written Purchase Agreement ("the Agreement"). Pursuant to Section 12.7 of the Agreement, Fisons, in a letter dated January 8, 1990, filed a notice of claim against Pennwalt, claiming Pennwalt committed fraud and breach of warranty by allegedly misrepresenting and concealing facts from Fisons concerning manufacturing and regulatory problems with Pentuss, a cough medicine manufactured by Pennwalt's Pharmaceutical Group and one of the assets conveyed by Pennwalt to Fisons under the terms of the Purchase Agreement. On February 5, 1990, Atochem brought this declaratory judgment action, seeking a declaration that it did not commit fraud or breach certain representations and warranties when it sold the assets of Pennwalt's Pharmaceutical Group to Fisons. On February 16, 1990, Fisons filed a plenary action against Atochem for fraud and breach of contract in the United States District Court for the Southern District of New York. Presently before the court are the motions of Fisons to dismiss or alternatively

transfer this action to the United States District Court for the Southern District of New York and to disqualify plaintiff's counsel and the motion of Atochem for a temporary restraining order and preliminary injunction enjoining Fisons from further prosecution its plenary action in the Southern District of New York. For the reasons which follow, Fisons' motion to dismiss is granted and the remaining motions are denied as moot.

Fisons requests that this court dismiss this action because the issues tendered for declaratory judgment will be resolved in Fisons' plenary action in the Southern District of New York. Atochem opposes this motion by citing the ""first-filed" rule. Fisons responds by claiming that the "first- filed" rule does not apply to the facts of the case sub judice because Atochem's first filing was made in anticipation of imminent judicial proceedings by Fisons. We agree with Fisons.

It is well-settled that federal courts have discretion to decline to entertain a declaratory judgment action. Tempco Elec. Heater Corp. v. Omega Engineering Inc., 819 F.2d 746, 747 (7th Cir. 1987). In declining to entertain a declaratory judgment action filed under similar circumstances as the one in the case sub judice, the court in Tempco focused on the underlying purposes of a declaratory judgment action:

> The purposes of declaratory judgments are to 'clarify and settle the legal relations at issue' and to 'terminate and afford relief from the uncertainty, insecurity and controversy giving rise to the proceeding.'

Tempco, 819 F.2d at 749 (quoting in part Borchard, Declaratory Judgments, 299 (2d ed. 1941). The Tempco court noted that a subsequently filed infringement action pending before another district court in Connecticut had caused the controversy before the Tempco court to "ripen" to the point where a declaratory judgment would serve no useful purpose. On appeal, the Court of Appeals held that the refusal of the district court to entertain the earlier filed declaratory judgment action was a proper exercise of discretion.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1990 WL 31897 (E.D.Pa.)
**(Cite as: 1990 WL 31897 (E.D.Pa.))**

* The same rationale applies with equal fervor to the facts of the case sub judice. Fisons has filed a plenary action in the Southern District of New York which is the mirror-image of the declaratory judgment action Atochem filed in this court. Thus, a declaratory judgment in this action would serve no useful purpose, as the issues tendered for declaratory judgment can be asserted and disposed of in the New York litigation. To hold otherwise would be to condone a process that would not resolve all the issues that now exist between the parties.

The fact that the declaratory judgment action was filed in this district first is not binding. Our Court of Appeals has cautioned against "wooden application of the ["first to file"] rule without regard to rare or extraordinary circumstances, inequitable conduct, bad faith or forum shopping." Equal Employment Opportunity Commission v. The University of Pennsylvania, 850 F.2d 969, 972 (3d Cir. 1988), aff'd on other grounds, 110 S.Ct. 577 (1990). One such circumstance is "when the first-filing party instituted suit in one forum in anticipation of the opposing party's imminent suit in another, less favorable, forum" Id. at 976. See also Factors Etc. Inc. v. Pro Arts, Inc., 579 F.2d 215, 217, 219 (2d Cir. 1978), cert. denied, 440 U.S. 908 (1979); Ven-Fuel, Inc. v. Department of the Treasury, 673 F.2d 1194, 1195 (11th Cir. 1982) (first-filing not controlling when it was made "in apparent anticipation of imminent judicial proceedings" by opposing party); Yoder v. Heinhold Commodities, Inc., 630 F.Supp. 756, 760, 761 (E.D. Va. 1986) ("foremost among [the] equitable considerations are the timing and circumstances surrounding the filing of" the first suit.); Consolidated Rail Corp. v. Grand Trunk Western Railroad Co., 592 F.Supp. 562, 568, 569 (E.D. Pa. 1984).

In the case sub judice, Atochem was the first-filing party, having commenced this declaratory judgment action in this district on February 5, 1990. However, the timing of the filing of this declaratory judgment action indicates an attempt by Atochem to preempt an imminent action by Fisons in the Southern District of New York.

As noted above, on January 8, 1990, Fisons sent Pennwalt a notice of claim letter in which it put Atochem on notice that Fisons viewed its conduct as ""actionable fraud," "tortious fraud, which creates

exposure to compensatory and punitive damages" and "breaches of numerous...representations and warranties" in the Purchase Agreement. The letter also stated that:

> ...at a minimum Fisons is entitled to an adjustment to the purchase price that would constitute full recompense for Pennwalt's failure to convey to Fisons the lawfully merchantable product that Pennwalt represented Pentuss to be. This demand should not, however, be construed as a waiver of Fisons' right to amplify at the present claim or to state other claims as to this or any other matter under the Purchase Agreement as such may arise, and we expressly reserve such and all other rights...Should you wish to enter into a standstill or tolling agreement to afford an opportunity to discuss the above, we would suggest you promptly communicate with...our litigation counsel.

*3 While the letter did not specifically state that legal action would be taken, the tenor of the letter is clear. In apparent anticipation of an imminent action for fraud and breach of contract by Fisons, Atochem promptly filed the instant declaratory judgment action. See Complaint at ¶14 and Atochem's memorandum of law in support of its motion for a temporary restraining order and preliminary injunction at 3. Eleven days later, Fisons did indeed file the anticipated plenary action against Atochem in the Southern District of New York alleging claims identical to those it threatened in its notice of claim letter of January 8, 1990. "When the declaratory judgment action has been triggered by a notice letter, this equitable consideration may be a factor in the decision to allow the later filed action to proceed to judgment in the plaintiffs' chosen forum." Factors Etc., supra, at 219. As Mr. Justice Brennan has observed, "[t]he federal declaratory judgment is not a prize to the winner of a race to the courthouse." Perez v. Ledesma, 401 U.S. 82, 119 n. 12 (Brennan, J. dissenting). Moreover, Atochem, by agreeing to the terms in the Purchase Agreement, knew that New York law would govern any dispute arising out of the Purchase Agreement[FN1] and that, in all likelihood, such dispute would be litigated in the United States District Court for the Southern District of New York.[FN2] Indeed, the parties each designated a New York agent for service of process.[FN3] It is, therefore, this court's opinion that Atochem's conduct in filing this declaratory judgment action amounts to nothing more than a preemptive

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1990 WL 31897 (E.D.Pa.)
**(Cite as: 1990 WL 31897 (E.D.Pa.))**

strike designed to secure for Atochem its choice of forum while preventing Fisons from litigating the dispute in a forum of its own choosing. Under these circumstances, Atochem should not be rewarded for winning the race to the courthouse. Consequently, this court, in the exercise of its discretion, declines to hear this declaratory judgment action. However, as the New York action involves the same facts, parties and issues, we will dismiss this action without prejudice to Atochem reasserting it as part of the action pending in the United States District Court for the Southern District of New York, Fisons Corporation et al. v. Atochem North America, Inc., NO. 90 Civ. 1080 (S.D.N.Y.).[FN4]

FN1. Purchase Agreement at §12.10.

FN2. The Purchase Agreement contains the following forum selection clause:

12.11 Submission to Jurisdiction. The parties to this Agreement agree that any legal suit, action or proceeding arising out of or relating to this Agreement or the Related Agreements, including but not limited to issues of specific performance and indemnity, may be instituted in the United States District Court for the Southern District of New York, United States of America, and each party waives any objection which it may have now or hereafter to the laying of the venue of any such suit, action or proceeding, and irrevocably submits to the jurisdiction of any such court...

FN3. Purchase Agreement at §12.11.

FN4. In dismissing this action without prejudice to Atochem reasserting it as part of the plenary action in the Southern District of New York, we note that any inconvenience Atochem, its witnesses or counsel will suffer by having to litigate this matter in New York City rather than in Philadelphia is de minimis given the close proximity of the two cities and the convenience of modern transportation facilities such as Amtrak and the New Jersey Turnpike.

**\*4** Atochem has filed a motion for a temporary restraining order and preliminary injunction to enjoin

Fisons from further prosecution of the New York action until this court decides Fisons' motion to dismiss or transfer. Since we will grant Fisons' motion to dismiss, Atochem's motion for a temporary restraining order and preliminary injunction is moot. For the same reason, Fisons' motion to disqualify Atochem's counsel is moot.

ORDER

The motion of defendants to dismiss is GRANTED. This action is dismissed without prejudice to plaintiff reasserting it as part of the action pending in the United States District Court for the Southern District of New York, Fisons Corporation, et al v. Atochem North America, Inc., No. 90 Civ. 1080 (S.D.N.Y.).

The motion of plaintiffs for a temporary restraining order and preliminary injunction is DENIED as moot.

The motion of defendants to disqualify plaintiff's counsel is DENIED as moot.

IT IS SO ORDERED.

E.D.Pa., 1990.
Atochem North America, Inc. v. Fisons plc
Not Reported in F.Supp., 1990 WL 31897 (E.D.Pa.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3169367 (D.S.C.)
**(Cite as: 2010 WL 3169367 (D.S.C.))**

Only the Westlaw citation is currently available.

United States District Court,
D. South Carolina,
Charleston Division.
BANK MERIDIAN, N.A., Plaintiff,
v.
MOTOR YACHT "IT'S 5'OCLOCK SOME-
WHERE" OFFICIAL NUMBER 1073764, her en-
gines, bowsprit, anchor, cables, chains, rigging,
tackle, apparel, furniture and all accessories hereunto
appertaining and belonging to her, in rem, and
Painter's Alley Yachts, LLC, Gregory L. Williams,
Debra J. Williams, and Terry G. Lanford, in per-
sonam, Defendants.
**Civil Action No. 2:09-cv-594-MBS.**

Aug. 6, 2010.

S. Scott Bluestein, Bluestein Law Firm, Charleston,
SC, Shane William Rogers, Johnson Smith Hibbard
and Wildman, Spartanburg, SC, for Plaintiff.

David Alexander, Culbertson and Alexander, Green-
ville, SC, David B. Marvel, Prenner Marvel, Charles-
ton, SC, for Defendants.

### ORDER AND OPINION

MARGARET B. SEYMOUR, District Judge.

**\*1** Plaintiff Bank Meridian filed the within action on
March 3, 2009 against Motor Yacht "It's 5'O'Clock
Somewhere" ("Vessel"), *in rem;* and Painter's Alley
Yachts, LLC ("Painter's Alley"), Gregory Williams
("G.Williams"), Debra Williams ("D.Williams")
(collectively "the Williamses"), and Terry Lanford
("Lanford"), *in personam.* This case is before the
court on Plaintiff's motion to strike Lanford's jury
trial demand and/or for the action to remain on the
court's non-jury roster, which was filed on October
23, 2009. Lanford responded on November 24, 2009.
On December 8, 2009, Plaintiff replied.

### FACTS

Plaintiff designated this action as a Rule 9(h) admi-

ralty action. Plaintiff alleges claims for breach of
contract and default, and seeks foreclosure of a mari-
time lien. Plaintiff avers that Painter's Alley executed
a note in which it promised to pay Plaintiff
$1,400,000, which note was personally guaranteed by
G. Williams, D. Williams and Lanford. Compl. ¶¶
11-12. Plaintiff was granted a Preferred Ship Mort-
gage on the Vessel in exchange for the loan. Compl.
¶ 14. Plaintiff alleges that loan payments were not
made as required under the note. Compl. ¶ 16.

Lanford has filed counterclaims against Plaintiff and
cross-claims against G. Williams and D. Williams.
Lanford has demanded a jury trial on his claims. The
counterclaims against Plaintiff are for fraud, misrep-
resentation, civil conspiracy, breach of fiduciary
duty, unjust enrichment, recession, and violations of
the South Carolina Unfair Trade Practices Act. The
cross-claims are for fraud, misrepresentation, civil
conspiracy, breach of fiduciary duty, unjust enrich-
ment, an accounting, and dissolution. Lanford alleges
that Brian Murdoch ("Murdoch"), a member of Plain-
tiff's senior management, knowing that the William-
ses were delinquent on the vessel's loans, conspired
with the Williamses to get Lanford to invest in the
vessel so that Plaintiff would not suffer a loss on the
loans. Answer ¶¶ 40, 42. Lanford alleges that Mur-
doch induced him into going into business with the
Williamses by making false representations about the
Williamses and the vessel. Answer ¶¶ 47-49. As a
result of these alleged misrepresentations, Lanford
contends that he formed Painter's Alley with the Wil-
liamses. Answer ¶ 53. Lanford alleges that the Wil-
liamses have absconded with the yacht and left him
with the debt. *See* Answer ¶¶ 72-73.

### *DISCUSSION*

Plaintiff seeks an order from the court striking Lan-
ford's demand for a jury trial on his counter- and
cross-claims. "The Seventh Amendment preserves
the right to a jury trial in suits at common law ." *In re
Lockheed Martin Corp.,* 503 F.3d 351, 354 (4th
Cir.2007) (internal citation omitted). The Seventh
Amendment provides:

In Suits at common law, where the value in contro-
versy shall exceed twenty dollars, the right of trial

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3169367 (D.S.C.)
(Cite as: 2010 WL 3169367 (D.S.C.))

by jury shall be preserved, and no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law.

**\*2** Although the Seventh Amendment does not require jury trials in admiralty cases, jury trials are not forbidden in such cases. *Fitzgerald v. U.S. Lines Co.,* 374 U.S. 16, 20, 83 S.Ct. 1646, 10 L.Ed.2d 720 (1963); *see also Vodusek v. Bayliner Marine Corp.,* 71 F.3d 148, 152-53 (4th Cir.1995) ( "While the Seventh Amendment guarantees a jury trial in cases 'at common law,' no constitutional provision guarantees, or indeed prohibits, jury trials for cases tried in equity or in admiralty. Traditionally, however, admiralty courts and courts of equity did not rely on juries.").

As stated by the *Lockheed Martin* court, "[t]he role of the jury trial in admiralty cases ... is complicated by the 'saving to suitors' clause of 28 U.S.C. § 1333." 503 F.3d at 354. Section 1333 states: "[t]he district courts shall have original jurisdiction, exclusive of the courts of the States, of: (1) Any civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled ." 28 U.S.C. § 1333. The saving-to-suitors clause has been interpreted to preserve a plaintiff's right to a common law remedy "in all cases where the common law is competent to give it." *Lockheed Martin,* 503 F.3d at 354.

A plaintiff may invoke a district court's admiralty jurisdiction under Federal Rule of Civil Procedure 9(h), which states:

> If a claim for relief is within the admiralty or maritime jurisdiction and also within the court's subject-matter jurisdiction on some other ground, the pleading may designate the claim as an admiralty or maritime claim for purposes of Rules 14(c), 38(e), and 82 and the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions. A claim cognizable only in the admiralty or maritime jurisdiction is an admiralty or maritime claim for those purposes, whether or not so designated.

Generally, "if a plaintiff designates his claim as a Rule 9(h) maritime claim, the saving-tosuitors clause does not permit a defendant to trump that designation and demand a jury trial." *Lockheed Martin,* 503 F.2d

at 357. However, this rule does not govern proceedings where the defendant asserts counterclaims and cross-claims. *Id.* While courts are split on whether a plaintiff's Rule 9(h) admiralty designation prevents a defendant from having a jury trial on counterclaims and cross-claims, the Fourth Circuit has held that such a designation does not preclude a jury trial on *compulsory* counterclaims and/or cross-claims. *Id.* at 358. In *Lockheed Martin,* the Fourth Circuit stated that any other result would "improperly elevate" the traditional mode of trial in admiralty "to a right *not* to proceed before a jury." *Id.* The Fourth Circuit went on to note that:

> To permit the plaintiff's choice of a customary but not constitutionally required mode of trial to prevent a defendant from taking advantage of his constitutionally guaranteed mode of trial is inconsistent with the Supreme Court's admonition that the Seventh Amendment right to a jury trial must be preserved "wherever possible."

**\*3** *Id.* Therefore, if Lanford's counterclaims and cross-claims are compulsory and are suits at law, Lanford has a right to a jury trial that cannot be abridged by Plaintiff's admiralty designation. While Plaintiff argues that Lanford has no right to a jury trial because he has no independent basis for federal jurisdiction, there is no indication in Fourth Circuit jurisprudence that this is a determinative factor. The court finds that Lanford need not have an independent basis for federal jurisdiction to assert his right to a jury trial on his legal compulsory counter- and cross-claims in this case.[FN1]

> FN1. A district court in California has come to the same conclusion. In *Avon Insurance, PLC v. Lubinski,* No. C-92-1474-DLJ, 1993 300557 (N.D.Cal.), the court addressed a motion to strike a jury trial for compulsory counterclaims over which the court was exercising supplemental jurisdiction in an action proceeding in admiralty under Fed. R. Civ. P 9(h). *Id.* at *1. The *Lubinski* court denied the motion to strike despite the fact that Lubinski has no independent basis for federal jurisdiction finding that Lubinski had not "waived his Seventh Amendment right to a jury trial merely as a result of having his [ ] counterclaims joined" with an admiralty claim. *Id.* The court indicated that Lubinski

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3169367 (D.S.C.)
**(Cite as: 2010 WL 3169367 (D.S.C.))**

should not be denied his right to a jury trial simply because he lost the race to the courthouse. *Id.*

Federal Rule of Civil Procedure 13(a), which governs when counter- and cross-claims are compulsory, provides:

[a] pleading must state as a counterclaim any claim that-at the time if its service-the pleader has against an opposing party if the claim (A) arises out of the transaction or occurrence that is the subject matter of the opposing party's claim; and (B) does not require adding another party over whom the court cannot acquire jurisdiction.

*Id.* Because Lanford's claims arise from how Lanford came to participate in the loan agreements that are the subject of this lawsuit and do not require the addition of any new parties, the court finds that Lanford's counterclaims and cross-claims are compulsory.

Pursuant to the Seventh Amendment, Lanford is entitled to a jury trial on all of his claims at law as well as any issues that are common to both legal and equitable claims. *See Curtis v. Loether,* 415 U.S. 189, 196 n. 11, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1974) ("If a legal claim is joined with an equitable claim, the right to a jury trial on the legal claim, including all issues common to both claims, remains intact."). Of Lanford's counter- and cross-claims, the following claims are suits at law: 1) misrepresentation, *see Turnbull v. Gadsden,* 1848 WL 2530, at *5 (S.C.Eq.1848); 2) fraud, *see Kaiser v. Carolina Life Ins. Co.,* 219 S.C. 456, 65 S.E.2d 865, 871 (S.C.1951); 3) civil conspiracy, *see Hackworth v. Greywood at Hammett, LLC,* 385 S.C. 110, 682 S.E.2d 871, 874 (S.C.Ct.App.2009); 4) unjust enrichment, *see Mosseri, Mosseri, Castro v. Austin's at the Beach, Inc.,* 372 S.C. 593, 642 S.E.2d 760, 761 (S.C.Ct.App.2007); 5) violation of South Carolina Unfair Trade Practices Act, *see Taylor v. Hoppin' Johns, Inc.,* 304 S.C. 471, 405 S.E.2d 410, 411 (S.C.Ct.App.1991); and 6) breach of fiduciary duty, *see Verenes v. Alvanos,* 387 S.C. 11, 690 S.E.2d 771, 773 (S.C.2010). The following counter-and cross-claims are suits at equity: 1) rescission, *see McMaster v. Strickland,* 322 S.C. 451, 472 S.E.2d 623, 625 (S.C.1996); 3) accounting, *see Historic Charleston Holdings, LLC v. Mallon,* 381 S.C. 417, 673 S.E.2d 448, 453 (S.C.2009); and 4) dissolution, *see Historic Charleston Holdings, LLC v.*

*Mallon,* 381 S.C. 417, 673 S.E.2d 448, 454 (S.C.2009).

Plaintiff seeks to have his case tried to the bench, while Defendant has invoked his Seventh Amendment Right to a jury trial on related claims. Rule 42(b) of the Federal Rules of Civil Procedure empowers district courts to use their discretion to separate trials in some cases. Rule 42(b) provides:

**\*4** Separate Trials. The court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of any claim, cross-claim, counterclaim, or third-party claim, or of any separate issue or of any number of claims, cross-claims, counterclaims, third-party claims, or issues, always preserving inviolate the right of trial by jury as declared by the Seventh Amendment to the Constitution or as given by a statute of the United States.

Fed.R.Civ.P. 42(b). The court declines to separate the trial of this case. The entire case shall be tried at the same time with Plaintiff's admiralty claims and Lanford's equitable claims tried to the court, and Lanford's legal claims tried to a jury.

### CONCLUSION

The court **denies** Plaintiff's motion to strike (Entry 32). Plaintiff's admiralty claims and Lanford's equitable claims will be tried to the court, and Lanford's legal claims will be tried to a jury.

**IT IS SO ORDERED.**

D.S.C.,2010.
Bank Meridian, N.A. v. Motor Yacht It's 5'OClock Somewhere Official No. 1073764
Slip Copy, 2010 WL 3169367 (D.S.C.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2004 WL 1195487 (Conn.Super.)
**(Cite as: 2004 WL 1195487 (Conn.Super.))**

▷Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Superior Court of Connecticut,
New Britain.
Richard J. BARRETT
v.
PENN. WARRANTY CORP.
**No. CV030522826-S.**

May 10, 2004.

Consumer Law Group LLC, Rocky Hill, for Richard
J. Barrett.

Loughlin Fitzgerald KampHenrici Mo, Wallingford,
for Penn. Warranty Corp.

WILLIAM P. MURRAY, Judge.

*1 On August 20, 2003, the plaintiff, Richard Barrett,
filed a two-count complaint against the defendant, the
Penn Warranty Corp.[FN1] The complaint alleges
breach of contract and a violation of the Magnuson-
Moss Warranty Act.[FN2] The parties stipulated to the
following facts.[FN3] On December 30, 2002, Barrett, a
Connecticut resident, purchased a used 1987 Chevro-
let Monte Carlo automobile from a New York auto-
mobile dealership. At that time, Barrett also pur-
chased a warranty contract of six months or 7,500
miles provided by Penn Warranty, a corporation
whose principal place of business is in Pennsylvania.
The warranty contract acknowledges that Barrett is a
resident of New Britain, Connecticut. Within the war-
ranty period, Barrett experienced problems with the
car and took it to Ceglarz Motor Repair and Sales,
LLC in New Britain, Connecticut to have it in-
spected. Barrett requested that Ceglarz contact Penn
Warranty to cover the repairs pursuant to the war-
ranty contract. Ceglarz telephoned Penn Warranty
and was instructed to "tear down and inspect the en-
gine, the transmission, and the differential" in order
to ascertain whether or not the damage was covered.
Ceglarz tore down and inspected the engine, as in-
structed, but Penn Warranty refused to pay for the
needed repairs. On April 3, 2003, Penn Warranty
informed Ceglarz via telephone that it would not
cover the damages to the car.

> FN1. A typographical error in one paragraph
> of the complaint misnamed the defendant.
> Both parties stipulated, however, to the error
> and that the correct name of the defendant
> was the Penn Warranty Corp.

> FN2. See 15 U.S.C. § 2301 et seq.

> FN3. The parties agreed that the court would
> rule on this motion based upon their sup-
> porting affidavits.

Penn Warranty filed a motion to dismiss the com-
plaint, accompanied by the signed and sworn affida-
vit of Gale Mayorowski, a corporate attorney for the
defendant. Barrett filed a memorandum in opposition,
accompanied by his affidavit and that of Peter Ce-
glarz, owner of Ceglarz Motor Repair and Sales,
LLC. Penn Warranty argues that it does not have
sufficient contacts with the state of Connecticut to
meet Connecticut's long-arm statute or the require-
ments under the due process clause of the United
States Constitution. Barrett argues that the warranty
contract satisfies both the provisions of the long-arm
statute and the constitutional principles of due proc-
ess.

"A motion to dismiss ... properly attacks the jurisdic-
tion of the court, essentially asserting that the plain-
tiff cannot as a matter of law and fact state a cause of
action that should be heard by the court ... A motion
to dismiss tests ... whether, on the face of the record,
the court is without jurisdiction." (Internal quotation
marks omitted.) *Blumenthal v. Barnes,* 261 Conn.
434, 442, 804 A.2d 152 (2002). "When a defendant
files a motion to dismiss challenging the court's juris-
diction, a two part inquiry is required. The trial court
must first decide whether the applicable state long-
arm statute authorizes the assertion of jurisdiction
over the [defendant]. If the statutory requirements
[are] met, its second obligation [is] then to decide
whether the exercise of jurisdiction over the [defen-
dant] would violate constitutional principles of due

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2004 WL 1195487 (Conn.Super.)
(Cite as: 2004 WL 1195487 (Conn.Super.))

process." (Internal quotation marks omitted.) *Knipple v. Viking Communications, Ltd.,* 236 Conn. 602, 606, 674 A.2d 426 (1996). "If a challenge to the court's personal jurisdiction is raised by a defendant, either by a foreign corporation or by a nonresident individual, the plaintiff must bear the burden of proving the court's jurisdiction." *Id.,* at 607.

**\*2** Penn Warranty argues that its actions are insufficient to establish jurisdiction under Connecticut's long-arm statute. The defendant asserts that it is not licensed to conduct business in Connecticut, does not have offices or employees in Connecticut, does not own or use any real property in Connecticut, does not have bank accounts in Connecticut, does not have a telephone listing in Connecticut and does not have an agent in Connecticut for service of process. In opposition, Barrett maintains that the warranty contract between himself and Penn Warranty was to be performed in Connecticut and therefore, this court has jurisdiction over the defendant pursuant to General Statutes § 33-929(f)(1).[FN4] Barrett also contends that Penn Warranty solicited business in Connecticut and is subject to the court's jurisdiction pursuant to General Statutes § 33-929(e).[FN5]

> FN4. General Statutes § 33-929(f) provides in part: "Every foreign corporation shall be subject to suit in this state ... Whether or not such foreign corporation is transacting or has transacted business in this state ... on any cause of action arising as follows: (1) Out of any contract made in this state or to be performed in this state ..."

> FN5. General Statutes § 33-929(e) provides: "Every foreign corporation which transacts business in this state in violation of section 33-920 shall be subject to suit in this state upon any cause of action arising out of such business." The plaintiff argues that the defendant transacted business in Connecticut by way of two telephone conversations between the defendant and Ceglarz concerning the repair of the plaintiff's car.

I

Under General Statutes § 33-929(f)(1), personal jurisdiction may be conferred upon a foreign corporation due to an action arising out of "any contract made in this state or to be performed in this state." "In order to satisfy this provision of General Statutes § 33-929(f)(1), the agreement serving as the basis for jurisdiction must contemplate or encompass some performance in Connecticut. However, that performance does not need to be by the defendant. The phrase 'to be performed in this state' does not require performance in this state by the party over whom jurisdiction is sought ... It has been held that jurisdiction is appropriate where the contract in question contemplated and required performance in this state by the plaintiff." (Internal quotation marks omitted .) *Hartford Fire Ins. v. United Restoration,* Superior Court, judicial district of Hartford, Docket No. CV 02 0813517 (April 4, 2003, Booth, J.); see also *Thornton & Co. v. Pennsak, Inc.,* Superior Court, judicial district of New Britain, Docket No. CV-98-04906075 (Nov. 20, 1998, Robinson, J.) (23 Conn. L. Rptr. 532).

Despite the defendant's arguments concerning its limited contacts within the state, the warranty contract with the plaintiff clearly contemplates performance in Connecticut. The contract lists Barrett's address as being in New Britain, Connecticut. The contract also states that the warrantied vehicle "must be at a repair center in order for a claim to be opened" and that the plaintiff may take the car to any "qualified repair center [he chooses]." It is, therefore, reasonably foreseeable that the contract was to be performed in Connecticut because it is most likely that a person would bring a car to be repaired in the state where the person resides. The court, therefore, concludes that it has valid personal jurisdiction over Penn Warranty under § 33-929(f)(1) of our longarm statute.[FN6]

> FN6. Because jurisdiction exists over the defendant pursuant to General Statutes § 33-929(f)(1), the court does not address the plaintiff's argument under § 33-929(e).

II

Penn Warranty further argues that even if Barrett can establish that it is subject to Connecticut's long-arm statute, it did not maintain sufficient contacts with Connecticut for the court to exercise personal jurisdiction over it. Penn Warranty argues that it did not expect to be haled into Connecticut's courts and, to do so, would violate due process.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2004 WL 1195487 (Conn.Super.)
**(Cite as: 2004 WL 1195487 (Conn.Super.))**

**\*3** The law of in personam jurisdiction is well estab-
lished. "The federal due process clause permits state
courts to exercise in personam jurisdiction over a
nonresident corporate defendant that has certain
minimum contacts with [the forum] such that the
maintenance of the suit does not offend traditional
notions of fair play and substantial justice." (Internal
quotation marks omitted.) *Thomason v. Chemical
Bank,* 234 Conn. 281, 287, 661 A.2d 595 (1995),
citing *International Shoe Co. v. Washington* 326 U.S.
310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945). "The
twin touchstones of due process analysis under the
minimum contacts doctrine are foreseeability and
fairness. '[T]he foreseeability is critical to due
process analysis ... is that the defendant's conduct and
connection with the forum state are such that he
should reasonably anticipate being haled into court
there.' " *United States Trust Co. v. Bohart,* 197 Conn.
34, 41-495 A.2d 1034 (1985), quoting *World Wide
Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297,
100 S .Ct. 559, 62 L.Ed.2d 490 (1980), "Either ' spe-
cific' jurisdiction or 'general' jurisdiction can satisfy
the constitutional requirement of sufficient minimum
contacts between the defendant and the forum."
*Thomason v. Chemical Bank, supra,* 234 Conn. at
287-88. "A state court will have ' specific jurisdic-
tion' over a nonresident defendant whenever the de-
fendant has 'purposefully directed' [its] activities at
residents of the forum ... and the litigation [has] re-
sult[ed] from alleged injuries that 'arise out of or re-
late to' those activities ..." (Citations omitted; internal
quotation marks omitted.) *Thomason v. Chemical
Bank, supra,* at 288. "As long as it creates a substan-
tial connection with the forum state, even a single act
can support jurisdiction." *Tri-State Tank Corp. v.
Higganum Heating, Inc.,* 45 Conn.App. 798, 803,
699 A.2d 201 (1997).

In the present case, Penn Warranty's contacts with the
state of Connecticut comport with the requirements
for specific jurisdiction. Penn Warranty entered into a
warranty contact with Barrett, a Connecticut resident.
The contract explicitly authorized Barrett to procure
repair estimates at any qualified repair shop he would
choose. Because Barrett is a Connecticut resident, it
is reasonably foreseeable that he would repair his car
in Connecticut. The court further finds that it is fair to
require Penn Warranty to defend this matter in Con-
necticut. It would be unfair to require Barrett to initi-
ate suit under the contract in either New York, Penn-

sylvania or another state. Furthermore, the warranty
contact does not limit its application and enforcement
to any particular state.[FN7] Rather than containing lim-
iting "choice of forum" or "choice of law" provi-
sions, the contract acknowledges that the rights given
under it may vary from state to state. Penn Warranty,
therefore, should have reasonably expected to be
haled into a state court for the enforcement of the
specific rights provided in its warranty contract. By
purposefully entering into a used car warranty con-
tract covering repairs to a car housed in Connecticut,
Penn Warranty has submitted to the specific personal
jurisdiction of Connecticut's courts for claims arising
out of the contract.

> FN7. The warranty contract provides: "Your
> used car limited warranty gives you specific
> rights. You may have other rights *that vary
> from state to state.* No credit will be issued
> on early terminations, however your rights
> to apply for a refund on a newly purchased
> contract *vary from state to state and will be
> honored in accordance with state law.*"
> (Emphasis added.)

\* The court has specific personal jurisdiction over
Penn Warranty Corp. to determine controversies aris-
ing out of the warranty contract with Barrett. Accord-
ingly, the defendant's motion to dismiss is denied.

Conn.Super.,2004.
Barrett v. Penn. Warranty Corp.
Not Reported in A.2d, 2004 WL 1195487
(Conn.Super.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2007 WL 1315716 (C.A.2 (N.Y.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 2007 WL 1315716 (C.A.2 (N.Y.)))**

**H**Only the Westlaw citation is currently available. This case was not selected for publication in the Federal Reporter.

United States Court of Appeals,
Second Circuit.
THE BOEING COMPANY, Plaintiff-Appellee,
v.
EGYPTAIR, Defendant,
and
MISR Insurance, Defendant-Appellant.
**No. 05-5986-CV.**

May 7, 2007.

Scott F. Seablom, Perkins Coie LLP, Seattle, WA (Jeffrey Dobbins, Perkins Coie LLP, Seattle, WA; Joel W. Nomkin, Perkins Coie Brown & Bain, P.A., Phoenix, AZ; Lee S. Richards III, Arthur S. Greenspan, H. Rowan Gaither IV, Richards Kibbe & Orbe LLP, New York, NY, on the brief), for Plaintiff-Appellee.

Frederick P. Alimonti, Alimonti Law Offices, P.C., White Plains, NY, for Defendant-Appellant.

Present CHESTER J. STRAUB, ROSEMARY S. POOLER and BARRINGTON D. PARKER, Circuit Judges.

**SUMMARY ORDER**

**\*1** AFTER ARGUMENT AND UPON DUE CONSIDERATION, it is hereby ORDERED, ADJUDGED, AND DECREED that the order of the District Court is AFFIRMED in part and the appeal is DISMISSED in part.

Misr Insurance appeals from the September 30, 2005 order of the United States District Court for the Eastern District of New York (Frederic Block, *Judge* ), denying Misr's motions to dismiss. *See The Boeing Co. v. EgyptAir,* 392 F.Supp.2d 461 (E.D.N.Y.2005). We assume the parties' familiarity with the facts and procedural history of the case.

In pursuing this collateral appeal, Misr contends the District Court erred by not dismissing Boeing's complaint because (1) the court lacked subject matter jurisdiction based on the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1330 & 1602 *et seq.;* (2) there were insufficient "minimum contacts" to establish personal jurisdiction; and (3) the court should have declined to exercise jurisdiction pursuant to the Declaratory Judgment Act. We address these arguments in turn.

First, under the collateral order exception to the final judgment rule, we have jurisdiction to review the District Court's finding that subject matter jurisdiction was properly premised on the FSIA. *See Filler v. Hanvit Bank,* 378 F.3d 213, 216 (2d Cir.2004). In reviewing a denial of a motion to dismiss under the FSIA, we assume all of the nonmoving party's factual allegations to be true. *Transatlantic Shiffahrtskontor GmbH v. Shanghai Foreign Trade Corp.,* 204 F.3d 384, 386 (2d Cir.2000).

The District Court properly invoked the commercial activity exception to sovereign immunity under the FSIA. Section 1605 of Title 28 of the United States Code provides that an instrumentality of a foreign state such as Misr is not entitled to immunity in any case "in which the action is based ... upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." 28 U.S.C. § 1605(a)(2); *see also Virtual Countries, Inc. v. Republic of South Africa,* 300 F.3d 230, 236 (2d Cir.2002).[FN1]

> FN1. It is undisputed that Misr, as a corporation that is wholly owned by the Arab Republic of Egypt, is considered a "foreign state" pursuant to 28 U.S.C. § 1603.

The District Court held that Misr's naming of Boeing as an additional assured under EgyptAir's hull and liability insurance policy constituted an act outside the United States taken in connection with Misr's commercial activity of providing insurance, and that this act had the direct effect of providing insurance coverage for the aircraft at issue to Boeing, without which EgyptAir would have been unable to fly to or from the United States. Misr argues that Boeing's

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2007 WL 1315716 (C.A.2 (N.Y.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 2007 WL 1315716 (C.A.2 (N.Y.)))**

lawsuit is not based upon the naming of Boeing as an additional assured, but rather based upon Misr's lawsuit in Egypt. This, however, is a myopic view of Boeing's claims. The naming of Boeing as an additional assured is central to its claims for declaratory relief, as Boeing contends that its status as a named insured means that Misr cannot recover from Boeing the damages it has paid as a result of the crash of Flight 990. There exists, therefore, the requisite "significant nexus" between Boeing's claims and Misr's commercial activity. *See Reiss v. Société Centrale du Groupe des Assurances Nationales,* 235 F.3d 738, 747 (2d Cir.2000) ("[T]here must be 'a significant nexus ... between the commercial activity in [the foreign state] upon which the exception is based and a plaintiff's cause of action.' ") (quoting *NYSA-ILA Pension Trust Fund v. Garuda Indonesia,* 7 F.3d 35, 38 (2d Cir.1993)).

**\*2** Further, Misr has no rights against Boeing that are not premised on its subrogeesubrogor relationship with EgyptAir. This relationship was created by the policy on which Boeing is an additional assured, and is limited by the rights given to EgyptAir under its contracts with Boeing. Thus, Boeing's claims against Misr are "based upon" the insurance policy Misr issued in Egypt. *See Saudi Arabia v. Nelson,* 507 U.S. 349, 357, 113 S.Ct. 1471, 123 L.Ed.2d 47 (1993) (holding that a lawsuit is "based upon" an act or acts outside the United States if this act or these acts, "if proven," would establish the "elements of [the] claim that ... would entitle a plaintiff to relief under his theory of the case").[FN2]

> FN2. Because we find that the District Court properly concluded that Misr does not have sovereign immunity under the FSIA's commercial activity exception, we need not address whether Misr also expressly waived sovereign immunity in its role as EgyptAir's subrogee.

The second basis for Misr's interlocutory appeal is its contention that there were insufficient "minimum contacts" to establish personal jurisdiction under the Due Process Clause. We will exercise pendent appellate jurisdiction over this argument because "questions regarding minimum contacts for personal jurisdiction purposes and commercial contacts for FSIA purposes [are] inextricably intertwined." *U.S. Fidelity and Guar. Co. v. Braspetro Oil Services, Co.,* 199

F.3d 94, 97 (2d Cir.1999) (per curiam). Assuming, *arguendo,* that the minimum contacts requirement of the Due Process Clause applies to foreign instrumentalities such as Misr, *see Hanil Bank v. PT. Bank Negara Indonesia,* 148 F.3d 127, 134 (2d Cir.1998) (noting that it is an open question whether foreign sovereigns are subject to due process analysis), we have no difficulty finding that there were sufficient minimum contacts here. As the District Court explained, Boeing's claims arise out of Misr's contact with the United States; Misr purposefully availed itself of the privilege of conducting commercial activities within the United States by adding Boeing as an additional assured to EgyptAir's hull and liability insurance policy and by insuring EgyptAir's flight operations to and from the United States; and the United States has a substantial interest in adjudicating this dispute because Boeing is a U.S. corporation and two of the agreements central to Boeing's claims are governed by, and will require application of, U.S. law.

Finally, Misr asks us to review the District Court's decision to retain jurisdiction of this dispute under the Declaratory Judgment Act ("DJA"). We decline to do so, however, because the District Court's discretionary decision to exert jurisdiction under the DJA is neither dependent on, nor inextricably intertwined with, our analysis of Misr's immunity under the FSIA. As a general rule, we do not exercise pendent appellate jurisdiction on interlocutory appeals of issues not themselves immediately appealable. *U.S. Fidelity and Guar. Co.,* 199 F.3d at 97. We recognize "only two exceptions to this rule: (a) where an issue is inextricably intertwined with a question that is the proper subject of an immediate appeal, or (b) where review of a jurisdictionally insufficient issue is necessary to ensure meaningful review of a jurisdictionally sufficient one." *Id.* (internal citations and quotation marks omitted). Misr concedes that the second exception does not apply here, but argues that the first does because the "true and singular basis for Boeing's claims for purposes of both the FSIA and the DJA" is Misr's action against Boeing in Egypt.

**\*3** Regardless of whether Misr is correct about the "true basis" for Boeing's claims, however, the issues pertaining to DJA jurisdiction and FSIA immunity in this case are not so intertwined as to warrant the exercise of pendent appellate jurisdiction. Resolving the DJA question would require determining whether the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2007 WL 1315716 (C.A.2 (N.Y.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 2007 WL 1315716 (C.A.2 (N.Y.)))**

District Court abused its discretion in weighing the factors we identified in *Dow Jones & Co. v. Harrods Ltd.,* 346 F.3d 357, 359-60 (2d Cir.2003) (per curiam). These factors include (1) whether the declaratory judgment "will serve a useful purpose in clarifying or settling the legal issues involved," and (2) "whether a judgment would finalize the controversy and offer relief from uncertainty," as well as other factors such as whether the proposed remedy is being used merely for procedural fencing; whether the use of a declaratory judgment would increase friction between sovereign legal systems; and whether there is a better or more effective remedy. *Id.* at 360. Applying and weighing these factors would certainly touch on our FSIA immunity analysis-both require, for example, examining Misr's obligations as the insurer-subrogee for EgyptAir-but the DJA determination turns on issues wholly separate from the immunity analysis, including to what extent a declaratory judgment would resolve the Egyptian subrogation action. Thus, we cannot say that the DJA and FSIA immunity issues are inextricably intertwined. *See Rein v. Socialist People's Libyan Arab Jamahiriya,* 162 F.3d 748, 761 (2d Cir.1998) (pendent interlocutory jurisdiction is not appropriate where "we can easily decide subject matter jurisdiction and leave key issues of [the second question] unresolved").

For the foregoing reasons, the order of the District Court is AFFIRMED to the extent that it denied Misr's motion to dismiss based on lack of subject matter jurisdiction and lack of personal jurisdiction, and Misr's appeal of the District Court's decision to retain jurisdiction pursuant to the DJA is DISMISSED.

C.A.2 (N.Y.),2007.
The Boeing Co. v. Egyptair
Slip Copy, 2007 WL 1315716 (C.A.2 (N.Y.))

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1905030 (D.Puerto Rico)
**(Cite as: 2010 WL 1905030 (D.Puerto Rico))**

Only the Westlaw citation is currently available.

United States District Court,
D. Puerto Rico.
BUMBLE BEE FOODS LLC, Plaintiff,
v.
REFRIAMMONIA, et als., Defendants.
**Civ. No. 08-1752 (PG).**

May 10, 2010.

PHV PeterG. Rossi, PHV WilliamE. Gericke, Cozen O'Connor, Philadelphia, PA, Roberto Abesada-Aguet, Mcconnell Valdes, San Juan, PR, for Plaintiff.

Manuel Cobian-Roig, San Juan, PR, Milagros Del Carmen Lopez-Perez, Cobian Cobian, San Juan, PR, for Defendants.

### OPINION AND ORDER

JUAN M. PEREZ-GIMENEZ, District Judge.

**\*1** Plaintiff Bumble Bee Foods LLC (hereinafter "Plaintiff" or "Bumble Bee") filed this action against RefriAmmonia [FN1], GMC Engineering Corporation ("GMC") and Integrand Assurance Company ("Integrand"). *See* Dockets No. 1, 57. In the amended complaint, Plaintiff brings forth several causes of action against the defendants for damages, breach of contract and breach of good faith. *Id.* Federal jurisdiction is predicated on diversity of citizenship pursuant to 28 U.S.C. § 1332. *See* Docket No. 57 at ¶¶ 2.1-2.3.

> FN1. All claims against co-defendant Refri-ammonia were voluntarily dismissed on September 8, 2009, and partial judgment was thus issued. *See* Dockets No. 53-55.

Defendants GMC and Integrand now move for summary judgment requesting the dismissal of the claims against them on the grounds that Bumble Bee lacks standing to sue and is not the real party in interest. In addition, the moving defendants argue that the real party in interest has failed to toll the applicable statute of limitations and its claim is thus time-barred. *See* Docket No. 73. The Plaintiff timely opposed the

defendants' motion. *See* Dockets No. 74-75.

After a close examination of the evidence on record and a careful review of the applicable law, the Court **DENIES** the pending motion for summary judgment for the reasons explained below.

### I. SUMMARY JUDGMENT STANDARD

A motion for summary judgment is governed by Rule 56(c) of the Federal Rules of Civil Procedure, which allows disposition of a case if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See Sands v. Ridefilm Corp.,* 212 F.3d 657, 660 (1st Cir.2000). A factual dispute is "genuine" if it could be resolved in favor of either party, and "material" if it potentially affects the outcome of the case. *See Calero-Cerezo v. U.S. Dep't of Justice,* 355 F.3d 6, 19 (1st Cir.2004).

To be successful in its attempt, the moving party must demonstrate the absence of a genuine issue as to any outcome-determinative fact in the record, *see DeNovellis v. Shalala,* 124 F.3d 298, 306 (1st Cir.1997), through definite and competent evidence. *See Maldonado-Denis v. Castillo Rodriguez,* 23 F.3d 576, 581 (1st Cir.1994). Once the movant has averred that there is an absence of evidence to support the non-moving party's case, the burden shifts to the non-movant to establish the existence of at least one fact in issue that is both genuine and material. *See Garside v. Osco Drug, Inc.,* 895 F.2d 46, 48 (1st Cir.1990) (citations omitted). If the non-movant generates uncertainty as to the true state of any material fact, the movant's efforts should be deemed unavailing. *See Suarez v. Pueblo Int'l,* 229 F.3d 49, 53 (1st Cir.2000). Nonetheless, the mere existence of "some alleged factual dispute between the parties will not affect an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). However, "summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." *Medina-*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1905030 (D.Puerto Rico)
**(Cite as: 2010 WL 1905030 (D.Puerto Rico))**

*Muñoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 8 (1st Cir.1990).

**\*2** At the summary judgment juncture, the Court must examine the facts in the light most favorable to the non-movant, indulging that party with all possible inferences to be derived from the facts. *See Rochester Ford Sales, Inc. v. Ford Motor Co.,* 287 F.3d 32, 38 (1st Cir.2002). The Court must review the record "taken as a whole," and "may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 135, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). This is so, because credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. *Id.*

## II. FACTUAL FINDINGS

As per the foregoing discussion, the Court found the following relevant facts were undisputed:

1. Bumble Bee is a subsidiary of Connors Bros. Income Fund ("Connors"), a publicly traded international company, with its principle place of business in Markham, Ontario, Canada.

2. On July 9, 2008, Bumble Bee filed the present claim alleging that a fire that took place on August 6, 2007 was caused by the negligence and breach of contract of GMC and Refriammonia, resulting in damages in excess of $15,000,000.00. In its amended complaint, the Plaintiff also alleged that Integrand has acted in bad faith.

3. Lexington Insurance Company ("Lexington") paid Connors $13,052,339.00 for the damages caused by the fire that took place on August 6, 2007 in a property in Puerto Rico known as Bumble Bee Tuna Processing located in Mayagüez, Puerto Rico. The parties signed a Subrogation Receipt on June 23, 2009, whereby Connors subrogated Lexington to all of the rights, claims and interest which it may have against any party liable for the losses resulting from the fire.

4. On August 16, 2007, Lexington had paid Connors $1,500,000.00 as an advance payment on the total settlement. A different Subrogation Receipt

was signed on said date.

5. Connors and any subsidiary, associated or allied company, corporation, firm, and organization are referred to as the "Insured" in Lexington's insurance policy. Therefore, Bumble Bee was an insured party under the policy.

6. Lexington's policy covered the Insured's locations in the United States, Canada and Puerto Rico, including Bumble Bee's facility in Mayagüez, Puerto Rico.

7. Pursuant to the terms of Lexington's insurance policy, the amount of the deductible was $500,000.00, which was not reimbursed by Lexington.

## III. DISCUSSION

### A. Rule 17 and Ratification

In the pending motion for summary judgment, the moving defendants argue that the claim should be dismissed on the theory that Rule 17(a) allows only the insurer-subrogee, Lexington, to pursue this claim for reimbursement for the losses incurred after the Bumble Bee fire. *See* Docket No. 73. In response, Plaintiff argues that it sustained an unreimbursed loss in excess of the amount of its insurer's reimbursement, including, but not limited to, the amount of the $500,000.00 deductible. Plaintiff thus contends that because it sustained an unreimbursed loss, it is also a real party in interest with respect to this claim for damages and for breach of contract and is thus entitled to prosecute it. *See* Docket No. 75. This Court agrees.

**\*3** "[I]n diversity cases federal law governs the issue of in whose name a lawsuit must be brought, even though state law controls the underlying substantive right of an insured to recovery." *Church Ins. Co. v. Trippe Mfg. Co.,* No. 04 Civ.6111 HB, 2005 WL 3462726, at \*2 (S.D.N.Y. December 19, 2005) (*quoting Brocklesby Transport v. Eastern States Escort Servs.,* 904 F.2d 131, 133 (2d Cir.1990)). Rule 17(a) of the Federal Rules of Civil Procedure provides that "[a]n action must be prosecuted in the name of the real party in interest." FED.R.CIV.P. 17(a)(1). Moreover, Rule 17(a) states that:

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1905030 (D.Puerto Rico)
**(Cite as: 2010 WL 1905030 (D.Puerto Rico))**

The court may not dismiss an action for failure to prosecute in the name of the real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action. After ratification, joinder, or substitution, the action proceeds as if it had been originally commenced by the real party in interest.

FED.R.CIV.P. 17(a)(3). "It has been held that Rule 17(a) serves the purpose of protecting defendants 'from facing a subsequent similar action brought by one not a party to the present proceeding and to ensure that any action taken to judgment will have its proper effect as res judicata.' " *Pabon Lugo v. MONY Life Ins. Co. of America,* 465 F.Supp.2d 123 (D.P.R.2006) (*quoting Prevor-Mayorsohn Caribbean, Inc. v. Puerto Rico Marine Management, Inc.,* 620 F.2d 1, 4 (1st Cir.1980)).

Under federal law, if an insurer has compensated an insured for an entire loss, the insurer is the only real party in interest and must sue in its own name; however, if the insured is only partially compensated by the insurer, both are real parties in interest.

> If the [insurer-subrogee] has paid an entire loss suffered by the insured, it is the only real party in interest and must sue in its own name. 3 Moore, Federal Practice (2d Ed.) p. 1339. If it has paid only part of the loss, both the insured and insurer ... have substantive rights against the tortfeasor which qualify them as real parties in interest.

*United States v. Aetna Cas. & Surety Co.,* 338 U.S. 366, 381-82, 70 S.Ct. 207, 94 L.Ed. 171 (1949). To that effect, Wright and Miller state:
> An insurer who pays a part of the loss is only partially subrogated to the rights of the insured. This may occur when the loss exceeds the coverage or when the insurance policy contains a deductible amount that must be borne by the insured. The respective rights of the party in this situation parallel those when there has been a partial assignment. Either the insured or the insurer may sue. Thus, if the insured brings suit, the insurer who is partially subrogated may intervene in the action to protect its pro rata share of the potential recovery. If either sues and the other does not voluntarily join or intervene, defendant may seek protection from mul-

tiple lawsuits by having the absent party joined.

6A CHARLES A. WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE & PROCEDURE § 1546 (2d ed.1990).

**\*4** In the case at hand, Connors and its subsidiary Bumble Bee were both "the insured" pursuant to the terms of the policy with Lexington. Bumble Bee, however, claims to be a real party in interest inasmuch as it is alleging that the losses incurred in the fire exceeded the amount of the coverage. This remains to be determined. Nevertheless, it is uncontested that Bumble Bee incurred in a $500,000.00 disbursement-the amount of the deductible pursuant to the terms of Lexington's insurance policy-that was not reimbursed by Lexington. Therefore, pursuant to the applicable law and the uncontested facts of this case, this Court concludes that Bumble Bee is also a real party in interest.

As per the foregoing, Lexington, which is only partially subrogated, may intervene in this action to protect its pro rata share of the potential recovery. However, in its opposition, Bumble Bee attached an "Affidavit of Ratification" whereby Lexington agrees to be bound by and comply with any and all orders entered by this Court to the same and full extent as if it were a named party in this action. *See* Docket No. 74-4. Lexington also agrees to respond to all discovery requests, subject to the applicable rules and privileges, as if it were a party to this case, as well as to be bound forever by the results of this case, whether obtained by verdict, settlement or otherwise. *Id.* Finally, Lexington waives forever any and all rights to pursue any subrogation claim arising out of the August 6, 2007 fire against GMC and Integrand in any separate or subsequent action. *Id.*

Courts have interpreted the term ratify in Rule 17(a) to mean "to validate an arrangement by which the real party in interest authorizes the continuation of an action brought by another and agrees to be bound by its result, thereby eliminating any risk of multiple liability." WRIGHT, MILLER & KANE, supra, at § 1555. As a result, "[f]ormal joinder or substitution of the real party in interest will not be necessary when the real party ratifies the commencement of the action." *Id.*

As illustrated above, Lexington ratified the present

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1905030 (D.Puerto Rico)
**(Cite as: 2010 WL 1905030 (D.Puerto Rico))**

lawsuit, authorized its continuation, and agreed to be bound by its result by means of an "Affidavit of Ratification". Consequently, the Court need not order the formal joinder of Lexington to this action. *See Pabon Lugo,* 465 F.Supp.2d at 128.

Finally, the defendants contend that Lexington's action is time-barred because Connors, the subrogor, failed to toll the statute of limitations. *See* Docket No. 73 at page 7. We disagree. It is undisputed that the present action was filed before the applicable one-year statute of limitations.[FN2] Moreover, Rule 17(a) provides that "after ratification, ..., the action proceeds as if it had been originally commenced by the real party in interest." FED.R.CIV.P. 17(a)(3). In view that Lexington has effectively ratified this action, the defendants' argument is no longer at issue. *See also* WRIGHT, MILLER & KANE, supra, at § 1555 (there no longer is any doubt that a federal court may apply the substitution and relation-back provision of Rule 17(a)(3) in a diversity of citizenship case even though the law of the state in which the court is sitting would not allow relief from the failure to bring suit in the name of the real party in interest and dismissal would be required under the applicable forum state's statute of limitations).

> FN2. The statute of limitations for tort actions pursuant to Article 1802 is one year. P.R. LAWS ANN. tit. 31, § 5298; *see Arturet Velez v. R.J. Reynolds Tobacco Co.,* 429 F.3d 10, 12 (1st Cir.2005).

### IV. CONCLUSION

*5 For the reasons stated above, this Court hereby **DENIES** defendants' motion for summary judgment (Docket No. 73).

**IT IS SO ORDERED.**

D.Puerto Rico,2010.
Bumble Bee Foods LLC v. Refriammonia
Slip Copy, 2010 WL 1905030 (D.Puerto Rico)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw

Slip Copy, 2009 WL 577916 (S.D.N.Y.)
**(Cite as: 2009 WL 577916 (S.D.N.Y.))**

**H**Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
DOLPHIN DIRECT EQUITY PARTNERS, LP, and
Race Car Simulation Corp., Plaintiffs,
v.
INTERACTIVE MOTORSPORTS AND ENTER-
TAINMENT CORPORATION, Perfect Line, Inc.,
Race Car Simulators, Inc., and William Donaldson,
Defendants.
**No. 08 Civ. 1558(RMB)(THK).**

March 2, 2009.

West KeySummary
Guaranty 195 ⟨⟩ 36(8)

195 Guaranty
   195II Construction and Operation
      195k36 Scope and Extent of Liability
         195k36(8) k. Guaranties of Leases. Most
Cited Cases
A manufacturer breached its performance guarantee
with an investment firm by not paying guaranteed
minimum payments under third party leases. The
manufacturer found third party leases for the invest-
ment firm's simulated race cars that were purchased
and the third parties agreed to minimum payments.
The manufacturer entered into a guarantee of pay-
ment with the investment firm that stated the firm
would receive the minimum payments. Further, the
manufacturer had failed to rebut that it guaranteed the
payments or that the investment firm had not re-
ceived any payments from the third parties.

***DECISION & ORDER***

RICHARD M. BERMAN, District Judge.

**I. Introduction**

**\*1** On February 14, 2008, Dolphin Direct Equity
Partners, LP ("Dolphin Direct") and Race Car Simu-
lation Corp. ("Race Car Corp .") (collectively,
"Plaintiffs") filed a complaint ("Complaint") based
upon diversity jurisdiction against Defendants Inter-

active Motorsports and Entertainment Corporation
("IMTS"), Perfect Line, Inc. ("Perfect Line"), Race
Car Simulators, Inc. ("RCSI") (collectively, "Corpo-
rate Defendants"), and William Donaldson ("Do-
naldson"), Chief Executive Officer ("CEO") of IMTS
and Chairman of its Board of Directors, CEO of Per-
fect Line, and CEO of RCSI, alleging, among other
things, that "[D]efendants breach[ed] written agree-
ments regarding [the] purchase of race car simulators
and [the] lease of those race car simulators to third
parties." (Compl., dated Feb. 14, 2008, ¶ 1; *see also
id.* ¶¶ 2, 4-8; Pls.' Rule 56.1 Statement, dated Oct. 28,
2008 ("Pls.56.1"), ¶ 2.)

The Complaint asserts breach of contract with respect
to three agreements: (i) an Asset Purchase Agree-
ment, dated December 31, 2004 ("Purchase Agree-
ment"), among Plaintiffs and the Corporate Defen-
dants, which "contains a guarantee that [P]laintiffs
would receive from [the Corporate Defendants] ...
certain minimum payments" ("Performance Guaran-
tee") and a clause providing that the Corporate De-
fendants "may not compete against [P]laintiffs in the
race car simulator market if that competition would
favor those [Corporate] [D]efendants" ("Corporate
Non-Competition Clause"); (ii) a Management
Agreement, dated December 31, 2004 ("Management
Agreement"), among Plaintiffs and the Corporate
Defendants, which contains a clause providing that
the Corporate Defendants "must place into service
any [of Plaintiffs'] [s]imulators that are lying idle
prior to placing any other race car simulators into
service" ("Most Favored Nation Clause"); and (iii) a
Non-Competition Agreement, dated December 31,
2004 ("Non-Competition Agreement"), between
Race Car Corp. and Donaldson, which prohibits
Donaldson from "compet[ing] against Race Car
Corp. in the race car simulator market if that compe-
tition would favor [Donaldson] over Race Car Corp."
(Compl. ¶¶ 13, 15, 20, 26, 27; *see also id.* ¶¶ 9-14.)

On October 28, 2008, Plaintiffs moved for summary
judgment pursuant to Rule 56 of the Federal Rules of
Civil Procedure ("Fed. R. Civ.P.") arguing, among
other things, that (1) "[t]he Corporate Defendants
breached the Performance Guarantee" by "making no
payments to [P]laintiffs"; (2) the Corporate Defen-
dants breached the Purchase Agreement and the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 577916 (S.D.N.Y.)
**(Cite as: 2009 WL 577916 (S.D.N.Y.))**

Management Agreement by "placing their simulators into revenue-generating arrangements while [P]laintiffs' simulators [were] idle"; (3) Donaldson breached the Non-Competition Agreement because the Corporate Defendants "plac[ed] their simulators into revenue-generating arrangements while [P]laintiffs' simulators [were] idle"; (4) "the Court should order the Corporate Defendants to pay [P]laintiffs their attorneys' fees and costs" pursuant to the Purchase Agreement's indemnification clause; and (5) the Court should enter a declaratory judgment finding Defendants "in continuing violation of the Most Favored Nation Clause and the Non-Competition Clauses[.]" (Pls.' Mem. of Law in Supp. of Mot. for Summ. J., dated Oct. 28, 2008 ("Pls.Mem."), at 15, 17, 21, 22 n. 8, 24; Pls.' Reply Mem. of Law in Further Supp. of Mot. for Summ. J., dated Dec. 9, 2008 ("Reply"), at 10.)

**\*2** On December 2, 2008, Defendants filed an opposition arguing, among other things, that (1) "[a]n issue of material fact exists with regard to whether ... the [Corporate Defendants] actually breached any term of the [P]erformance [G]uarantee"; (2) Defendants "did not compete to the detriment of Plaintiffs"; and (3) "[t]he Non-Competition Agreement was not signed by [ ] Donaldson in his individual capacity." (Defs.' Mem. of Law in Opp'n to Pls.' Mot. for Summ. J., dated Nov. 29, 2008 ("Def.Mem."), at 3, 7, 9 (internal quotations omitted).) Defendants do not appear to respond to Plaintiffs' arguments concerning attorneys' fees or declaratory relief.

On December 9, 2008, Plaintiffs filed a reply brief. (*See* Reply.) The parties waived oral argument.

**For the reasons set forth below, Plaintiffs' motion for summary judgment is granted in part and denied in part.**

**II. Background**

Dolphin Direct is "a private investment firm" and "the sole shareholder" of Race Car Corp. (Pls. 56.1 ¶ 1; Decl. of Carlos Salas, dated Oct. 27, 2008 ("Salas Decl."), ¶ 1.)[FN1] The Corporate Defendants "manufacture and market race car simulators, which are stationary machines that provide users with the simulated experience of driving an actual racing car." (Pls. 56.1 ¶ 4; *see also* Dep. of William R. Donaldson, dated July 14, 2008 ("Donaldson Dep."), at 19:5-14.)

"The Corporate Defendants manufacture two types of simulators: 'SMS' simulators. and 'Reactor' simulators," (Pls. 56.1 ¶ 4; *see also* Donaldson Dep. at 20:14-21:15), and place these simulators "into three types of revenue-generating arrangements: revenue-sharing agreements, leases, and sales," (Pls.56.1 ¶ 4). (*See also* Donaldson Dep. at 47:2-10.)

> FN1. In responding to Plaintiffs' motion, Defendants failed to submit a Rule 56.1 counterstatement of undisputed facts pursuant to Local Civil Rule 56.1(b). But, this Court "has broad discretion to determine whether to overlook a party's failure to comply with local court rules ... [and] may in its discretion opt to conduct an assiduous review of the record even where one of the parties has failed to file ... [a Rule 56.1] ... statement," *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 73 (2d Cir.2001), which the Court has done.

"Under the Purchase Agreement, [P]laintiffs agreed to purchase forty-four race car simulators from the Corporate Defendants." (Pls. 56.1 ¶ 5; *see also* Purchase Agreement at Art. 1.) Under the Management Agreement, the Corporate Defendants agreed to arrange leases with third parties for Plaintiffs' simulators, and Plaintiffs "were to receive all proceeds from any leases arranged by the Corporate Defendants for the [s]imulators." (Pls. 56.1 ¶ 7; *see also* Mgmt. Agreement § 1(a).)

Beginning on or about January 1, 2005, "the Corporate Defendants, acting on [P]laintiffs' behalf, leased [certain of Plaintiffs'] [s]imulators to various third parties, including National Tour, Inc. ['National Tour'] and RLB Development LLC ['RLB Development'] [collectively, the 'Third Party Leases']." (Pls. 56.1 ¶ 10; *see also* Salas Decl. ¶¶ 8-9.) Each of the Third Party Leases "contains a provision detailing minimum payments to [P]laintiffs[.]" (Pls. 56.1 ¶ 11; *see, e.g.,* National Tour Simulator Lease Agreement, dated Jan. 1, 2005, at 4, attached as Ex. D to Salas Decl. ("Payments: Quarterly payments of $19,000 due January 1, April 1, July 1 and October 1 of each year during the Term.").) Plaintiffs allege that, pursuant to the Performance Guarantee, "the Corporate Defendants guaranteed that [P]laintiffs would receive no less than [the] expected minimum payments with respect to each of the [Third Party] Leases." (Pls.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 577916 (S.D.N.Y.)
**(Cite as: 2009 WL 577916 (S.D.N.Y.))**

56.1 ¶ 11; *see also* Donaldson Dep. at 111:6-24.)[FN2] Plaintiffs allege that, as of October 28, 2008, National Tour and RLB Development have not made certain minimum payments under the Third Party Leases, and "the Corporate Defendants owe [P]laintiffs the shortfall ..., which totals $648,666.56." (Pls. 56.1 ¶ 16; *see also* Salas Decl. ¶¶ 10-18; Aff. of Michael D. Tiger, dated Oct. 28, 2008 ("Tiger Aff."), ¶ 7 & Ex. E.) "Plaintiffs have demanded that the Corporate Defendants pay this amount," but "the Corporate Defendants have made no payments pursuant to the Performance Guarantee." (Pls. 56.1 ¶ 16; *see also* Salas Decl. ¶ 18.)

> FN2. "Each of the [Corporate Defendants] hereby absolutely and unconditionally guarantees to [Plaintiffs], with respect to each Lease ... that [Plaintiffs] shall receive an amount at least equal to the minimum payments ... provided for therein ...." (Purchase Agreement § 4.12.)

**\*3** "Plaintiffs entered into three ... lease agreements [with National Tour]." (Pls. 56.1 ¶ 21; *see also* Salas Decl. ¶ 8 .) After the three National Tour leases expired on November 21, 2006, December 31, 2006, and March 31, 2007, respectively, National Tour returned Plaintiffs' simulators to the Corporate Defendants' warehouse in Concord, North Carolina. (*See* Donaldson Dep. at 101:10, 103:19-104:1.) Plaintiffs allege that, upon the expiration of each National Tour lease, the Most Favored Nation Clause and Corporate Non-Competition Clause "obligated the Corporate Defendants to place [Plaintiffs' idle simulators] into service before placing into service any of their own race car simulators." (Pls. 56.1 ¶ 23.)[FN3] At his deposition, Donaldson acknowledged that "[t]he Corporate Defendants never re-deployed [Plaintiffs' twelve] [s]imulators." (Pls. 56.1 ¶ 23; *see* Donaldson Dep. at 101:8-22, 103:7-18, 104:2-7.)

> FN3. "[The Corporate Defendants] hereby agree[ ] to ..., if any [of Plaintiffs'] Simulators are not, at any time, being utilized to generate revenue for [Race Car Corp.], place such Simulators into service under Leases with operators prior to placing any of its own or any competing racecar simulators into any such arrangements ...." (Mgmt. Agreement § 1(a).)

"[The Corporate Defendants] shall not and shall cause their respective affiliates not to ... directly or indirectly, own, manage, control, participate in, consult with, render services for, or in any manner engage in or represent any business involving, directly or indirectly, racecar simulators; provided that actions or inactions prohibited by the foregoing shall not constitute a violation of this Section 5.3(a) so long as such actions or inactions do not favor or result in more favorable treatment to the operation and maintenance of other racecar simulators and related assets over the operation and maintenance of [Plaintiffs' simulators]." (Purchase Agreement § 5.3(a).)

After the expiration of the first National Tour lease on November 21, 2006, the Corporate Defendants "entered into new revenue-sharing or lease agreements with third parties with ... their own race car simulators," (Pls. 56.1 ¶ 30; *see also* Tiger Aff. ¶¶ 15-21 & Exs. K-M), and "sold ... race car simulators to third parties," (Pls. 56.1 ¶ 31). (*See also* Tiger Aff. ¶ 21 & Exs. K-M.) Plaintiffs allege that the Corporate Defendants breached the Most Favored Nation Clause and Non-Competition Clause with each such revenue-generating arrangement because "those arrangements did not re-deploy the [Plaintiffs'] [s]imulators." (Pls. 56.1 ¶ 24; *see also* Pls. 56.1 ¶¶ 26, 28; Tiger Aff. ¶¶ 15-21 & Exs. K-M; Purchase Agreement § 5.3(a); Mgmt. Agreement § 1(a).) Plaintiffs allege that, pursuant to the Non-Competition Agreement, "Donaldson is [personally] liable for these breaches, as well." (Pls. 56.1 ¶ 31; *see also* Non-Comp. Agreement § 3(a).)[FN4]

> FN4. "During the term of this Agreement, Executive agrees not to compete, directly or indirectly, with the business (including without limitation the ownership, maintenance or operation of racecar simulators any related assets, such as are the subject of the [ ] Purchase Agreement) conducted or to be conducted by [Race Car Corp.] or its affiliates ... anywhere in North America ... provided, however, that the foregoing shall not prohibit such actions or inactions to the extent that they do not result in more favorable treatment to the operation and maintenance

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 577916 (S.D.N.Y.)
**(Cite as: 2009 WL 577916 (S.D.N.Y.))**

of other racecar simulators and related assets owned or operated by IMTS over the operation and maintenance of [Plaintiffs' simulators]." (Non-Comp. Agreement § 3(a).)

In December 2006, DGI, Inc. ("DGI"), "a corporation owned and operated by Donaldson, purchased at least twenty-four race car simulators from Perfect Line and subsequently leased those simulators to third parties Sprint Nextel and Toyota/Brand Promotions." (Pls. 56.1 ¶ 39; *see also* Donaldson Dep. at 16:1-24, 32:9-12; Tiger Aff. ¶ 21 & Ex. K.) Plaintiffs allege that these leases "violate [d] the Corporate Non-Competition Clause," (Pls. 56.1 ¶ 39; *see also* Purchase Agreement § 5.3(a)), and that "Donaldson breached the ... Non-Competition Agreement through these transactions, as well," (Pls. 56.1 ¶ 40; *see also* Non-Comp. Agreement § 3(a)).

### III. Legal Standard

"Summary judgment is appropriate 'if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.' " *Oilman v. Special Bd. of Adjustment No. 1063,* 527 F.3d 239, 245 (2d Cir.2008) (quoting Fed.R.Civ.P. 56(c)). The moving party bears the burden of informing the district court of the basis for its motion. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The nonmoving party must set forth specific facts showing that there is a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "A court reviewing a motion for summary judgment must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Oilman,* 527 F.3d at 245 (internal quotations omitted); *see also Palmieri v. Allstate Ins. Co.,* 445 F.3d 179, 187 (2d Cir.2006).

**\*4** "[I]n a contract dispute, summary judgment may be granted only where the language of the contract is unambiguous." *Nowak v. Ironworkers Local 6 Pension Fund,* 81 F.3d 1182, 1192 (2d Cir.1996). "A contract is unambiguous if there is 'no reasonable basis for a difference of opinion' as to the meaning of the contract." *Nationsbanc Commercial Corp. v. Chemical Bank,* No. 93 Civ. 8201, 1994 WL 9655, at

\*2 (S.D.N.Y. Jan.13, 1994) (quoting *Hunt Ltd. v. Lifschultz Fast Freight, Inc.,* 889 F.2d 1274, 1277 (2d Cir.1989)).

### IV. Analysis

The Court will apply New York law because the Purchase Agreement, Management Agreement, and Non-Competition Agreement each contain choice-of-law provisions providing for the application of New York law. (*See* Purchase Agreement § 6.9; Mgmt. Agreement § 10; Non-Comp. Agreement § 5); *see also Walter E. Heller & Co. v. Video Innovations, Inc.,* 730 F.2d 50, 52 (2d Cir.1984) ("New York courts generally accord deference to choice-of-law provisions in contracts [.]"). And, "[t]he parties do not dispute that New York law applies here." *Postlewaite v. McGraw-Hill Inc.,* 411 F.3d 63, 67 (2d Cir.2005); (*see* Pls. Mem. at 15; Def. Mem. at 3-10.)

### (1) Breach of Performance Guarantee

Plaintiffs argue, among other things, that the Corporate Defendants breached the Performance Guarantee because "National Tour and RLB Development failed to make [certain] minimum payments to [P]laintiffs" pursuant to the Third Party Leases; "the Corporate Defendants guaranteed [these] minimum payments under the [Third Party] Leases"; and "the Corporate Defendants have made no payments to [P]laintiffs pursuant to the Performance Guarantee[.]" (Pls. Mem. at 14, 15.) Plaintiffs also argue that they have "detailed every payment made to them by National Tour or RLB Development pursuant to [the Third Party Leases]" and "the Corporate Defendants [owe] $648,666.56 to [P]laintiffs for violation of the Performance Guarantee." (Reply at 4, 5.)

Defendants counter, among other things, that Plaintiffs and Johnny Capels ("Capels"), the CEO of National Tour, "agreed to a buy out [of $200,000.00] in full satisfaction of the obligations National Tour had to Plaintiffs" under the National Tour leases ("Capels Guarantee"). (Def. Mem. at 4.) The Corporate Defendants also argue that the total amount allegedly owed pursuant to the Performance Guarantee, *i.e.,* $648,666.56, is not "accurate" because the Corporate Defendants "have no way of knowing what [National Tour or RLB Development] paid and what Plaintiffs actually collected." (Def. Mem. at 4.)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 577916 (S.D.N.Y.)
**(Cite as: 2009 WL 577916 (S.D.N.Y.))**

"For a plaintiff to establish a *prima facie* case that it is entitled to recover on a guarantee under New York law, it must show: [i] that it is owed a debt from a third party; [ii] that the defendant made a guarantee of payment of the debt; and [iii] that the debt has not been paid by either the third party or the defendant." *Chemical Bank v. Haseotes,* 13 F.3d 569, 573 (2d Cir.1994); *see also Verela v. Citrus Lake Dev., Inc.,* 53 A.D.3d 574, 575, 862 N.Y.S.2d 96 (N.Y.App. Div.2d Dep't 2008). Plaintiffs have established a *prima facie* case. *See Valley Nat. Bank v. Greenwich Ins. Co.,* 254 F.Supp.2d 448, 453-54 (S.D.N.Y.2003).

**\*5** It is undisputed that, pursuant to the Third Party Leases, National Tour and RLB Development agreed to pay Plaintiffs certain "minimum payments" to lease Plaintiffs' simulators. (PLs. 56.1 ¶ 11; *see also* National Tour Leases at Art. 1, attached as Ex. D to Salas Deck; RLB Development Lease at Art. 1, attached as Ex. E to Salas Decl.) As detailed in the Affidavit of Carlos Salas ("Salas"), National Tour and RLB Development owe Plaintiffs a total of $648,666.56 under the Third Party Leases as of October 28, 2008. (*See* Salas Decl. ¶¶ 6-18 & Ex. F; *see also* Pls. 56.1 ¶¶ 11-16; Tiger Decl. Ex. E.) Pursuant to Section 4.12 of the Purchase Agreement, Plaintiffs and the Corporate Defendants entered into a "guarantee of payment" under which the Corporate Defendants "guarantee[ed] that [P]laintiffs would receive [the] minimum payments specified in each [Third Party Lease]." (Pls. 56.1 ¶ 9; Purchase Agreement § 4.12 ("The foregoing is a guarantee of payment[.]")); *see* Donaldson Dep. at 111:16-24; Salas Decl. ¶ 7; *see also N.Y.C. Dept. of Fin. v. Twin Rivers, Inc.,* 920 F.Supp. 50, 53 (S.D.N.Y.1996) ("[A] guarantor of payment undertakes an unconditional guaranty that the debtor will pay on the debt."); *Gen. Phoenix Corp. v. Cabot,* 300 N.Y. 87, 92, 89 N.E.2d 238 (1949). And, it is undisputed that the $648,666.56 has not been paid by National Tour, RLB Development, or the Corporate Defendants. (*See* Pls. 56.1 ¶¶ 12-16; Salas Decl. ¶¶ 11-18 & Ex. F; Tiger Decl. Ex. E.)

"Once a plaintiff has established a *prima facie* case of entitlement to recover under a guarantee, the defendant bears the burden of producing 'evidentiary facts showing the existence of a triable issue of fact with respect to a [ ] defense.' " *Indus. Bank of Japan Trust Co. v. Haseotes,* No. 92 Civ. 6074, 1993 WL 322775, at *4 (S.D.N.Y. Aug.19, 1993) (quoting *Banner Indus., Inc. v. Key B.H. Assos.,* 170 A.D.2d 246, 246,

565 N.Y.S.2d 456 (N.Y.App. Div. 1st Dep't 1991)). The Corporate Defendants fail to raise a triable issue of fact in their "defense" of Plaintiffs' claim for breach of the Performance Guarantee. *See Ford Motor Credit Co. v. Miller,* 990 F.Supp. 107, 111 (N.D.N.Y.1998). "The Capels Guarantee did not relieve [the Corporate Defendants] of any obligations under the Performance Guarantee," (Reply Decl. of Carlos Salas, dated Dec. 8, 2008 ("Salas Reply Decl."), ¶ 3), because, "[w]here [as here] there is more than one secondary obligor [*i.e.,* the Corporate Defendants and Capels] with respect to the same underlying obligation, each secondary obligor is liable to the obligee [*i.e.,* Plaintiffs] in accordance with the terms of its secondary obligation," Restatement (Third) of Suretyship and Guaranty § 52 (1996). *See also Citicorp Leasing, Inc. v. United Am. Funding, Inc.,* No. 03 Civ. 1586, 2005 WL 1847300, at *6 (S.D.N.Y. Aug. 5, 2005) (quoting *FDIC v. Schwartz,* 78 A.D.2d 867, 868, 432 N.Y.S.2d 899 (N.Y.App. Div.2d Dep't 1980)).

**\*6** And, the Corporate Defendants fail to rebut Salas's sworn statement that "[P]laintiffs have not received any payments from Capels under the Capels Guarantee," (Salas Reply Decl. ¶ 4), beyond offering "Donaldson's unsubstantiated conjecture," (Reply at 5; *see* Donaldson Dep. at 107:19-108:4) ("Q: Do you have any knowledge of Dolphin [Direct] receiving any payments from National Tour for any of the 12 Dolphin [Direct] simulators with National Tour after January 2006? A: All I can view are reports that Dolphin [Direct] submits to me, so I don't know whether they received it or not.")). *See also Kulak v. City of New York,* 88 F.3d 63, 71 (2d Cir.1996) ("[C]onclusory statements, conjecture or speculation by the [non-moving party] will not defeat summary judgment.").

And, while the Corporate Defendants purportedly "dispute that the damages amount [*i.e.,* $648,666.56] is correct," (Def. Mem. at 4; *see also* Donaldson Dep. at 114:5-9, 116:8-11, 120:16-20), Plaintiffs have "detailed every payment made to them by National Tour [and] RLB Development pursuant to [the Third Party Leases]," (Reply at 4; *see also* Salas Decl. Ex. F; Tiger Decl. Ex. E). The Corporate Defendants' "unsupported denials of [Plaintiffs'] evidence, without more, cannot create disputes of material fact." *Arias-Zeballos v. Tan,* No. 06 Civ. 1268, 2008 WL 833225, at *3 (S.D.N.Y. Mar. 28, 2008); (*see* Donaldson Dep.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 577916 (S.D.N.Y.)
**(Cite as: 2009 WL 577916 (S.D.N.Y.))**

at 116:13-117:5 ("Q: Strictly as a matter of mathematics of what is owed compared to what was in the individual lease and revenue-sharing agreements and what Dolphin [Direct] has been paid, do you dispute this number? ... A: I still don't agree with some of the math. Q: Well, then ... can you please point to where you disagree with the math? A: Well, I don't think-I have to study this a little bit, but ... whole spreadsheet is kind of convoluted.")); *see also Fabry's S.R.L. v. IFT Intern., Inc.,* No. 02 Civ. 9855, 2003 WL 21203405, at *3 (S.D.N.Y. May 21, 2003); *Ford Motor Credit,* 990 F.Supp. at 112.

Plaintiffs are, unequivocally, entitled to summary judgment on their claim for breach of the Performance Guarantee against the Corporate Defendants in the amount of $648,666.56 plus interest.

**(2) Breach of Purchase Agreement and Management Agreement**

Plaintiffs argue, among other things, that the Corporate Defendants breached the Purchase Agreement and Management Agreement because the Corporate Defendants failed "to place [P]laintiffs' newly out-of-service race car simulators into revenue-generating arrangements before placing their own simulators into service." (Pls. Mem. at 16.) The Corporate Defendants counter, among other things, that Plaintiffs fail to show that "no issue of fact exists that the Defendants could have ... placed [Plaintiffs'] simulators in the marketplace"; Defendants "did not compete to the detriment of Plaintiffs" by placing a different type of simulator [*i.e.,* SMS simulators versus Reactor simulators] into revenue-generating agreements with third parties; and Defendants did not violate "any agreement [by] sell[ing] simulators" to third parties. (Def. Mem. at 7, 8 (emphasis omitted).)

*\*7* "To prevail on a breach of contract claim under New York law, a plaintiff must prove [i] a contract; [ii] performance of the contract by one party; [iii] breach by the other party; and [iii] damages." *Terwilliger v. Terwilliger,* 206 F.3d 240, 245-46 (2d Cir.2000) (internal quotations omitted); *see also Furia v. Furia,* 116 A.D.2d 694, 695, 498 N.Y.S.2d 12 (N.Y.App. Div.2d Dep't 1986).

No genuine issue of material fact exists with respect to Plaintiffs' claims for breach of the Purchase Agreement and Management Agreement against the Corpo-

rate Defendants. *See Korea Life Ins. Co. v. Morgan Guar. Trust Co.,* 269 F.Supp.2d 424, 435 (S.D.N.Y.2003). That is, there is no dispute that "[e]ffective December 31, 2004, [P]laintiffs entered into [the Purchase Agreement and Management Agreement] with the Corporate Defendants," (Pls. 56.1 ¶¶ 5, 7; *see also* Pls. 56.1 ¶¶ 17, 19), or that Plaintiffs have "performed all their obligations" under these agreements, (Compl.¶¶ 32, 36). (*See also* Salas Decl. ¶¶ 3, 6); *Spheronomics Global Contact Ctrs. v. vCustomer Corp.,* 427 F.Supp.2d 236, 247 (E.D.N.Y.2006).

And, beginning in November 2006, the Corporate Defendants breached the Purchase Agreement and Management Agreement by placing their own race car simulators into "new revenue-sharing or lease agreements with third parties," instead of using Plaintiffs' simulators which remained idle in the Corporate Defendants' warehouse. (Pls. 56.1 ¶¶ 24, 29, 30; *see also* Tiger Aff. ¶¶ 15-19, Exs. K-M; Donaldson Dep. at 101:2-22, 103:7-104:7.) The Corporate Defendants also breached the Purchase Agreement tlirough "DGI's leases with Sprint Nextel and Toyota/Brand Promotions." (Pls. 56.1 ¶ 39.) DGI is an affiliate of the Corporate Defendants, (*see* Donaldson Dep. at 32:9-12), and "the Corporate Non-Competition Clause bars competition by the Corporate Defendants and 'their respective affiliates,' " (Pls. 56.1 ¶ 39 (quoting Purchase Agreement § 5.3(a))). The Corporate Defendants further breached the Purchase Agreement through the sale of simulators to third parties because "[s]ales of race car simulators constitute 'business involving ... race car simulators' " under the Purchase Agreement. (Pls. Mem. at 16 n. 2 (quoting Purchase Agreement § 5.3(a)). (*See also* Donaldson Dep. at 211:10-23 ("Q: And you are intentionally placing non-Dolphin [Direct] simulators into agreements before you place Dolphin [Direct] simulators because you believe you need to do so to maintain your business? ... A: I have to choose the-a path that keeps us in business. I'd rather-well, I will choose the path to keep us in business and be able to perform the rest of the obligations under the [M]anagement [A]greement for the other 32 simulators.")) [FN5]

FN5. At Donaldson's deposition, the following additional colloquy occurred: "Q: Do you believe that you can continue to place non-Dolphin [Direct] simulators while the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 577916 (S.D.N.Y.)
**(Cite as: 2009 WL 577916 (S.D.N.Y.))**

National Tour simulators are lying idel? A: **If it's a choice between staying in business and continuing to execute on the [M]anagement [A]greement, yes, we have to do what we have to do to stay in business.** Q: But do you think that permits you to choose which provisions of the [M]anagement [A]greement to adhere to? A: Well, it's a decision you get to, isn't it? You have to choose-if you have to choose one path or another, either one is a default, so, I think we chose the path that's better for Dolphin [Direct] [because] if we were not in business, ... then we would breach all of the [M]anagement [A]greement." (Donaldson Dep. at 209:13-210:21 (emphasis added).)

Plaintiffs argue persuasively that the Most Favored Nation Clause and Corporate Non-Competition Clause "do[ ] not distinguish between types of 'race-car simulators.' " (Reply at 7; *see* Purchase Agreement § 5.3(a) ("[The Corporate Defendants] shall not ... engage in or represent any business involving ... racecar simulators."); Mgmt. Agreement § 1(a) ("[The Corporate Defendants] agree[ ] to ... place [Plaintiffs'] [s]imulators into service under Leases with operators prior to placing any of its own or any competing racecar simulators into any such arrangements[.]").)

**\*8** Lastly, Plaintiffs "sufficiently evidence damages," *Fantozzi v. Axsys Techs., Inc.,* No. 07 Civ. 2667, 2008 WL 4866054, at \*5 (S .D.N.Y. Nov. 6, 2008), by coming forward with revenue-sharing agreements and lease agreements entered into between Defendants and third parties for the use of Defendants' simulators during the time Plaintiffs' simulators were idle, (*see* Tiger Aff. ¶¶ 22-27 & Exs. N-S); *Stanford Square, L.L.C. v. Nomura Asset Capital Corp.,* 229 F.Supp.2d 199, 206 (S.D.N.Y.2002) (Under New York law, "[a] party must come forward with specific evidence in order to establish the existence of damages flowing from a breach of contract."). *See also Gusmao v. GMT Group, Inc.,* No. 06 Civ. 5113, 2008 WL 2980039, at \*11 (S.D.N.Y. Aug. 1, 2008) ("Under New York law, a party injured by breach of contract is entitled to be placed in the position it would have occupied had the contract been fulfilled according to its terms") (internal quotations omitted); *Kenford Co. v. County of Erie,* 73 N.Y.2d 312, 319, 540 N.Y.S.2d 1, 537 N.E.2d 176 (1989).

Plaintiffs are, accordingly, entitled to summary judgment as to liability on their claims for breach of the Purchase Agreement and Management Agreement against the Corporate Defendants. *See McCoy Assocs., Inc. v. Nulux, Inc.,* 218 F.Supp.2d 286, 294 (E.D.N.Y.2002). The issue of Plaintiffs' actual damages on their breach of contract claims against the Corporate Defendants is referred to United States Magistrate Judge Theodore H. Katz for an inquest. *See id.* at 295.

**(3) Breach of Non-Competition Agreement**

Plaintiffs argue, among other things, that Donaldson breached the Non-Competition Agreement through the actions of both the Corporate Defendants and DGI by "placing [Defendants'] race car simulators into revenue-generating arrangements in competition with [P]laintiffs' [simulators" and that he is "[personally] liable for the conduct of ... the Corporate Defendants and DGI." (Pls. Mem. at 21, 22.) Defendants do not appear to contest the breach of the Non-Competition Agreement; rather, they counter, among other things, that Donaldson is not personally liable because the Non-Competition Agreement defines him "as the 'Executive' " and "[n]owhere in [this] agreement is there a reference to 'individual capacity.' " (Defs. Mem. at 9.)

No genuine issue of material fact exists with respect to Plaintiffs' claim for breach of the Non-Competition Agreement against Donaldson. *See Korea Life Ins.,* 269 F.Supp.2d at 435. There is no dispute that "[e]ffective December 31, 2004, Race Car Corp. and Donaldson entered into the ... Non-Competition Agreement," (Pls. 56.1 ¶ 8), or that Race Car Corp. has "performed all [its] obligations" under the agreement, (Compl.¶ 40). *See also Spherenomics,* 427 F.Supp.2d at 247. Beginning on November 21, 2006, Donaldson breached the Non-Competition Agreement because the Corporate Defendants placed their "own race car simulators into revenue-generating arrangements in competition with [P]laintiffs' [s]imulators." (Pls. Mem. at 21; *see* Pls. 56.1 ¶¶ 24, 26, 28, 30; Tiger Aff. ¶¶ 15-19, Exs. K-M; Donaldson Dep. at 209:13-210:21, 211:10-23.) Donaldson also breached the Non-Competition Agreement through "DGI's leases with Sprint Nextel and Toyota/Brand Promotions" because DGI is "owned and operated by Donaldson," (Pls. 56.1 ¶ 39;

Slip Copy, 2009 WL 577916 (S.D.N.Y.)
**(Cite as: 2009 WL 577916 (S.D.N.Y.))**

see also Donaldson Dep. at 16:1-24), and the Non-Competition Agreement "defines 'competition' as action taken [by Donaldson] 'as a sole proprietor, partner, [or] corporate officer" among other positions, (Pls. Mem. at 22 (quoting Non-Comp. Agreement § 3(a)). (See also Donaldson Dep. at 32:9-12 ("Q: DGI is privately held? A: Yes. Q: Are there any officers? A: Myself and my wife.").)

**\*9** Lastly, Plaintiffs "sufficiently evidence damages," *Fantozzi*, 2008 WL 4866054, at *5, as noted *supra* at 14, by coming forward with revenue-sharing agreements and lease agreements the Corporate Defendants and/or DGI entered into with third parties for the use of Defendants' simulators during the time Plaintiffs' simulators were idle, (*see* Tiger Aff. ¶¶ 22-27 & Exs. N-S); *Stanford Square*, 229 F.Supp.2d at 206 (Under New York law, "[a] party must come forward with specific evidence in order to establish the existence of damages flowing from a breach of contract ."). *See also Gusmao*, 2008 WL 2980039, at *11; *Kenford*, 73 N.Y.2d at 319, 540 N.Y.S.2d 1, 537 N.E.2d 176.

**Donaldson's Personal Liability**

Under New York law, an agent for a disclosed principal will be personally bound if there is" 'clear and explicit evidence of the agent's intention to substitute ... his personal liability for ... that of his principal.' " *Salzman Sign Co. v. Beck*, 10 N.Y.2d 63, 67, 217 N.Y.S.2d 55, 176 N.E.2d 74 (1961) (quoting *Mencher v. Weiss*, 306 N.Y. 1, 4, 114 N.E.2d 177 (1953)); *see also Raymond Weil, S.A. v. Theron*, 585 F.Supp.2d 473, 482 (2008). To determine whether an agent will be found personally liable, New York courts and other courts in this Circuit applying New York law have considered the following factors: "[i] the length of the contract; [ii] the placement of the liability clause relative to the signature line; [iii] the appearance of the signatory's name in the agreement itself; [iv] the nature of the negotiation that surrounded the contract; and [v] the signatory's role in the company." *Theron*, 585 F.Supp.2d at 482; *see also Paribas Prop., Inc. v. Benson*, 146 A.D.2d 522, 525, 536 N.Y.S.2d 1007 (N.Y.App. Div. 1st Dep't 1989).

The record contains "clear and explicit evidence" of Donaldson's intent to be bound personally to the Non-Competition Agreement. *Mencher*, 306 N.Y. at

4, 114 N.E.2d 177. The contract is five pages long. (*See* Salas Decl. Ex. C); *Trustees of the Plumbers Local Union No. 1 Welfare Fund v. Philip Gen. Constr.*, No. 05 Civ. 1665, 2007 WL 3124612, at *7 (E.D.N.Y. Oct. 23, 2007) ("The Second Circuit has observed that the shorter the contractual document, the less likely it will be a trap for an unwary signatory.") (internal quotation omitted); *see also Theron*, 585 F.Supp.2d at 483 (finding personal liability where, among other things, "[t]he agreement was only ten pages long"). Because the liability clause is on page two and the signature block on page five, (*see* Salas Decl. Ex. C at 2, 5), "the risk that [Donaldson] may have overlooked [the liability] provision when he signed the [Non-Competition Agreement] is mitigated by the agreement's relative brevity," *Jacobson v. Citi-Wide Elec. Corp.*, No. 03 Civ. 263, 2008 WL 4491374, at *3 (E.D.N.Y. Sept. 30, 2008). The contract also "specifically identifies [Donaldson] as a party [.]" *Afolabi v. Jones*, No. 06 Civ. 2756, 2008 WL 4890166, at *3 (E.D.N.Y. Nov. 12, 2008); (*see* Non-Comp. Agreement at 1 ("This Non-Competition Agreement is made effective as of December 31, 2004. by and between Race Car Simulation Corp., a New York corporation (the 'Company') and William Donaldson (the 'Executive').")).

**\*10** The Executive (*i.e.,* Donaldson) is obligated under the Non-Competition Agreement. "[T]he only [obligations] under the [a]greement are to be provided by [the 'Executive' (*i.e.,* Donaldson) ]." Theron, 585 F.Supp.2d at 483; (*see* Non-Comp. Agreement § 2); *see also Theron*, 585 F.Supp.2d at 483 (personal liability where, among other things, contract defined individual defendant as "Artist"). Moreover, Donaldson signed the contract "on a line [above] his printed name, without any reference to [the Corporate Defendants] or [Donaldson's] corporate title [*i.e.,* CEO]." *Afolabi*, 2008 WL 4890166, at *3; *see also Theron*, 585 F.Supp.2d at 483 ("[Defendant's] signature is not followed by the addition of any corporate title."). By contrast, the signature pages of the Purchase Agreement and Management Agreement, which were executed simultaneously with the Non-Competition Agreement on December 31, 2004, include Donaldson's signature below the Corporate Defendants' names and specifically followed by his title "CEO." (Purchase Agreement at 18; Mgmt Agreement at 6); *see also Liberty USA Corp. v. Buyer's Choice Ins. Agency LLC*, 386 F.Supp.2d 421, 425 (S.D.N.Y.2005) ("In New York, it is the general rule that written contracts executed simultaneously and

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 577916 (S.D.N.Y.)
**(Cite as: 2009 WL 577916 (S.D.N.Y.))**

for the same purpose must be read and interpreted together.") (citing *Nau v. Vulcan Rail & Constr. Co.,* 286 N.Y. 188, 197, 36 N.E.2d 106 (1941)).[FN6]

> FN6. Also, Donaldson personally participated in the negotiations for the Non-Competition Agreement. *See Theron,* 585 F.Supp.2d at 483. On December 8, 2004, Carlos Salas, "a managing director and member of Dolphin Advisors, LLC, the managing general partner of plaintiff Dolphin Direct," sent an email to Donaldson stating, "[W]e would ask that you personally agree to a non-compete agreement on reasonable terms to ensure that IMTS and Dolphin [Direct] continue to enjoy the benefit of your relationship with NASCAR." (Salas Reply Decl. ¶¶ 1, 6 & Ex. C.) In an email, dated December 9, 2004, Donaldson responded that, "I am conceptually okay with your proposed resolutions .... I would need to see the terms of the non-compete before committing to that concept." (Salas Reply Decl. Ex. C; *see also* Donaldson Dep. at 53:15-19.) As CEO of all of the Corporate Defendants, (*see* Pls. 56.1 ¶ 3; Donaldson Dep. at 29:7-30:16, 33:3-4), Donaldson "exercise[s] considerable control over [their] corporate decisions[,]" *Theron,* 585 F.Supp.2d at 483. *See also Afolabi,* 2008 WL 4890166, at *3 (personal liability where, among other things, individual defendant was "one of two principal officers of the corporation").

Plaintiffs are, accordingly, entitled to summary judgment as to liability on their claim for breach of the Non-Competition agreement and Donaldson is personally liable for such breaches. *See McCoy Assocs.,* 218 F.Supp.2d at 294. The issue of Plaintiffs' actual damages on their breach of contract claim against Donaldson is referred to United States Magistrate Judge Theodore H. Katz for an inquest. *See id.* at 295.

**(4) Attorneys' Fees and Costs**

Plaintiffs argue, among other things, that "[t]he Court should order the Corporate Defendants to pay [P]laintiffs their attorneys' fees and costs" because Section 5.1(a) of the Purchase Agreement "permits

[P]laintiffs to collect attorneys' fees for prosecuting this action." (Pls. Mem. at 24 (citing Purchase Agreement § 5.1(a).) Defendants' opposition papers do not appear to respond to Plaintiffs' argument. (*See* Def. Mem. at 3-10.)

"Under New York law, an agreement by a party to a contract to indemnify the other for attorney[s'] fees incurred in litigation between them must be 'unmistakably clear from the language of the promise,' or else it must be manifest from the surrounding facts and circumstances or purpose of the agreement." *Promuto v. Waste Mgmt., Inc.,* 44 F.Supp.2d 628, 650 (S.D.N.Y.1999) (internal citation omitted) (quoting *Hooper Assocs., Ltd. v. AGS Computers, Inc.,* 74 N.Y.2d 487, 492, 549 N.Y.S.2d 365, 548 N.E.2d 903 (1989)).

Plaintiffs' claim for attorneys' fees and costs fails because Section 5.1(a) of the Purchase Agreement does not contain "unmistakably clear" language of an intent to indemnify attorneys' fees and costs incurred in an action between Plaintiffs and the Corporate Defendants arising from a breach of the Purchase Agreement. *Hooper,* 74 N.Y.2d at 492, 549 N.Y.S.2d 365, 548 N.E.2d 903; *see also Tecnoclima v. PJC Group,* No. 89 Civ. 4337, 1995 WL 390255, at *2 (S.D.N.Y. June 30, 1995). Section 5.1(a) provides: "The [Corporate Defendants] shall jointly and severally indemnify, defend and hold harmless [Plaintiffs] ... from and against, and shall reimburse each of the [Plaintiffs] for, any adverse consequences which are suffered or incurred by any of the [Plaintiffs] (regardless of whether or not such adverse consequences relate to any third party claims) and which are the direct and proximate result of ... any breach of any covenant or obligation of any [Corporate Defendant] in this [Purchase] Agreement[.]" (Purchase Agreement § 5.1(a).) This language "does not expressly provide for indemnification of claims asserted between the parties to [the Purchase Agreement]," *Sequa Corp. v. Gelmin,* 851 F.Supp. 106, 110 (S.D.N.Y.1994), nor "does [it] mention attorneys' fees," *Homebridge Mortgage Bankers Corp. v. Vantage Capital Corp.,* No. 06 Civ. 9465, 2008 WL 5146957, at *5 (S.D.N.Y. Dec. 5, 2008).

**\*11** And, a promise by the Corporate Defendants to indemnify Plaintiffs for attorneys' fees cannot clearly be implied from the language and purpose of the Purchase Agreement and the surrounding facts and cir-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 577916 (S.D.N.Y.)
**(Cite as: 2009 WL 577916 (S.D.N.Y.))**

cumstances. *See Hooper,* 74 N.Y.2d at 492, 549 N.Y.S.2d 365, 548 N.E.2d 903; *see also Greenwich Capital Fin. Prods., Inc. v. Kay-Co Invs. Inc.,* No. 07 Civ. 6523, 2008 WL 1700212, at *2 (S.D.N.Y. Apr. 4, 2008). "[I]n New York, indemnification agreements are strictly construed; a court cannot find a duty to indemnify absent manifestation of a clear and unmistakable intent[.]" *Commander Oil v. Advance Food Serv. Equip.,* 991 F.2d 49, 51 (2d Cir.1993) (internal quotations omitted); *see also Eldoh v. Astoria Generating Co.,* 57 A.D.3d 603, 869 N.Y.S.2d 209, 209 (N.Y.App. Div.2d Dep't 2008).

The fact that Plaintiffs and the Corporate Defendants expressly provided for the reimbursement of "reasonable attorneys' fees and expenses" in Section 5.2(b) cuts against a finding that a similar promise can clearly be implied in Section 5.1(a) of the Purchase Agreement, which provides only for reimbursement of "adverse consequences." (*Compare* Purchase Agreement § 5.2(b) ("[T]he Indemnifying Party will reimburse the Indemnified Party promptly and periodically for the costs of defending against [third party claims] (including reasonable attorneys' fees and expenses)[.]") *with* Purchase Agreement § 5.1(a) ("The [Corporate Defendants] ... shall reimburse each of the [Plaintiffs] for, any adverse consequences[.]")). The Court will not "read [ ] into [Section 5.1(a) of the Purchase Agreement] a duty which the parties [may not have] intend[ed] to be assumed." *Hooper,* 74 N.Y.2d at 491, 549 N.Y.S.2d 365, 548 N.E.2d 903.

**(5) Declaratory Relief**

Plaintiffs argue, among other things, that the Court should issue a declaratory judgment that "[D]efendants are in continuing violation of the Most Favored Nation Clause and the Non-Competition Clauses" because the "[D]efendants continue to place race car simulators in revenue-generating arrangements while [P]laintiffs' simulators lie idle[.]" (Pls. Mem. at 24.) Defendants' opposition papers do not appear to respond to Plaintiffs' argument. (*See* Def. Mem. at 3-10.)

"[F]ederal courts have 'unique and substantial discretion in deciding whether to declare the rights of litigants[.]' " *Nat'l Union Fire Ins. Co. v. Int'l Wire Group, Inc.,* No. 02 Civ. 10338, 2003 WL 21277114, at *4 (S.D.N.Y. June 2, 2003) (quoting *Wilton v. Seven Falls Co.,* 515 U.S. 277, 286, 115 S.Ct. 2137,

132 L.Ed.2d 214 (1995)); *see* 28 U.S.C. § 2201(a). "The court must consider whether a declaratory judgment will [i] 'serve a useful purpose in clarifying and settling the legal relations in issue'; or [ii] 'afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.' " *Camofi Master LDC v. College Partnership, Inc.,* 452 F.Supp.2d 462, 480 (S.D.N.Y.2006) (quoting *Cont'l Cas. Co. v. Coastal Sav. Bank,* 977 F.2d 734, 737 (2d Cir.1992)).

The declaratory judgment Plaintiffs seek would "serve[ ] neither of these two objectives." *Camofi Master,* 452 F.Supp.2d at 480. "Because this Court has already analyzed the parties' rights [and obligations] under the [Purchase Agreement, Management Agreement, and Non-Competition Agreement] in connection with [Plaintiffs'] breach of contract claim[s], a declaratory judgment on the same issue[s] would be superfluous." *Core-Mark Int'l Corp. v. Commonwealth Ins. Co.,* No. 05 Civ. 0183, 2006 WL 2501884, at *9 (S.D.N.Y. Aug. 30, 2006); *see also Gen. Motors Corp. v. Dealmaker, LLC,* No. 07 Civ. 141, 2007 WL 2454208, at *3-4 (N.D.N.Y. Aug.23, 2007); *Miramax Film Corp. v. Abraham,* No. 01 Civ. 5202, 2003 WL 22832384, at *15 (S.D.N.Y. Nov.25, 2003) ("The lawfulness of defendants' actions will be determined by resolution of the contract claim. Hence, the declaratory relief will serve no useful purpose[.]").

**V. Conclusion**

**\*12** For the reasons set forth above, Plaintiffs' motion for summary judgment [# 12] is granted in part and denied in part as follows: Plaintiffs prevail on their claim for breach of the Performance Guarantee against the Corporate Defendants in the amount of $648,666 .56 plus interest; Plaintiffs prevail with respect to the issue of liability on their claims for breach of contract against the Corporate Defendants and Donaldson; and Plaintiffs' motion is denied with respect to their requests for attorneys' fees and declaratory relief.

The case is referred to United States Magistrate Judge Theodore H. Katz for an inquest to calculate the amount of Plaintiffs' actual damages on their claims for breach of the Purchase Agreement and Management Agreement against the Corporate Defendants and for breach of the Non-Competition Agreement against Donaldson in his individual ca-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 577916 (S.D.N.Y.)
**(Cite as: 2009 WL 577916 (S.D.N.Y.))**


pacity.

S.D.N.Y.,2009.
Dolphin Direct Equity Partners, LP v. Interactive
Motorsports and Entertainment Corp.
Slip Copy, 2009 WL 577916 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2952225 (D.Conn.)
**(Cite as: 2009 WL 2952225 (D.Conn.))**

**C** Only the Westlaw citation is currently available.

United States District Court,
D. Connecticut.
Ulla Christine FREDRIKSSON, Marjatta Peurala and
Antti Olavi Peurala
v.
SIKORSKY AIRCRAFT CORP., INC., Helicopter
Support, Inc., HR Textron, Inc., and Plasma Tech-
nologies, Inc.
**CIV. No. 3:08CV450 (WWE).**

Sept. 2, 2009.

Bradley R. Bowles, Michael P. Verna, Bowles &
Verna, LLP, Walnut Creek, CA, Gerald C. Sterns,
Sterns & Walker, Oakland, CA, for Plaintiffs.

Garrett J. Fitzpatrick, Kevin F. Cook, Alice Chan,
Kevin Francis Cook, Mendes & Mount, LLP, Chris-
topher Raleigh, Cozen & O'Connor, Jeffrey L. Loop,
Dorsey & Whitney LLP, New York, NY, James W.
Hunt, Mendes & Mount, LLP, Los Angeles, CA,
Steven M. Greenspan, Day Pitney LLP, Hartford,
CT, Catherine B. Slavin, Cozen & O'Connor, Phila-
delphia, PA, David W. Chant, John Griggs Sams,
Stephen C. Howell, Brown, Dean, Wiseman, Proctor,
Hart, & Howell, LLP, Fort Worth, TX, John F.
Keating, Jr., Keating & McHugh, New Fairfield, CT,
David M.S. Shaiken, David Shaiken LLC, Vernon,
CT, Kathlene W. Lowe, Dorsey & Whitney, LLP,
Irvine, CA, Patrick Arrington, Fortis General Coun-
sel, LLP, Aliso Viejo, CA, for Defendants.

*RECOMMENDED RULING ON DEFENDANTS'
MOTION TO DISMISS ON THE GROUND OF FO-
RUM NON CONVENIENS*

HOLLY B. FITZSIMMONS, United States Magis-
trate Judge.

*INTRODUCTION*

**\*1** This is a wrongful death and product liability ac-
tion arising out of an August 2005 helicopter crash in
Tallinn Bay in the territorial waters of Estonia that
killed twelve passengers and two pilots. Plaintiffs are
the survivors and estate representatives of the two
pilots.[FN1] Defendants are the helicopter manufacturer,
the Sikorsky Aircraft Corporation ("Sikorsky"); and
Helicopter Support, Inc. ("HSI"), H.R. Textron, Inc.
("HRT"), and Plasma Technology Inc. ("PTI"),
which manufactured component helicopter parts.

> FN1. Plaintiffs are Ulla Fredriksson, Marjala
> Peurala and Antti Olavia Peurala, surviving
> family members of the two Finnish pilots.
> [Doc. # 12]. Plaintiffs allege four causes of
> action: (1) strict product liability; (2) breach
> of warranty; (3) negligence; and (4) willful
> misconduct/gross negligence. Plaintiffs seek
> "compensatory and punitive damages in an
> amount to be determined at trial, and sur-
> vival damages to Plaintiffs' decedents for
> conscious pre-death pain and suffering, plus
> pre-judgment interest, attorney's fees and
> costs, as well as any other damages sup-
> ported by the proof." [Pl. Amend. Compl. at
> 7].

Defendants Sikorsky, HST, HRT and PTI move to
dismiss this action on the ground of forum non con-
veniens.[FN2] For the reasons that follow, the Motion to
Dismiss **[Doc. # 105]** is conditionally **GRANTED.**

> FN2. At oral argument on April 17, 2009,
> defendants Sikorsky, HSI and PTI moved to
> join in HRT's motion.

*STANDARD OF LAW*

In deciding a motion to dismiss, the court accepts the
allegations of a complaint as true and construes them
in a manner favorable to the pleader. *Hoover v. Ron-
win,* 466 U.S. 558, 587 (1984); *Grandon v. Merrill
Lynch & Co.,* 147 F.3d 184, 188 (2d Cir.1998). The
court must draw all reasonable inferences in the
plaintiff's favor. *See, e.g., Yung v. Lee,* 432 F.3d 142,
146 (2d Cir.2005) (discussing Rule 12(b)(6) motion
to dismiss); *Lunney v. United States,* 319 F.3d 550,
554 (2d Cir.2003) (internal citations omitted) (dis-
cussing Rule 12(b)(1) motion to dismiss). The mover
and the pleader may use affidavits and other materi-
als beyond the pleadings themselves in support of or

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

**Slip Copy, 2009 WL 2952225 (D.Conn.)**
**(Cite as: 2009 WL 2952225 (D.Conn.))**

in opposition to a challenge to jurisdiction.[FN3] *Land v. Dollar,* 330 U.S. 731, 735 (1947) (stating "general Rule [that] the District Court would have the authority to consider questions of jurisdiction on the basis of affidavits as well as the pleadings."); *Exchange Nat. Bank of Chicago v. Touche Ross & Co.,* 544 F.2d 1126, 1130 (2d Cir.1976), *cert. denied,* 469 U.S. 884 (1984). "[I]n the determination of a motion to dismiss for forum non conveniens, the court may consider affidavits submitted by the moving and opposing parties," *In re Air Crash Near Peixoto De Azeveda, Brazil, on September 29, 2006,* 574 F.Supp.2d 272, 279 n. 1 (E.D.N.Y.2008) (quoting *Vanity Fair Mills, Inc. v. T. Eaton Co.,* 234 F.2d 633, 645 (2d Cir.1956), and make findings of fact. *Id.* (citing *Pollux Holding Ltd. v. Chase Manhattan Bank,* 329 F.3d 64 (2d Cir .2003)).

> FN3. In deciding this motion the Court considered defendants' Memorandum of Law with exhibits [doc. # 106, 107]; plaintiff's Memorandum of Law in Opposition, [doc. # 169]; Declaration of Bradley R. Bowles with exhibits [doc. # 170]; Declaration of Michael R. Verna with exhibits [doc. # 171]; and Erratum Re: Exhibit A to Declaration of Michael A. Verna with exhibit [doc. # 172]; and Defendants' Reply brief dated November 10, 2008. [Doc. # 177]. This motion was referred by Judge Eginton for a recommended ruling on December 10, 2008. [Doc. # 178].

The instant Motion to Dismiss is based, *inter alia,* on the common law doctrine of *forum non conveniens.* "The principle of *forum non conveniens* is simply that a court may resist imposition upon its jurisdiction even when jurisdiction is authorized by the letter of a general venue statute." *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 507 (1947). Thus, *forum non conveniens* is a discretionary device, which, in rare circumstances, permits a court "to dismiss a claim even if the court is a permissible venue with proper jurisdiction over the claim ." *Wiwa v. Royal Dutch Petroleum Co.,* 226 F.3d 88, 100 (2d Cir.2000) (internal quotation omitted). As such, "[d]ismissal for *forum non conveniens* reflects a court's assessment of a range of considerations, most notably the convenience to the parties and the practical difficulties that can attend the adjudication of a dispute in a certain locality." *Sinochem Int'l Co. v. Malay. Int'l Shipping*

*Corp.,* 549 U.S. 422, 423 (2007) (internal quotation omitted). "The *forum non conveniens* determination is committed to the sound discretion of the trial court." *Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 266 (1981).

*BACKGROUND*

**\*2** On August 10, 2005, Copterline Oy ("Copterline") was operating a Sikorsky S-76C helicopter, registration OH-HCI, on a scheduled passenger service between Helsinki, Finland, and Tallinn, Estonia. *See* Estonian Aircraft Accident Investigation Commission's "Final Report Aircraft Accident Investigation," Ex. A to Verna Decl. Doc. # 172 (hereinafter the "Final Report"). In August 2005, there were fourteen scheduled flights from Helsinki each weekday, departing from Helsinki on the hour, and returning from Tallinn at thirty minutes past the hour. The route was 80 km and the usual flight time was 18 to 20 minutes. *Id.*

*The Accident*

On August 10, 2005, the helicopter OH-HCI was operating from its homebase (Copterline) at Helsinki/Malmi Airport in Finland. The flight crew was on its tenth leg, i.e., the return flight of their fifth round trip to Tallinn, that day.

At approximately 12:39PM (local time), the helicopter took off from the Tallinn City Hall heliport for Copterline heliport in Helsinki. At approximately 12:41PM, the attitude of the helicopter changed rapidly. It pitched up abruptly and rolled to the left. Following the initial upset flight condition, according to the recorded flight data, the helicopter began a rotation to the right with significant oscillations in pitch and roll attitudes. An air traffic controller at the Tallinn Airport observed the helicopter disappear from radar coverage and witnesses saw the helicopter impact the water. Flotation devices on board the helicopter did not fully deploy, causing it to sink within seconds of impact. A search and rescue operation was initiated within two minutes of the accident. There were no survivors. *Id.* at 1. The decedents included Peter Jarl Fredriksson and Seppo Antero Peurala, whose survivors and estates are plaintiffs in this action.

*The Accident Investigation*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2952225 (D.Conn.)
**(Cite as: 2009 WL 2952225 (D.Conn.))**

A search and rescue operation was initiated immediately following the accident. [Doc. # 172 Commission's Final Report at 1]. All fourteen of the occupants were fatally injured. *Id.* at 2. On August 13, 2005, three days after the accident, the wreckage of the helicopter was recovered from the sea. *Id.* at 6. It was transported to a hangar at Tallinn Airport for a detailed examination, and later moved to the Estonian Air Force base at Amari. [Doc. # 106, Ex. A at 6].

The accident was investigated by an Aircraft Accident Investigation Commission appointed under decree No. 313 of the Minister of Economic Affairs and Communications, Estonia. [Doc. # 172, Ex. A, Final Report at IX]. The Commission was charged with investigating the circumstances of the accident, determining the causes of the accident and formulating safety recommendations, as appropriate, in order to prevent aircraft accidents or incidents. It was not the function of the Commission to assign fault or to determine civil or criminal liability. The accident was investigated in accordance with the Estonian Aviation Law, in accordance with the Standards and Practices of the International Civil Aviation Organization (ICAO). As the State of Registry of the helicopter, Finland appointed an accredited representative and technical advisors to him to participate in the investigation. Because the United States was the State of Design and the State of Manufacture of the helicopter, the United States of America's National Transportation Safety Board ("NTSB") appointed an accredited representative. *Id.* Sikorsky, HR Textron, Honeywell, HSI and the Federal Aviation Administration ("FAA") participated in the investigation as technical advisors to the USA accredited representative. *Id.* at IX-X. France ("Bureau d'Enqueltes et d'Analyses" ("BEA")), as the State of Manufacture of the engines, appointed an accredited representative to the investigation. *Id.* at X.

**\*3** A Final Accident Report was issued on August 6, 2008.

*The Helicopter*

The helicopter, was manufactured by Sikorsky in West Palm Beach, Florida, in February 2000; and was registered in Finland on March 21, 2000, with nationality and registration marks OHHCI, by Copterline Oy. *Id.* at 6.

The Sikorsky S-76 is a general-purpose all weather helicopter. It was used extensively for passenger transport, corporate executive transport, offshore oil support and general utility operations. The normal flight crew compliment in regular passenger flights was two pilots. The passenger section of OH-HCI was configured for a maximum of twelve passengers, three rows of benches with four passengers per row. *Id.*

Copterline, a Finnish company, was the owner, the operator and the maintenance organization for the helicopter. *Id.* at 8.

*The Parties*

Plaintiffs are Ulla Fredriksson and Marjala Peurala and Antti Olavia Peurala, surviving family members of the two Finnish pilots, Peter Jarl Fredriksson and Seppo Antero Peurala. Plaintiffs reside in and are citizens of the Republic of Finland. [Doc. # 12 ¶¶ 3, 4, 5; Bowles Decl. Ex. 3 ¶¶ 6, 8, 9].

Defendant Sikorsky, a Delaware corporation with its principal place of business in Connecticut, is the designer, manufacturer and seller of the accident helicopter. [Amend. Copl. Doc. # 12 ¶ 7; Bowles Decl. Ex. 3 ¶ 11]. Defendant HSI, a Connecticut corporation with its principal place of business in Trumbull, Connecticut, is a wholly-owned subsidiary of Sikorsky. [Doc. # 12 ¶9; Bowles Decl. Ex. 3 ¶ 13]. Defendant HR Textron is a Delaware corporation with its principal place of business in Santa Clara, California. [Doc. # 12 ¶ 8; Bowles Decl. Ex. 3 ¶ 12]. Defendant Plasma Technologies, Inc. ("PTI"), a California corporation with its principal place of business in Torrance, California, is the supplier of plasma applied coatings and performed work on certain component parts of the accident helicopter. [Doc. # 12 ¶ 6; Bowles Decl. Ex. 3 ¶ 10]. A second PTI plant is located in South Windsor, Connecticut. [Bowles Decl. Ex. 18 at 1].

*Stipulation*

Defendants Sikorsky, HSI and HRT in *Fredriksson,* 07CV214 (ILG) and in *Kopperi v. Sikorsky,* 07CV3146(ILG), stipulated and agreed, as a condition of dismissal in the Eastern District of New York

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2952225 (D.Conn.)
**(Cite as: 2009 WL 2952225 (D.Conn.))**

in favor of a Finnish forum, [FN4] to all of the follow-
ing:

> FN4. Defendants argued to Judge Glasser in
> the Eastern District of New York "that as
> compared to New York or Connecticut, Fin-
> land [was] the most convenient forum for
> these actions to be litigated...." *Fredriksson
> v. Sikorsky,* Nos. 07CV214(ILG),
> 07CV3146(ILG), 2008 WL 752469, *2 n. 7
> (E.D.N.Y. Mar. 19, 2008). Judge Glasser
> found that because the Eastern District of
> New York lacked personal jurisdiction, the
> court could not entertain the *forum non con-
> veniens* motion and that the motion should
> be made in the District of Connecticut. *Id.* at
> *6.

-Consent to the jurisdiction of the Finish courts for
purposes of defending these civil actions;

-Tolling any applicable statute of limitations for a
period of 120 days after dismissal of these civil ac-
tions;

-Making available to the Finnish courts any witnesses
or documents in their possession, custody, or control
that the Finnish court may deem relevant; and

-any other conditions as may be set by the Court.
[Doc. # 107 Ex. K].

*Proposed Deposition Witnesses*

The plaintiffs in *Fredriksson* and *Kopperi* estimate
they will need to conduct twenty-two depositions;
fifteen witnesses are located in Connecticut (Sikor-
sky/HSI employees), three witnesses in Texas (HRT
employees), two witnesses in California (PTI em-
ployees), one witness in Washington D.C. (NTSB
employee) and one witness in Estonia (Estonian
Commission member). [Copterline. Let. 4/6/09; Fre-
driksson/Kopperi Let. 4/8/09].

**\*4** Defendants Sikorsky, HSI, HRT and PTI estimate
they will conduct thirty-five depositions; twenty-five
witnesses are located in Finland (of which eleven are
identified as Copterline witnesses,[FN5] four witnesses
are Finnish CAA members, three witnesses are the
plaintiffs, five witnesses will testify regarding eco-

nomic loss, the remaining witnesses are not identi-
fied); six witnesses are located in the United King-
dom (identified as Super Puma waterspout incident),
two witnesses are located in Estonia (identified as
eyewitnesses) and two witnesses are identified as
"unknown passenger, location unknown." [Def. Let
4/6/09].

> FN5. Copterline Oy was sold after the acci-
> dent and Copterline has undergone man-
> agement changes. "A number of non-
> management employees, including persons
> involved in the maintenance of the fleet, are
> no longer employed by Copterline." [Doc. #
> 177 at 9].

*Other Lawsuits*

Copterline filed an action against defendants Sikor-
sky, HSI, and PTI, *Copterline v. Sikorsky,*
07CV1450(WWE), alleging breach of express war-
ranty, breach of implied warranty, negligence, gross
negligence, and failure to instruct/warn.
[07CV1450(WWE), doc. # 1]. That case has now
been settled. [Stip. of Dismissal, Doc. # 219]

Plaintiffs Pirkko Onverva Kopperi and Marika Kop-
peri-Gronlund, the wife and adult daughter of a Fin-
nish citizen who was a passenger killed in the acci-
dent, have sued Sikorsky, HSI, HRT and PTI in *Kop-
peri v. Sikorsky,* 08CV451(WWE). As in the
amended complaint in this case, the *Kopperi* plain-
tiffs bring claims against defendants under the theo-
ries of strict product liability, breach of warranty,
negligence and willful misconduct/gross negligence.
Plaintiffs in *Frederiksson* and *Kopperi* are repre-
sented by the same counsel.

*DISCUSSION*

Defendants move to dismiss plaintiffs' suit pursuant
to the doctrine of *forum non conveniens,* arguing that
"convenience and the ends of justice will best be
served by dismissing these actions in favor of litigat-
ing the Finnish plaintiffs' claims in Finland." [Doc. #
106 at 9].

A. *Forum Non Conveniens*

While the "district courts enjoy broad discretion in

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2952225 (D.Conn.)
**(Cite as: 2009 WL 2952225 (D.Conn.))**

applying [the doctrine of *forum non conveniens,* the Second Circuit,] sitting *en banc* in *Iragorri v. United Techs. Corp.,* 274 F.3d 65 (2d Cir.2001), outlined a three-step process to guide the exercise of that discretion." *Norex Petroleum, Ltd. v. Access Indus.,* 416 F.3d 146, 153 (2d Cir.2005). At step one, the district court determines the degree of deference properly accorded the plaintiff's choice of forum. *See id.* At step two, it considers whether the alternative forum proposed by the defendants is adequate to adjudicate the parties' dispute. *See id.* Finally, at step three, the court balances the private and public interests implicated in the choice of forum. *See id.* Defendants bear the burden of persuasion on each element.

### 1. Deference to Plaintiffs' Choice of Forum

Any review of a *forum non conveniens* motion starts with "a strong presumption in favor of the plaintiff's choice of forum." *Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 255 (1981). In fact, "it is generally understood that, unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." *Norex Petroleum, Ltd. v. Access Indus.,* 416 F.3d 146, 154 (2d Cir.2005) (internal quotation omitted). However, courts recognize that "the degree of deference given to a plaintiff's forum choice [can vary] with the circumstances." *Iragorri,* 274 F.3d at 71 (internal quotation omitted). Typically, "the greatest deference is afforded a plaintiff's choice of its home forum, while less deference is afforded a foreign plaintiff's choice of a United States forum." *Norex Petroleum, Ltd.,* 416 F.3d at 154 (internal citations and quotation omitted); *see also Piper,* 454 U.S. at 255-256. As the Second Circuit emphasized in *Iragorri,* these are not "abrupt or arbitrary" rules. *Iragorri,* 274 F.3d at 72. Rather, they illustrate "a broader principle under which the degree of deference to be given to a plaintiff's choice of forum moves on a sliding scale" depending on the degree of convenience reflected by the choice in a given case. *Id.* at 71. "Because the central purpose of any forum non conveniens inquiry is to ensure that the trial is convenient, a foreign plaintiff's choice deserves less deference." *Piper Aircraft Co.,* 454 U.S. at 256.

**\*5** In determining the degree of deference to which a plaintiff's forum choice is entitled, a district court must undertake a review of the totality of the circumstances surrounding the plaintiff's forum selection.

*See Iragorri,* 274 F.3d at 71-72. Specifically, the court may consider relevant factors such as: (1) whether the plaintiff is a U.S. citizen; (2) convenience to the plaintiff of the chosen forum as compared to its home forum; (3) availability of witnesses in the forum; (4) defendant's amenability to suit in the forum; (5) availability of appropriate legal assistance; and (6) evidence of forum shopping to be subject to favorable law, "the habitual generosity of juries in the United States, [and] the plaintiff's popularity or the defendant's unpopularity in the region." *Iragorri,* 274 F.3d at 72. The Court will consider these factors in turn.

### (a) Plaintiffs are Citizens of Finland

To begin, it is important to note that all of the survivor and estate representative plaintiffs in this suit are Finnish citizens. *See* Amend. Compl. Doc. # 12. Likewise, the decedents these plaintiffs represent were all Finnish citizens. *See id.* Copterline Oy, the owner of the helicopter and the decedents' employer, is a corporation organized under the laws of Finland with its principal place of business in Helsinki. *See* Complaint, 07CV1450, *Copterline v. Sikorsky,* Doc. # 1. As previously noted, the fact that plaintiffs are not citizens of the United States means that, from the outset, their forum choice is entitled to less deference. *See Norex Petroleum, Ltd.,* 416 F.3d at 154.

### (b) Convenience of Plaintiffs' Chosen Forum as Compared to Their Home Forum

The second factor the court considers is the relative convenience of the chosen forum for the plaintiffs. Plaintiffs claim that the District of Connecticut is a more convenient forum than Finland because, *inter alia,* Sikorsky designed and manufactured the helicopter at issue in Connecticut, and thus the records, witnesses, and experts most relevant to the plaintiffs' product liability claims are both easily accessible in the District of Connecticut and within the compulsory process of the court. Bowles Decl. Ex. 4, 5. HSI also admits its principal place of business is in Connecticut and all of its facilities are in Connecticut. Bowles Decl. Ex. 13. Further, the plaintiffs point out, the defendants' records are in English, and it is likely that the majority of the witnesses and experts relevant to the plaintiffs' product liability claims do not speak Finnish.[FN6] Moreover, because of the involvement of the NTSB and Sikorsky, HR Textron, Honeywell,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2952225 (D.Conn.)
(Cite as: 2009 WL 2952225 (D.Conn.))

HSI and the FAA as technical advisors in the Estonian accident investigation, many documents and witnesses relating to that investigation are located in Connecticut and the United States, and are therefore more easily accessible in the District of Connecticut than they would be in Finland. Finally, plaintiffs point out that "none of the other defendants have joined HR Textron's motion." [FN7] [Doc. # 169 at 9, 13].

> FN6. Defendants' legal expert Dr. Heiskanen stated that the Finnish Courts accept documents in Finnish, Swedish and English. "[T]he language of court proceedings is Finnish or Swedish. All written and oral pleadings must be filed or presented in either of these languages. However, judges may accept English language documents to be filed without translation into Finnish or Swedish, depending on the circumstances of the case" [Heiskanen Aff. ¶ 16 at 7].

> FN7. Defendants argued before Judge Glasser in the Eastern District of New York that Finland was the most convenient forum for this case to be litigated and consented to the jurisdiction of Finland. [Doc. # 107, Ex. K]. They have since joined in this motion. See n. 2.

**\*6** The Court does not question these arguments. Undoubtedly, there exist in the United States generally, and in Connecticut specifically, records and witnesses essential to the plaintiffs' suit. That said, the Court finds that the plaintiffs have underestimated the importance of documents and witnesses located outside the United States.

First, it is important to keep in mind that the accident at issue in this dispute took place in the Baltic Sea between Tallinn and Helsinki, involved a Finnish corporation operating a helicopter which had been serviced and maintained in Finland, and led to the deaths of six Finnish citizens, four Estonian citizens and two citizens of the United States. Further, regardless of any assistance the NTSB and defendants may have provided to the Estonian investigators, the primary investigation of the accident is taking place in Estonia; the Estonian Aircraft Accident Investigation Commission issued the final accident report. [Doc. # 172].

Second, while the records and witnesses concerning the helicopter's design and manufacture are located in Connecticut and California, eyewitnesses to the accident and the helicopter wreckage are located in Estonia. The sources of evidence located in Finland specifically include: (1) Copterline's S-76 maintenance program, maintenance staff and maintenance records; (2) details of the helicopter's flight time and cycles; (3) a Finnish Border Patrol pilot who had discussions with Fredriksson several days before the accident [FN8]; (4) estate witnesses Ulla Christine Fredriksson and Marjatta Peurala; (5) Finnish CAA witnesses [FN9]; (6) witnesses and evidence relating to damages [FN10]; (7) Copterline witnesses [FN11]; (8) proximity to the accident scene; (9) proximity to the recovered helicopter wreckage in Estonia; (10) eyewitnesses to the descent of the helicopter during the crash [FN12]; (11) licensing, rating, flight and duty records, training and performance records of the helicopter pilots and crew; (12) helicopter log books. Not only would this evidence likely have to be brought to the District of Connecticut if the case were adjudicated here, but it would also require translation into English.[FN13]

> FN8. See Pl. Let 4/6/09.

> FN9. Defendants identified four Finnish CAA witnesses. [Pl. Let. 4/6/09].

> FN10. Defendants identified five witnesses on damages located in Finland. [Pl. Let. 4/6/09].

> FN11. Defendants identified eleven witnesses from Copterline located in Finland. [Pl. Let. 4/6/09].

> FN12. Plaintiffs state that "[t]he Estonian witnesses to the crash of the Copterline helicopter into Tallinn Bay have nothing relevant to contribute regarding the upset condition (i.e. the uncommanded servo extension) that precipitated the accident." [Doc. # 169 at 7].

> FN13. The parties agree that official translation costs will be borne by the parties. The language of court proceedings in Finland is Finnish or Swedish. The Finnish Court will

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2952225 (D.Conn.)
**(Cite as: 2009 WL 2952225 (D.Conn.))**

accept documents in English without a translation into Finnish or Swedish. [Heiskanen Aff. ¶ 16 at 7].

Importantly, plaintiffs fail to consider the findings contained in the Final Accident Report regarding Copterline's maintenance of the accident helicopter. [FN14] Access to maintenance records and staff is relevant to this case. Since the accident, Copterline Oy was sold and Copterline has undergone management changes. "A number of non-management employees, including persons involved in the maintenance of the fleet, are no longer employed by Copterline." [Doc. # 177 at 9]. Finland provides better access to this evidence, former Copterline employees and these witnesses.

FN14. The Final Report contains the following findings regarding Copterline's maintenance of the accident helicopter.

• Inadequate maintenance and pre-flight practices hindered the discovery of the poorly performing main rotor forward actuator.

• The forward actuator had accumulated 2276 hours; in accordance with the manufacturer's maintenance manual and Copterline's approved maintenance programme, [sic] CA-HOS76, a leakage test that had its due time at 2250 hours; there was no records that the leakage test had been performed, nor were there indications in Copterline documentation that such test was deferred or planned;

• the excessive leakage of the forward actuator could have been discovered if Sikorsky's maintenance manual had been followed;

• Copterline had not properly included the internal leakage test in its maintenance monitoring programme [sic];

• The hydraulic fluid was contaminated beyond acceptable levels; Copterline maintenance did not find the contaminated hydraulic fluid through routine maintenance practices;

• The actuator internal leakage test and cautious attention to hydraulic fluid patch test should have been sufficient to alert Copterline maintenance to the leaking forward actuator;

• Hydraulic filters had been fairly frequently changed; the Copterline maintenance documentation did not list any specific reasons; there was no evidence that the hydraulic flushing procedure was performed;

• Copterline was not documenting its maintenance actions, as required in its approved maintenance management system (JAR OPS 3, Subpart M) and by its maintenance procedures (Part 145);

• There were witness accounts of irregular events preceding the accidents (15 June, 26 July and approximately 6 August 2005); there were evidence of Copterline maintenance actions and tests, but there were no maintenance documentation describing the actions taken, the test results or test protocols;

• There were indications of the absence of a company safety culture and a firm commitment to safety by Copterline management and many of its personnel; and

• there were indications that defect reporting was not encouraged by Copterline management, or at least was not to be documented in any official logbook.

[Final Rpt. § 3.1.5]. More detailed findings are contained in the sections, and the subsections contained therein, entitled "Maintenance Intervention" at § 2.4.6; "S-76 Maintenance" § 2.8; and "Events prior to the Accident" § 2.10.

Dr. Heiskanen explained that the Finnish Code of Judicial Procedure does not provide for pre-trial discovery. "However, judges may, upon an individual-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2952225 (D.Conn.)
**(Cite as: 2009 WL 2952225 (D.Conn.))**

ized request by one party, order another party to pro-
duce specific documents or types of documents to the
court." [Heiskanen Aff. at 7]. He also explained that
written statements by fact witnesses, such as deposi-
tions and/or affidavits, are not permissible in the Fin-
nish court. "Expert opinions, on the other hand, may
be filed in writing." [Heiskanen Aff. at 8].

*7 Plaintiffs argue that "[i]f this case is tried in Fin-
land ... far less evidence will be available to both
sides than if the whole case is tried in Connecticut as
Finnish Courts cannot compel testimony or produc-
tion of documents from the Estonians." [Doc. # 169
at 3]. Plaintiffs argue that they will not be able to
compel non-party United States [FN15], Finnish and
non-party Estonian witnesses if this case proceeds in
Finland. Dr. Heiskanen offered no opinion regarding
plaintiffs' ability to compel testimony of Estonian
witnesses and/or the admission of Estonian docu-
ments and it was not addressed by defendants. And
neither defendants or plaintiffs' legal experts ad-
dressed this issue in their affidavits except to say that
deposition testimony would not be admissible in the
Finnish Courts.[FN16]

>   FN15. Defendants noted that there is only
>   one non-party United States witness cur-
>   rently identified by the parties. The parties
>   agree that the NTSB representative would
>   not be permitted to testify at trial in the
>   United States or Finland. Based on the pro-
>   posed deposition witness lists to date, the
>   majority of non-party witnesses identified
>   are located in Finland and Estonia.

>   FN16. Plaintiffs' legal expert Dr. Koulu
>   opined that "access to evidence is far better
>   in the United States of America than in
>   Finland. There is no discovery institution in
>   Finnish law. In addition, a Finnish court
>   does not have the power to make the United
>   States-based defendants present any docu-
>   ments, more specifically this kind of deci-
>   sion could not be enforced. Neither can the
>   Finnish court bindingly obligate people in
>   the United States of America to come to
>   Finland to testify in a Finnish trial." [Koulu
>   Aff. at ¶ 24.].

Thus, while bringing suit in Connecticut affords the
plaintiffs substantial convenience in the accessibility

of evidence relating to Sikorsky, HSI, HRT and PTI
and the involvement of Sikorsky, HSI and HRT and
the NTSB in the accident investigation, it affords
them substantial inconvenience in the inaccessibility
of evidence relating to the primary investigation of
the accident, as well as evidence relating to the
events leading up to the accident and evidence of the
accident itself. Indeed, defendants' proposed deposi-
tion witness list contains twenty-five witnesses from
Finland, six witnesses in the United Kingdom and
two witnesses in Estonia, while plaintiffs seek to de-
pose fifteen witnesses in Connecticut, three witnesses
in Texas, one witness in Washington, D.C. and one
witness in Estonia. Defendants have stipulated that
they will make available to the Finnish courts any
witnesses or documents in their possession, custody,
or control that the Finnish court may deem relevant.

Consequently, the Court cannot find, at this point in
the analysis, that the District of Connecticut is more
convenient to the plaintiffs than their home forum.
This weighs against deference to their choice of fo-
rum.

c) *Availability of Witnesses in the Forum*

The third factor the court considers in the first step is
the availability of witnesses. As has just been dis-
cussed, relevant witnesses in this case are located in
the United States, Finland, Estonia, and the United
Kingdom. While the U.S. witnesses are relatively
available in the District of Connecticut, defendants
stipulate that they will make their witnesses and/or
documents in their possession, custody, or control
available to the Finnish courts. [Doc. # 107 Ex. K].

Thus, the Court cannot conclude that witnesses rele-
vant to this dispute are more available in the District
of Connecticut than they are in the plaintiffs' home
forum, which argues against deference to the plain-
tiffs' choice to bring suit in the District of Connecti-
cut.

d) *Defendants' Amenability to Suit*

The fourth factor the court considers is the defen-
dants' amenability to suit in the plaintiff's chosen
forum. Sikorsky and HSI have their principal places
of business in Connecticut, and PTI has a plant lo-
cated in Connecticut. Clearly, they are amenable to
suit in the District of Connecticut, which argues in

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2952225 (D.Conn.)
**(Cite as: 2009 WL 2952225 (D.Conn.))**

favor of deference to the plaintiffs' choice of forum.[FN17] *See Norex Petroleum, Ltd. v. Access Indus.,* 416 F.3d 146, 155 (2d Cir.2005) (plaintiff's decision to litigate where all defendants were amenable to suit is properly viewed as a strong indicator that convenience, and not tactical harassment of an adversary, informed its decision to sue outside its home forum). Although a plaintiff's choice of a defendant's home forum does not, by itself, support a presumption of convenience, substantial deference may still be appropriate when that choice is made to obtain jurisdiction over a defendant. *See id.* at 154. But such deference is not automatically given. *See In re Air Crash near Peixoto De Azeveda,* 574 F.Supp.2d 272, 281 (E.D.N.Y.2008). A plaintiff's "choice of the defendant's home forum provides a much less reliable proxy for convenience," than plaintiff's choice of his own home forum. *Pollux Holding, Ltd. v. Chase Manhattan Bank,* 329 F.3d 64, 73 (2d Cir.2003). "Accordingly, a plaintiff's choice to initiate suit in the defendant's home forum" as opposed to any other [forum] where the defendant is also amenable to suit "only merits heightened deference to the extent that the plaintiff and the case possess bona fide connections to, and conveniens factors favor, that forum." *Id.* at 74. In the present action, while the case has some connection to the United States (the plaintiffs allege that defendants "designed and manufactured a defective component" in Connecticut and California), the plaintiffs do not. Further, as discussed below, the convenience factors weigh heavily in favor of the Finnish forum. Accordingly, the Court cannot conclude that the plaintiffs' choice of forum is entitled to greater deference based solely on the fact that the plaintiffs initiated the current action in the defendants' home forum.

> FN17. The fact that the defendants support their *forum non conveniens* motions with a representation that they will submit to jurisdiction in Finland is certainly relevant at the second and third steps of the *forum non conveniens* analysis, but it does not alter the fact that the plaintiffs' choice of a Connecticut forum rather than their own home forum was motivated, in part, by this genuine jurisdictional convenience. *See Norex Petroleum, Ltd. v. Access Indus.,* 416 F.3d 146, 156 (2d Cir.2005).

e) *Availability of Legal Assistance*

**\*8** The fifth factor the court considers is the availability of appropriate legal assistance. Appropriate legal assistance is available in both the District of Connecticut and Finland. Neither party has shown any disadvantage in receiving appropriate legal assistance in either forum.

f) *Evidence of Forum Shopping*

The sixth and final factor the court considers is any evidence of forum shopping to be subject to favorable law, the habitual generosity of juries in the United States, or the plaintiff's popularity or the defendant's unpopularity in the region. Despite both defendants' and plaintiffs' explicit and implicit accusations of forum-shopping and reverse forum-shopping, the court does not find that either the plaintiffs or the defendants were, or now are, motivated solely by improper motives.[FN18]

> FN18. As one court in this circuit observed, "[i]n applying the *Iragorri* factors, [a district court] cannot be blind to the practical realities of cross-border litigation. The often pejorative connotation inherent in the label 'forum shopping' is generally undeserved. It is a fact that plaintiffs will almost always select a forum in which they believe they will maximize their recovery, as long as they have a reasonable chance of remaining in that forum, and that forum is often within the U.S. Conversely, defendants will generally seek to relegate actions to the forum in which they believe their exposure is minimized, and that forum is often outside of the U.S. Assuming the requirements of Federal Rule of Civil Procedure 11 are met ... there is nothing immoral or unsavory about plaintiffs making such choices or defendants seeking to undo them." *In re Air Crash near Peixoto De Azeveda,* 574 F.Supp.2d 272, 279 (E.D.N.Y.2008).

That said, however, this Court is bound by the Second Circuit's instruction that, "when [a] foreign plaintiff chooses a United States forum, a plausible likelihood exists that the selection was made for forum-shopping reasons, such as the perception that United States courts award higher damages than are common in other countries." *Norex Petroleum, Ltd.,* 416 F.3d

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2952225 (D.Conn.)
(Cite as: 2009 WL 2952225 (D.Conn.))

at 155. Consequently, this Court recognizes that the plaintiffs likely have a pecuniary interest in having this dispute adjudicated in the United States, and this interest was likely a factor in their decision to bring suit in the United States.

Based on a review of the factors discussed in this section, it is the Court's opinion that the plaintiffs choice to bring their suits in the District of Connecticut is entitled to some deference. While this deference is important, it is less deference than plaintiffs would have been given if they were not foreign plaintiffs. *See Overseas Media, Inc. v. Skvortsov,* 277 Fed. Appx. 92, 97 (2d Cir.2008) ("There was no abuse of discretion in the District Court's conclusion that plaintiffs' choice of forum was entitled to some deference, but less deference than if they were not foreign plaintiffs"). Yet, even where the degree of deference is reduced, an "action should be dismissed only if the chosen forum is shown to be genuinely inconvenient and the selected forum significantly preferable." *Iragorri,* 274 F.3d at 74-75. With this in mind, and with the scales recalibrated to account for reduced deference to the plaintiffs' choice of forum, the Court turns to the second and third steps of the *forum non conveniens* analysis. *See Norex Petroleum, Ltd.,* 416 F.3d at 157 (the court's determination of the level of deference to accord a plaintiff's choice of forum "recalibrate[s] the balance for purposes of the remaining analysis").

### 2. Is Finland an Adequate Alternative Forum?

"To secure dismissal of an action on grounds of forum non conveniens, a movant must demonstrate the availability of an adequate alternative forum." *Norex Petroleum Ltd. v. Access Indus. Inc.,* 416 F.3d 146, 157 (2d Cir.2005) (citations omitted).

**\*9** "An alternative forum is adequate if the defendants are amenable to service of process there, and if it permits litigation of the subject matter of the dispute." *Id.* (citing *Pollux Holding Ltd. v. Chase Manhattan Bank,* 329 F.3d 64, 75 (2d Cir.2003) (citing *Piper Aircraft,* 454 U.S. at 254 n. 22; *Capital Currency Exch., N.V. v. Nat'l Westminster Bank PLC,* 155 F.3d 603, 609 (2d Cir.1998)).

The courts in Finland are capable of affording substantial justice to the parties. Finland is a Civil Law country, with an independent judiciary. [Heiskanen

Aff. ¶¶ 8-9]. Finland has been a Member State of the European Union since 1995, and the law of the European Union is part of the Finnish legal system. [Heiskanen Aff. ¶ 10]. Private and criminal law matters are subject to the jurisdiction of the general courts. [Heiskanen Aff. ¶ 12]. Cases are heard by a District Court, subject to appeal before a Court of Appeal and leave of appeal before the Finnish Supreme Court. [Heiskanen Aff. ¶ 13]. The District Court sits in panels of one or three professional judges. A single judge presides over the pre-trial procedure.[FN19] [Heiskanen Aff. ¶ 19]. Judges have unrestricted competence to evaluate the evidence put before them and are independent from any other organs or authorities. [Heiskanen Aff. ¶ 15]. Civil court procedure is governed by the Code of Judicial Procedure, supplemented by statutes concerning, e.g., the organization and specific procedures applied in special courts, preliminary investigations and coercive measures; the status, rights and obligations of prosecutors and attorneys; legal aid, cost-free legal proceedings, and other matters. [Heiskanen Aff. ¶ 14]. The Finnish Code of Judicial Procedure does not provide for pre-trial discovery. However, judges may, upon an individualized request by one party, order another party to produce specific documents or types of documents to the court. [Heiskanen Aff. ¶ 16]. Cases are divided into a pre-trial phase and then a trial phase in the District Court. The pre-trial phase involves exchanges of written pleadings and a preparatory hearing. The pleadings consist of a statement of claim, the defendant's written response and any further written submissions the court may deem appropriate and necessary. The preparatory hearing serves to define the exact claims, their grounds, and the evidence that will be presented at the main hearing. A dispute may be resolved in the course of the pre-trial phase. During the main hearing, the parties present their claims, witnesses are examined and cross-examined, and the parties make their closing statements. [Heiskanen Aff. ¶ 17]. Written statements by fact witnesses are not permissible in court. Expert opinions, on the other hand, may be filed in writing. [Heiskanen Aff. ¶ 16]. All parties are bound to be truthful throughout the proceedings. [Heiskanen Aff. ¶ 15]. The subsequent judgment has to state the reasons for the decision reached. [Heiskanen Aff. ¶ 17].

> FN19. "In criminal cases and in certain family law disputes, District Court panels include lay members in addition to professional judges. No lay members are among

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2952225 (D.Conn.)
**(Cite as: 2009 WL 2952225 (D.Conn.))**

the judges dealing with claims for damages based on tort." [Heiskanen Aff. ¶ 19].

**\*10** Dr. Heiskanen, defendants' legal expert, opined that plaintiffs are able to commence a civil action against defendants in Finland. "Finnish Courts would have jurisdiction because (1) the defendants consent to jurisdiction in Finland; (2) the consequences of the accident were felt in Finland; (3) the defendants agree to waive any statute of limitations defense;[FN20] (4) plaintiff may bring claims based on general torts law as well as specific provisions of the Finnish Product Liability law;[FN21] (5) for purposes of the Finnish Product Liability Act, it is relevant that plaintiffs are Finnish citizens and are domiciled in Finland; (6) provided plaintiffs establish liability, they may recovery compensatory damages and interest on the damages awarded and at least a portion, if not all, legal costs.[FN22] [Heiskanen Aff. at 10-11; 19-20].

> FN20. Defendants have stipulated they will consent to the jurisdiction of the Finnish Courts if this case is dismissed on forum non conveniens grounds. The parties' experts seem to agree that the Finnish Court would accept an agreement to jurisdiction. "[I]f foreign corporations such as the Defendants submit and consent to the jurisdiction of the courts of Finland, either by express agreement or by appearing before a Finnish court and addressing the merits of the case, without challenging jurisdiction, Finnish courts would have jurisdiction over them." [Heiskanen Aff. at 11-12]. Plaintiff's expert Dr. Koulu did not dispute this statement of the law, stating an agreement is "basically binding." [Koulu Aff. ¶ 18]. Dr. Koulu states, "if parties are allowed [sic] agree upon the jurisdiction, or make a prorogation agreement, the question of jurisdiction is examined only if a party makes a claim or does not appear in court...." [Koulu ¶ 17]. He opined that "[a] fraudulent party could obstruct the trial several times by giving promises and retracting them, thus deprive the plaintiff of access to justice." [Koulu Aff. ¶¶ 8, 18]. However, Dr. Koulu does not suggest any basis for the Court to believe that defendants' stipulation is untrustworthy or fraudulently presented. Here, defendants have also stipulated and

agreed to any conditions set by the Court. The Court will condition dismissal on, among other things, the defendants' agreement to pay any judgment awarded by the Finnish Courts and will not prevent plaintiffs from returning to this Court if the Finnish courts decline to accept jurisdiction of this action.

> FN21. "Claims based on the Finnish Product Liability Act may also be brought before the court of the domicile of the plaintiff." "The application of the rule would likely require that the damage occurred in Finland, which is the case here." [Heiskanen Aff. at 16].

> FN22. The Finnish Tort Liability Act provides for "only compensatory damages" and "possible damages" may be awarded to the heirs of the deceased in cases where the death was caused "deliberately or by a grossly negligent act." [Heiskanen Aff. at 17]. "In addition, under Finnish law, a successful plaintiff is also entitled to interest on the damages awarded." [Heiskanen Aff. at 18]. "[T]he losing party in civil proceedings bears all reasonable legal costs of the winning party. However, judges have discretion to derogate from this rule if it would be manifestly unreasonable to hold one party liable for the other party's legal costs, bearing in mind the circumstances giving rise to the proceedings, the situation of the parties, and the significance of the dispute." [Heiskanen Aff. at 18]. Neither punitive damages nor "survival damages to plaintiff's decedents for conscious pre-death pain and suffering are recoverable under Finnish law." [Heiskanen Aff. at 18].

The courts of Finland are capable of providing fair and substantial justice to the parties in this litigation. Under Finnish law, actions may be brought against manufacturers for harm caused by defective products under the Finnish Product Liability Act and Finland has a remedy for wrongful death claims under the Finnish Tort Liability Act. Compensatory damages and funeral expenses are available and maintenance/child support damages may be awarded; in addition, the heirs of the deceased whose death has been caused deliberately or by a grossly negligent act

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2952225 (D.Conn.)
**(Cite as: 2009 WL 2952225 (D.Conn.))**

may recover damages "for the anguish arising from the death." [Heiskanen Aff. ¶¶ 26-28; 43-44]. A successful plaintiff is also entitled to interest on the damages awarded and a losing party in civil proceedings bear all reasonable legal costs of the winning party. [Heiskanen Aff. ¶¶ 45-46]. In Finland, neither punitive damages nor survival damages are recoverable under Finnish law. [Heiskanen Aff. ¶ 47]. It is well-established that " '[t]he availability of an adequate alternative forum does not depend on the existence of the identical cause of action in the other forum,' nor on identical remedies.' *Norex Petroleum Ltd.,* 416 F.3d at 158 (quoting *PT United Can Co. v. Crown Cork & Seal Co.,* 138 F.3d 65, 74 (2d Cir.1998). "An adequate forum need not be a perfect forum." *Satz v. McDonnell Douglas Corp.,* 244 F.3d 1279, 1283 (11th Cir.2001); *Acosta v. JP Morgan Chase & Co.,* No. 05 Civ. 977(NRB), 2006 WL 229196, at *7 (S.D.N.Y. Jan. 30, 2006) (an alternative forum "need not be perfect to be adequate."). In *Piper Aircraft v. Reyno,* the Supreme Court held that only where the remedy offered by the other forum is clearly unsatisfactory should a Court begin to question whether the alternative forum is inadequate. 454 U.S. at 254-55. The Supreme Court noted that a remedy is inadequate when it amounts to "no remedy at all." *Id.* 454 U.S. at 254. Although punitive damages and survival damages may not be available in Finland, there is no danger that plaintiffs will be "deprived of any remedy or treated unfairly." *Id.* 454 U.S. at 255.

*11 Finnish Courts have territorial jurisdiction over all torts that have been committed in Finland and, under certain conditions, torts that occur outside Finland. [Heiskanen Aff.¶ 32]. Dr. Heiskanen opined that the Finnish Courts would have jurisdiction to hear and decide the tort claims at issue in this case. [Heiskanen Aff. ¶ 39]. The general limitations period under Finnish law is three years, pursuant to the Act on Limitation of Debts. [Heiskanen Aff. ¶ 49].

Regarding a statute of limitations defense, Dr. Heiskanen stated that under Finnish law, "[t]he statute of limitations may be invoked by the defendant; judges cannot apply it at their own initiative. Defendants cannot waive their right to invoke the statute of limitations in advance, but they can choose not to invoke it *after* the limitations period has expired." [Heiskanen Aff. at 19 (emphasis added) ]. Here, defendants have stipulated to tolling the statute of limita-

tions.

Moreover, Finland is an adequate forum in view of the defendants' stipulation to the jurisdiction of its courts. *See Piper Aircraft,* 454 U.S. at 255 n. 22 ("Ordinarily, [the availability] requirement will be satisfied when the defendant is 'amenable to process' in the other jurisdiction." (quoting *Gulf Oil Corp.,* 330 U.S. at 506-07 (1947)); *DiRienzo v. Philip Servs. Corp.,* 232 F.3d 49, 57 (2d Cir.2000) ("[A]n agreement by the defendant to submit to the jurisdiction of the foreign forum can generally satisfy th[e] [alternative forum] requirement.") (citation omitted), *vacated on other grounds,* 294 F.3d 21 (2d Cir.2002); *Melton v. Oy Nautor AB,* 161 F.3d 13, 1998 WL 613798, *1 (9th Cir. Sept. 4, 1998) ("In this case, [the parties] are subject to, or have submitted to, jurisdiction in Finland. An adequate alternative forum exists.").

Here, defendants stipulate to jurisdiction before the Finnish courts. The defendants agree to make all relevant evidence and witnesses under their control available in Finland. Further, the defendants agree to pay any judgment imposed by the Finnish Courts and stipulate that, should Finland refuse to exercise jurisdiction, plaintiffs may move in this Court to reopen this action. *See In re Air Crash Near Peixoto de Azeveda, Brazil,* 574 F.Supp.2d 272, 290 (E.D.N.Y.2008) (listing conditions set by the court).

3. *Private and Public Interest Factors*

In the third and final stage of the *forum non conveniens* calculus, courts consider a number of private and public factors that influence the relative convenience of the fora in question. *See Gulf Oil Corp.,* 330 U.S. 501, 508-09 (1947). Private interests to the litigants include:

(1) The relative ease of access to sources of proof; (2) availability of compulsory process [to compel] attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; (3) the possibility of [a] view of premises, if [a] view would be appropriate to the action; (4) the enforcibility of a judgment if one is obtained; and (5) all other practical problems that make trial of a case easy, expeditious and inexpensive.

*12 *BFI Group Divino Corp. v. JSC Russian Aluminum,* 298 Fed. Appx. 87, 2008 WL 4810779, *4 (2d

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2952225 (D.Conn.)
**(Cite as: 2009 WL 2952225 (D.Conn.))**

Cir. Nov. 4, 2008) (quoting *Gulf Oil Corp,* 330 U.S. 501, 508-09 (1947)). The public interests the court considers include:

> (1) Administrative difficulties inherent in bringing a case in a congested docket; (2) imposing jury duty on citizens who have no relation to the litigation; (3) holding the trial in the view and reach of the citizens whom the trial might affect; (4) local interest in having localized controversies decided at home; and (5) avoiding requiring that a court in some other forum untangle problems in conflict of laws, and in law foreign to itself.

*Id.* (quoting *Gulf Oil Corp,* 330 U.S. 501, 508-09 (1947)).

a. Private Factors

*Relative Ease of Access to Sources of Proof and Residence of the Parties and Witnesses and Availability of Compulsory Process and Other Sources of Proof*

In weighing the relative ease of access to sources of proof in this dispute, as well as the availability of compulsory processes to compel attendance of unwilling, and the cost of obtaining attendance of willing, witnesses, the court begins by noting that the defendants have offered, as a condition of dismissal, to make all relevant evidence and witnesses under their control available to the plaintiffs in Finland *See* Doc. # 107 Ex. K. The court also notes that the defendants have already produced thousands of pages related to the S-76 main rotor forward actuator, servo, and the helicopter's instructions, manuals, and warnings, and further that these documents were produced on disc which can be transported to Finland quite easily.[FN23] Because the plaintiffs primarily seek evidence and witnesses concerning defendants' design and manufacture of the helicopter and its component parts and plasma coating, the Court finds that this production and the defendants' stipulation adequately address plaintiffs' concerns.

> FN23. At oral argument, counsel stated that some documents are available on a secure web site created for this litigation.

Based on findings contained in the Final Accident Report, defendants may assert that negligence on the part of Copterline and its maintenance staff is the actual and proximate cause of the accident. [Doc. #

172 § 3.1.5]. They have a good faith basis to do so. The official accident report prepared by the Estonian Accident Investigation Commission notes that, "the Copterline flight operations, maintenance management system, maintenance organization and approved maintenance program were well documented and clear: however, the actual practices and performed processes showed deficiencies and deviations from the requirements and approved documented procedures." *Id.; see infra* n. 14.

The presence of these issues is significant. Evidence concerning maintenance and repair of the helicopter is in Finland. The helicopter operator, its former employees, and maintenance staff are in Finland, as are all of the surviving family members, many liability witnesses and every single damages witness, party or non-party. Evidence relating to the scene of the accident, the surrounding circumstances, the cause of the accident and the official investigation is in nearby Estonia. Defendants contend that "[t]he fact that some witnesses and documentary evidence may be located outside Finland-in Estonia, the United Kingdom, and France-does not change this analysis. These nations all are members of the European Union and the ease of access among them is greater than that available to litigants in this Court." [Doc. # 106 at 17]. This weighs in favor of adjudication in Finland.

*Ability to View the Accident Scene*

**\*13** Regarding the possibility of viewing the accident scene, while it is unlikely that a view of the crash site will be necessary in adjudicating this action, it may be necessary for the trier of fact to view the wreckage of the helicopter, which is located in Estonia. This weighs in favor of adjudication in Finland.

*Enforcibility of Judgment*

The Court also considers the enforcibility of a judgment if one is obtained. Because the defendants have agreed, as a condition of dismissal here, to pay any final, post-appeal judgment against them by a Finnish court, the District of Connecticut is no more convenient than Finland in this regard. This factor is neutral.

*Weighing Convenience and Expense of Trial and Other Practical Problems*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2952225 (D.Conn.)
**(Cite as: 2009 WL 2952225 (D.Conn.))**

Finally, regarding the practical problems in this dispute, the Court finds that these considerations weigh in favor of adjudicating this case in Finland. Most importantly, Copterline and its maintenance staff, some of whom are no longer employed by Copterline, are not subject to personal jurisdiction in this forum, and therefore defendants will be unable to join these entities in defending the suit if the action remains here. And virtually all of the non-party factual witnesses on liability and damages are located in Estonia or Finland, beyond the compulsory process of this Court.

In contrast, the defendants have unequivocally consented to jurisdiction in Finland. This difference in jurisdiction over potentially liable entities weighs strongly in favor of dismissal. *See, e.g., Piper Aircraft Co. v. Reyno,* 454 U.S. 235 (1981) (holding that dismissal was proper because it would be unfair to make the defendants proceed to trial in the U.S. when witnesses were beyond the reach of the compulsory process, and defendants would be unable to implead potential foreign third-party defendants); *Allstate Life Ins. Co. v. Linter Group Ltd.,* 994 F.2d 996, 1001-02 (2d Cir.1993) (noting that witness unavailability is a factor favoring dismissal, litigation in the U.S. without all of the interested parties "creates a risk of inconsistent judgments"); *Crosstown Songs U.K. Ltd. v. Spirit Music Group, Inc.,* 513 F.Supp.2d 13, 17 (S.D.N.Y.2007) (holding that, "[i]t would be unfair to require [defendant] to litigate here without the opportunity to bring in parties and witnesses who are critical to its setoff defense").

In weighing convenience and expense of trial and other practical problems, the court considers the relative costs of litigating this suit in Finland and the United States. None of the parties has offered any evidence or argument concerning the costs of counsel. They focus instead on costs related to the document translation. "Virtually all relevant documents-accident investigation reports, flight logs, and other records relating to the aircraft and its crew, as well as regulatory oversight documents (e.g. licensing, supervision, and auditing of Copterline's operations)-will have been originally drafted in Finnish or Estonian and will need to be officially translated into English, at considerable expense." [Doc. # 106 at 20]. However, as the Court has previously noted, the defendants have produced thousands of pages of documents on a compact disc, which can be transported

quite easily. If the litigation proceeds in Finland, only a small percentage of liability documents, and virtually no damages documents, will require translation. While written and oral proceedings in Finland are presented in Finnish or Swedish, a judge may accept English language documents without translation. [Heiskanen Aff. ¶ 16]. Moreover, Finnish, Swedish and Estonian are Finno-Urgic languages and closely related. As a result, the cost factor argues in favor of adjudicating this dispute in Finland.

**\*14** In sum, all of the private interest factors the Court considered are either neutral or weigh in favor of resolving the dispute in Finland.

b. *Public Factors*

*Administrative Difficulties and Burden on the Community*

Concerning the administrative difficulties of this case, the parties' arguments focus on the administrative difficulties of dealing with translations, as well as the burden and costs associated with a complicated, highly technical, and likely lengthy trial.

As the Court has already noted, regardless of the forum, the court that eventually adjudicates this case will be dealing with documents in translation. The parties, not the court, will provide these translations and incur the costs. Thus, the administrative difficulties pertaining to translations are essentially equivalent in both fora.

Plaintiffs argue that it would be most efficient to try the *Copterline* and *Kopperi* cases at the same time as the three cases share "common issues of accident causation and liability against the same four defendants...." [Doc. # 169 at 36]. However, since the argument on these motions, *Copterline* has been settled.

As for the next public interest factor, defendants argue that because "[t]his accident occurred outside the territorial waters of the United States, ... the Death on the High Seas Act ("DOSHA"), 46 U.S.C. § 30101, *et seq.* likely governs plaintiffs' claims" and "there is no right to a jury trial under DOSHA." [Doc. # 106 at 22]. In response, plaintiffs argue that "if one assumes that [defendants'] "no jury trial" position is correct (a

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2952225 (D.Conn.)
**(Cite as: 2009 WL 2952225 (D.Conn.))**

point that plaintiffs do not concede), then it follows that the trial of plaintiffs' claims in this Court will not impose any jury duty obligation on citizens of this District." [Doc. # 169 at 37]. The Court addresses the application of DOSHA below.

*Interest in Resolving Local Disputes Locally*

The Court next considers the public interest factors of holding the trial in the view and reach of the citizens whom the trial might affect, and the local interest in having localized controversies decided at home. Plaintiffs argue that Connecticut courts "have a compelling interest in ascertaining whether companies that do business in this District engaged in the negligent design, manufacture and/or overhaul of a defective servo that caused the death of everyone on board (including two Americans) at the time of the crash." [Doc. # 169 at 38]. The defendants, on the other hand, contend that Finland has a significant and compelling local interest in having this litigation result not only in full and fair compensation to the families of its citizens who died in the crash, but also of having all parties who are potentially at fault participate in the suit and be held accountable.[FN24] [Doc. # 106 at 23]. The Court agrees.

> FN24. Specifically, defendants point to the fact that: (1) Copterline is a Finnish air carrier that does not fly in the United States; (2) Plaintiffs all reside in Finland, as did their decedents; (3) The aircraft wreckage is in neighboring Estonia, where the accident investigation is based; (4) Copterline is subject to Finnish, Estonian and European regulations promulgated and administered by the governing Civil Aviation Authority (the equivalent of the FAA in this country). [Doc. # 106 at 23].

As has been noted throughout this ruling, at the time of the crash, Copterline, a Finnish corporation, was operating the helicopter at issue. All the plaintiffs are Finnish citizens. Estonia, and not Finland or the United States, is handling the primary investigation of the accident. Contrary to the plaintiffs' arguments, the primary purpose of this litigation is not to determine the general safety of the Sikorsky S-76C, but rather to determine whether the defendants are liable for the injuries resulting from the August 10, 2005, crash in Tallinn Bay, in the territorial waters of Estonia. Thus, it is the Court's conclusion that Finland has the deeper interest in holding the trial in the view and reach of its citizens, a factor that weighs heavily in favor of dismissal.[FN25]

> FN25. It is also noted that at the time of this writing, the Prosecutor General of the Republic of Estonia has initiated a criminal investigation into the cause of the accident, another factor that weighs in favor of dismissal.

*Applicability of Foreign Law*

**\*15** The final public interest factor the Court considers is the extent to which this Court can avoid problems in conflict of laws and the application of foreign law. To this end, the Supreme Court has counseled that:

> The doctrine of *forum non conveniens* ... is designed in part to help courts avoid conducting complex exercises in comparative law. As we stated in *Gilbert,* the public interest factors point towards dismissal where the court would be required to 'untangle problems in conflict of laws, and in law foreign to itself .'

*Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 251 (1981) (quoting *Gilbert,* 330 U.S. at 509). However, "the need to apply foreign law is not in itself a reason to apply the doctrine of *forum non conveniens,*" and courts "must guard against an excessive reluctance to undertake the task of deciding foreign law, a chore federal courts must often perform." *Manu Int'l, S.A. v. Avon Prods., Inc.,* 641 F.2d 62, 67-68 (2d Cir.1981) (internal quotation and citation omitted).

In order to determine the applicable substantive law, the court must look to the proper choice of law rules. In this case, however, it is not immediately clear which choice of law rules apply. Typically, "[a] federal court sitting in diversity applies the choice of law rules of the forum state," in this case, Connecticut. *Maryland Casualty Co. v. Continental Casualty Co.,* 332 F.3d 145, 151 (2d Cir.2003) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co .,* 313 U.S. 487, 496 (1941)). Here, defendants ask the Court to apply the federal admiralty choice of law rules, arguing that plaintiffs' law claims are preempted by the Death on the High Seas Act ("DOSHA"), 46 U.S.C. § 30301, *et seq..*[FN26]

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2952225 (D.Conn.)
**(Cite as: 2009 WL 2952225 (D.Conn.))**

The Court agrees.

> FN26. Plaintiffs did not provide choice of law analysis. Rather, they argued that "Connecticut is by far the more convenient forum, as American law-either federal or Connecticut-will apply to plaintiffs' claims, whether they are based on federal maritime law, Connecticut law based on diversity of citizenship of the parties (including Connecticut product liability law), or DOSHA." [Doc. # 169 at 39]. Defendants, on the other hand, state that DOSHA "appears to afford plaintiffs' their exclusive remedy...." 46 U.S.C. § 30302. [Doc. # 106 at 24].

Under the DOHSA, "[w]hen the death of an individual is caused by wrongful act, neglect, or default occurring on the high seas beyond three nautical miles from the shore of the United States, the personal representative of the decedent may bring a civil action in admiralty against the person or vessel responsible." 46 U.S.C. § 30302. DOHSA clearly applies in the present case because plaintiffs' decedents died on the high seas in Tallinn Bay, in the territorial waters of Estonia, well beyond three nautical miles from the shores of the United States. *See Jennings v. Boeing Co.,* 660 F.Supp. 796, 802 (E.D.Pa.1987), *aff'd,* 838 F.2d 1206 (3d Cir.1988) (holding that DOHSA properly applies to accidents occurring within foreign territorial waters); *Offshore Logistics v.. Tallentire,* 477 U.S. 207, 219 (1986) (applying DOHSA to a helicopter crash on the high seas finding, "[a]lthough the decedents were killed while riding in a helicopter and not a more traditional maritime conveyance, that helicopter was engaged in a function traditionally performed by waterborne vessels...."). Further, courts have held that the DOHSA applies "where the decedent is injured on the high seas, even if a party's negligence is entirely land-based and begins subsequent to that injury." *Motts v. M/V Green Wave,* 210 F.3d 565, 567 (5th Cir.2000) (finding delay in medical treatment of injury sustained at sea was the proximate cause of death) (citing cases).

**\*16** The DOHSA "preempts all wrongful death actions under state law where it applies." *Id.* at 569 (citation omitted). Further, the Supreme Court has held that "DOHSA expresses Congress' judgment that there should be no [survival] cause of action in cases of death on the high seas. By authorizing only

certain surviving relatives to recover damages, and by limiting damages to the pecuniary losses sustained by those relatives, Congress provided the exclusive recovery for deaths that occur on the high seas." *Dooley v. Korean Air Lines Co.,* 524 U.S. 116, 123 (1998). As a result, any recovery to which plaintiffs would be entitled based on Connecticut state law are preempted by the DOHSA. *See Offshore Logistics, Inc. v. Tallentire,* 477 U.S. 207, 218-19 (1986) (finding DOSHA is the exclusive remedy for wrongful death actions for maritime deaths occurring on the high seas).

The fact that plaintiffs invoked the court's diversity jurisdiction rather than its admiralty jurisdiction does not mean that the court is barred from exercising its admiralty powers.[FN27] *See, e.g., Preston v. Frantz,* 11 F.3d 357, 358 (2d Cir.1993) (instructing that, "[w]hen ... plaintiffs bring a suit based upon diversity jurisdiction, we nevertheless apply substantive federal maritime law if we have admiralty jurisdiction"); *Capozziello v. Brasileiro,* 443 F.2d 1155, 1157 (2d Cir.1971) (holding "[t]hat the district court's diversity, rather than its admiralty, has been invoked does not change the applicable [maritime] law"). Thus, the court applies the federal admiralty choice of law analysis in determining the law applicable to this case.[FN28] *See State Trading Corp. v. Assuranceforeningen Skuld,* 921 F.2d 409, 414 (2d Cir.1990) (citing cases) ("A federal court sitting in admiralty must apply federal choice of law rules").

> FN27. In this case, the DOHSA expressly provides for admiralty jurisdiction because the accidental deaths occurred beyond three nautical miles from the shores of the United States. *See* 46 U.S .C. § 30302. Even without this statutory provision, however, admiralty jurisdiction is appropriately invoked here under traditional principles because "the accident occurred on the high seas and in furtherance of an activity bearing a significant relationship to a traditional maritime activity." *Offshore Logistics v. Tallentire,* 477 U.S. 207, 219 (1986) (holding that, "[a]lthough the decedents were killed while riding in a helicopter and not a more traditional maritime conveyance, [admiralty jurisdiction was appropriate because] that helicopter was engaged in a function traditionally performed by waterborne vessels:

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2952225 (D.Conn.)
**(Cite as: 2009 WL 2952225 (D.Conn.))**

the ferrying of passengers from an island ... to the shore" (internal quotation omitted)); *Preston v. Frantz,* 11 F.3d 357, 358 (2d Cir.1993) (holding that admiralty jurisdiction was appropriate in a case in which a helicopter crashed while en route from Connecticut to Nantucket Island, Massachusetts).

FN28. It is of no matter that "decedents were killed while riding in a helicopter and not a more traditional maritime conveyance, that helicopter was engaged in a function traditionally performed by waterborne vessels: the ferrying of passengers ... to the shore." *Offshore Logistics, Inc.,* 477 U.S. 207, 219 (1986) (citing *Executive Jet Aviation, Inc. v. City of Cleveland,* 409 U .S. 249, 271 n. 20).

Plaintiffs argue that "there are no circumstances under which Finnish law will apply to this case." [Doc. # 169 at 38-39]. However, in order for plaintiffs to take this position they must overlook the findings contained in the Final Accident Report, "Maintenance Intervention" at § 2.4.6; "S-76 Maintenance" at § 2 .8; "Events prior to the Accident" at § 2.10. and "Operator (Copterline)," at § 3.1.5, addressing Copterline's maintenance of the accident helicopter. [Doc. # 172]. On this record, the Court can foresee circumstances where Finnish law would apply.

*Federal Choice of Law Analysis*

In resolving conflict of laws questions in maritime tort cases, the Supreme Court has adopted an interest analysis that looks to a number of factors, including: (1) the place of the wrongful act; (2) the law of the vessel's flag; (3) the domicile of the injured party; (4) the domicile of the vessel owner; (5) the place of the contract; (6) the inaccessibility of the foreign forum; (7) the law of the forum, and (8) the vessel owner's base of operations.[FN29] *See Carbotrade S.p.A. v. Bureau Veritas,* 99 F.3d 86, 90 (2d Cir.1996) (citing *Hellenic Lines, Ltd. v. Rhoditis,* 398 U.S. 306, 308 (1970); *Lauritzen v. Larsen,* 345 U.S. 571, 582 (1953); *Romero v. International Terminal Operating Co.,* 358 U.S. 354, 359 (1959)).

FN29. Courts frequently refer to these as the "*Lauritzen* " factors, after the Supreme

Court case in which the bulk of the factors were first set out. *See Lauritzen v. Larsen,* 345 U.S. 571, 582 (1953).

\* To begin, it is important to note that certain *Lauritzen* factors do not apply in this case. First, in contrast to *Lauritzen,* no direct contractual relationship exists between the plaintiffs and the defendants in this case, so the fifth factor, "the place of the contract," is not involved in the court's analysis. *See Carbotrade S.p.A. v. Bureau Veritas,* 99 F.3d 86, 90 (2d Cir.1996). Further, the Second Circuit considers the seventh *Lauritzen* factor, "the law of the forum," to be "generally of little relevance in United States courts." *Rationis Enterprises Inc. of Panama v. Hyundai Mipo Dockyard Co.,* 426 F.3d 580, 587 (2d Cir.2005) (citing *Carbotrade,* 99 F.3d at 91) ("The seventh *Lauritzen* factor-the law of the forum-is irrelevant here because this litigation is in the courts of the United States"). Thus, this court considers only six of the eight *Lauritzen* factors.

First, the place of the alleged wrongful act is not straight forward. Our Court of Appeals holds that the place of the alleged wrongful act is where the negligence occurred. *Rationis Enterprises Inc. of Panama,* 426 F.3d at 587 (citing *Carbotrade,* 99 F.3d at 91) (holding "that the place of the wrongful act is not where the vessel sinks, but where the negligence occurs."). Based on this record, the place of the negligent design and/or manufacture of the helicopter or its component parts, is Connecticut or, alternatively, the place of the negligent maintenance of the helicopter is Finland. Second, the law of the helicopter's flag is Finnish. The helicopter was owned and operated by Copterline Oy, a Finnish corporation, and registered in Finland.[FN30] Third, the domicile of all the plaintiffs is Finland. Fourth, the domicile of the helicopter's owner is Finland. Fifth, the foreign forum, *i.e.,* Finland, is not inaccessible to the plaintiffs. As previously discussed, plaintiffs are Finnish citizens and defendants have agreed to submit to jurisdiction in the courts of Finland. Sixth, the helicopter's base of operations is Finland. Thus, the *Lauritzen* factors appear to indicate that, were this court to adjudicate the dispute, it would apply the law of Finland. "While the Court need not definitively resolve the choice of law issue at this point, the likelihood that foreign law will apply weighs against retention of the action." *Ioannides v. Marika Maritime Corp.,* 928 F.Supp. 374, 379 (S.D.N.Y.1996).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2952225 (D.Conn.)
**(Cite as: 2009 WL 2952225 (D.Conn.))**

FN30. In *Lauritzen,* the Supreme Court placed special emphasis on the law of the flag, noting that the law of the flag "must prevail unless some heavy counterweight appears." *Lauritzen v. Larsen,* 345 U.S. 571, 586 (1953). More recently, however, the Second Circuit has instructed that, "[g]enerally, we look to the law of the ship's flag [as the determinative factor] only if the shipowner is a party." *Rationis Enterprises, Inc. of Panama,* 426 F.3d at 586. In the present case, while the helicopter's owner, Copterline, is currently not a party, defendants may bring counterclaims against Copterline after a ruling on this motion. HRT sought affirmative relief through an indemnity counterclaim against plaintiffs Frederiksson and Peurala which was voluntarily dismissed without prejudice. *See* Doc.37, 145.

All of the public interest factors the Court considered, "(1) the administrative difficulties; (2) holding the trial in the view and reach of the citizens whom the trial might affect; (3) local interest in having localized controversies decided at home; and (4) applicable law" are either neutral or weigh in favor of resolving the dispute in Finland. With this finding, the Court has concluded its consideration of the third step of the *forum non conveniens* analysis, examining the private and public interests at stake in this litigation. *See Iragorri,* 274 F.3d 65. For the reasons discussed in the previous sections, these private and public interests weigh decisively in favor of adjudicating the case in the courts of Finland. *See In re Air Crash Over the Taiwan Strait on May 25, 2002,* 331 F.Supp.2d 1176, 1209-10 (C.D.Cal.2004) ( "Although plaintiffs present no argument regarding the *Lauritzen* factors, a brief preliminary review indicates that Taiwan law would likely govern the action if admiralty choice of law rules were used. The accident occurred in Taiwan's territorial waters; the 'law of the flag' indicates that Taiwanese law should apply, as China Airlines is a Taiwanese carrier and Flight CI611 involved an aircraft registered in Taiwan; the vast majority of those killed in the accident were citizens and residents of Taiwan; China Airlines' allegiance and base of operations are located in Taiwan; the majority of the decedents purchased their tickets in Taiwan; and Taiwan is an accessible forum."); *Satz v. McDonnell Douglass Corp.,* 244 F.3d 1279 (11th

Cir.2001) (agreeing that foreign law applied where all the deceased passengers were foreign citizens, the airline at issue was foreign owned and did not operate in the United States, and the accident occurred overseas).

**\*18** Thus, the Court finds that: (1) plaintiffs' choice of forum deserves some deference, but not as much deference as if plaintiffs were citizens of the United States; (2) Finland is an adequate alternative forum; and (3) the private and public factors favor adjudicating this dispute in Finland. As a result, after giving full consideration to the three-step process set out by the Second Circuit in *Iragorri,* the court finds that the balance is strongly in favor of the defendants' motion. *See Gulf Oil Corp.,* 330 U.S. at 508. The reduced deference given to the plaintiffs' choice of the District of Connecticut is not enough to outweigh the significant factors that favor the courts of Finland. *See Iragorri,* 274 F.3d at 74-75. Accordingly, Defendants' Motions to Dismiss for *forum non conveniens* is granted.

*CONCLUSION*

For the foregoing reasons, defendant H.R. Textron's Motion to Dismiss **[Doc. # 105]** is **GRANTED,** provided that: (1) defendants consent to jurisdiction and to accept process in any suit plaintiffs file in Finland on claims that arise out of the instant suit; (2) defendants waive any statute of limitations defense(s) that may be available to them in Finland that arose on or after the date of this lawsuit, so long as litigation is pursued in Finland within 120 days after dismissal of this civil action; (3) defendants make available for discovery and for trial, at their own expense, any documents, or witnesses, including retired employees, within their control that are needed for a fair adjudication of the plaintiffs' claims; (4) defendants will not act to prevent plaintiffs from returning to this court if the Finnish courts decline to accept jurisdiction of this action, if it is filed here within thirty days of the Finnish court's ruling; and (5) defendants agree to pay any judgment awarded by the Finnish courts.

Any objections to this recommended ruling must be filed with the Clerk of the Court within ten (10) days of the receipt of this order. Failure to object within ten (10) days may preclude appellate review. *See* 28 U.S.C. § 636(b)(1); Rules 72, 6(a) and 6(e) of the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2952225 (D.Conn.)
**(Cite as: 2009 WL 2952225 (D.Conn.))**

Federal Rules of Civil Procedure; Rule 72.2 of the Local Rules for United States Magistrates; *Small v. Secretary of H.H.S.,* 892 F.2d 15 (2d Cir.1989)(per curiam); *F.D.I.C. v. Hillcrest Assoc.,* 66 F.3d 566, 569 (2d Cir.1995).

D.Conn.,2009.
Fredriksson v. Sikorsky Aircraft Corp., Inc.
Slip Copy, 2009 WL 2952225 (D.Conn.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 3178077 (D.Colo.), 2004 A.M.C. 2992
**(Cite as: 2004 WL 3178077 (D.Colo.))**

c

United States District Court,
D. Colorado.
ING GROEP, NV, Plaintiff(s),
v.
David STEGALL, Defendant(s).
**No. CIVA03-PC-1621(BNB).**

Sept. 28, 2004.

Steven E. Goldman, Goldman & Hellman, Ft. Lauderdale, FL, Theodore Albert Ulrich, Popham, Haik, Schnobrich, Denver, CO, for Plaintiff.

David Stegall, Louisville, CO, pro se.

MEMORANDUM OPINION AND ORDER

COAN, Magistrate J.

**\*1** This is a declaratory judgment action involving a marine insurance contract. The matter before the court is Plaintiff's Motion to Deny Defendant's Request for Jury Trial [filed February 23, 2004]. The parties consented to disposition of this action by a United States Magistrate Judge under 28 U.S.C. § 636(c) on March 23, 2004. The motion is fully briefed and I have determined that oral argument would not aid the resolution of this matter.

I.

Plaintiff ING Groep, NV ("ING"), a corporation organized and existing under the laws of the United Kingdom, filed a complaint for declaratory judgment in the United States District Court for the District of Oregon on April 25, 2002 seeking a declaration of non liability for certain alleged losses suffered by defendant Stegall, the holder of a marine insurance policy issued by ING, when Stegall's sailboat, "The DreamChaser," partially sank and sustained extensive hull damage. The sailboat was subsequently declared a constructive total loss. ING denied Stegall's claim for payment in the amount of $135,000 based on its determination that Stegall failed to exercise due diligence to maintain the vessel in seaworthy condition, as required by the terms of the policy.

Defendant, who is *pro se*, filed his Answer on May 7, 2003, denying that the vessel was unseaworthy at the time of the incident. The action was transferred to the United States District Court for the District of Colorado on August 6, 2003, pursuant to 28 U.S.C. § 1404(a), because the defendant and some of the witnesses reside in Colorado.

Defendant filed a "Counterclaim" in this court on September 16, 2003 asking that judgment be entered in his favor in the policy amount of $135,000 because the damage to the DreamChaser was not related to her seaworthiness.[FN1] Defendant requested a jury trial in the Scheduling Order filed on September 25, 2003, and in the Preliminary Pretrial Order filed on February 23, 2004.[FN2] *See* Scheduling Order, at 6; Preliminary Pretrial Order, at 6. Defendant later clarified that he is requesting a jury trial for his counterclaim only. *See* defendant's response to Plaintiff's Motion to Deny Defendant's Request for Jury Trial, filed March 16, 2004.

> FN1. I liberally construe defendant's compulsory counterclaim(s) as sounding in contract, and possibly, tort. *See Haines v. Kerner,* 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972)(holding that *pro se* pleadings are held to less stringent standards than those drafted by lawyers).

> FN2. I note that defendant filed his counterclaim and jury trial demand more than four months after he filed his Answer. Plaintiff does not move to strike the counterclaim and jury demand as untimely but does argue that the court should not allow defendant to amend his Answer to include the omitted counterclaim because the requirements of Fed.R.Civ.P. 13(f) have not been satisfied. Rule 13(f) provides that a defendant may be allowed to amend his Answer to include an omitted counterclaim when the omission was due to "oversight, inadvertence, or excusable neglect" or "when justice requires." The issue of the timeliness of the counterclaim and jury demand has not been fully briefed and will be decided at a later date.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 3178077 (D.Colo.), 2004 A.M.C. 2992
**(Cite as: 2004 WL 3178077 (D.Colo.))**

For purposes of this Memorandum Opinion and Order only, I assume, without deciding, that defendant has asserted a timely counterclaim and jury demand.

Plaintiff asks the court to deny defendant's request for a jury trial on his counterclaim(s) because plaintiff's Fed.R.Civ.P. 9(h) election to proceed under the court's admiralty jurisdiction requires that the entire action be tried to the court.

## II.

The federal district courts have original jurisdiction of "[a]ny civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled ." 28 U.S.C. § 1333(1). A suit seeking a declaratory judgment as to the rights and responsibilities of parties to a marine insurance contract is within the federal district court's admiralty jurisdiction. *See New England Mutual Marine Ins. Co. v. Dunham,* 11 Wall. 1, 78 U.S. 1, 20 L.Ed. 90 (1870); *Windsor Mount Joy Mut. Ins. Co. v. Giragosian,* 57 F.3d 50, 54 (1st Cir.1995); *New Hampshire Ins. Co. v. Martech U.S.A., Inc.,* 993 F.2d 1195, 1198 (5th Cir.1993); *Continental Cas. Co. v. Anderson Excavating & Wrecking Co.,* 189 F.3d 512, 517 (7th Cir.1999). However, such suits may also be pursued in an ordinary civil action pursuant to the "savings to suitors" provision. *See Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd.,* 369 U.S. 355, 359, 82 S.Ct. 780, 7 L.Ed.2d 798 (1962).

**\*2** Fed.R.Civ.P. 9(h) sets forth the procedure for a party to invoke the federal court's admiralty jurisdiction when a complaint can be characterized as an admiralty action or a general civil suit. *See* 5A Wright & Miller, *Federal Practice and Procedure: Civil 3d* § 1313, at 367-68 (2004). Rule 9(h) states: "A pleading or count setting forth a claim for relief within the admiralty and maritime jurisdiction that is also within the jurisdiction of the district court on some other ground may contain a statement identifying the claim as an admiralty or maritime claim for the purposes of Rules 14(c), 38(e), 82 and the Supplemental Rules for Certain Admiralty and Maritime Claims."

Plaintiff alleges that this case "is an admiralty and maritime cause within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure, and this Court

has jurisdiction pursuant to Title 28 of the United States Code, sec. 1333." (Compl., ¶ 3) The plaintiff's statement that the action is one in admiralty within the meaning of Rule 9(h) is sufficient to invoke the court's admiralty jurisdiction. *See Bodden v. Osgood,* 879 F.2d 184, 186 (5th Cir.1989); *Wingerter v. Chester Quarry Co.,* 185 F.3d 657, 666 (7th Cir.1998)(citing cases).

Generally, admiralty claims are decided in a non-jury trial. *See Natasha, Inc. v. Evita Marine Charters, Inc.,* 763 F.2d 468, 470 (1st Cir.1985)(recognizing that there is "no right to a jury trial in admiralty"); *Bodden,* 879 F.2d at 186 (recognizing that "a plaintiff in an admiralty action is not entitled to a jury trial"); *Wingerter,* 185 F.3d at 667 ("[A] plaintiff that invokes admiralty jurisdiction is not entitled to a jury trial"); *Koch Fuels, Inc. v. Cargo of 13,000 Barrels of No.2 Oil,* 704 F.2d 1038, 1041 (8th Cir.1983)(recognizing that the plaintiff's election to proceed in admiralty under Rule 9(h) generally precludes a jury trial); *Ghotra v. Bandila Shipping, Inc.,* 113 F.3d 1050, 1054 (9th Cir.1997)(stating that "there is no right to jury trial if general admiralty jurisdiction is invoked"); *see, also,* Fed.R.Civ.P. 9(h), Advisory Committee Notes (stating that there is no right to jury trial in admiralty suits except as provided by statute); Fed.R.Civ.P. 38(e)( providing that the Federal Rules of Civil Procedure shall not be construed to create a right to a jury trial in an admiralty or maritime case within the meaning of Fed.R.Civ.P. 9(h)).

When the plaintiff's admiralty claim triggers a compulsory legal counterclaim and jury demand, the federal courts are divided about whether the defendant is entitled to a jury trial on his counterclaim.

Although the Tenth Circuit has not addressed the question, the majority of courts to do so have held that the plaintiff's Rule 9(h) election to proceed under admiralty law governs the entire proceeding and precludes the defendant's right to a jury trial which may otherwise exist. *See Harrison v. Flota Mercante Grancolombiana, S.A.,* 577 F.2d 968, 986-88 (5th Cir.1978); *Royal Ins. Co. of America v. Hansen,* 125 F.R.D. 5, 9 (D.Mass.1988); *Norwalk Cove Marina, Inc. v. S/V/ Odysseus,* 100 F.Supp.2d 113, 114 (D.Conn.2000); *Windsor Mount Joy Mutual Ins. Co. v. Johnson,* 264 F.Supp.2d 158, 162 (D.N.J.2003); *Matter of Armatur,* 710 F.Supp. 404, 405 n. 4 (D.P.R.1989); *St. Paul Fire and Marine Ins. Co. v.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 3178077 (D.Colo.), 2004 A.M.C. 2992
**(Cite as: 2004 WL 3178077 (D.Colo.))**

*Holiday Fair, Inc.,* 1996 WL 148350 at *2 (S.D.N.Y.1996); *Jefferson Ins. Co. of New York,* 2001 WL 484040 at *2 (D.Maine 2001); *Underwriters Subscribing to Certif. of Ins. No. 98B1/800 ... v. On the Loose Travel, Inc.,* 1999 WL 694212 at *1 (S.D.Fla.1999). These courts reason that allowing the defendant to defeat the plaintiff's right to designate the action as an admiralty case by demanding a jury trial would undermine the purposes of Rule 9(h). *Id.*

**\*3** Other courts have concluded that a defendant's Seventh Amendment right to a jury trial on his legal counterclaim must be preserved when a non maritime ground of federal jurisdiction exists. *See Wilmington Trust v. United States Dist. Ct. for the Dist. of Hawaii,* 934 F.2d 1026, 1031-32 (9th Cir.1991); *Sphere Drake Ins. PLC v. J. Shree Corp.,* 184 F.R.D. 258, 260-61 (S.D.N.Y.1999); *Reliance Nat'l Ins. Co. (Europe) Ltd. v. Hanover,* 222 F.Supp.2d 110, 115-116 (D.Mass.2002); *Progressive Northern Ins. Co. v. Bachman,* 314 F.Supp.2d 820, 833 (W.D.Wis.2004); *Canal Barge Co. v. Commonwealth Edison Co.,* 2002 WL 206054 at ----3-4 (N.D.Ill.2002).

Although it is a close and difficult question, I am persuaded by the majority view. If plaintiff had not elected to proceed under the court's admiralty jurisdiction, the court would have jurisdiction over the plaintiff's claims and the counterclaim(s) under the diversity jurisdiction statute, 28 U.S.C. § 1332, and either party would have a right to a jury trial under the Seventh Amendment. There is no constitutional right to a jury trial in a maritime action, however. *See Fitzgerald v. U.S. Lines, Inc.,* 374 U.S. 16, 20, 83 S.Ct. 1646, 10 L.Ed.2d 720 (1963) (recognizing that the Constitution neither requires nor forbids a jury trial in admiralty cases); *see, also, Harrison,* 577 F.2d at 986 ("[I]n the suit in admiralty there is no right to jury trial except as provided by statute.")

Moreover, resolution of the plaintiff's claims and the defendant's counterclaim(s) hinges on the determination of ING's obligations, if any, with regard to the marine insurance contract in question. The plaintiff's right to have its claims decided in a non-jury trial will be lost if the defendant is granted a jury trial on his closely intertwined counterclaim(s) because the entire case will have to be tried to the jury, *see Wilmington Trust,* 934 F.2d at 1032; or, if the claims and counterclaim(s) are severed, the common operative factual issues will be tried to the jury first [FN3] which will

effectively dispose of all or part of the plaintiff's action. *See, e.g., Royal Ins. Co. of America,* 125 F.R.D. at 9 (denying defendant a jury trial on his legal counterclaim asserted in action designated by plaintiff as one in admiralty under Rule 9(h) because the claims and counterclaims arose from a common set of facts and were based on the same maritime insurance contract); *Windsor Mount Joy Mut. Ins. Co.,* 264 F.Supp.2d at 162-63 (same); *Jefferson Ins. Co. of New York,* 2001 WL 484040 at *2 (same).

> FN3. Generally, when a case involves both a jury trial and a bench trial, any material factual issues which are central to both must be first tried to the jury so that the litigant's Seventh Amendment rights are not foreclosed. *See Dairy Queen, Inc. v. Wood,* 369 U.S. 469, 472-73, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962).

The circumstances presented in this case are thus distinguishable from the facts in *Koch Fuels, Inc.* There, the plaintiff initiated an *in rem* action seeking a declaration of ownership and possession of a cargo of oil and invoked the court's admiralty jurisdiction pursuant to Rule 9(h). *Koch Fuels, Inc.,* 704 F.2d at 1039. The defendant counterclaimed for breach of contract and requested a jury trial. *Id.* The district court severed the counterclaim and granted defendant a jury trial. *Id.* On appeal, the plaintiff claimed that the trial court erred in granting a jury trial on the counterclaim after plaintiff designated its claim as one in admiralty. *Id.* The Eighth Circuit affirmed the district court's decision, concluding that a trial court must preserve a litigant's Seventh Amendment right to a jury trial whenever possible, and noting that neither the Constitution, nor federal statute or federal rule of procedure forbids jury trials in admiralty cases. *Id.* at 1041-42. The Eighth Circuit held that severance of the claim and counterclaim was appropriate under Fed.R.Civ.P. 42(b) because the plaintiff's action *in rem* was independent of the defendant's breach of contract counterclaim; thus, both parties could prevail on their respective claims before different triers of fact "without prejudicing the other party or arriving at inconsistent results." *Id.* at 1042. Here, defendant could not prevail on his legal counterclaim(s) without prejudicing the plaintiff because the claims and counterclaims are based on the same marine insurance policy and arise from a common set of facts. Thus, defendant is not entitled to a jury trial on

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 3178077 (D.Colo.), 2004 A.M.C. 2992
**(Cite as: 2004 WL 3178077 (D.Colo.))**

his counterclaim(s).

**\*4** The Supreme Court's decision in *Fitzgerald* does not compel a different result. In that case, the plaintiff seaman sued his employer for negligence under the Jones Act, 46 App. U.S.C.A. § 688, and for failure to provide maintenance and cure after he injured his back while working on his employer's ship. *Fitzgerald,* 374 U.S. at 17. The trial court granted the plaintiff a jury trial for the Jones Act claim, but held a bench trial on the maintenance and cure claim. *Id.* The Supreme Court held that when claims under the Jones Act and for maintenance and cure arise from one set of facts, the plaintiff is entitled to have both claims tried to the jury in the interests of fairness and judicial economy. *Id.* at 18-21. Here, the plaintiff has invoked the court's admiralty jurisdiction as to all claims and I will not nullify that election by granting the defendant a jury trial on his closely intertwined counterclaim(s).

I respectfully disagree with the Ninth Circuit's decision in *Wilmington Trust.* In that case, the Ninth Circuit held that the union was entitled to a jury trial on its legal counterclaims which were properly before the federal district court under the general civil jurisdictional statutes, notwithstanding plaintiff's Rule 9(h) election to proceed under the court's admiralty jurisdiction for its *in rem* claim to foreclose a first preferred ship mortgage against the vessel and related *in personam* claim against the vessel's owner. *Wilmington Trust,* 934 F.2d at 1032. The Ninth Circuit concluded that the Union's Seventh Amendment right to a jury trial must be given effect over plaintiff's "preference" for a bench trial when the parties' interests conflicted, citing *Beacon Theatres, Inc. v. Westover,* 359 U.S. 500, 510-11, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959) and Fed.R.Civ.P. 38(a). *Id.* at 1031-32.

In *Beacon Theatres, Inc.,* 359 U.S. at 502-03, the plaintiff sued for declaratory and injunctive relief, claiming non liability to the defendant under the Sherman Antitrust Act ("Act"). The defendant counterclaimed for treble damages under the Act and demanded a jury trial. *Id.* at 503. The district court held a bench trial on the plaintiff's equitable claims before trying the defendant's counterclaim to the jury. *Id.* The claims and counterclaim were based on some common factual issues. *Id.* at 503-04. The Supreme Court found that the district court's decision deprived the defendant of his constitutional right to a full jury

trial on his counterclaim. *Id.* at 508. The Court held that where legal and equitable causes are asserted in the same action, a federal district court must endeavor to preserve a litigant's constitutional right to a jury trial. *Id.* at 510-11 (stating that the "right to a jury trial of legal issues [cannot] be lost through prior determination of equitable claims."). *Beacon Theatres* was not a maritime case involving a Rule 9(h) election and is therefore factually distinguishable from the present action. As discussed previously, the Supreme Court has recognized that there is no constitutional right to a jury trial in an admiralty case. *Fitzgerald,* 374 U.S. at 20.

**\*5** Further, although Fed.R.Civ.P. 38(a) provides that the Seventh Amendment right to a jury trial "shall be preserved inviolate," the Advisory Committee Notes to Fed.R.Civ.P. 9(h) support my determination that preclusion of a jury trial on the defendant's legal counterclaim(s) is an intended procedural consequence of the plaintiff's invocation of the court's maritime jurisdiction. *See* Fed.R.Civ.P. 9(h), Advisory Committee Notes (stating "[o]ne of the important procedural consequences [of Rule 9(h) ] is that in the civil action either party may demand a jury trial, while in the suit in admiralty there is no right to jury trial except as provided by statute.") Accordingly, it is

HEREBY ORDERED that Plaintiff's Motion to Deny Defendant's Request for Jury Trial [filed February 23, 2004] is GRANTED. This admiralty action will be tried in its entirety, if necessary, in a non-jury trial.

D.Colo.,2004.
ING Group v. Stegall
Not Reported in F.Supp.2d, 2004 WL 3178077 (D.Colo.), 2004 A.M.C. 2992

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1974392 (S.D.N.Y.)
**(Cite as: 2009 WL 1974392 (S.D.N.Y.))**

**C**Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
INTELLECTUAL CAPITAL PARTNER, Plaintiff,
v.
INSTITUTIONAL CREDIT PARTNERS LLC, Defendant.
**No. 08 Civ. 10580(DC).**

July 8, 2009.

Crosby & Higgins LLP, by: Todd A. Higgins, Esq., Carolyn A. Klos, Esq., New York, NY, for Plaintiff.

Dewey & Leboeuf LLP, by: Christopher J. Clark, Esq., Angela M. Paplaskaris, Esq., New York, NY, for Defendant.

### *MEMORANDUM DECISION*

CHIN, District Judge.

**\*1** In this breach of contract case, defendant Institutional Credit Partners LLC ("ICP") moves to dismiss the complaint of plaintiff Intellectual Capital Partner ("IntelCap") pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons set forth below, ICP's motion is granted in part and denied in part.

### *BACKGROUND*

**A.** *The Facts*

For the purposes of this motion to dismiss, the facts in the complaint are assumed to be true and are construed in the light most favorable to IntelCap.

**1.** *The Parties*

IntelCap is a foreign company with its principal place of business in Luxembourg. (Compl.¶ 9). It was started in 2004 by its managing partner and sole owner, Yves Soyfer ("Soyfer"). (*Id.* ¶ 15). Its objective is "to originate and help in the structuring process of credit transactions in emerging markets," with

a "primary focus" on Mexico and Latin America. (*Id.*).

ICP is a domestic limited liability corporation. In response to the Court's inquiry, the parties have advised the Court that no member of ICP is a foreign entity or citizen. (Order Feb. 23, 2009). The Court thus has subject matter jurisdiction under 28 U.S.C. § 1332.

**2.** *The Contract*

In January 2007, IntelCap and ICP entered into an agreement (the "Agreement"). (*See id.* Ex. A (hereafter "Agreement")). IntelCap was engaged to "assist ICP with business development ... in the origination of assets on which structured financing techniques could be applied." (Compl. ¶ 22; Agreement ¶ 1). In return, ICP was to pay IntelCap an annual consulting fee, to be paid monthly. (Agreement ¶ 2). Paragraph 2(b) of the Agreement provided for a "fee sharing arrangement ... for each deal brought to [ICP] by [IntelCap]." (*Id.*¶ 2(b)). By its terms, paragraph 2(b) survived termination of the Agreement. (*Id.* ¶ 11).

The Agreement was to continue until December 31, 2007. (*Id.* ¶ 3). The term and termination provision of the Agreement provided that:

[t]his Agreement shall continue until December 31, 2007, at which point it may be extended for an additional year upon approval by both [ICP] and [IntelCap] (and may be continued for each subsequent year at each December 31st, until one or both of the parties terminate this Agreement pursuant to this Section 3 (the "Term"). This Agreement may be terminated by [ICP] or [IntelCap] at the end of any calendar year by delivering written notice to the other party prior to December 31st of such year.

(*Id.*).

New York State law governs the Agreement. (*Id.* ¶ 13)

**3.** *Modification of the Contract*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1974392 (S.D.N.Y.)
**(Cite as: 2009 WL 1974392 (S.D.N.Y.))**

In April 2007, the parties agreed to modify the Agreement and insert an additional section regarding the non-solicitation of each party's clients.

> While [IntelCap] is performing services for [ICP] in accordance with this Agreement and for a period of three years after any termination of this Agreement, both [IntelCap] and [ICP] will not solicit business or perform work for the clients of the other party (i.e. [ICP] will not solicit business or perform work for [IntelCap's] clients and [IntelCap] will not solicit business or perform work for [ICP's] clients).... The list of [IntelCap's] clients is presented in Exhibit B of this Agreement.

**\*2** (Agreement ¶ 6).

Exhibit B of the Agreement [FN1] listed IntelCap's exclusive clients and included seven clients. ICP was to refrain from soliciting business from or performing any work for these seven clients during the term of the Agreement and for three years following its termination, unless such work was performed with IntelCap's consent in accordance with the fee-sharing provision. (Compl.¶ 30).

> FN1. The Agreement cites to "Exhibit B"; the document attached to the Agreement, however, is titled "Appendix B." The Court assumes that Exhibit B cited in paragraph 6 of the Agreement refers to Appendix B.

### 3. *Performance of the Contract*

IntelCap performed its obligations under the Agreement by *inter alia* providing ICP with insight on the Mexican market and access to IntelCap's exclusive contacts. (*Id.* ¶ 24). In particular, IntelCap provided ICP with information regarding contracts for Mexico's state-owned petroleum company Petroleos Mexicanos ("PEMEX"). (*Id.*). It also connected ICP with PEMEX contractors, including one company called Blue Marine Technology, S.A. de C.V. ("Blue Marine"), a PEMEX shipping contractor "with substantial financing needs." (*Id.* ¶¶ 3, 24). Blue Marine was included on the list of exclusive IntelCap clients in Exhibit B of the Agreement. (Agreement Ex. B).

IntelCap and ICP began working together on Blue Marine's financing needs, and in March 2007, ICP and Blue Marine entered into an engagement letter that expressly stated that ICP and Blue Marine had been introduced to each other by IntelCap. (*Id.* ¶ 25). IntelCap and ICP worked with Blue Marine "throughout the rest of 2007" to develop structured financing options on a wide variety of potential PEMEX transactions. (*Id.* ¶¶ 25-27). One such transaction involved a "five product tanker tender" that would satisfy the requirements of an anticipated PEMEX tender. (*Id.* ¶ 26-27).

### 4. *Soyfer's Agreement With Muzuho International*

In August 2007, Soyfer received and accepted an offer to create and co-manage a new principal investment group with Mizuho International ("Mizuho"). (*Id.* ¶ 32). On August 8, 2007, Soyfer informed ICP of this development "and suggested that he would not be able to continue with ICP in the same capacity in the future, but that he nonetheless looked forward to continuing the relationship." (*Id.*). Subsequently, ICP discontinued paying IntelCap a monthly consulting fee. (*Id.* ¶ 33).

Soyfer continued to "periodically confer and discuss with ICP potential financing opportunities that ICP and Mizuho could work together on, including with respect to PEMEX contracts." (*Id.* ¶ 34). ICP suggested that it would be willing to partner with Mizuho if IntelCap released ICP from its obligations under the Agreement; IntelCap, however, declined to do so. (*Id.*). Neither party took any steps to extend the Agreement at the end of 2007. (*Id.*).

### 5. *ICP's Transaction With Blue Marine*

On October 14, 2008, media reports indicated that ICP had successfully structured and arranged a $121 million financing package for Blue Marine for the acquisition of two ships to be leased to PEMEX, with an option to purchase. The deal was part of the same "five product tanker tender" for PEMEX that IntelCap and ICP had been working on for the PEMEX tender. (*Id.* ¶¶ 37, 38).

**\*3** In November 2008, IntelCap through its attorneys sent ICP two letters requesting documentation for ICP's transaction with Blue Marine so that it could calculate its share of the fees owed to IntelCap pursuant to the Agreement's fee-sharing provision. (*Id.* ¶¶

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1974392 (S.D.N.Y.)
**(Cite as: 2009 WL 1974392 (S.D.N.Y.))**

39, 40). The initial letter also reminded ICP of its continuing obligations under the non-solicitation clause of the Agreement prohibiting ICP from soliciting or doing business for Blue Marine or any of IntelCap's exclusive clients listed in Exhibit B of the Agreement, except in accordance with the fee-sharing provision of the Agreement. (*Id.* ¶ 39). ICP refused to provide documentation about the Blue Marine transaction or remit payment to IntelCap. (*Id.* ¶ 40).

### B. *Procedural History*

IntelCap filed the complaint in this action on December 5, 2008. Count one alleges breach of contract; count two seeks an accounting; count three claims unjust enrichment; count four seeks quantum meruit; counts five and six seek a declaratory judgment on the scope and continuing enforceability of the fee-sharing provision at paragraph 2(b) of the Agreement and the non-solicitation provision at paragraph 6 of the Agreement, respectively. ICP moved to dismiss on March 6, 2009.

### *DISCUSSION*

### A. *Motion to Dismiss Standard*

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1949 (2009) (citing *Bell Atlantic v. Twombly,* 550 U.S. 544, 570 (2007)). The Supreme Court in *Iqbal* set out a "two-pronged" approach for courts considering a motion to dismiss. *Id.* at 1950.

First, the court accepts plaintiff's factual allegations as true and draws all reasonable inferences in its favor. *See id.; see also Vietnam Ass'n for Victims of Agent Orange v. Dow Chemical Co.,* 517 F.3d 104, 115 (2d Cir.2008). The court considers only the factual allegations in the complaint and "any documents that are either incorporated into the complaint by reference or attached to the complaint as exhibits." *Blue Tree Hotels Inv. (Can.), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.,* 369 F.3d 212, 217 (2d Cir.2004). Legal conclusions must be supported by factual allegations. *Iqbal,* 129 S.Ct. at 1949. Pleadings that are "no more than conclusions are not entitled to the assumption of truth." *Id.* at 1950.

Second, the court determines whether the "well-pleaded factual allegations ... plausibly give rise to an entitlement to relief." *Iqbal,* 129 S.Ct. at 1950. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly,* 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly,* 550 U.S. at 557). Determining plausibility is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

### B. *Breach of Contract Claim*

\*4 ICP argues that IntelCap has failed to properly plead a breach of contract claim because it failed to allege adequate performance under the Agreement and because its repudiation of the Agreement was a material breach relieving ICP of its contractual obligations.

### 1. *Applicable Law*

"The elements of a breach of contract claim under New York law are as follows: (1) the existence of an agreement; (2) adequate performance of the contract by the plaintiff; (3) breach of contract by the defendant; and (4) damages." *24/7 Records, Inc. v. Sony Music Entm't, Inc.,* 429 F.3d 39, 42 (2d Cir.2005); *accord O.D.F. Optronics Ltd. v. Remington Arms Co.,* No. 08 Civ. 4746(DLC), 2008 WL 4410130, at \*8 (S.D.N.Y. Sept. 26, 2008) (same).

A repudiation of a contract can be either "a statement by the obligor to the obligee indicating that the obligor will commit a breach that would itself give the obligee a claim for damages for total breach," or "a voluntary affirmative act which renders the obligor unable or apparently unable to perform without such a breach ." *Mattis v. Zheng,* No. 05 Civ. 2924(DC), 2006 WL 3155843, at \*4 (S.D.N.Y.2006) (citing Restatement (Second) of Contracts § 250 (hereafter "Restatement"); *see Norcon Power Partners, L.P. v. Niagra Mohawk Power Corp.,* 92 N.Y.2d 458, 463 (1998)). "When a party repudiates contractual duties prior to the time designated for performance and before all of the consideration has been fulfilled, the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1974392 (S.D.N.Y.)
**(Cite as: 2009 WL 1974392 (S.D.N.Y.))**

repudiation entitles the nonrepudiating party to claim damages for total breach." *Norcon Power Partners,* 92 N.Y.2d at 462-63 (quotations omitted); *accord* Restatement § 243. Total breach "not only renders the breacher liable in damages but it also excuses the obligee from the duty of further performance." *Melodies, Inc. v. Mirabile,* 179 N.Y.S.2d 991 (3d Dep't 1958); *accord* Restatement § 253.

### 2. Application

ICP's motion is denied as to IntelCap's breach of contract claim. At this point, ICP does not dispute that there was an agreement between IntelCap and ICP. (Compl.¶¶ 2, 21-23). Nor does it dispute that IntelCap properly pleads breach and damages by alleging that ICP failed to adhere to the fee-sharing provision of the Agreement as to the Blue Marine transaction that was facilitated by IntelCap and closed by ICP in October 2008. (*Id.* ¶¶ 44-45). The issues are (1) whether IntelCap has properly alleged adequate performance of its obligations under the Agreement, and (2) whether IntelCap repudiated the Agreement, thereby excusing ICP from the duty of further performance.

IntelCap has properly alleged adequate performance of its obligations under the Agreement to maintain its contract claim. Its pleadings assert more than mere legal conclusions and instead assert factual allegations sufficient to establish IntelCap's adequate performance. *See Iqbal,* 129 S.Ct. at 1950. IntelCap alleges that it "provid[ed] ICP with insight on the Mexican market, access to IntelCap's exclusive contacts, and information regarding PEMEX contracts." (*Id.* ¶ 24). It also alleges it "connect[ed] ICP with IntelCap's clients and PEMEX contracts, including Blue Marine," which had "immediate needs for structured financing models." (*Id.*). This connection to Blue Marine led to an engagement letter being signed by ICP and Blue Marine that expressly stated that ICP and Blue Marine had been introduced by IntelCap. (*Id.* ¶ 26).

**\*5** ICP argues IntelCap failed to allege performance after August 2007, when Soyfer reached an agreement with Mizuho and informed ICP that "he would not be able to continue with ICP in the same capacity in the future." (*Id.* ¶ 32). The Agreement was to run until December 2007. (Agreement ¶ 3). ICP's argument, however, is contradicted by IntelCap's claim

that it worked with ICP to meet Blue Marine's financing needs for the PEMEX tender, and that this work-as well as work on "a number of other transactions"-continued "throughout the rest of 2007." (Compl.¶ 27).

ICP also claims that because of Soyfer's agreement with Mizuho, IntelCap was not, as a matter of law, "ready, willing or able to do all that the contract required" from August to December 2007. (Def.'s Br. at 7 (citing *Roberts v. Karimi,* 251 F.3d 404, 407 (2d Cir.2001)). ICP's argument is unavailing. The complaint specifies that Soyfer-not IntelCap-made an agreement with Mizuho and that Soyfer-not IntelCap-"suggested that he would not be able to continue with ICP in the same capacity in the future, but that he nonetheless looked forward to continuing the relationship." (*Id.* ¶ 32). This is not the refusal or failure to perform by IntelCap that ICP claims it to be. There is no indication that IntelCap was unwilling or unable to perform its obligations under the Agreement following Soyfer's deal with Mizuho. Indeed, IntelCap continued to work with ICP and Blue Marine "throughout the rest of 2007." Additionally, there is no indication that the terms of the Agreement restricted Soyfer from working with Mizuho or were otherwise exclusive. Accordingly, ICP's argument that the Mizuho agreement established IntelCap's failure to perform as a matter of law is rejected.

For the same reasons, ICP's argument that the Mizuho agreement, and Soyfer's remarks to ICP, constituted a repudiation is also rejected, at least as this early stage of the litigation. ICP's reliance on *Computer Possibilities Unlimited, Inc. v. Mobil Oil Corp.,* 301 A.D.2d 70, 77 (1st Dep't 2002), is misplaced. Unlike in *Computer Possibilities Unlimited,* it is not clear from the complaint that Soyfer's agreement with Mizuho prevented IntelCap from fulfilling its obligations under the Agreement. Certainly, nothing in the complaint indicates that Soyfer or IntelCap gave Mizuho the power to determine "whether [IntelCap's] contractual obligations [would] be fulfilled." *Computer Possibilities Unlimited,* 301 A.D.2d at 78-79. Accordingly, ICP's motion to dismiss IntelCap's breach of contract claim is denied.

### C. Declaratory Relief

In counts five and six of the complaint, IntelCap seeks a declaratory judgment concerning the "scope

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1974392 (S.D.N.Y.)
**(Cite as: 2009 WL 1974392 (S.D.N.Y.))**

and continuing enforceability" of the fee-sharing and non-solicitation provisions of the Agreement, respectively. (*See* Complaint ¶¶ 58-65; Agreement ¶¶ 2(b), 6). ICP moves to dismiss IntelCap's claims for declaratory relief arguing that any resolution of the breach of contract claim will necessarily resolve all issues raised by IntelCap's claims for a declaratory judgment. (Def.'s Br. at 12; Def.'s Reply at 5-6).

### 1. *Applicable Law*

\*6 "Declaratory relief is intended to settle legal rights and remove uncertainty and insecurity from legal relationships without awaiting a violation of the rights or a disturbance of the relationships." *Nat'l Union Fire Ins. Co. of Pittsburgh v. Int'l Wire Group, Inc.,* No. 02 Civ. 10338(SAS), 2003 WL 21277114, at \*4 (S.D.N.Y. June 2, 2003) (citations and internal quotation quotes omitted). There must be a "substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.,* 261 F.Supp.2d 293, 295 (S.D.N.Y.2003).

It is within the broad discretion of the trial court whether to exercise declaratory jurisdiction. *Dow Jones & Co. v. Harrods Ltd .,* 346 F.3d 357, 359 (2d Cir.2003). Five factors are considered: "(i) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; (ii) whether a judgment would finalize the controversy and offer relief from uncertainty; (iii) whether the proposed remedy is being used merely for 'procedural fencing' or a 'race to res judicata'; (iv) whether the use of a declaratory judgment would increase friction between sovereign legal systems or improperly encroach on the domain of a state or foreign court; and (v) whether there is a better or more effective remedy." *New York Times Co. v. Gonzales,* 459 F.3d 160, 167 (2d Cir.2006) (citing *Dow Jones & Co.,* 346 F.3d at 359-60) (internal quotation marks omitted).

### 2. *Application*

ICP's motion is granted as to count five of the complaint, IntelCap's claim for a declaratory judgment on paragraph 2(b) of the Agreement (the fee-sharing provision). ICP's motion to dismiss count six, IntelCap's request for declaratory relief on paragraph 6 of the Agreement (the non-solicitation provision) is de-

nied.

#### a. *Fee-sharing Provision*

The factors outlined in *Gonzales* weigh against Intel-Cap's claim for a declaratory judgment on paragraph 2(b) of the Agreement. Although declaratory relief may clarify or settle the parties' legal relations as to that provision, IntelCap's breach of contract claim accomplishes these same goals. Any "cloud of uncertainty" regarding the scope and enforceability of the provisions will be dispelled in litigation of the breach of contract claim, which also provides for damages. *See Camofi Master LDC v. College Partnership, Inc.,* 452 F.Supp.2d 462, 480 (S.D.N.Y.2006) (dismissing claims for declaratory relief as duplicative of breach of contract claim).

Additionally, while the requested relief raises no federalism concerns or concerns about procedural fencing, overall I find that here declaratory relief would serve no useful purpose as the legal issues will be resolved by litigation of the breach of contract claim. *Sofi Classic S.A. de C.V. v. Hurowitz,* 444 F.Supp.2d 231, 249-50 (S.D.N.Y.2006) ("Plaintiffs' declaratory judgment claim seeks resolution of legal issues that will, of necessity, be resolved in the course of the litigation of the other causes of action. Therefore, the claim is duplicative in that it seeks no relief that is not implicitly sought in the other causes of action."); *see also Fisher-Price, Inc. v. Well-Made Toy Mfg. Corp .,* No. 92 Civ. 0832(EM), 1993 WL 379589, at \*2 (W.D.N.Y. Sept. 21, 1993).

\*7 Accordingly, ICP's motion to dismiss count five of IntelCap's complaint is granted, and count five is dismissed.

#### b. *Non-Solicitation Provision*

ICP's motion to dismiss count six of IntelCap's complaint is denied. IntelCap seeks a determination that the non-solicitation clause "survived the termination of the Agreement and requires ICP to refrain from soliciting business from or doing work for" IntelCap's exclusive clients for three years from the date of termination "unless such work is done with IntelCap's consent in accordance with the fee-sharing provision set forth in paragraph 2(b) of the Agreement." (Compl. at 17).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1974392 (S.D.N.Y.)
**(Cite as: 2009 WL 1974392 (S.D.N.Y.))**

Though there appears to be substantial overlap, resolution of IntelCap's contract claim may not resolve questions regarding the scope and enforceability of the Agreement's non-solicitation provision. To the extent IntelCap seeks declaratory relief as to its rights vis a vis ICP's transaction with Blue Marine, IntelCap has adequately shown there to be a "substantial controversy ... of sufficient immediacy and reality." *See Duane Reade, Inc.,* 261 F.Supp.2d at 295-96.

### D. *Accounting*

In count two of the complaint, IntelCap seeks the equitable remedy of an accounting "for all fees generated directly and indirectly from the $121 million financing package [ICP] arranged for Blue Marine." (Compl.¶ 48). ICP moves to dismiss on the basis that no fiduciary relationship existed between the parties that would warrant such relief.

#### 1. *Applicable Law*

Under New York Law, to establish a right to an accounting, "a plaintiff must demonstrate the existence of a fiduciary relationship between himself and defendant, or the existence of a joint venture or other special circumstances warranting equitable relief." *Millennium Expressions, Inc. v. Chauss Mktg, Ltd.,* No. 02 Civ. 7545(JCF), 2007 WL 950070, at *10 (S.D.N.Y. March 30, 2007) (quoting *Rodgers v. Roulette Records, Inc.,* 677 F.Supp. 731, 738 (S.D.N.Y.1988); *see also Penato v. George,* 52 A.D.2d 939, 942 (2d Dep't 1976).

#### 2. *Application*

ICP's motion is granted, and IntelCap's claim for the equitable remedy of an accounting is dismissed; IntelCap, however, is entitled to discovery on damages for its other claims, including discovery on fees generated from the Blue Marine transaction and ICP's profits.

IntelCap does not allege any fiduciary relationship or joint venture with ICP that would warrant the equitable remedy of an accounting; nor has it alleged other special circumstances warranting equitable relief. There is no indication that IntelCap's relationship with ICP was "founded upon trust or confidence reposed by one person in the integrity and fidelity of another." *See S.O. Textiles Co., Inc. v. A & E Products Group,* 18 F.Supp.2d 232, 242 (E.D.N.Y.1998) (accounting claim dismissed where parties' relationship "purely commercial"). In fact, IntelCap alleges that "[f]rom the outset of the parties' relationship, IntelCap had concerns regarding the best way to protect itself and the exclusive client and contact list it had accumulated." (Compl.¶ 28). The non-solicitation provision at paragraph 6 of the Agreement was negotiated and inserted into the Agreement as a result of these concerns. (*Id.* ¶ 29).

**\*8** IntelCap argues that ICP's receipt of a fee from the Blue Marine transaction made it a "custodian" of IntelCap's property, thereby creating "special circumstances warranting equitable relief. (Pl.'s Opp'n at 19-20 (citing *Rodgers,* 677 F.Supp. at 738)). IntelCap's reliance on *Rodgers* is misplaced, however. The court in *Rodgers* actually rejected the plaintiff's argument that a fiduciary relationship was created by defendants' collection of money on behalf of plaintiff in the form of royalties or license fees; the court instead deemed the parties' relationship a "contractual relationship." *Rodgers,* 677 F.Supp. at 738 (citing cases). Similarly, here the parties' fee-sharing agreement and ICP's obligation to pass fees on to IntelCap are insufficient to make ICP a fiduciary of IntelCap or otherwise put ICP and IntelCap in a relationship of trust or confidence.

Accordingly, ICP's motion to dismiss count two of IntelCap's complaint seeking an accounting is granted. Nevertheless, IntelCap is still entitled to conduct discovery and seek damages for its other remaining claims.

### E. *Unjust Enrichment and Quantum Meruit*

Finally, ICP moves to dismiss counts three and four of IntelCap's complaint.

#### 1. *Applicable Law*

To recover under quantum meruit in New York a party "must establish performance of [its duties] in good faith, acceptance of the services by persons to whom such services were rendered, expectation of compensation, and the reasonable value of such services." *Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.,* 418 F.3d 168, 175 (2d

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1974392 (S.D.N.Y.)
**(Cite as: 2009 WL 1974392 (S.D.N.Y.))**

Cir.2005); *see also Fluor Daniel Carribean, Inc. v. Humphreys (Cayman) Ltd.,* No. 04 Civ. 686(DC), 2005 WL 1214278, at *5 (S.D.N.Y. May 23, 2005). "To state a claim for unjust enrichment in New York, a plaintiff must allege that (1) defendant was enriched; (2) the enrichment was at plaintiff's expense; and (3) the circumstances were such that equity and good conscience require defendants to make restitution." *Kidz Cloz, Inc. v. Officially for Kids, Inc.,* 320 F.Supp.2d 164, 177 (S.D.N.Y.2004) (internal quotations omitted). Unjust enrichment and quantum meruit claims are not separate causes of action and are reviewed together. *Mid-Hudson Catskill Rural Migrant Ministry, Inc.,* 418 F.3d at 175.

**2. *Application***

IntelCap has adequately pleaded claims for unjust enrichment and quantum meruit. Where, as here, the existence of an enforceable contract is disputed, these claims may proceed alongside IntelCap's breach of contract claim as alternative theories. *See Labajo v. Best Buy Stores, L.P.,* 478 F.Supp.2d 523, 531 (S.D.N.Y.2007) ("When there is a bona fide dispute as to the existence of a contract, a party may proceed upon a theory of unjust enrichment, and an unjust enrichment claim may be alleged alongside a breach of contract claim.").

Additionally, ICP's argument that IntelCap has failed to allege the reasonable value of its services is premature. IntelCap alleges that ICP accepted and benefitted from its services but failed to share fees generated from the Blue Marine deal; it claims the fees represented the reasonable value of its services. (Compl. ¶¶ 51, 56; Pl.'s Opp'n at 22-23). While the alleged value of IntelCap's services may be duplicative of its contract claim, at this stage in the litigation, IntelCap is permitted to proceed with its claims for quantum meruit and unjust enrichment. ICP's motion to dismiss counts three and four of the complaint is denied.

### *CONCLUSION*

***9** For the foregoing reasons, ICP's motion to dismiss is denied in part and granted in part. Counts two and five of the complaint seeking, respectively, an accounting and declaratory relief on paragraph 2(b) of the Agreement are dismissed. IntelCap may proceed on its breach of contract and quantum meruit and unjust enrichment claims, as well as its claim for a declaratory judgment on the scope and enforceability of paragraph 6 of the Agreement.

As previously ordered by the Court, all discovery, fact and expert, shall be completed by September 25, 2009. The parties shall appear that day for a pre-trial conference that day at 2 p.m.

SO ORDERED.

S.D.N.Y.,2009.
Intellectual Capital Partner v. Institutional Credit Partners LLC
Slip Copy, 2009 WL 1974392 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp., 1998 WL 274346 (S.D.N.Y.)
**(Cite as: 1998 WL 274346 (S.D.N.Y.))**

**H**Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
K. BELL & ASSOCIATES, INC., Plaintiff,
v.
LLOYD'S UNDERWRITERS, Defendant.
**No. 92Civ.5249(AJP)(KTD).**

May 26, 1998.

OPINION AND ORDER

PECK, Magistrate J.

**\*1** Plaintiff K. Bell & Associates, Inc. ("Bell") brought this action against defendant Lloyd's Underwriters ("Lloyd's") in 1992, asserting diversity jurisdiction. Six years later, after decisions on a motion to dismiss, motions for summary judgment, a jury trial, and two Second Circuit decisions were about to result in a final judgment in Lloyd's favor, Bell raised the question of whether diversity jurisdiction really exists. Despite the waste of judicial resources (and the unfairness of allowing Bell to have another bite of the apple in state court), the Court concludes that diversity jurisdiction is lacking, and the case must be dismissed without prejudice.

Lloyd's is not an entity, but rather a consortium of individual investors, known as "Names," that are severally, but not jointly, liable for their fraction of the risk on an insurance policy. Since some of the Lloyd's Names on the insurance policy at issue in this case are New York residents, diversity jurisdiction is lacking. Lloyd's proposal that this Court recharacterize the action as a defendant class under Rule 23 or Rule 23.2, Fed.R.Civ.P., with the named defendants being the English lead underwriters, would solve the problem of lack of diversity, but fails for another reason-Bell's claim against any single Name does not satisfy the diversity jurisdiction amount in controversy requirement.

Accordingly, for the reasons set forth below, this action is dismissed without prejudice for lack of subject matter jurisdiction.

**PROCEDURAL BACKGROUND**

Familiarity with the prior decisions in this case of the Second Circuit and this Court (Judge Duffy and Magistrate Judges Peck and Roberts) is assumed. *K. Bell & Assocs., Inc. v. Lloyd's Underwriters,* No. 97-7397, slip op. (2d Cir. Jan.2, 1998), *vacating,* 129 F.3d 113 (table), 1997 WL 701387 (2d Cir. Nov.10, 1997), *aff'g,* 92 Civ. 5249, 1997 WL 137444 (S.D.N.Y. March 24, 1997) (Peck, M.J.) & 1997 WL 96551 (S.D.N.Y. March 5, 1997) (Peck, M .J.); *K. Bell & Assocs., Inc. v. Lloyd's Underwriters,* 97 F.3d 632 (2d Cir.1996), *rev'g,* 1995 WL 169013 (S.D.N.Y. April 10, 1995) (Roberts, M.J.) & 1994 WL 250183 (S.D.N.Y. June 1, 1994) (Roberts, M.J.); *K. Bell & Assocs., Inc. v. Lloyd's Underwriters,* 827 F.Supp. 985 (S.D.N.Y.1993) (Duffy, D.J.). The Court will briefly review the facts and procedural background relevant to the instant opinion.

Bell, a New York insurance broker, brought this action in 1992 seeking indemnification under its professional liability policy with Lloyd's for Bell's settlement of a lawsuit against it by a third party, American Marine Insurance Group, Inc. ("AMIG"). *See, e.g., Bell v. Lloyd's,* 97 F.3d at 633; *Bell v. Lloyd's,* 1997 WL 701387 at \*1; *Bell v. Lloyd's,* 1997 WL 96551 at \*1.

In its complaint, Bell alleged diversity jurisdiction, as follows:

1. Plaintiff is a corporation incorporated under the laws of the State of New York and is licensed to act as an insurance broker and reinsurance intermediary.

**\*2** 2. Defendant is a consortium of underwriters operating under the laws of the United Kingdom, and located in the United Kingdom.

3. Jurisdiction is predicated on the diversity of citizenship of the parties and the fact that the amount in controversy exceeds $50,000 pursuant to 28 U.S.C. § 1332(a).

(Cplt.¶¶ 1-3.) Lloyd's answer stated in part:
2. Deny the allegations contained in paragraph 2 of

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

**Not Reported in F.Supp., 1998 WL 274346 (S.D.N.Y.)**
**(Cite as: 1998 WL 274346 (S.D.N.Y.))**

the verified complaint but aver that the defendants sued herein incorrectly as 'Lloyd's Underwriters' are individual persons who are underwriting members of Lloyd's London, England and as such have a principal place of business within and do business under the laws of the United Kingdom.

(Lloyd's Answer ¶ 2.) The case proceeded without any issue being raised as to jurisdiction.

On July 21, 1993, Judge Duffy denied Lloyd's motion to dismiss Bell's claim for breach of contract, waiver, and equitable estoppel, and granted Lloyd's motion to dismiss Bell's claim for punitive damages. *Bell v. Lloyd's,* 827 F.Supp. 985.

The parties then consented to trial before a Magistrate Judge pursuant to 28 U.S.C. § 636(c) On June 1, 1994, Magistrate Judge Roberts denied Lloyd's motion for summary judgment, holding that Bell's claim did not fall within Exclusion (f) of the insurance policy. *Bell v. Lloyd's,* 1994 WL 250183. On April 10, 1995, Magistrate Judge Roberts denied Bell's motion for summary judgment, holding, *inter alia:* there was a material issue of fact as to the reasonableness of the settlement entered into by Bell with AMIG; Exclusion (g) to the insurance policy did not protect Lloyd's; and the amount of damages was not limited to $255,000. *Bell v. Lloyd's,* 1995 WL 169013.

Upon Magistrate Judge Robert's departure from the bench, the case was reassigned to me. In June 1995, I held a jury trial which resulted in a judgment for Bell against Lloyd's for $1,250,000. Following this judgment, Lloyd's appealed to the Second Circuit from Magistrate Judge Roberts' pre-trial decisions. *See Bell v. Lloyd's,* 97 F.3d at 636. The parties did not raise any question as to federal diversity jurisdiction before the Second Circuit.

On September 23, 1996, the Second Circuit reversed Magistrate Judge Roberts' two prior decisions, holding that Exclusion (f) to the insurance policy did apply, and remanded the case for the limited purpose of determining whether Lloyd's was estopped from denying coverage under Exclusion (f). *See Bell v. Lloyd's,* 97 F.3d at 637-39. On March 5, 1997, I held that Lloyd's was not estopped from asserting Exclusion (f), and since the Second Circuit had already determined that Exclusion (f) applied in the absence of estoppel, granted summary judgment for Lloyd's.

*Bell v. Lloyd's,* 1997 WL 96551. I denied Bell's motion for reargument on March 24, 1997. *Bell v. Lloyd's,* 1997 WL 137444.

Bell again appealed to the Second Circuit. Bell did not then raise any question as to federal jurisdiction. On November 10, 1997, the Second Circuit affirmed my decisions, finding that Lloyd's was not estopped from relying upon Exclusion (f) and that I had properly denied Bell's motion for reargument. *Bell v. Lloyd's,* 1997 WL 701387. On November 14, 1997, Bell petitioned for rehearing pursuant to Fed.R.App.P. 40, raising for the first time the issue of whether federal diversity jurisdiction was lacking.[FN1] On January 2, 1998, the Second Circuit granted Bell's petition for rehearing, vacated its November 10, 1997 decision, and remanded for determination of the jurisdictional issue. *Bell v. Lloyd's,* No. 97-7397, slip op. (2d Cir. Jan. 2, 1998).

> FN1. According to Bell's rehearing petition, Bell's counsel became aware of the jurisdictional issue while attending oral argument in the Second Circuit on October 28, 1997 in another Lloyd's case, *Advani Enterprises, Inc. v. Underwriters at Lloyd's,* during which the Second Circuit panel *sua sponte* raised the question of whether diversity jurisdiction exists where the Lloyd's Names are not all diverse to the plaintiff. (*See* Bell's 2d Cir. Pet. & Br. for Reh'g at 3-4; *see also* 5/13/98 Oral Arg. Tr. at 8.) While it is clear that counsel for both parties (objectively) should have been aware much earlier in this case of the developing case law as to diversity jurisdiction and Lloyd's, the Court accepts Bell's counsel's assertion that (subjectively) he was not aware of the issue until it was raised in an unrelated Second Circuit oral argument that he attended. (*See* 5/13/98 Oral Arg. Tr. at 8-12.) The Court also commends Lloyd's counsel, Mr. Fraser, for a civility all too often lacking in lawyers today; Lloyd's specifically declined to request any sanctions inquiry under Rule 11 or 28 U.S.C. § 1927. (*See* 5/13/98 Oral Arg. Tr. at 12.)

***Jurisdictional Facts As to Lloyd's Developed on Remand***

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 274346 (S.D.N.Y.)
**(Cite as: 1998 WL 274346 (S.D.N.Y.))**

**\*3** To analyze the jurisdictional issue, it is necessary to understand the structure of Lloyd's:

Lloyd's is not an insurance company, but instead functions as a marketplace where investors buy and sell insurance risks. These investors-also known as "Names"-invest funds and pledge their assets as security for insurance risks offered in the Lloyd's market.

Names do not actively participate in the business of underwriting risks, but instead appoint a managing agent to represent them. In turn, the managing agent employs an active underwriter to underwrite risks for the Names. Each Name is severally, but not jointly, liable to the insured for his fraction of the risk on a given policy.

*Long Island Lighting Co. v. Aetna Cas. & Sur. Co.,* 96 Civ. 9664, 1997 WL 567342 at *1 (S.D.N.Y. Sept.11, 1997) (record citations omitted); *see also, e.g., Indiana Gas Co. v. Home Ins. Co.,* Nos. 97-1381, 97-1328, 1998 WL 154848 at *1-3 (7th Cir. April 6, 1998); *Humm v. Lombard World Trade, Inc.,* 916 F.Supp. 291, 293 (S.D.N.Y.1996).

On remand here, Lloyd's counsel informed the Court that more than 30 Lloyd's syndicates were the insurers on the Bell policy. (*See* Fraser 5/1/98 Aff. ¶¶ 1-5 & Exs. A-C.) The Active Underwriters for those syndicates are residents of the United Kingdom and not residents of New York. (Fraser 5/1/98 Aff. ¶¶ 405.) The "actual number of Names having interests in the policy ... number in the thousands." (Fraser 4/29/98 Aff. ¶ 4.) Lloyd's counsel readily conceded that some of those Names are New York residents. (Fraser 4/29/98 Aff. ¶¶ 2-3 & Ex. at pp. 12-14; 5/13/98 Oral Arg. Tr. at 12-13.)

Lloyd's counsel also conceded that while the lead syndicate's liability under the policy exceeds the $50,000 jurisdictional amount in controversy requirement, no single Name has exposure of $50,000 or more under the policy. (5/13/98 Oral Arg. Tr. at 15.) As in all Lloyd's policies, the Names are severally liable and not jointly liable under the policy. (5/13/98 Oral Arg. Tr. at 14, 21.)

### ANALYSIS

Although raised at the eleventh hour by Bell, it is axiomatic that "[s]ubject matter jurisdiction cannot be waived and the issue may be raised at any point during the litigation," including by the plaintiff who first asserted jurisdiction. *Chase Manhattan Bank, N .A. v. Aldridge,* 906 F.Supp. 870, 872 (S.D.N.Y.1995); *accord, Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 702, 102 S.Ct. 2099, 2104, 72 L.Ed.2d 492 (1982); *Tongkook America, Inc. v. Shipton Sportswear Co.,* 14 F.3d 781, 786 (2d Cir.1994); 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure: Civil 2d* § 1393 at 764-76 (2d ed.1990).

The Second Circuit recently addressed the effect of Lloyd's structure on the diversity jurisdiction analysis:

Both Underwriters at Lloyd's and Syndicate 735 are unincorporated associations. Consequently, for jurisdictional purposes, they do not have legal identities separate from their members. *Carden v. Arkoma Assocs.,* 494 U.S. 185, 110 S.Ct. 1015, 108 L.Ed.2d 157 (1990). Thus, courts faced with the task of determining the citizenship of a Lloyd's syndicate have done so in one of two ways. Under the first, and more popular, approach a Lloyd's syndicate is a citizen of every state in which its individual investors, known as "Names," are citizens. *See, e.g., Humm v. Lombard World Trade, Inc.,* 916 F.Supp. 291 (S.D.N.Y.1996); *Chase Manhattan Bank, N.A. v. Aldridge,* 906 F.Supp. 870 (S.D.N.Y.1995); *Lowsley-Williams v. North River Ins. Co.,* 884 F.Supp. 166 (D.N.J.1995); *Transamerica Corp. v. Reliance Ins. Co.,* 884 F.Supp. 133 (D.Del.1995); *Bath Iron Works Corp. v. Certain Member Cos. of Inst. of London Underwriters,* 870 F.Supp. 3 (D.Me.1994). Under the second approach, a Lloyd's syndicate is only a citizen of the state in which its managing/lead underwriter is a citizen. *See Certain Interested Underwriters at Lloyd's, London, Eng. v. Layne,* 26 F.3d 39 (6th Cir.1994).

**\*4** *Advani Enters., Inc. v. Underwriters at Lloyd's,* No. 726, Docket 97-7664, 140 F.3d 157, 1998 WL 133755 at *3 (2d Cir. March 20, 1998). While noting the two different approaches, the Second Circuit in *Advani* did "not decide ... which approach best determines the citizenship of Lloyd's syndicate because under either approach the pleadings are lacking," and, moreover, the Second Circuit found admiralty jurisdiction to exist. *Id.* at *3-4.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 274346 (S.D.N.Y.)
**(Cite as: 1998 WL 274346 (S.D.N.Y.))**

Since the Second Circuit's *Advani* opinion, Judge Easterbrook of the Seventh Circuit has addressed the issue in a thorough and well-reasoned opinion joined by Chief Judge Posner. *Indiana Gas Co. v. Home Ins. Co.,* Nos. 97-1381, 97-1328, 1998 WL 154848 (7th Cir. April 6, 1998); *see also, e.g., Humm v. Lombard World Trade, Inc.,* 916 F.Supp. 291, 295-96 (S.D.N.Y.1996) (rejects *Layne* as inconsistent with New York law as to agency). The Court is persuaded by the *Indiana Gas* and *Humm* Courts' analyses and therefore joins those courts in rejecting the Sixth Circuit's opinion in *Certain Interested Underwriters at Lloyd's, London, Eng. v. Layne,* 26 F.3d 39 (6th Cir.1994).

Indeed, the Court notes that Lloyd's counsel disclaimed reliance on *Layne* at oral argument, conceding that *Layne* was based on Tennessee state law as to agency that is not analogous to the law of New York (or most other states, for that matter). (*See* 5/13/98 Oral Arg. Tr. at 13-14.)

The Court therefore finds that "Lloyd's" is a citizen of every state in which its Names are citizens. This conclusion is in accord with the holdings of all other district court decisions in the Second Circuit that have addressed the issue. *See Long Island Lighting Co. v. Aetna Cas. & Sur. Co.,* 96 Civ. 9664, 1997 WL 567342 at *2-3 (S.D.N.Y. Sept.11, 1997); *Humm v. Lombard World Trade, Inc.,* 916 F.Supp. at 297-98; *Chase Manhattan Bank, N.A. v. Aldridge,* 906 F.Supp. 870, 872-73 (S.D.N.Y.1995); *see also* 5/13/98 Oral Arg. Tr. at 12 (Lloyd's counsel concedes that "[e]xisting case law in this district, I would concede, is adverse to diversity jurisdiction" over Lloyd's).[FN2]

>   FN2. *Accord, e.g., Ashenden v. Lloyd's of London,* 934 F.Supp. 992, 995 n. 2 (N.D.Ill.1996); *Certain Underwriters at Lloyd's, London v. P.J.T., Inc.,* No. 96 C 3628, 1996 WL 377081 at *1-2 (N.D.Ill. June 27, 1996); *Transamerica Corp. v. Reliance Ins. Co.,* 884 F.Supp. 133, 137-39 (D.Del.1995); *Lowsley-Williams v. North River Ins. Co.,* 884 F.Supp. 166, 169-72 (D.N.J.1995); *Bath Iron Works Corp. v. Certain Member Cos. of Inst. of London Underwriters,* 870 F.Supp. 3, 4-8 (D.Me.1994); *International Ins. Co. v. Cer-*

*tain Underwriters at Lloyd's London,* No. 88 C 9838, 1991 WL 693319 at *2-9 (N.D.Ill. Sept.16, 1991); *Queen Victoria Corp. v. Insurance Specialists of Hawaii, Inc.,* 711 F.Supp. 553, 554 (D.Haw.1989).

Since it is undisputed that Bell is a New York corporation and one or more of the Lloyd's Names are New York residents, diversity jurisdiction is lacking here.

To save jurisdiction (and thus to save its judgment dismissing Bell's complaint), Lloyd's asks the Court to recharacterize this case, pursuant to 28 U.S.C. § 1653,[FN3] as either a Rule 23.2 [FN4] or 23 [FN5] defendant class action. (*See generally* Lloyd's 4/22/98 & 4/30/98 Brs.; 5/13/98 Oral Arg. Tr. at 13.) As either type of class action, Lloyd's asserts that only the citizenship of the class representatives would need be considered in the diversity inquiry, and Lloyd's proposes to have the United Kingdom lead underwriters serve as the named class representatives. (*See* Lloyd's 4/30/98 Br. at 2; 5/13/98 Oral Arg. Tr. at 13, 16.)

>   FN3. 28 U.S.C. § 1653 provides that "[d]efective allegations of jurisdiction may be amended, upon terms, in the trial or appellate courts."

>   FN4. Rule 23.2 provides in pertinent part:

>   **Actions Relating to Unincorporated Associations**

>   An action brought by or against the members of an unincorporated association as a class by naming certain members as representative parties may be maintained only if it appears that the representative parties will fairly and adequately protect the interests of the association and its members.

>   FN5. Rule 23 provides, in pertinent part:

>   **(a) Prerequisites to a Class Action.** One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 274346 (S.D.N.Y.)
**(Cite as: 1998 WL 274346 (S.D.N.Y.))**

common to the class, (3) the claims or de-
fenses of the representative parties are
typical of the claims or defenses of the
class, and (4) the representative parties
will fairly and adequately protect the in-
terests of the class.

**(b) Class Actions Maintainable.** An ac-
tion may be maintained as a class action if
the prerequisites of subdivision (a) are sat-
isfied, and in addition:

....

**(3)** the court finds that the questions of
law or fact common to the members of the
class predominate over any questions af-
fecting only individual members, and that
a class action is superior to other available
methods for the fair and efficient adjudi-
cation of the controversy. The matters per-
tinent to the findings include: (A) the in-
terest of the members of the class in indi-
vidually controlling the prosecution or de-
fense of separate actions; (B) the extent
and nature of any litigation concerning the
controversy already commenced by or
against members of the class; (C) the de-
sirability or undesirability of concentrat-
ing the litigation of the claims in the par-
ticular forum; (D) the difficulties likely to
be encountered in the management of the
class action.

**\*5** The Court assumes, without deciding, that it can
recharacterize Bell's complaint on Lloyd's motion
pursuant to 28 U.S.C. § 1653. Under that scenario, at
least in the procedural posture of this case-where
class certification would protect the Court's jurisdic-
tion and hence Lloyd's "victory" in this case-the
Court finds that certification of a defendant class of
Lloyd's Names, represented by the United Kingdom
lead underwriters, would be appropriate under either
Rule 23.2 or Rule 23.[FN6]

FN6. The proposed class, consisting of the
hundreds if not thousands of Names, all are
allegedly liable under the same insurance
contract. There thus are questions of law and
fact common to the class, and those ques-
tions predominate over any questions affect-

ing any individual class members. The de-
fenses of the representatives are typical of
those of the class. And there can be no doubt
here that the representatives will fairly and
adequately protect the interests of the class:
The proposed representatives (or more pre-
cisely, Lloyd's counsel) have successfully
defended against these claims. Should the
representatives successfully persuade the
Court that it has jurisdiction, the judgment in
favor of the proposed class would stand, a
result in the best interests of all members of
the proposed class.

The class action device does not save federal jurisdic-
tion here, however, because the case still would not
meet the $50,000 diversity jurisdiction amount in
controversy requirement.[FN7]

FN7. 28 U.S.C. § 1332(a) was amended in
October 1996 to increase the amount in con-
troversy requirement to $75,000 from
$50,000 for actions brought after January
19, 1997. Since the instant action was
brought on July 14, 1992, the $50,000
amount is applicable.

A corollary of the Court's holding that the citizenship
of each Lloyd's Name must be considered for diver-
sity purposes is that the amount of the claim against
each individual Name, and *not* against "Lloyd's" (*i.e.*,
all Names) in the aggregate, must be considered for
amount in controversy purposes. It is well-established
that aggregation of a plaintiff's claims against multi-
ple defendants is impermissible unless defendants'
liability is joint, rather than several: "A plaintiff must
allege that the amount in controversy is in excess of
the jurisdictional amount against each defendant
unless the plaintiff's claims against the defendants are
common and undivided so that the defendant's liabil-
ity is properly characterized as joint and not several."
15 James W. Moore et al., *Moore's Federal Practice*
§ 102.108[2] at p. 102-189 (3d ed.1998); *see also,
e.g., Sovereign Camp, W.O.W. v. O'Neil,* 266 U.S.
292, 295, 45 S.Ct. 49, 50, 69 L.Ed. 293 (1924) ("It is
the settled general rule ... that in a suit based on di-
versity of citizenship brought against several defen-
dants ... which are separate and distinct ... the test of
jurisdiction is the amount of each separate claim, and
not their aggregate amount"); *North Am. Fin. Group,
LLC v. Suburban Air Sys., Inc.,* 96 Civ. 2330, 1996

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 274346 (S.D.N.Y.)
**(Cite as: 1998 WL 274346 (S.D.N.Y.))**

WL 345790 at *1 (S.D.N.Y. June 24, 1996) (" '[W]hen the defendants' liability is several, ... aggregation is not allowed' "); *Crouch v. Atlas Van Lines, Inc.,* 834 F.Supp. 596, 604 (N.D.N.Y.1993) ("While the courts can aggregate all of the plaintiff's claims against one defendant to satisfy [the $50,000] requirement, or can aggregate claims against two or more defendants who are jointly liable, it cannot aggregate the claims against two essentially separate individual defendants to reach this amount.") (citations omitted); *Congram v. Giella,* 91 Civ. 1134, 1992 WL 349845 at *3 (S.D.N.Y. Nov.10, 1992) ("In a diversity case involving a single plaintiff and multiple defendants, aggregation of claims is not proper unless the liability to the plaintiff is common, undivided or joint. '[I]t is immaterial that the claims are transactionally related or that they arise from a common origin or document.' "); *Uniroyal, Inc. v. Heller,* 65 F.R.D. 83, 87-88 (S.D.N.Y.1974) (plaintiff cannot aggregate claims against multiple defendants when liability is several).

**\*6** Since the liability of the individual Names here is several, not joint, Bell's claims against each Name cannot be aggregated. Two prior decisions in this District have reached the same conclusion as to the jurisdictional amount in controversy and Lloyd's Names. *See Long Island Lighting Co. v. Aetna Cas. & Sur. Co.,* 1997 WL 567342 at *3 (jurisdiction over Lloyd's names "will depend also on the percentage share of liability of each Name, to assure that the statutory amount in controversy requirement has been met as well."); *Chase Manhattan Bank, N.A. v. Aldridge,* 906 F.Supp. at 874 (no individual Name's amount satisfies the jurisdictional amount, and "[t] he claims cannot be aggregated ... because the liability for the individual underwriters for their proportion of the risk is strictly several.").

The fact that Lloyd's seeks to recharacterize the case as a defendant class action does not change this conclusion. The aggregation doctrine is based in statute, and therefore neither Rule 23 nor Rule 23.2 can change this doctrine to expand the Court's jurisdiction. *See, e.g., Zahn v. International Paper Co.,* 414 U.S. 291, 299, 94 S.Ct. 505, 511, 38 L.Ed.2d 511 (1973) (" 'The doctrine that separate and distinct claims could not be aggregated ... is based ... upon th[e Supreme] Court's interpretation of the statutory phrase 'matter in controversy.' ... Nothing in the amended Rule 23 changes this doctrine.") (quoting

*Snyder v. Harris,* 394 U.S. 332, 336, 89 S.Ct. 1053, 1057, 22 L.Ed.2d 319 (1969)); *Snyder v.. Harris,* 394 U.S. at 337-39, 89 S.Ct. at 1057 (plaintiff class action fails where claims of class members do not satisfy the jurisdictional amount without resort to aggregation; the Supreme Court has "held that the rule making authority was limited to 'the inability of a court, by rule, to extend or restrict the jurisdiction conferred by a statute.' ... We have consistently interpreted the jurisdictional statute passed by Congress as not conferring jurisdiction where the required amount in controversy can be reached only by aggregating separate and distinct claims. The interpretation of that statute cannot be changed by a change in the Rules."); *see also Gilman v. BHC Sec., Inc.,* 104 F.3d 1418 (2d Cir.1997) (plaintiff class members' claims for punitive damages cannot be aggregated to satisfy jurisdictional amount in controversy requirement).[FN8]

> FN8. Indeed, Lloyd's has presented no authority that there is a different aggregation rule for a defendant class (where defendant's liability is several not joint) than a plaintiff class action. (Fraser 5/18/98 Letter to Court.)

Lloyd's has represented that no individual Name has exposure under the policy of more than $50,000. (5/13/98 Oral Arg. Tr. at 15.) Therefore, use of a Rule 23.2 or a Rule 23 defendant class action, even if otherwise permissible, would not preserve federal jurisdiction in this case because Bell's claim against any individual Name does not satisfy the $50,000 jurisdictional amount in controversy requirement.

## CONCLUSION

For the reasons set forth above, the Court has no choice but to dismiss this action for lack of federal subject matter jurisdiction.

The Clerk of Court is directed to enter judgment dismissing this action without prejudice for lack of jurisdiction.

S.D.N.Y.,1998.
K. Bell & Associates, Inc. v. Lloyd's Underwriters
Not Reported in F.Supp., 1998 WL 274346 (S.D.N.Y.)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 274346 (S.D.N.Y.)
**(Cite as: 1998 WL 274346 (S.D.N.Y.))**

END OF DOCUMENT

Westlaw.

205 Fed.Appx. 861, 2006 WL 3147487 (C.A.2 (N.Y.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 205 Fed.Appx. 861, 2006 WL 3147487 (C.A.2 (N.Y.)))**

**H**This case was not selected for publication in the Federal Reporter.

United States Court of Appeals,
Second Circuit.
LEATHER FORM S.R.L. and Casprini Gruppo Industriale S.P.A., Plaintiffs-Appellants,
v.
KNOLL, INC., Defendant-Appellee.
**No. 05-6994-cv.**

Nov. 2, 2006.

**Background:** Manufacturer of furniture designs brought action seeking declaratory judgment that 1965 agreement by designer to assign his designs and the exclusive use of his name in the United States and elsewhere was ambiguous with regard to whether 1965 agreement transferred world-wide rights to the designs. The United States District Court for the Southern District of New York, Jed S. Rakoff, J., 2005 WL 3312064, declined to exercise jurisdiction over the declaratory action and dismissed the complaint. Manufacturer appealed.

**Holding:** The Court of Appeals held that district court appropriate declined jurisdiction in light of fact that German courts were already considering the issue and declaratory judgment action was mere attempt to circumvent the holdings and jurisdictions of the German courts.

Affirmed.

West Headnotes

**[1] Declaratory Judgment 118A** ⟜7

118A Declaratory Judgment
    118AI Nature and Grounds in General
        118AI(A) In General
            118Ak7 k. Necessity, Utility and Propriety. Most Cited Cases

**Federal Courts 170B** ⟜51

170B Federal Courts
    170BI Jurisdiction and Powers in General
        170BI(B) Right to Decline Jurisdiction; Abstention Doctrine
            170Bk47 Particular Cases and Subjects, Abstention
                170Bk51 k. Declaratory Judgment in General. Most Cited Cases
Tenuous merits of plaintiff's case under New York law could be taken into account when considering whether declaratory judgment would serve a useful purpose, as one of the issues that district court considered when determining whether to exert jurisdiction over plaintiff's proposed declaratory judgment action.

**[2] Declaratory Judgment 118A** ⟜45

118A Declaratory Judgment
    118AI Nature and Grounds in General
        118AI(C) Other Remedies
            118Ak45 k. Pendency of Other Action. Most Cited Cases

**Federal Courts 170B** ⟜51

170B Federal Courts
    170BI Jurisdiction and Powers in General
        170BI(B) Right to Decline Jurisdiction; Abstention Doctrine
            170Bk47 Particular Cases and Subjects, Abstention
                170Bk51 k. Declaratory Judgment in General. Most Cited Cases
Federal district court appropriately declined jurisdiction over declaratory judgment action involving claim to world wide rights to distribute designer's furniture designs, where German courts were already considering the issue, United States court would not finalize the controversy between the parties in Europe, declaratory judgment action was mere attempt to circumvent the holdings and jurisdictions of German courts, and German legal process provided adequate remedy.

**\*862** Appeal from a final decision of the United States District Court for the Southern District of New

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

205 Fed.Appx. 861, 2006 WL 3147487 (C.A.2 (N.Y.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 205 Fed.Appx. 861, 2006 WL 3147487 (C.A.2 (N.Y.)))**

York (Jed S. Rakoff, Judge).
AFTER ARGUMENT AND UPON DUE CONSID-
ERATION, IT IS HEREBY ORDERED, AD-
JUDGED AND DECREED that the judgment of the
District Court is AFFIRMED.Nicole M. Meyer,
Dickinson Wright PLLC (Samuel D. Littlepage,
Dickinson Wright PLLC, Washington, DC, Aidan M.
McCormack, Erik W. Drewniak, Nixon Peabody
LLP, New York, NY, on the brief), for Appellants.

Thomas C. Morrison, Patterson, Belknap, Webb &
Tyler LLP (Evan Mandel, Patterson, Belknap, Webb
& Tyler LLP, on the brief), New York, NY, for Ap-
pellees.

PRESENT: Hon. RALPH K. WINTER, Hon. JO-
SEPH M. McLAUGHLIN, Hon. CHESTER J.
STRAUB, Circuit Judges.

### SUMMARY ORDER

**\*\*1** Plaintiffs-Appellants Leather Form S.R.L. and
Casprini Gruppo Industriale S.P.A. (collectively,
"Casprini") appeal the judgment of the District Court
for the Southern District of New York (Jed S. Rakoff,
*Judge* ), declining to exercise jurisdiction under 28
U.S.C. § 2201(a) over Casprini's declaratory judg-
ment action, and dismissing Casprini's complaint. We
assume the parties' familiarity with the facts and is-
sues on appeal.

Casprini brought this action seeking a declaratory
judgment regarding a 1965 Agreement between the
designer Mies van der Rohe and Knoll, Inc.'s prede-
cessor Knoll Associates, Inc., in which Mr. van der
Rohe agreed to "sell, assign and convey all of [his]
right, title and interest in [his] designs and the exclu-
sive use of [his] **\*863** name in connection with [such]
sale in the United States and elsewhere." The 1965
Agreement is governed by New York law pursuant to
a choice-of-law provision. Casprini argued below that
this language contains a "latent ambiguity," and
claimed that extrinsic evidence would show that the
signatories to the 1965 Agreement intended to trans-
fer only domestic rights to the designs.

Casprini is currently engaged in the manufacture and
sale of the designs in the United States and Europe.
In 2003, Knoll, Inc.'s subsidiary, Knoll International
S.P.A., brought suit in Germany against one of Ca-
sprini's distributors. Casprini intervened in that ac-

tion, but was not permitted to introduce evidence in
support of its "latent ambiguity" theory. On January
21, 2005, the German court held that the 1965
Agreement conveyed worldwide copyrights to Knoll,
and enjoined Casprini's distributor from continuing to
sell or advertise the designs. This decision is cur-
rently on appeal. On February 3, 2005, Knoll Interna-
tional brought a second suit in Germany, this time
against Casprini itself. The latter litigation, brought
on February 3, 2005, is ongoing. Casprini brought
this action in the Southern District of New York on
August 5, 2005, seeking a declaration that its manu-
facture, distribution, sale, offering for sale and adver-
tising of reproductions of certain items of furniture
do not infringe upon or otherwise violate any rights
claimed by Knoll under the 1965 Agreement. The
District Court declined to exercise jurisdiction over
Casprini's action.

The Declaratory Judgment Act vests the district
courts with discretion to determine whether they will
exert jurisdiction over a proposed declaratory action
or not. 28 U.S.C. § 2201(a) ("In a case of actual con-
troversy within its jurisdiction ... any court of the
United States ... *may* declare the rights and other le-
gal relations of any interested party seeking such dec-
laration ....") (emphasis added). "Courts have consis-
tently interpreted this permissive language as a broad
grant of discretion to district courts to refuse to exer-
cise jurisdiction over a declaratory action that they
would otherwise be empowered to hear." *Dow Jones
& Co. v. Harrods Ltd.,* 346 F.3d 357, 359 (2d
Cir.2003) (citing, *inter alia, Wilton v. Seven Falls
Co.,* 515 U.S. 277, 282-83, 115 S.Ct. 2137, 132
L.Ed.2d 214 (1995)). Moreover, "this broad discre-
tion is reviewed deferentially, for abuse of discre-
tion." *Id.*

**\*\*2** In exercising its discretion, the District Court
considered five factors, all of which it found weighed
against taking jurisdiction of the case. These factors
are drawn from our decision in *Dow Jones,* in which
we re-articulated the two factors traditionally consid-
ered in this Circuit, namely "(1) whether the judg-
ment will serve a useful purpose in clarifying or set-
tling the legal issues involved; and (2) whether a
judgment would finalize the controversy and offer
relief from uncertainty," and recognized that "[o]ther
circuits have built upon this test, to ask also: (1)
whether the proposed remedy is being used merely
for 'procedural fencing' or a 'race to res judicata'; (2)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

205 Fed.Appx. 861, 2006 WL 3147487 (C.A.2 (N.Y.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 205 Fed.Appx. 861, 2006 WL 3147487 (C.A.2 (N.Y.)))**

whether the use of a declaratory judgment would increase friction between sovereign legal systems or improperly encroach on the domain of a state or foreign court; and (3) whether there is a better or more effective remedy." *Id.* Where the district court's exercise of discretion is based on these five factors, we will not entertain "argument[s] that the district court should have balanced the various factors differently," but will affirm unless "we ... believe that the district court's decision is premised on an erroneous view of the law, [or] a clear error of fact." *Id.* at 360.

[1] In this case, we do not believe that the District Court abused its discretion. **\*864** In particular, we do not think that the District Court erred in taking into account the tenuous merits of Casprini's case under New York law when considering whether a declaratory judgment would serve a useful purpose.[FN1] *See Wilton,* 515 U.S. at 287, 115 S.Ct. 2137 (holding that "the propriety of declaratory relief in a particular case will depend upon a circumspect sense of its fitness informed by the teachings and experience concerning the functions and extent of federal judicial power.... In the declaratory judgment context, the normal principle that federal courts should adjudicate claims within their jurisdiction yields to considerations of practicality and wise judicial administration.").

> FN1. Under well-established New York law, where a contract is unambiguous on its face, extrinsic evidence is not admissible to challenge its meaning. *Nichols v. Nichols,* 306 N.Y. 490, 496, 119 N.E.2d 351 (N.Y.1954). A "latent ambiguity is where you show the words apply equally to two different things or subject-matters, and then evidence is admissible to show which of them was the thing or subject-matter intended." *Petrie v. Trustees of Hamilton College,* 158 N.Y. 458, 464, 53 N.E. 216 (N.Y.1899). There is no ambiguity in the 1965 Agreement, latent or otherwise, as to the geographic scope of the transfer of rights. The 1965 Agreement plainly transfers "*all* ... right, title and interest" in the designs, without geographic limitation; moreover, the 1965 Agreement explicitly states that it "sold, assigned and conveyed ... exclusive *world wide* rights."

[2] Nor do we see any error in the District Court's weighing of the remaining factors. We think that the District Court correctly determined that a ruling by a United States court would not serve to finalize the controversy between the parties, which is in Europe; as Casprini concedes, here and below, the declaration of an American court would merely be "instructive" as to the parties' rights in Germany. We see no reason to disturb the District Court's finding that "the instant action is nothing but an attempt to circumvent the holdings and jurisdictions of the German courts," or that the German legal process offers an adequate remedy and will more effectively address the parties' actual dispute. While we do not believe that the risk of friction between legal systems, under these circumstances, is so great that by itself it would require the District Court to decline jurisdiction, given the strength of the other factors we do not think the District Court's decision was an abuse of discretion.

**\*\*3** For the foregoing reasons, the judgment of the District Court is AFFIRMED.

C.A.2 (N.Y.),2006.
Leather Form S.R.L. v. Knoll, Inc.
205 Fed.Appx. 861, 2006 WL 3147487 (C.A.2 (N.Y.))

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.2d, 2005 WL 3312064 (S.D.N.Y.)
**(Cite as: 2005 WL 3312064 (S.D.N.Y.))**

**H**Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
LEATHER FORM S.R.L., Casprini Gruppo Industriale, S.P.A., Plaintiffs,
v.
KNOLL, INC., Defendant.
**No. 05 Civ. 6994(JSR).**

Dec. 7, 2005.

*MEMORANDUM ORDER*

RAKOFF, J.

**\*1** This is the latest in a series of legal disputes between the parties or their affiliates that are being, or have been litigated in various fora. Each concerns a 1965 Agreement between the well-known designer Mies van der Rohe and defendant Knoll Inc.'s predecessor, Knoll Associates, Inc., in which Mr. van der Rohe agreed to "sell, assign and convey all of [his] right, title and interest in [his] designs and the exclusive use of [his] name in connection with [such] sale in the United States and elsewhere." *See* Complaint, Exh. 1, ¶ 2. The terms of the 1965 Agreement are governed by New York law under its choice-of-law provision. *Id* . ¶ 7.

Plaintiffs, asserting that extrinsic evidence would show that the signatories to the 1965 Agreement intended the language transferring "all right, title, and interest" in van der Rohe's designs to mean only domestic rights, *see* Tr., Oct. 5, 2005, at 6-7, seek in the instant action a declaratory judgment that their manufacture, distribution, sale, offering for sale, and advertising of reproductions of numerous furniture items designed by van der Rohe neither infringe upon, nor otherwise violate, any copyrights claimed to be held by defendant Knoll pursuant to the Agreement. Complaint ¶ 1.[FN1] Defendant now moves to dismiss.

> FN1. The Complaint states only that there is an "actual, substantial, immediate and justifiable controversy" between the parties, but

the specific nature of the dispute was clarified at oral argument on October 5, 2005.

Prior to the instant action, in 2003, Knoll International, a subsidiary of defendant Knoll, Inc., filed suit in the District Court of Hamburg, Germany against a customer of the instant plaintiffs. On January 21, 2005, the Hamburg court held that the 1965 Agreement conveyed to Knoll valid "worldwide" copyrights and enjoined the customer from continuing to sell or advertise the van der Rohe designs. Decl. of Thomas C. Morrison, Sept. 1, 2005 ("Morrison Decl."), Exh. I, at 22-24, 33.[FN2]

> FN2. Plaintiff Leather Form intervened in the German action one month prior to the court's judgment but was not permitted to enter any evidence. It claims not to be bound by the German court's ruling. Tr., Oct. 5, 2005, at 22.

Thereafter, on February 3, 2005, Knoll International sued Casprini and Leather Form in the District Court of Hamburg, Germany, alleging copyright infringement. That litigation is ongoing. Complaint ¶ 11; Tr., Oct. 5, 2005, at 23.

Given the prior German ruling, the pending German action, and plaintiffs' admission at oral argument that they face threat of infringement suits only in Europe, *see* Tr., Oct. 5, 2005, at 35, this Court declines to exercise jurisdiction over the instant action. District courts are afforded broad discretion under the Declaratory Judgment Act in determining whether to hear declaratory actions. *See* 28 U.S.C. § 2201(a) ("[A]ny court of the United States, upon the filing of an appropriate pleading, *may* declare the rights and other legal relations of any interested party seeking such declaration ....") (emphasis added); *Wilton v. Seven Falls Co.,* 515 U.S. 277, 282-83, 287-88 (1995). In choosing whether to exercise jurisdiction in such a case, a court must consider "(1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; and (2) whether a judgment would finalize the controversy and offer relief from uncertainty," and may also consider "[3] whether the proposed remedy is being used merely for 'procedural fencing' or a 'race to res judicata'; [4]

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3312064 (S.D.N.Y.)
**(Cite as: 2005 WL 3312064 (S.D.N.Y.))**

whether the use of a declaratory judgment would increase friction between sovereign legal systems or improperly encroach on the domain of a state or foreign court; and [5] whether there is a better or more effective remedy." *Dow Jones & Co., Inc. v. Harrods, Ltd.,* 346 F.3d 357, 359 (2d Cir.2003) (internal citations omitted).

**\*2** As to the first factor, this Court is doubtful whether any latent ambiguity exists in the 1965 Agreement that requires clarification. But even assuming, *arguendo,* that there is some such issue that needs to be clarified, each of the other factors tilts decidedly against exercising jurisdiction in this case.

As to the second factor, it is clear, even to plaintiffs, that any decision by this Court would be at most "instructive," rather than decisive. *See* Tr., Oct. 5, 2005, at 39. The parties have not asserted that any verdict by this Court would be binding on the German courts in either of the German actions regarding the rights conveyed by the 1965 Agreement, and at least one court in this District has already concluded that a German court "would not recognize a judgment rendered by an American court." *See Gordon & Breach Sci. Publishers, S.A. v. Am. Inst. of Physics,* 905 F.Supp. 169, 179 & n. 8 (S.D.N.Y.1995).

For similar reasons, it is clear that, as to factor three, the instant action is nothing but an attempt to circumvent the holdings and jurisdiction of the German courts; that, as to factor four, the effect of a parallel suit here would raise a high risk of creating friction between legal systems; and that, as to factor five, the German legal process offers a better remedy than any action here.

Accordingly, the Court declines to exercise jurisdiction under 28 U.S.C. § 2201(a) and hereby dismisses the complaint. Clerk to enter judgment.

SO ORDERED.

S.D.N.Y.,2005.
Leather Form S.R.L. v. Knoll, Inc.
Not Reported in F.Supp.2d, 2005 WL 3312064 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in A.2d, 2005 WL 1671528 (Conn.Super.), 39 Conn. L. Rptr. 560
**(Cite as: 2005 WL 1671528 (Conn.Super.))**

▷

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Superior Court of Connecticut,
Judicial District of New Haven.
Rachel MITCHELL
v.
Mary PATTERSON.
**No. 4001501.**

June 21, 2005.

Cirello & Vessicchio Llc, New Haven, for Rachel
Mitchell and On Point Productions.

Willinger, Willinger & Bucci Pc, Bridgeport, for
Mary Patterson and Mya Productions.

BRUCE L. LEVIN, J.

**\*1** The defendants move to dismiss this civil action
for lack of personal jurisdiction. The defendants al-
lege that they lack the contacts required by General
Statutes § 52-59b for the court to exercise jurisdiction
over them.

The court held an evidentiary hearing on the motion.
Where the court holds an evidentiary hearing on a
motion to dismiss for lack of personal jurisdiction,
the court does not assume the truth of the allegations
in the complaint. See *Bradley's Appeal from Probate,*
19 Conn.App. 456, 462, 563 A.2d 1358 (1989). The
court, however, reviews the allegations of the com-
plaint to put the case in context.

The complaint alleges the following. The individual
plaintiff, Rachel Mitchell, and James Clanton were
partners in the plaintiff On Point Productions, a part-
nership in the business of managing entertainers, with
a principal place of business in Connecticut. The in-
dividual defendant, Mary Patterson, is a partner in the
defendant MYA Productions, a partnership in the
business of promoting performances, and providing
press kits and promotional items for entertainers,
with a principal place of business in North Carolina.

In the spring of 2002, Dan Jenkins of Raw Enter-
tainment, LLC, a New Jersey limited liability com-
pany with an office in Connecticut, contracted with
Patterson to render promotional services for an enter-
tainer he managed named Monte Gill. Later that
spring, Jenkins introduced Clanton to Patterson.
Clanton, on behalf of On Point Productions, entered
into a contract with Patterson. Under the contract,
Patterson was to provide promotional, marketing and
related services and materials for a July 20, 2002,
Bike Fest Summer Jam concert in North Carolina.
These services were specifically for the benefit of an
artist known as "Sunny." In turn, On Point Produc-
tions would pay Patterson compensation for her ser-
vices.

The first count of the complaint alleges that the de-
fendants breached the contract. The second count
incorporates the allegations of the first count and
further alleges that the plaintiffs received facsimiles,
e-mails and other correspondence from Patterson to
induce them to pay the defendants to participate in
Bike Fest Summer Jam in North Carolina. The plain-
tiffs allege that they relied on the representations in
these e-mails to their detriment, suffering financial
losses. The third count incorporates the allegations of
the second count and alleges that Patterson "has been
unjustly enriched by accepting payment from the
plaintiffs while failing to provide the services in re-
turn." The fourth count incorporates the allegations
of the third count and alleges that Patterson's actions
constitute a violation of the Connecticut Unfair Trade
Practices Act. The plaintiffs claim money damages
and other relief.

The defendants filed a motion to dismiss alleging that
the Connecticut Superior Court lacked personal juris-
diction over them because they did not have suffi-
cient contacts with Connecticut to satisfy the re-
quirements of General Statutes § 52-59b. The motion
was supported by the affidavit of Patterson. Patterson
subsequently filed a supplemental affidavit.[FN1]

> FN1. In paragraph 8 of her supplemental af-
> fidavit, Patterson stated that she executed
> the contract giving rise to this litigation in
> Connecticut. She later filed a corrected affi-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2005 WL 1671528 (Conn.Super.), 39 Conn. L. Rptr. 560
**(Cite as: 2005 WL 1671528 (Conn.Super.))**

davit stating that she executed the contract in North Carolina regarding work to be performed in North Carolina. The court does not condone the signing of affidavits by persons who do not carefully read, understand and agree with their contents.

**\*2** The plaintiffs objected to the motion to dismiss, asserting that the defendants did have minimum contacts with Connecticut sufficient to satisfy General Statutes § 52-59b. According to the plaintiffs, "[t]he substantial minimum contacts include but are not limited to, facsimiles and other correspondence directed at the plaintiffs originating while the plaintiffs resided in Connecticut. The purpose and scope of these communications was to induce the plaintiffs to enter into a contract with the defendants. Also, some of the payments on the contract were made in Connecticut for the services that were to be provided by the defendants." The plaintiffs' objection was accompanied by a supporting brief and an affidavit by Clanton.

The summons states that the address of both defendants is in North Carolina. Service of process was made on them by constructive service, by a Connecticut marshal serving the secretary of state of Connecticut and mailing a copy of the summons and complaint to the defendants at their North Carolina address. When constructive service is used, the burden of proving facts sufficient to confer jurisdiction on the court is on the plaintiff. *Standard Tallow Corp. v. Jowdy,* 190 Conn. 48, 54, 459 A.2d 503 (1983). Moreover, "[w]hen a motion to dismiss for lack of personal jurisdiction raises a factual question which is not determinable from the face of the record, the burden of proof is on the plaintiff to present evidence which will establish jurisdiction." *Id.*

"[A] determination of whether sufficient minimum contacts with Connecticut exist is a fact question ... A motion to dismiss may ... raise issues of fact and would, therefore, require a ... hearing [to determine the facts] ... [A]ffidavits are insufficient to determine the facts unless, like the summary judgment, they disclose that no genuine issue as to a material fact exists ... When issues of fact are necessary to the determination of a court's jurisdiction, due process requires that a trial-like hearing be held, in which an opportunity is provided to represent evidence and to cross-examine adverse witnesses." (Citations omit-

ted; internal quotation marks omitted.) *Id.,* at 56, 459 A.2d 503. For this reason the court held an evidentiary hearing on the defendants' motion to dismiss.

Having heard the evidence, the court finds the following facts. Patterson, the individual defendant, is a resident of North Carolina where she is employed by NACCO Materials Handling Group, Inc., an entity that, among other things, manufactures fork lifts. In their spare time, she and her cousin, Anthony Daniels, a recording producer and North Carolina resident, create promotional materials. They also create "demo" compact discs in connection with concerts by contemporary entertainers.[FN2] Patterson and Daniels conduct this business under the name of the other defendant, MYA Productions or MYA Publishing, a North Carolina entity.

> FN2. The American Heritage Dictionary of the English Language (4th Ed.2000) defines a "demo" as "[a] brief tape or recording illustrating the abilities of a musician or other performer."

Sometime prior to entering into the contract giving rise to this litigation, Patterson had transported an entertainer named Monte Gill to Connecticut for a performance. At the performance, she met Clanton. Clanton was employed by a car dealership. He is also one of the two partners who comprise the plaintiff On Point Productions, a partnership. Notwithstanding the allegations of the complaint, the individual plaintiff, Rachel Mitchell, is not a partner in On Point Productions. Moreover, Mitchell did not testify at the hearing and never had any contact with Patterson.

**\*3** Clanton and On Point Productions were planning to produce a concert in North Carolina in which their client, Sunny Gibson, was to perform. Dan Jenkins, a producer-promoter with an office in Norwich, Connecticut doing business as Raw Entertainment, recommended to Clanton that he retain Patterson promote the event. Clanton and Jenkins, who was not the agent of Patterson or MYA, were employed by the same car dealership.

Following Jenkins' recommendation, Clanton contacted Patterson in North Carolina. Patterson then prepared and signed the contract in North Carolina on May 15, 2002 and sent it to Clanton, who signed it in Connecticut on May 20, 2002.[FN3] All of the services

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2005 WL 1671528 (Conn.Super.), 39 Conn. L. Rptr. 560
**(Cite as: 2005 WL 1671528 (Conn.Super.))**

that Patterson was to provide under the contract were to be provided in North Carolina.

    FN3. The contract provides:

    "You have been retained by On Point Productions, as an independent contractor for the project of "Sunny" demo packaging, imaging, press kit, marketing, club promotions.

    You will be responsible for successfully completing said project according to specifications. The project is to be completed by November 13, 2002.

    The cost to complete will not exceed

    You will invoice us for your services rendered at the end of each month. $1,000

    We will not deduct or withhold an[y] taxes, FICA or other deductions. As an independent contractor, you will not be entitled to any fringe benefits, such as unemployment insurance, medical insurance, pension plans, or other such benefits that would be offered to regular employees.

    During this project you may be in contact with proprietary information which is important to our company and its competitive position. All information must be treated with strict confidence and may not be used at any time or in any manner in work you may do with others in our industry."

After entering into the contract, Patterson faxed a chart to Clayton depicting the services she would be rendering and when they would be rendered. Later in May 2002, when Daniels, Patterson's partner, was in Connecticut visiting relatives, he met with Clanton, and Clanton gave him approximately $2,500 for the services Patterson was to perform pursuant to the contract.

On June 6, 2002, Patterson faxed a memo to Jenkins, in Connecticut, in which she provided him with detailed information about upcoming regional conferences of the National Association of Campus Activities, at which Jenkins could showcase information about the performers he managed. The memo encouraged Jenkins to enroll in one of these conferences. Patterson faxed a copy of this memo to Clanton.

On June 13, 2002, Patterson faxed a one-page memo to a colleague in North Carolina, Yomi Shafau, advising him that Clanton and Gibson would be in North Carolina on June 20-23. The memo contained their itinerary. A copy of this memo was faxed to Clanton. Also on June 13, 2002, Patterson faxed information to Jenkins about promotional activities she was providing in connection with an August 30 concert featuring Gill and Gibson. A copy of this memo was faxed to Clanton.

Also, in June, Jenkins and Clanton were considering having other performers they each managed (Donell Jones, Monte Gill, Sunny Gibson and possibly Kim Travis) perform at a concert in North Carolina. They requested that Patterson give them a "break-even" analysis of promotional expenses. Patterson faxed a one-page analysis to Clanton.

On June 13, 2002, Patterson sent Jenkins a one-page e-mail in which she confirmed the details of a concert in North Carolina that she and Jenkins were working on in an unpaid capacity.

"When a defendant files a motion to dismiss challenging the court's [personal] jurisdiction, a two part inquiry is required. The trial court must first decide whether the applicable state long-arm statute authorizes the assertion of jurisdiction over the [defendant]. If the statutory requirements [are] met, its second obligation [is] then to decide whether the exercise of jurisdiction over the [defendant] would violate constitutional principles of due process." (Internal quotation marks omitted.) *Knipple v. Viking Communications, Ltd.,* 236 Conn. 602, 606, 674 A.2d 426 (1996). With regard to the first part of this inquiry, the plaintiffs argue that personal jurisdiction over the defendants is authorized by Connecticut's long-arm statute under General Statutes 52-59b(a)(1) and (5).

*4 General Statutes § 52-59b(a) provides in relevant part: "As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nonresident individual,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2005 WL 1671528 (Conn.Super.), 39 Conn. L. Rptr. 560
**(Cite as: 2005 WL 1671528 (Conn.Super.))**

foreign partnership or foreign voluntary association, or over the executor or administrator of such nonresident individual, foreign partnership or foreign voluntary association, who in person or through an agent: (1) Transacts any business within the state ... or (5) uses a computer, as defined in subdivision (1) of subsection (a) of section 53-451, or a computer network, as defined in subdivision (3) of subsection (a) of said section, located within the state." "In order to find jurisdiction over a nonresident defendant, only one of the provisions of § 52-59b needs to be satisfied." *Pro Performance Corporate Services, Inc. v. Goldman,* 47 Conn.Supp. 476, 483, 804 A.2d 248 (2002) (32 Conn. L. Rptr. 404).

The court may quickly dispose of the plaintiffs' claim that the court has jurisdiction over the defendants pursuant to General Statutes § 52-59b(a)(5). Section 52-59b(a)(5) expressly incorporates the definition of computer network in General Statutes § 53-451(a)(3) which states: " 'Computer network' means a set of related, remotely connected devices and any communications facilities including more than one computer with the capability to transmit data among them through the communications facilities." The plaintiffs essentially argue that the fact that the defendants had, or made use of, a web site accessible by computer in Connecticut is evidence that they used a computer network. Such an interpretation would, at the very least, read the word "related" out of the statutory definition. "Related" means "connected by reason of an established or discoverable relation ..." Merriam-Webster's Collegiate Dictionary (10th Ed.1997). "Relation" is defined as "an aspect or quality ... that connects two or more things or parts as being or belonging or working together or as being of the same kind ..." *Id.* Quite clearly a web site is not a computer network, as statutorily defined. If the legislature had meant "internet" instead of "computer network" it would have said so, as it did in General Statutes §§ 1-96c, 1-267, 3-37, 4a-57, 4d-80, 4d-82, 4d-83, 9-348gg, 10-262n, 10a-151b, 11-23c, 12-407, 12-408, 12-411, 12-412, 17b-367, 19a-177, 20-327b, 22a-1b, 22a-263a, 22a-620, 28-25b, 30-86, 32-23d, 53-451, 53a-90a, 54-142i, 54-258.[FN4]

> FN4. Such language or intent would cast grave doubt on the constitutionality of General Statutes § 52-59b and General Statutes § 53-451. "[T]he mere operation of a commercially interactive web site should not

subject the operator to jurisdiction anywhere in the world. Rather, there must be evidence that the defendant 'purposefully availed' itself of conducting activity in the forum state, by directly targeting its web site to the state, knowingly interacting with residents of the forum state via its web site, or through sufficient other related contacts." *Toys "R" Us, Inc. v. Step Two, S.A.,* 318 F.3d 446, 454 (3d Cir.2003). "In choosing between two constructions of a statute, one valid and one constitutionally precarious, we will search for an effective and constitutional construction that reasonably accords with the legislature's underlying intent." *State v. Breton,* 212 Conn. 258, 269, 562 A.2d 1060 (1989).

The plaintiffs' remaining argument is that the defendants transacted business in Connecticut, thereby authorizing this court to assert jurisdiction over them. "In determining whether the plaintiffs' cause of action arose from the defendants' transaction of business within this state we do not resort to a rigid formula. Rather, we balance considerations of public policy, common sense, and the chronology and geography of the relevant factors." *Zartolas v. Nisenfeld,* 184 Conn. 471, 477, 440 A.2d 179 (1981). Moreover, "in enacting § 52-59b, the legislature used New York Civil Practice Law § 302 (McKinney 1980-81 Sup.) as a model ... [Therefore] the judicial interpretation given to that New York statute" is pertinent to the interpretation of § 52-59b. (Citations omitted.) *Id.,* at 474, 440 A.2d 179. As such, this court turns to the judicial interpretations of the New York statute.[FN5]

> FN5. N.Y. C.P.L.R. § 302(a)(1) provides in relevant part, "[a]cts which are the basis of jurisdiction. As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary, or his executor or administrator, who in person or though an agent: 1. transacts any business within the state or contracts anywhere to supply goods or services in the state ..."

**\*5** "In order to meet the 'transacting business' element, a plaintiff must show that the defendant 'purposefully avail[ed] [itself] of the privilege of conducting activities within [the forum state], thus invoking, the benefits and protections of its laws.'

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2005 WL 1671528 (Conn.Super.), 39 Conn. L. Rptr. 560
(Cite as: 2005 WL 1671528 (Conn.Super.))

*Cutco Indus[tries, Inc. v. Naughton],* 806 F.2d 361, 365 [ (2d Cir., 1986) ] (citation and quotation marks omitted). Courts should examine the totality of defendant's contacts with [the forum], rather than focus on each isolated event. *Id.*" *Nassar v. Florida Fleet Sales, Inc.,* 69 F.Supp.2d 443, 446 (S.D.N.Y.1999). Although "a single purposeful business transaction" in Connecticut can be sufficient to support jurisdiction; [FN6] *Zartolas v. Nisenfeld, supra,* 184 Conn. at 474, 440 A.2d 179 (adopting the New York rule); "the nature and quality of the [forum state's] contacts must be examined to determine their significance. *George Reiner & Co. v. Schwartz,* 41 N.Y.2d 648, 394 N.Y.S.2d 844, 847, 363 N.E.2d 551 (N.Y.1977). In judging whether there are sufficient contacts, the New York Court of Appeals has cautioned that ...'defendants, as a rule, should be subject to suit where they are normally found, that is, at their preeminent headquarters or where they conduct substantial general business activities.' *McKee Elec. Co. v. Rauland-Borg Corp.,* 20 N.Y.2d 377, 283 N.Y.S.2d 34, 38, 229 N.E.2d 604 (N.Y.1967)." *Nassar v. Florida Fleet Sales, Inc., supra,* 69 F.Supp.2d at 446-47).

> FN6. This broad elliptical expression in *Zartolas v. Nisenfeld,* 184 Conn. 471, 474, 440 A.2d 179 (1981), was later in the decision by clarifying that "[i]n determining whether the plaintiffs' cause of action arose from the defendants' transaction of business within this state we do not resort to a rigid formula. Rather, we balance considerations of public policy, common sense, and the chronology and geography of the relevant factors ... In this case each of those considerations leads us to conclude that the plaintiffs' cause of action against the defendants arose from the defendants' transaction of business, in person, within the state." *Id.,* at 477, 440 A.2d 179. Notably, *Zartolas* dealt with the out of state execution of a warranty deed conveying real property located in Connecticut, a fact highlighted in *Rosenblit v. Danaher,* 206 Conn. 125, 138, 537 A.2d 145 (1988). In *Rosenblit,* the court noted that "[t]he situs of the real property in Connecticut in *Zartolas* suggests ... that *Zartolas* is distinguishable factually from the case before us"; *id.,* at 139, 537 A.2d 145; in which the evidence showed that two Connecticut plaintiffs went to Massachusetts and hired the defendants, members of a Massachusetts law firm, to

bring an action that arose out of events that primarily occurred in that state, and that the individual defendant "was only physically present in Connecticut on this matter on one occasion ..." *Id.,* at 137, 537 A.2d 145. The court explained that it was "the fundamental incidents of the warranty deed in *Zartolas* [that] render[ed] the defendants' purposeful execution of it [in Iowa] a transaction of any business within this state." *Id.,* at 139, 537 A.2d 145. Moreover, the court pointed out that in *Zartolas,* "we noted that the 'execution of a warranty deed pursuant to a sale of real property was a legal act of a most serious nature' and that 'the defendants' purposeful Connecticut related activity suffices to locate this transaction within this state.' " *Id.* In addition, "[w]e specifically pointed out that inasmuch as the defendants had 'purposefully availed themselves of the privileges of owning and selling Connecticut land [then] this state may require them to defend a Connecticut suit alleging breach of the deed's warranties.' *Id.,* at 478, 440 A.2d 179. Clearly, Connecticut was the only possible forum in *Zartolas.'* " *Rosenblit v. Danaher, supra* 206 Conn. at 140, 537 A.2d 145. In contrast, in *Rosenblit,* the court observed that "[e]ven though it is true that [one of the other defendants] resides in Connecticut and some witnesses may reside in Connecticut, on balance, we cannot say that *Zartolas* or *Computer Assistance, Inc. [v. Morris,* 564 F.Supp. 1054 (D.Conn.1953) ], required, under relevant legal principles, that the trial court hold [the individual defendant] amenable to in personam jurisdiction under § 52-59b(a)(1) ." *Rosenblit v. Danaher, supra,* 206 Conn. at 140-41, 537 A.2d 145.

> As explained in one Superior Court decision, "[w]here the single transaction at issue is not so fundamentally based in Connecticut, as it was in *Zartolas,* the Supreme Court in *Rosenblit v. Danaher* ... made it clear that the trial court should scrutinize the real locus of the underlying transaction at issue. While the words of § 52-59b(a)(1) could be read as allowing jurisdiction generally if a defendant transacts any business in Connecticut, the Su-

Not Reported in A.2d, 2005 WL 1671528 (Conn.Super.), 39 Conn. L. Rptr. 560
(Cite as: 2005 WL 1671528 (Conn.Super.))

preme Court in *Zartolas* ... made it clear that jurisdiction under this section exists only if the business that gives rise to the plaintiff's cause of action was transacted in Connecticut ... Likewise, in *Gaudio v. Gaudio,* 23 Conn.App. 287 [580 A.2d 1212] (1990), the transaction of business that rendered the [defendant] subject to the jurisdiction of a Connecticut court [on a claim for fraudulent transfer of stock] was his visit to Connecticut to effectuate the purchase of the very stock at issue." *Cooper Companies, Inc. v. Woodbridge Associates, LP,* Superior Court, judicial district of New Haven, Docket No. CV 92 0329693 (May 19, 1992, Hodgson, J.) (6 Conn. L. Rptr. 415, 417-18). See also *R.O.I. Development Corp. v. Weiss,* Superior Court, judicial district of Hartford/New Britain at Hartford, Docket No. CV 91 0391584 (December 21, 1992, Dunn, J.) (8 Conn. L. Rptr. 122, 122-23) (distinguishing *Zartolas* and *Rosenblit* ). Other trial courts have also recognized that " 'jurisdiction is proper under § 52-59b(a)(1) only if the plaintiff's cause of action arises out of the business transacted in the state.' *Weinberg v. Zimet, Haines, Friedman & Kaplan,* No. 3;94 CV 1681, slip opinion, at 3-4 (D.Conn., August 8, 1996), citing *Sherman Associates v. Kals,* 899 F.Supp. 868, 870 (D.Conn.1995)." *Sherman v. Physicians for Women, P.C.,* Superior Court, judicial district of Danbury, Docket No. 323672 (May 19, 1997, Stodolink, J.) (19 Conn. L. Rptr. 465, 466).

Another trial court has observed that, in applying the balancing standard announced in *Zartolas,* "courts have reached varying results. For example, in *Zartolas,* the Connecticut Supreme Court held that the defendants' execution, in Iowa, of a warranty deed for Connecticut realty satisfied the statute, as 'execution of a warranty deed pursuant to a sale of real property is a legal act of a most serious nature.' [*Zartolas v. Nisenfeld* ] 184 Conn. 475 Similarity, Judge Dorsey held that the defendant's execution, in New York, of a guaranty of a lease, fell within this long-

arm statute, where the office space being leased was in Connecticut, both the lessor and lessee were Connecticut entities, and all notices with respect to the lease were to be given in Connecticut. *Corporate Park [Associates v. Goldstein,* No. H89-173(PCD) (D.Conn., September 7, 1989) ], slip opinion, 3-4.

"Less substantial involvement has led judges to conclude that the statutory requirements of § 52-59b(a)(1) were not met. See, e.g., *Savin [v. Ranier]* 898 F.2d [304] 306-07 (Kentucky defendant's execution of promissory note as part of New York syndication with payments to Connecticut plaintiff insufficient to confer jurisdiction in this state); *Crestment [Federal Savings & Loan Association v. Craumer,* No. CV B89-503(TFGD) (D.Conn., November 16, 1989) ], slip opinion, 7-8 (foreign defendants' guarantee of limited partnership's obligation to New Jersey plaintiff not within statute, where even though realty was located in this state, payments were to be made in New Jersey); *Greene v. Sha-Na-Na,* 637 F.Supp. 591, 595-96 (D.Conn.1986) (no § 52-59b(a)(1) jurisdiction over partnership for advertisement in *New York Post* for New York performance or for broadcast into Connecticut of national telethon originating in California); *Rosenblit v. Danaher,* 206 Conn. 125, 140-42, 537 A.2d 145 (1988) (no long-arm jurisdiction present over Massachusetts attorneys in legal malpractice suit filed by Connecticut client, where only one meeting was held in Connecticut and litigation at issue had been filed in Massachusetts)." *Coan v. Bell Atlantic Systems Leasing International, Inc.,* 813 F.Supp. 929, 946 (D.Conn.1990).

"Several factors should be considered in determining whether an out-of-state defendant transacts business in [ Connecticut], including: (I) whether the defendant has an on-going contractual relationship with a [ Connecticut] corporation; (ii) whether the contract was negotiated or executed in [ Connecticut] and whether, after executing a contract with a [ Connecti-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2005 WL 1671528 (Conn.Super.), 39 Conn. L. Rptr. 560
(Cite as: 2005 WL 1671528 (Conn.Super.))

cut] business, the defendant has visited [ Connecticut] for the purpose of meeting with parties to the contract regarding the relationship; (iii) what the choice-of-law clause is in any such contract; and (iv) whether the contract requires franchisees to send notices and payments into the forum state or subjects them to supervision by the corporation in the forum state. *Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp.,* 98 F.3d 25, 29 (2d Cir.1996) (internal citations omitted). Although all factors are relevant, no one factor is dispositive and other factors may be considered. See *id.* The ultimate determination is based on the totality of the circumstances. *Id.*" (Internal quotation marks omitted.) *Sunward Electronics, Inc. v. McDonald,* 362 F.3d 17, 22-23 (2d Cir.2004); see also *Zartolas v. Nisenfeld, supra,* 184 Conn. at 477, 440 A.2d 179 ("we balance considerations of public policy, common sense, and the chronology and geography of the relevant factors"). Balancing the various factors, the court finds that the plaintiffs have not proven that the defendants transacted business in Connecticut within the meaning of General Statutes § 52-59b(1).

\*6 First, there is no evidence of an ongoing contractual relationship between the defendants and a Connecticut corporation or other entity, although there was some evidence that the defendants had done business with Jenkins and Raw Entertainment in the past and were hoping to do so in the future. Second, though the contract giving rise to this dispute was "made" in Connecticut, since Clanton was the last to sign it and did so in Connecticut-"[i]t is well established that a contract is considered made when and where the last thing is done which is necessary to create an effective agreement. *Alfred M. Best Co., Inc. v. Goldstein,* 124 Conn. 597, 602, 1 A.2d 140 (1938), and cases cited therein." *Bilco Co. v. Carey Precast Concrete Co.,* Superior Court, judicial district of New Haven, Docket No. CV 97 405960 (June 19, 1998, Levin, J.) (22 Conn. L. Rptr. 309)-this alone is an insufficient basis on which to find that the defendants had transacted business in Connecticut. See *Libra Global Technology Services (UK) Ltd. v. Telemedia International, Ltd.,* 279 A.D.2d 326, 327, 719 N.Y.S.2d 53 (2001) (where "a defendant has signed a contract outside of this State, a court cannot exercise jurisdiction over that defendant pursuant to CPLR § 302(a)(1) [New York's long-arm statute] based simply on the circumstance that the plaintiff signed in New York see *Standard Wine & Liq. Co. v. Bombay Spirits Co.,* 20 N.Y.2d 13, 17, 281 N.Y.S.2d

299, 228 N.E.2d 367; *Millner Co. v. Noudar, Ltd.,* 24 A.D.2d 326, 329, 330, 266 N.Y.S.2d 289).") Even when standing with other evidence of transacting business, the happenstance that a party is the last to sign a contract would seem to be a circumstance entitled to little weight.

Third, the contract did not contain a choice-of-law clause, and no franchise relationship was involved.

Other relevant circumstances are that Patterson had once driven a client of Jenkins to Connecticut and had been introduced to Clanton. Also her partner, Daniels, received money from Clanton in Connecticut, as consideration for the contract between Clanton and Patterson. Although the payment was made in Connecticut, Daniels' reason for coming to Connecticut was to visit family.

"A 'purposeful business transaction' is one in which the defendant has engaged in some form of affirmative conduct allowing or promoting the transaction of business within the forum state." *Zemina v. Petrol Plus, Inc.,* Superior Court, judicial district of New Haven, Housing Session, Docket No. CV NH 9712-8590 (March 3, 1998) (22 Conn. L. Rptr. 94); see also *Mayacas Corp. v. Gulfstream Aerospace Corp.,* 190 Ga.App. 892, 380 S.E.2d 303, cert. vacated, 259 Ga. 455, 385 S.E.2d 412 (1989) (holding that company president's attendance at a trade show held in forum state was fortuitous and did not constitute transacting business in the state). Thus, Daniels' conduct in receiving the payment on behalf of Patterson while he was in Connecticut primarily for another, personal purpose was merely fortuitous and not an affirmative, purposeful act, as that term is used in connection with our statutes.

\*7 Beyond this there are seven single-page documents that the Patterson faxed or e-mailed to Clanton in Connecticut, dealing with her plan to promote Sunny Gibson, the services she would provide, and information about upcoming events not pertaining to the contract. It is true that "one need not be physically present in order to be subject to the jurisdiction of our courts ... for, particularly in this day of instant long-range communications, one can engage in extensive purposeful activity here without ever actually setting foot in the State." (Internal quotation marks omitted.) *Under Par Associates, LLC v. Wash Depot A, Inc.,* 47 Conn.Supp. 319, 322, 793 A.2d 300

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2005 WL 1671528 (Conn.Super.), 39 Conn. L. Rptr. 560
**(Cite as: 2005 WL 1671528 (Conn.Super.))**

(2002) (47 Conn.Supp. 319, 793 A.2d 300, 31 Conn. L. Rptr. 20). Nevertheless, " '[t]he transmission of communications between an out-of-state defendant and a [party] within the jurisdiction does not, by itself. constitute the transaction of business within the forum state.' *Bross Utilities Service Corp. v. Aboubshait,* 489 F.Supp. 1366, 1371-72 (D.Conn.), aff'd mem., 646 F.2d 559 (2d Cir.1980) (construing Conn. Gen.Stat. § 33-411(b) [and § 52-59b(a)(1) ] ) ... See also *Greene v. Sha-Na-Na,* 637 F.Supp. 591, 596 (D.Conn.1986) (nonresident's telephone call, telegram and letter to Connecticut plaintiff did not constitute transaction of business within meaning of § 52-59(a)(1)); *Connecticut Artcraft Corp. v. Smith,* 574 Conn. 626, 631 (D.Conn.1983) (nonresident's telephone calls to alleged coconspirators in Connecticut concerning trade secrets of their former employer, a Connecticut corporation, did not constitute transaction of business within meaning of § 52-59b(a)(1)) ." *Custom Navigation Systems, Inc. v. Pincus,* 935 F.Supp. 117, 119 (D.Conn.1995); see also *Coan v. Bell Atlantic Systems Leasing International, Inc.,* 813 F.Supp. 929, 946 (D.Conn.1990) (nonresident's transmission of a draft tax opinion to the plaintiff's Connecticut corporation is insufficient to confer jurisdiction under § 52-59); *Schembri v. Physicians for Women, P.C ., supra,* 19 Conn. L. Rptr. at 466 (nonresident's mailing of report to Connecticut resident does not constitute " ' transacting business' within the state."); *International Capital Realty Investment Co. v. West,* 234 Ga.App. 725, 728, 507 S.E.2d 545 (1998), cert. denied, 1999 Ga. Lexis 199 (1999) (plaintiff's telephone and mail contact with out-of-state defendant and defendant's visits to forum are insufficient to establish purposeful activity with forum state).

Of course, the test is not whether each of these individual items standing alone constitutes the transaction of business in Connecticut but, rather, whether the totality of circumstances shows the transaction of business. "A court must consider the totality of circumstances when determining the existence of purposeful activity, and may not subject the defendant to jurisdiction based on 'random,' 'fortuitous,' or 'attenuated' contacts. *CutCo Indus.,* 806 F.2d at 365. It is the 'nature and quality' and not the amount of New York contacts that determine the purposeful activity. *PaineWebber, Inc. v. WHV, Inc.,* 1995 U.S. Dist. LEXIS 6514, 1995 WL 296398, at *2 (S.D.N.Y., May 16, 1995). The requisite minimum contacts must provide a fair warning to the defendant of a possibil-

ity of being subject to courts of the forum state." *SAS Group, Inc. v. Worldwide Inventions, Inc.,* 245 F.Sup.2d 543, 548 (S.D.N.Y.2003).

**\*8** Focusing on the nature and quality of the defendants' acts, the court holds that they do not constitute transacting business in Connecticut. Other than the three e-mails or faxes Patterson sent to Connecticut in which she described actions that the defendants would undertake for the plaintiffs within the state of North Carolina pursuant to their contract, the plaintiffs did not provide evidence that the defendants engaged in purposeful acts in Connecticut. Furthermore, the plaintiffs did not prove that the defendants had an ongoing relationship with a Connecticut person. "As a broad generalization, a nondomiciliary who enters [the forum state's] service economy pursuant to a contract is more likely to be deemed to be transacting business in [the forum state] than is one who performs services out of State for [the forum state's] residents on a random basis ..." ..." *McLenitban v. Bennington Community Health Plan,* 223 A.D.2d 777, 778, 635 N.Y.S.2d 812, appeal dismissed, 88 N.Y.2d 1017, 649 N.Y.S.2d 383, 672 N.E.2d 609 (1996). Section 52-59b does not generally exert jurisdiction to the limits of due process. "The term 'transacting business' is not broadly interpreted in Connecticut. *Chemical Trading v. Manufacture de Produits Chimiques de Tourman,* 870 F.Supp. 21, 23 (D.Conn.1994); *Hospitality Systems, Inc. v. Oriental World Trading Co., LTD.,* No. CV 99 0169927 2000 Conn. Super LEXIS 255, 2000 WL 177441 (February 1, 2000) (26 Conn. L. Rptr. 401)." *Milne v. Catuogno Court Reporting Services, Inc.,* 239 F.Sup.2d 195, 198 (D.Conn.2002).

Finally, the plaintiffs made no showing that anything the defendants did or said caused them any loss in Connecticut.

The court finds that the plaintiffs have failed to prove that the defendants transacted business in Connecticut, within the meaning of General Statutes § 52-59b. Because the statutory requirements have not been satisfied, it is unnecessary for the court to determine whether the exercise of jurisdiction over Patterson would violate due process. *Rosenblit v. Danaher,* 206 Conn. 125, 142, 537 A.2d 145 (1988). The motion to dismiss is granted.

Conn.Super.,2005.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2005 WL 1671528 (Conn.Super.), 39 Conn. L. Rptr. 560
**(Cite as: 2005 WL 1671528 (Conn.Super.))**


Mitchell v. Patterson
Not Reported in A.2d, 2005 WL 1671528
(Conn.Super.), 39 Conn. L. Rptr. 560

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 918538 (D.Conn.)
**(Cite as: 2008 WL 918538 (D.Conn.))**

**C**Only the Westlaw citation is currently available.

United States District Court,
D. Connecticut.
RJM AVIATION ASSOCIATES, INC., Plaintiff
v.
GP AVIATION SERVICES, LLC, and Richard Conrad, Defendants.
**No. 3:06-CV-2007 (CFD).**

March 28, 2008.

David E. Kamins, E. Hartford, CT, for Plaintiff.

June Louise Deptulski, Michael E. Satti, Michael E. Satti Attorney at Law LLC, Stonington, CT, for Defendants.

*RULING ON DEFENDANTS' MOTION TO DISMISS*

CHRISTOPHER F. DRONEY, District Judge.

**\*1** Plaintiff, RJM Aviation Associates, Inc. ("RJM"), brought this action in the Connecticut Superior Court alleging breach of contract, fraud and unfair trade practices by the defendants, GP Aviation Services, LLC ("GP"), and its sole owner Richard Conrad. The defendants removed the case to this Court based on diversity jurisdiction. The defendants have filed a motion to dismiss under Fed.R.Civ.P. 12(b)(2), alleging that this Court lacks personal jurisdiction over them. For the reasons below, the defendants' motion is granted in part and denied in part.

**I. Background**[FN1]

> FN1. The following facts are taken from the complaint, and the affidavits submitted by the parties.

RJM is a Connecticut corporation with its principal place of business in Berlin, Connecticut. Robert J. Morande is the president and CEO of RJM. According to GP, it is a Delaware limited liability company with its principal place of business in White Plains,

New York. Conrad is a citizen of New York.[FN2] Neither GP nor Conrad has a place of business in Connecticut.

> FN2. While RJM did not challenge removal of this action to this Court, the Court notes that it has subject matter jurisdiction. The citizenship of an LLC is determined by the citizenship of its members and not the state in which the LLC is registered or has its principal place of business. *See, e.g. Handelsman v. Bedford Village Assos. L.P.,* 213 F.3d 48, 52 (2d Cir.2000). Conrad, a citizen of New York is the sole member of GP.

As their names imply, both GP and RJM are aviation services companies. In late 2005, RJM began looking for a buyer for its Citation Encore airplane (the "Citation").

RJM alleges that, in January 2006, it negotiated an oral joint venture agreement with GP whereby RJM and GP would jointly market and manage timeshares in the Citation. Under this agreement, the Citation was to be based in Hartford, Connecticut at Brainard airport and piloted by one of RJM's employees. The records for the Citation were also to be maintained in Connecticut. This agreement was negotiated via telephone calls made to and from Connecticut.[FN3] Further, according to Morande, Conrad once visited Connecticut in connection with the potential joint venture.[FN4]

> FN3. Conrad denies that there was ever a joint venture agreement.

> FN4. Conrad denies that he visited Connecticut in connection with the matters alleged in the complaint, but admits that he has "from time to time met with RJM Associates, Inc. in Connecticut on other matters."

RJM and GP apparently contemplated that Vincent and Teresa Viola would be the principal timeshare holders of the Citation. However, the Violas were only interested in an outright purchase of the Citation. RJM alleges that it then agreed to sell the Cita-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 918538 (D.Conn.)
**(Cite as: 2008 WL 918538 (D.Conn.))**

tion to the Violas at a low price because GP represented through Conrad that it would jointly manage the Citation with RJM, splitting a $50,000 annual management fee from the Violas, and that RJM and GP "would continue to work together to implement their joint venture agreement," substituting other aircraft for the Citation.[FN5]

> FN5. Conrad denies that any joint-management agreement was ever reached.

In February 2006, the Citation was sold to Encore 684 LLC ("Encore"), an entity controlled by the Violas.[FN6] RJM paid Conrad a $50,000 commission for the sale of the Citation. Conrad mailed an invoice from the Commission to RJM in Connecticut and was paid via wire transfer to GP's bank account. RJM alleges that GP managed the aircraft, but refused to split its management fee with RJM.

> FN6. The Violas are residents of New York and Encore is a Delaware Limited Liability Company. The Citation was delivered in Wichita, Kansas. The Citation is currently based in White Plains, New York. The complaint alleges that the "LLC [was] controlled by Robert J. Morande and ultimately controlled by Viola." The Court assumes that this is a typographical error.

GP also used RJM to arrange charter flights for its customers. According to Morande, "on many occasions" Conrad called RJM in Connecticut to arrange for charter flights. In July 2006, Conrad contacted RJM and asked it to fly GP's customers from Boston, Massachusetts to Rockland, Maine in exchange for a fee. RJM alleges that GP was paid for the flight, but has refused to pay RJM.

**\*2** GP is named in Counts 1 (breach of the joint management agreement), 2 (fraud), 4, (unfair trade practices), and 5 (breach of the charter flight agreement). Conrad is named in Counts 3 (fraud) and 5.

## II. Motion to Dismiss Standard

"When a defendant challenges personal jurisdiction in a motion to dismiss, the plaintiff bears the burden of proving that the court has jurisdiction over the defendant." *Amerbelle Corp. v. Hommel,* 272

F.Supp.2d 189, 192 (D.Conn.2003) (citing *Metro. Life Ins. v. Robertson-Ceco Corp.,* 84 F.3d 560, 566-67 (2d Cir.1996)); *Ensign-Bickford Co. v. ICI Explosives USA, Inc.,* 817 F.Supp. 1018, 1026 (D.Conn.1993). "A plaintiff facing a Fed.R.Civ.P. 12(b)(2) motion to dismiss made before any discovery need only allege facts constituting a prima facie showing of personal jurisdiction. Moreover, we construe the pleadings and affidavits in plaintiff's favor at this early stage." *PDK Labs, Inc. v. Friedlander,* 103 F.3d 1105, 1109 (2d Cir.1997) (internal citations omitted); *see also Amerbelle Corp. v. Hommel,* 272 F.Supp.2d 189, 192 -193 (D.Conn.2003); *Jarrow Formulas, Inc. v. International Nutrition Co.,* 175 F.Supp.2d 296, 300 (D.Conn.2001) .[FN7]

> FN7. In connection with the instant motion, GP submitted the affidavit of Conrad. RJM submitted the affidavits of Morande and his former secretary Rose Tine. The defendants argue that the plaintiff's e-filed affidavits should be disregarded because they were not properly executed. However, the plaintiff has since provided the Court with copies of the signed documents.

## III. Personal Jurisdiction

GP and Conrad claim that the Court lacks personal jurisdiction over them because Connecticut's long-arm statute for individuals, Conn. Gen.Stat. § 52-59b, is the only statute applicable to individuals or limited liability companies, and this statute does not authorize jurisdiction over them. The defendants also argue that exercising jurisdiction over them would not comport with due process.

## A. Connecticut's Long Arm Statutes

In diversity cases, personal jurisdiction is determined by the law of the state in which the district court sits. *See Arrowsmith v. United Press Int'l,* 320 F.2d 219, 231 (2d Cir.1963). Connecticut General Statutes § 52-59b(a) governs the exercise of jurisdiction over nonresident individuals, foreign partnerships and foreign voluntary associations. Under that statute, personal jurisdiction exists "[a]s to a cause of action arising from any of the acts enumerated in this section" if the individual or entity, inter alia, "(1) Transacts any business within the state."

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 918538 (D.Conn.)
**(Cite as: 2008 WL 918538 (D.Conn.))**

Connecticut General Statutes § 33-929(f) provides in pertinent part that:

Every foreign corporation shall be subject to suit in this state, by a resident of this state or by a person having a usual place of business in this state, whether or not such foreign corporation is transacting or has transacted business in this state and whether or not it is engaged exclusively in interstate or foreign commerce, on any cause of action arising as follows: (1) Out of any contract made in this state or to be performed in this state; (2) out of any business solicited in this state by mail or otherwise if the corporation has repeatedly so solicited business, whether the orders or offers relating thereto were accepted within or without the state ...

**\*3** As this Court recently noted: "it remains unsettled whether a foreign limited liability company should be treated as a corporation or a partnership for purposes of the Connecticut long-arm statutes." [FN8] *SS & C Technologies, Inc. v. Providence Inv. Management, LLC,* No. 3:07 CV 484(CFD), 2008 WL 691702, \*2 (D.Conn. March 12, 2008); *Compare Nadler v. Grayson Const. Co., Inc.,* No. CV020190015S, 2003 WL 1963158, at \*5 (Conn.Super. April 15, 2003) (treating limited liability company as a partnership); *Screen Tech, Inc. v. Carolina Precision Plastics, LLC,* No. 3:05CV975(SRU), 2006 WL 197360, at \*2 (D.Conn. Jan.25, 2006) (same); *New England National LLC v. Kabro of East Lyme,* No. 550014, 2000 WL 254590, at \*2 (Conn.Super., Feb.23, 2000) (same); *Worms v. WGB Partners, L.L.C.,* No. CV 950149182S, 1996 WL 571464, at \*3 (Conn.Super., Sept.26, 1996) (same); *with In re Bayou Hedge Fund Investment Litigation,* 472 F.Supp.2d 534, 537 (S .D.N.Y. Jan 19, 2007) (applying Connecticut law and holding that a limited liability company should be treated as a corporation, but referring to limited liability company as limited liability corporation) and *Hartford Fire Ins. Co. v. United Restoration LLC,* No. CV020813517, 2003 WL 1962864, at \*5 (Conn.Super.Ct. Apr.4, 2003) (treating limited liability company as corporation in part because LLC referred to itself as a corporation). Because the Court finds that the outcome is the same whether GP is treated as a partnership or a corporation, it need not resolve this issue.[FN9]

FN8. RJM argues that Conn. Gen.Stat. § 34-233(b) confers jurisdiction over GP. Section 34-233(b) indicates that a foreign limited liability company's failure to register with the Connecticut Secretary of State does not preclude exercising jurisdiction over the company, but does not confer jurisdiction.

FN9. However, the practice of treating limited liability companies as limited partnerships to determine diversity jurisdiction suggests that similar treatment is likely appropriate for purposes of determining personal jurisdiction. *See, e.g., Cosgrove v. Bartolotta,* 150 F.3d 729, 731 (7th Cir.1998) (noting the similarity between limited liability companies and limited partnerships).

**1. *Conrad and RJM's Contact with Connecticut***

RJM seems to argue that GP and Conrad transacted business within Connecticut by entering into a contract to jointly manage the Citation, and by contracting for Charter flights.[FN10]

FN10. GP may also have transacted business "within" Connecticut by brokering the sale of the Citation, but RJM does not make this argument.

The Connecticut Supreme Court construes "transacts any business" "to embrace a single purposeful business transaction." *Zartolas v. Nisenfeld,* 184 Conn. 471, 474, 440 A.2d 179 (1981) (holding that sale of real property located in Connecticut constituted transacting business within the state, even where the deed was executed out of state). "[O]ne need not be physically present in order to be subject to the jurisdiction" of Connecticut courts under this provision. *Under Par Associates, L.L.C. v. Wash Depot A., Inc.,* 47 Conn.Supp. 319, 322, 793 A.2d 300, 302 (Conn.Super.2001) (holding that negotiations for sale of Connecticut real property conducted during telephone call between New York defendant and Connecticut plaintiff were sufficient to establish personal jurisdiction).

However, entering into a contract with or directing communications at a party located in Connecticut does not necessarily confer personal jurisdiction. *See, e.g., Ryan v. Cerullo,* 282 Conn. 109, 120-21, 918 A.2d 867 (Conn.2007) (holding that New York accountant's preparation of Connecticut income tax

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 918538 (D.Conn.)
**(Cite as: 2008 WL 918538 (D.Conn.))**

returns for Connecticut resident did not constitute transacting business within Connecticut); *Custom Nav. Systems, Inc. v. Pincus,* 935 F.Supp. 117, 119 (D.Conn.1995) (nonresident defendant's telephoning and writing to Connecticut corporation in connection with corporation's sale and installation of equipment on defendant's boat located in New York did not constitute "transaction of business" within Connecticut).

**\*4** Instead of applying a rigid formula to determine whether a party's contacts constituted the transaction of business within Connecticut, the Court balances considerations of public policy, common sense, and the chronology, geography, quality and nature of the party's contacts with the state. *Gaudio v. Gaudio,* 23 Conn.App. 287, 298, 580 A.2d 1212 (Conn.App.1990) (holding that one trip to Connecticut in which oral agreement to purchase the stock of a Connecticut corporation was formed constituted transacting business within the state). In doing so, the Court is guided by several factors, including:

> (i) whether the defendant has an on-going contractual relationship with a [Connecticut] corporation, (ii) whether the contract was negotiated or executed in [Connecticut] and whether, after executing a contract with a [Connecticut] business, the defendant visited [Connecticut] for the purpose of meeting with parties to the contract regarding the relationship, (iii) what the choice-of-law clause is in any such contract, and (iv) whether the contract requires [the defendants] to send notices and payments into the forum state or subjects them to supervision by the corporation in the forum state.

*Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp.,* 98 F.3d 25, 29 (2d Cir.1996) (internal citations omitted).[FN11]

> FN11. While the Second Circuit applied New York law in *Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp.* the Connecticut Supreme Court has noted the similarity between the personal jurisdiction statutes of Connecticut and New York and held that New York law is "pertinent" to interpreting the Connecticut statute. *Zartolas v. Nisenfeld,* 184 Conn. at 474, 440 A.2d 179.

a. *The Joint Management Contract*

If RJM and GP formed a contract to jointly manage the Citation as alleged, it would constitute an ongoing contractual relationship. Presumably in order for RJM to "manage" the Citation, the agreement contemplated that the airplane would be brought to Connecticut periodically. Further, resolving the conflicting evidence and drawing all reasonable inferences in favor of the plaintiff, as the Court must at this stage, Conrad visited Connecticut in connection with the agreement to jointly manage the Citation. Negotiation of the contract also involved communications exchanged between Connecticut and New York, although RJM has not provided evidence of the number or frequency of these communications. All of GP's contacts with Connecticut were made through Conrad.

Based on the above considerations, the Court concludes that by entering into an on-going contractual relationship with a Connecticut party to jointly manage the Citation, and by visiting Connecticut in connection with that contractual relationship, Conrad and GP transacted business within Connecticut within the meaning of § 52-59b(a).[FN12] Furthermore, the joint-management agreement constituted a "contract made in this state or to be performed in this state" within the meaning of § 33-929(f).

> FN12. All of Conrad's contacts with Connecticut seem to have been made on behalf of GP. While Conrad does not argue that this entitles him to the protection of the fiduciary shield doctrine, the Court notes that this doctrine "has been disfavored by Connecticut courts ." *Dictaphone Corp. v. Gagnier,* No. 3:05CV266 (CFD), 2006 WL 726675, 2 (D.Conn. March 22, 2006) (compiling cases). Conn. Gen.Stat. § 52-59b(2) also confers personal jurisdiction over RJM and Conrad with respect to at least Counts 3 and 4. This section of Conn. Gen.Stat. § 52-59b provides jurisdiction over a defendant who "(2) commits a tortious act within the state, except as to a cause of action for defamation of character arising from the act." *See Vertrue Inc. v. Meshkin,* 429 F.Supp.2d at 492 -493 (noting that "Connecticut federal district courts have consistently held that it is proper to assert personal jurisdiction, pursuant to Conn. Gen.Stat. § 52-59b(a)(2), over a nonresident defendant

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 918538 (D.Conn.)
(Cite as: 2008 WL 918538 (D.Conn.))

who transmits fraudulent representations to a Connecticut resident for the purpose of inducing that resident to act.")

### b. *The Charter Flights Contract*

However, the Court finds that GP and Conrad did not transact business in Connecticut by arranging for RJM to provide charter flights. The only basis for concluding that the arrangement was situated "within" Connecticut was that Conrad telephoned Morande in Connecticut, and presumably that RJM expected payment to be received in Connecticut. The contract was not ongoing in nature, RJM does not claim that Conrad visited Connecticut in connection with the allegations in Count 5, and does not make allegations concerning the choice of law. Indeed, RJM has not provided a basis for concluding that more than a single phone call was placed to arrange the charter flight.[FN13] Accordingly, Conn. Gen.Stat. § 52-59b does not authorize the exercise of jurisdiction over Conrad.

> FN13. Morande does claim that Conrad called "on many occasions" to arrange other charter flights.

**\*5** Further, even assuming that GP should be treated as a corporation and that the alleged charter flight contract was "made" in Connecticut,[FN14] as set forth below, the Court finds that exercising personal jurisdiction over GP for the purposes of Count 5 would not comport with due process.

> FN14. "[A] contract is made when and where the last thing is done which is necessary to create an effective agreement." *Hagar v. Zaidman,* 797 F.Supp. 132, 136 (D.Conn.1992), quoting *Electric Regulator Corporation v. Sterling Extruder Corp.,* 280 F.Supp. 550 (D.Conn.1968).

### B. *Due Process*

"In order to satisfy the Due Process Clause of the United States Constitution, the exercise of long-arm jurisdiction by [a state] must be based on defendants' 'minimum contacts' with the state and must comport with 'traditional notions of fair play and substantial justice.' " *Agency Rent A Car System, Inc. v. Grand*

*Rent A Car Corp.,* 98 F.3d at 32 (quoting *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945)).

Personal jurisdiction may be exercised based on either a defendant's general or claim-specific contacts with the forum. " '[G]eneral jurisdiction'-i.e., jurisdiction irrespective of whether the claim arises from or relates to the defendant's forum contacts-[is proper] only where these contacts are 'continuous and systematic.' " *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez,* 305 F.3d 120, 127 (2d Cir.2002) (quoting *U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co.,* 241 F.3d 135, 152 (2d Cir .2001).

"In contrast, specific jurisdiction is present only if the plaintiff's cause of action arises out of a defendant's forum-related activities, such that the defendant 'should reasonably anticipate being haled into court' in that forum." *Remick v. Manfredy,* 238 F.3d 248, 255 (3d Cir.2001) (quoting *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980)). "A plaintiff bringing multiple claims that arise out of different forum contacts of the defendant must establish specific jurisdiction for each claim." *Seiferth v. Helicopteros Atuneros, Inc.,* 472 F.3d 266, 274 (5th Cir.2006); *see also Remick v. Manfredy,* 238 F.3d at 255 (determining specific personal jurisdiction "is claim specific because a conclusion that the District Court has personal jurisdiction over one of the defendants as to a particular claim asserted by [the plaintiff] does not necessarily mean that it has personal jurisdiction over that same defendant as to [the plaintiff's] other claims"); *Salom Enters. LLC v. TS Trim Indus., Inc.,* 464 F.Supp.2d 676, 685 (E.D.Mich.2006) (noting that a claim-specific inquiry is appropriate because the primary purpose of the Due Process Clause is to give fair warning that a particular activity may subject them to jurisdiction).

The plaintiff does not suggest that Conrad or GP had the sort of substantial, systematic, continuous contacts with Connecticut necessary to establish general jurisdiction. Accordingly, the Court must analyze claims 1-4 and 5 separately.[FN15]

> FN15. JPM does not allege any basis for finding that the charter flights arose from, or were related to the joint management agreement.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 918538 (D.Conn.)
**(Cite as: 2008 WL 918538 (D.Conn.))**

### 1. *Joint-Management Agreement*

Here, as set forth above, GP is alleged to have knowingly entered into an ongoing contractual relationship with a party located in Connecticut, and visited Connecticut in connection with this relationship. Counts 1-4 of this action relate to an alleged breach of that contract, and fraud and unfair business practices related to the contract. Thus, exercising jurisdiction over GP and Conrad for the purposes of these Counts comports with due process, and RJM's motion to dismiss for lack of personal jurisdiction is denied as to these counts.

### 2. *Charter Flights Agreement*

**\*6** In contrast, Conrad's participation in a single telephone call is not sufficient to satisfy the requirements of "minimal contacts" under the circumstances here. *See Fox v. Boucher,* 794 F.2d 34, 37 (2d Cir.1986) ("It would offend 'minimum contacts' due process principles to force [the defendant], a Massachusetts resident, to litigate in a New York forum on the basis of one telephone call."); *Heinfling v. Colapinto,* 946 F.Supp. 260, 264 fn. 2 (S.D.N.Y.1996) ("Nor can the alleged single phone call [defendant] made to Plaintiff ... provide the basis for long-arm jurisdiction over [defendant].... Nor would such an exercise of jurisdiction be likely to satisfy a constitutional minimum contacts analysis."); *Grunberger Jewelers v. Leone,* 3:03-cv-647(CFD), 2004 WL 1393608, \*4 (D.Conn. Jun. 18, 2004) ("[defendant's] participation in two telephone calls on one day is not sufficient to satisfy the requirements of 'minimal contacts.' ") Considering the "totality of the circumstances," which include that the subject of the agreement was a charter flight that did not stop in or cross Connecticut, the Court concludes that the single phone call from Conrad to Morande in Connecticut, did not constitute a "connection with the forum [s]tate such that [Conrad or RJM] should [have] reasonably anticipated being haled into court [in Connecticut]." *World-Wide Volkswagen,* 444 U.S. at 297.

### V. Conclusion

Defendant's Motion to Dismiss [Doc. # 13] is DENIED as to Counts 1-4 and GRANTED as to Count 5.[FN16]

FN16. This order is without prejudice to the plaintiff filing a motion to transfer venue.

So ordered.

D.Conn.,2008.
RJM Aviation Associates, Inc. v. GP Aviation Services, LLC
Not Reported in F.Supp.2d, 2008 WL 918538 (D.Conn.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in A.2d, 2009 WL 1142570 (Conn.Super.), 68 UCC Rep.Serv.2d 650, 47 Conn. L. Rptr. 642
**(Cite as: 2009 WL 1142570 (Conn.Super.))**

**H**Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Superior Court of Connecticut,
Judicial District of Waterbury.
STATE of Connecticut
v.
MAXIMUS, INC.
No. X06CV075011488S.

April 1, 2009.

West KeySummary
States 360 ☞107

360 States
    360III Property, Contracts, and Liabilities
       360k107 k. Performance or Breach of Contracts. Most Cited Cases
A manufacturer's motion to strike a claim based on the economic loss rule was denied when the sales contract was not governed by the Uniform Commercial Code (UCC). After the parties contracted for the manufacturer to develop an online law enforcement communications teleprocessing system for the state, the state sued, alleging that the manufacturer negligently misrepresented the services they would provide. While the manufacturer sought to strike the negligent misrepresentation claim on the basis of the economic loss rule, the court found that the economic loss rule only applied to cases governed by the UCC. Because the contract between the parties was for the sale of services, the UCC did not apply.

Charles H. Walsh III, Richard Blumenthal, Nancy Arnold, Hartford, for State of Connecticut.

Murtha Cullina LLP, Hartford, for Maximus, Inc.

STEVENS, J.

*STATEMENT OF THE CASE*

*1 The plaintiff in this action is the State of Connecticut, acting through the chief information officer of the department of information technology and the commissioner of public safety for the department of public safety. The defendant is Maximus, Inc., a Virginia corporation that is authorized to conduct business in Connecticut.

In the second substitute complaint, the plaintiff alleges that the State, through the department of information technology, entered into an agreement with the defendant to upgrade the Connecticut Online Law Enforcement Communications Teleprocessing System ("Collect System"). The Collect System is a law enforcement messaging and database system used by the department of public safety. The Collect System facilitates the exchange of state and national criminal justice information. Maximus identified Advanced Technology Systems Corporation ("ATS") as its subcontractor. The complaint alleges that the defendant breached the agreement by failing to supply the plaintiff with a Collect System that met the requirements of the agreement. The three-count complaint asserts claims for breach of contract, breach of implied warranty of fitness for a particular purpose and negligent misrepresentation. Pending before the court is the defendant's motion to strike the third count of the complaint alleging negligent misrepresentation.

In this third count, the plaintiff alleges that as part of its contract proposal, the defendant made various false representations to the State. These representations included the following: that the defendant had chosen the most experienced and best qualified personnel available at Maximus and ATS to work on the project; that ATS had the most advanced products in the public safety marketplace and provided unparalleled software development and customer services; that the ATS staff would have the skills and experience to understand the subject matter of the Collect System, and would devote the time necessary to perform the services needed to develop the Collect System; and that the defendant would have a quality assurance and quality control program. Second Substitute Complaint, ¶¶ 51-60. According to the complaint, the defendant's proposals containing these representations ultimately were incorporated into the final agreement that was executed by the parties. Second Substitute Complaint, ¶ 16.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2009 WL 1142570 (Conn.Super.), 68 UCC Rep.Serv.2d 650, 47 Conn. L. Rptr. 642
**(Cite as: 2009 WL 1142570 (Conn.Super.))**

The complaint further alleges that the defendant knew or had the duty of knowing that these representations were not true, that the State justifiably relied on these representations in executing the agreement, and that the State suffered pecuniary losses that were caused by this justifiable reliance. These losses include the amounts that the State paid to the defendant and to third parties under the agreement, the amounts it paid as part of the bonding used to finance the project, and the costs it incurred in maintaining the existing system without the beneficial use of the upgraded system. Second Substitute Complaint, ¶¶ 61-64.

**\*2** In the motion to strike, the defendant argues that the third count of the plaintiff's complaint alleging negligent misrepresentation must be stricken under the economic loss doctrine. The court disagrees and denies the motion to strike.

### DISCUSSION

"The purpose of a motion to strike is to contest ... the legal sufficiency of the allegations of any complaint ... to state a claim upon which relief can be granted." (Internal quotation marks omitted.) *Fort Trumbull Conservancy, LLC v. Alves,* 262 Conn. 480, 498, 815 A.2d 1188 (2003). In ruling on a motion to strike, the court examines the complaint "construed in favor of the [plaintiff], to determine whether the [plaintiff] stated a legally sufficient cause of action." (Internal quotation marks omitted.) *Dodd v. Middlesex Mutual Assurance Co.,* 242 Conn. 375, 378, 698 A.2d 859 (1997). "It is fundamental that in determining the sufficiency of a complaint challenged by a defendant's motion to strike, all well-pleaded facts and those facts necessarily implied from the allegations are taken as admitted ... Indeed, pleadings must be construed broadly and realistically, rather than narrowly and technically." (Internal quotation marks omitted.) *Violano v. Fernandez,* 280 Conn. 310, 318, 907 A.2d 1188 (2006).

As previously stated, the defendant contends that the plaintiff's negligent misrepresentation claim must be stricken under the economic loss doctrine. The economic loss doctrine is a judicially created principle which prohibits recovery in tort when the claim arises from a contract and only seeks economic losses. See *Santoro, Inc. v. A.H. Harris & Sons, Inc.,* Superior Court, judicial district of Hartford, Docket No. CV 03

0828039 (September 23, 2004, Sheldon, J.) (38 Conn. L. Rptr. 4).

The defendant first argues that this court's construction of the economic loss rule should be guided by a ruling issued by Judge Hale in this case granting a previous motion to strike filed by the defendant. This ruling granted the defendant's motion to strike a negligence claim alleged by the plaintiff in an earlier complaint on the ground that it did not sufficiently plead any claims or duties distinct from the plaintiff's contract claims. See *State v. Maximus, Inc.,* Superior Court, judicial district of Hartford, Docket No. CV 07 5015239 (June 4, 2008, Hale, J.).[FN1] After this ruling, the plaintiff amended its complaint to allege negligent misrepresentation. According to the defendant, the plaintiff's negligent misrepresentation claim suffers from the same deficiency as its negligence claim. More specifically, the defendant insists that because the representations at issue were incorporated into the parties' agreements, the plaintiff "only redress is for breach of contract and/or warranty." Maximus, Inc.'s Memorandum of Law in Support of Motion to Strike, p. 4. The defendant further explains this position as follows:

> FN1. The case was subsequently transferred from the judicial district of Hartford to this court and assigned its present docket number.

This Court in this case has already found that the parties' duties owed to one another and their remedies for any breach of those duties are governed by contract law: "The court fails to see any duty imposed upon Maximus and/or ATS except the duty to complete the contract correctly. Failure to perform properly would result only in a violation of the contract. There was no other duty owed, any other organization or person aside from the duty to the contract ." Memorandum of Decision, p. 6.
**\*3** Maximus, Inc.'s Memorandum of Law in Support of Motion to Strike, p. 4.

The apparent thrust of the defendant's position is that when the gravamen of a plaintiff's claim is covered or governed by contact, tort claims are displaced and made unavailable. The court does not view Judge Hale's decision as being this broad. The defendant's position also appears much broader than the parameters of the economic loss doctrine. Furthermore, the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2009 WL 1142570 (Conn.Super.), 68 UCC Rep.Serv.2d 650, 47 Conn. L. Rptr. 642
**(Cite as: 2009 WL 1142570 (Conn.Super.))**

position appears unsupported under Connecticut case law.[FN2] Although the defendant is correct that "a mere breach of the contract would not afford a basis for a recovery in tort, but the necessary elements to establish negligence must be shown;" *Dean v. Hershowitz,* 119 Conn. 398, 409, 177 A. 262 (1935); there is no appellate authority supporting the proposition that common-law duties of care cannot emanate from contractual relationships, even when the contract is between commercial or sophisticated parties. Indeed, the most applicable appellate court cases are to the contrary. See, e.g., *Williams Ford, Inc. v. Hartford Courant Co.,* 232 Conn. 559, 579, 657 A.2d 212 (1995) ("The [plaintiffs] were not barred from pursuing a negligence claim solely because they also might have had a breach of contract claim"); *D'Ulisse-Cupo v. Board of Directors of Notre Dame High School,* 202 Conn. 206, 218-19, 520 A.2d 217 (1987) ("If the plaintiff's complaint otherwise contains the necessary elements of negligent misrepresentation, it survives a motion to strike even though [other counts] grounded in promissory estoppel must fall"); *Johnson v. Flammia,* 169 Conn. 491, 496, 363 A.2d 1048 (1975) ("A party may be liable in negligence for the breach of a duty which arises out of a contractual relationship"); *Sasso v. Ayotte,* 155 Conn. 525, 529, 235 A.2d 636 (1967) (same).

> FN2. The defendant's reliance on *Gazo v. Stamford,* 255 Conn. 245, 765 A.2d 505 (2001), to support its contention that negligence claims cannot emanate from contractual relations is misplaced. In *Gazo,* the plaintiff attempted to premise a third-party beneficiary contract claim on what was essentially a tort claim. The court rejected the plaintiff's contract claim because its essence sounded in tort, not contract. *Id.,* at 263-64, 765 A.2d 505. Consequently, *Gazo* did not involve a tort claim arising from contractual obligations.

The Supreme Court in *Dean v. Hershowitz, supra,* 119 Conn. at 398, 177 A. 262, made the following comments on this topic:

> We recently pointed out that negligence may be the outgrowth of precedent contractual relationship, but that it may also arise in situations where there is no thought of any such underlying relationship ... In other words, the particular facts which bring two

persons into a relationship to each other are not necessarily controlling, but the true test is, speaking generally, being in that relationship, are the circumstances such that one, in the performance of some act within the scope of that relationship, unless he uses proper care, is likely to do injury to the person, property or rights of the other ... It is in this sense that negligence grows out of contracts as nuisance may grow out of negligence ... Where there is a precedent relationship, all that is necessary to furnish a basis for an action of negligence is that there be present the elements necessary to establish such a cause of action, and if that is so, that that relationship is one of contract is not sound reason why the action should not lie.

*\*4* (Citations omitted.) *Id.,* at 408-09, 177 A. 262.

To support its argument that the economic loss doctrine bars the plaintiff's negligent misrepresentation claim, the defendant primarily relies on the Supreme Court's decision in *Flagg Energy Development Corp. v. General Motors Corp.,* 244 Conn. 126, 709 A.2d 1075 (1998). The plaintiffs in *Flagg* purchased engines manufactured by the defendant and brought suit alleging breach of contract, breach of warranties, tortious misrepresentations and violation of the Connecticut Unfair Trade Practices Act, General Statutes § 42-110(b) ("CUTPA"). In their misrepresentation claim, the plaintiffs alleged that the defendant "knew or should have known" that the representations and warranties made by the defendant as part of the sale were untrue. *Flagg Energy Development Corp. v. General Motors Corp., supra,* 244 Conn. at 151-52 n. 41, 709 A.2d 1075. The plaintiffs' CUTPA claim was premised on fraudulent inducement.

The defendant moved to strike the plaintiffs' tort and CUTPA claims arguing that the plaintiffs' recovery was limited to the remedies provided under the Uniform Commercial Code ("UCC") because the plaintiffs were only seeking the recovery of commercial losses. *Id.,* at 152, 709 A.2d 1075. In response, the plaintiffs argued that the economic loss doctrine was inapplicable to actions based on fraud, and alternatively, that their tort and CUTPA claims were validated by the savings provisions of the UCC, General Statutes §§ 42a-1-103 and 42a-2-721. *Id.* After an extensive review of the applicable UCC provisions, the trial court rejected the plaintiffs' argument, concluding that the UCC provided an adequate remedy.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2009 WL 1142570 (Conn.Super.), 68 UCC Rep.Serv.2d 650, 47 Conn. L. Rptr. 642
**(Cite as: 2009 WL 1142570 (Conn.Super.))**

On appeal, the plaintiffs argued that the trial court improperly applied the economic loss rule because the rule "does not apply to claims 'for negligent misrepresentation of information provided for the guidance of others or to claims for unfair trade practices.' " *Id.*, at 153, 709 A.2d 1075. The Supreme Court rejected the plaintiffs' contentions and affirmed the trial court's decision granting the motion to strike. "We agree with the holdings of cases in other jurisdictions that commercial losses arising out of the defective performance of contracts for the sale of goods cannot be combined with negligent misrepresentation." *Id.*

There is a split among Superior Court opinions about the scope of *Flagg. Maximus* relies on cases holding that *Flagg* applies the economic loss doctrine broadly to preclude tort claims seeking economic losses emanating from any contractual transactions involving commercial parties.[FN3] The plaintiff relies on cases construing *Flagg* more narrowly and concluding that *Flagg* applies the economic loss doctrine to preclude tort claims seeking economic losses in cases involving the sale of goods governed by the provisions of the UCC.[FN4] This court finds that the cases relied on by the plaintiff are more persuasive.

> FN3. See, e.g., *Morganti National, Inc. v. Greenwich Hospital Assn .,* Superior Court, complex litigation docket at Waterbury, Docket No. X06 CV 99 0160125 (September 27, 2008, McWeeney, J.); *Greater New Haven Transit District v. Nafis & Young Engineers, Inc.,* Superior Court, judicial district New Haven, Docket No. CV 02 0469107 (July 1, 2003, Arnold, J.) (35 Conn. L. Rptr. 100); *Dobco, Inc. v. Williams Development Co.,* Superior Court, complex litigation docket at Tolland, Docket No. X07 CV 99 0072152 (May 12, 2002, Sferrazza, J.) (32 Conn. L. Rptr. 214); *Worldwide Preservation Services, LLC. v. The IVth Shea, LLC,* Superior Court, complex litigation docket at Stamford, Docket No. X05 CV 98 0167154 (February 1, 2001, Tierney, J.) (29 Conn. L. Rptr. 1).

> FN4. See, e.g., *Hoydic v. B & E Juices, Inc.,* Superior Court, complex litigation docket at Stamford, Docket No. X08 CV 03 4010104 (February 27, 2008, Jennings, J.) (44 Conn.

L. Rptr. 501); *New Canaan v. Brooks Laboratories, Inc.,* Superior Court, judicial district of Stamford-Norwalk at Stamford, Docket No. CV 05 4006797 (November 7, 2007, Tobin, J.); *Santoro, Inc. v. All. Harris & Sons, Inc., supra,* 38 Conn. L. Rptr. at 4; *Metcoff v. NCT Group, Inc.,* Superior Court, complex litigation docket at Waterbury, Docket No. X04 CV 04 0184701, (January 10, 2005, Alander, J.).

As just discussed, the precise issue presented in *Flagg* was whether the plaintiffs' recovery was limited to the remedies provided under the UCC. In answering this narrow question in the affirmative, the court did not address or expressly overrule its earlier decisions that did not involve the UCC, in which it held that negligence claims are not precluded solely because the claims seek economic losses arising from the parties' contractual relationship. *Williams Ford, Inc. v. Hartford Courant Co., supra,* 232 Conn. at 579, 657 A.2d 212; *D'Ulisse-Cupo v. Board of Directors of Notre Dame High School, supra,* 202 Conn. at 218-19, 520 A.2d 217.[FN5] In *Flagg,* the court noted its agreement with two out of state cases applying the economic loss doctrine in situations that did not involve the UCC. See *Duquesne Light Co. v. Westinghouse Electric Corp.,* 66 F.3d 604, 618 (3d Cir.1995); *Princess Cruises, Inc. v. General Electric Co.,* 950 F.Supp. 151, 155 (E.D.Va.1996). The facts of *Flagg,* however, only involved the application of the UCC, and therefore, the issues presented in the case did not squarely call for the court to consider the application of the economic loss rule to a situation not involving the UCC. Consequently, in this particular context, the court's references to these out of state cases should be viewed as *obiter dicta.* The law is established that dictum does not represent binding authority. *Remax Right Choice v. Aryeh,* 100 Conn.App. 373, 378, 918 A.2d 976 (2007) ("It is well established that statements in prior cases that constitute dicta do not act as binding precedent"). Additionally, as a general rule, a trial court should proceed cautiously in concluding that dictum of a Supreme Court's decision overrules *sub silento* its prior, controlling precedent. Cf., *W & D Acquisition, LLC v. First Union National Bank,* 262 Conn. 704, 714-15, 817 A.2d 91 (2003) (where lower court mistakenly relied on dictum of prior Supreme Court decision).

> FN5. In *Williams Ford, Inc. v. Hartford*

Not Reported in A.2d, 2009 WL 1142570 (Conn.Super.), 68 UCC Rep.Serv.2d 650, 47 Conn. L. Rptr. 642
**(Cite as: 2009 WL 1142570 (Conn.Super.))**

*Courant Co., supra,* 232 Conn. at 579, 657 A.2d 212, the defendant argued that "where the controversy concerns purely economic losses allegedly caused by statements made during the course of a contractual relationship between businesses, it is contract law, rather than tort law, that should apply." *Id* . In rejecting this argument, the Supreme Court held that "a remedy on the contract is independent of a remedy for negligent misrepresentation. The [plaintiffs] were not barred from pursuing a negligence claim solely because they might also have had a breach of contract claim." *Id.*

**\*5** "*Flagg* stands for the proposition that, where a claim for damages arises out of the commercial sale of goods governed by the Uniform Commercial Code and the losses are purely economic, a plaintiff's remedies are limited to those available under the Code.[FN6] See *Santoro v. A.H. Harris & Sons, Inc.,* Superior Court, judicial district of Hartford at Hartford, Docket No. CV 03 0828039, (September 23, 2004, Sheldon, J.) (38 Conn. L. Rptr. 4, [6] ) ('Under close examination, [*Flagg* ] cannot reasonably be read to create a general rule barring all tort claims based in whole or in part upon alleged breaches of contract or alleged breaches of warranties of fitness and/or merchantability. Instead, it can only be read to bar such claims in the particular circumstances there at issue, to wit: where both the plaintiff and the defendant are sophisticated commercial parties, and their dispute arises from the defendant's allegedly defective performance under a contract for the sale of goods.') Such a limited construction is necessary in light of the language of *Williams Ford, Inc. v. Hartford Courant Co., supra,* [232 Conn. at 579], rejecting a broader doctrine. It is also consistent with holdings in other states. See, e.g., *Neibarger v. Universal [Cooperatives, Inc.],* [439 Mich. 512], 486 N.W.2d 612, 618 (Mich.1992) ('[W]e hold that where a plaintiff seeks to recover for economic loss caused by a defective product purchased for commercial purposes, the exclusive remedy is provided by the UCC, including its statute of limitations.') and *Trinity [Industries, Inc.] v. McKinnon Bridge Co.,* 77 S.W.3d 159, 171 (Tenn.Ct.App.2001) ('In a contract for the sale of goods where the only damages alleged come under the heading of economic losses, the rights and obligations of the buyer and seller are governed exclusively by the contract.')." *Metcoff v. NCT Group, Inc.,* Superior Court, complex litigation docket at

Waterbury, Docket No. X04 CV 04 0184701 (January 10, 2005, Alander, J.).

> FN6. "The rationale for such a rule has been cogently expressed by the Michigan Supreme Court. 'The code represents a carefully considered approach to governing the economic relations between suppliers and consumers of goods. If a commercial purchaser were allowed to sue in tort to recover economic loss, the UCC provisions designed to govern such disputes, which allow limitation or elimination of warranties and consequential damages, require notice to the seller, and limit the time in which such a suit must be filed, could be entirely avoided.' *Neibarger v. Universal Coops., [Inc.],* [439 Mich. 512], 486 N.W.2d 612, 618 (Mich., 1992)." *Metcoff v. NCT Group, Inc.,* Superior Court, complex litigation docket at Waterbury, Docket No. X04 CV 04 0184701 (January 10, 2005; Alander, J.). n. 6.

The plaintiff advances various reasons why the UCC, and, in turn, the economic loss rule do not apply in this case. The plaintiff first contends that the UCC does not apply to commercial sale transactions involving the State of Connecticut. The plaintiff cites no authority to support this position, but relies solely on an interpretation of the statutory language. See General Statutes § 1-2z.[FN7]

> FN7. General Statutes § 1-2z provides the following: "The meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered."

The Uniform Commercial Code-Sales, General Statutes §§ 42a-2-101 et seq., applies to contracts and agreements "relating to the present or future sale of goods." General Statutes § 42a-2-106(1). "Goods" are defined to include "all things, including specially manufactured goods, which are movable at the time of identification to the contract for sale ..." General Statutes § 42a-2-105(1). Under General Statutes §

Not Reported in A.2d, 2009 WL 1142570 (Conn.Super.), 68 UCC Rep.Serv.2d 650, 47 Conn. L. Rptr. 642
**(Cite as: 2009 WL 1142570 (Conn.Super.))**

42a-2-103(1), a "buyer" is defined as "a person who buys or contracts to buy goods," and a seller is defined as "a person who sells or contracts to sell goods." Under the general definitions section of the UCC, the words "person" and "state" are defined specifically and separately.[FN8] The plaintiff argues that because the UCC only applies to persons who buy or sell goods, and the UCC defines the terms "person" and "state" separately, the UCC does not apply to transactions involving state governments. Stated differently, according to the plaintiff because the term "state" is separately defined and its definition is not incorporated into the definition of "person," the UCC must be construed as excluding state agencies from its application.

> FN8. General Statutes § 42a-1-201(27) defines a "person" as follows:
>
> > "Person" means an individual, corporation, business trust, estate, trust, partnership, limited liability company, association, joint venture, government, governmental subdivision, agency or instrumentality, public corporation or any other legal commercial entity.
>
> General Statutes § 42a-1-201(38) defines a "state" as follows:
>
> > "State" means a state of the United States, the District of Columbia, Puerto Rico, the United States Virgin Islands or any territory or insular possession subject to the jurisdiction of the United States.

*6 The plaintiff is correct that the word "state" is a specifically defined term under the UCC. However, the plaintiff does not address the fact that the UCC also defines the word "person" to include the "government" or a "governmental subdivision, agency or instrumentality." See footnote 8. The plaintiff cannot seriously contend that the department of information technology and the department of public safety are not "governmental agencies." The plaintiff expressly alleges that each of these entities is a state "agency" in the complaint.

In construing a statute such as the UCC, the court must endeavor to interpret all of its provisions in a manner that is consistent and that avoids rendering any particular provision meaningless or superfluous. To conclude that the definition of the term "person," as defined under General Statutes § 42a-1-201(27); excludes state agencies despite the definition's statement that a "governmental agency" is part of the definition of this term interjects ambiguity into the plain words of the statute and treats this language of the definition as though it is meaningless.

Furthermore, as previously noted, the plaintiff does not cite any authority to support its argument that the UCC does not apply to the state, and the most applicable case law located by the court rejects its position. In determining whether a state owned cement plant was entitled to assert sovereign immunity or was an "organization" governed by the provisions of South Dakota's version of the UCC, the Supreme Court of South Dakota expressed the following:

> [T]he UCC provisions expressly apply to the state. In its general definitions, the UCC defines "organization" to include "government or governmental subdivision or agency." SDCL 57A-1-201(28) [see General Statutes § 42a-1-201(25) ]. Because it is a governmental agency, the cement plant is an organization within the meaning of the UCC. As an organization, the cement plant is a "person" under SDCL 57A-1-201(30) [see General Statutes § 42a-1-201(27) ], and, as a "person who sells or contracts to sell goods," it is a "seller" within the context of UCC-Sales. SDCL 57A-2-103(1)(d) [see General Statutes § 42a-2-102(1) ]. See *Northern Helex Company v. United States,* 197 Ct.Cl. 118, 455 F.2d 546 (Ct.Cl.1972), which applied UCC provisions to a sales contract between the federal government and a private company; and *Shea-Kaiser-Lockheed-Healy v. Dept. of W & P, Etc.,* 73 Cal.App.3d 679, 140 Cal.Rptr. 884 (1977), which held that a municipal water department was subject to the UCC in a sales transaction.

*Arcon Construction Co. v. South Dakota Cement Plant,* 349 N.W.2d 407, 410 (S.D.1984).

The plaintiff next contends that the UCC does not apply to its misrepresentation claims because the transaction between the parties did not involve a sale of "goods" as defined under the UCC.[FN9] According to the plaintiff, the contract was primarily a contract for services, and the production of materials under the contract incidental to these services. The court

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2009 WL 1142570 (Conn.Super.), 68 UCC Rep.Serv.2d 650, 47 Conn. L. Rptr. 642
**(Cite as: 2009 WL 1142570 (Conn.Super.))**

agrees.

> FN9. As previously indicated, the UCC defines "goods" as "all things, including specially manufactured goods which are movable at the time of identification to the contract for sale ..." General Statutes § 42a-2-105(1).

**\*7** In Connecticut, the distinction between a services contract governed by the common law and a sales contract governed by the UCC has been addressed more extensively by our trial courts than our appellate courts. See *Beckenstein v. Potter & Carrier,* 191 Conn. 150, 164, 464 A.2d 18 (1983); *Incomm, Inc. v. Thermo-Spa, Inc.,* 41 Conn.Supp. 566, 569-70, 595 A.2d 954 [3 Conn. L. Rptr. 346] (1991); *Gulash v. Stylarama, Inc.,* 33 Conn.Supp. 108, 111-13, 364 A.2d 1221 (1975); *Page v. Hotchkiss,* Superior Court, judicial district of Windham at Putnam, Docket No. CV 02 0067814 (December 2, 2003, Cosgrove, J.) (36 Conn. L. Rptr. 193); *DSP Software Engineering, Inc. v. NCT Group, Inc.,* Superior Court, judicial district of Fairfield at Bridgeport, Docket No. CV 00 0370062 (August 10, 2000, Melville, J.). This topic was reviewed thoroughly by Judge Cosgrove in *Page v. Hotchkiss, supra.*

"A number of courts have addressed the question of whether 'software' is a good or a service. These courts have come to differing conclusions depending upon the facts of each case. A significant factor for the courts was the degree of development and customization or programming that was required by the buyer. 'At one end of the spectrum is a consumer who walks into the local electronics store, pulls a shrink-wrapped word processing program from the shelf, pays the cashier and goes home with it. Such a sale is very clearly one for a good. At the other end of the spectrum is a programmer that invents and develops new software [from scratch] for a particular customer. In that case, the contract is more like a services contract.' *Smart Online, Inc. v. Opensite Technologies, Inc.,* Superior Court of North Carolina, Wake County, Business Court, Docket No. 01 CVS 09604, 2003 NCBC 5 (June 17, 2003) (51 U.C.C. Rep. Serv.2d 47). In the middle of the spectrum is the situation '[w]here programmers are selling preexisting software albeit with custom modifications or upgrades to adapt it to the user's needs or equipment.' *Id.* Where ... the facts of a case place the issue in the middle of the spectrum, the courts have explicitly or implicitly relied upon a predominate element test. D. Toedt, *The Law and Business of Computer Software* (Release # 12 10/2001) § 13.02, p. 13-3, and a primary factor in this analysis has been whether the programmer was 'paid in a manner primarily reflecting [the] sale of goods ...' *Pearl Investments, [LLC] v. Standard I/O, Inc.,* 257 F.Sup.2d 326, 353 (D.Me.2003).

"When applying the predominant element test 'the question becomes whether the dominant factor or essence of the transaction is the sale of the materials or the services' ... *Incomm, Inc. v. Thermo-Spa, Inc.,* 41 Conn.Supp. 566, 570, 595 A.2d 954. '[I]t is clear that where the contract is basically one for the rendition of services, and the materials are only incidental to the main purpose of the agreement, the contract is not one for the sale of goods under the UCC.' ... *Martisek v. Showron,* Superior Court, judicial district of Fairfield at Bridgeport, Docket No. CV 98 0354780 (July 9, 2003, Doherty, J.).

**\*8** " 'In determining whether a contract is one of sale [of goods] or to provide services, the court looks to the essence of the agreement to see whether service predominates over any sale aspect, such as supply of materials by the principal to the service entity ... Whether a contract is one for the sale of goods, or for work and labor to be rendered may depend on whether the primary intent is merely to provide for the delivery of goods, or whether the essential consideration is work and labor to be performed at the employer's instance and for his use rather than for the producer's benefit ... It is of no moment that the materials to be processed [were] transferred from the defendant's possession to the plaintiff's: where service predominates, and the transfer of personal property is only incidental to the transaction, it is a contract for work, labor and materials and not a sale.' ... *Id.*" *Page v. Hotchkiss, supra,* 36 Conn. L. Rptr. at 195.

Because the question whether the parties' agreement was a sales contract or a services contract is being presented in the context of a motion to strike, the court must accept the truth of complaint's factual allegations and must view these allegations liberally in favor of the plaintiff. Based on this standard, the court agrees with the plaintiff that the predominant aspect of the parties' agreement was for labor and materials and not for the sale of goods.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2009 WL 1142570 (Conn.Super.), 68 UCC Rep.Serv.2d 650, 47 Conn. L. Rptr. 642
**(Cite as: 2009 WL 1142570 (Conn.Super.))**

According to the complaint, the Federal Bureau of Investigation maintained a National Crime Information Center ("NCIC") that stored criminal justice data for the entire United States and Canada. The NCIC was replaced in 1999 by the "NCIC 2000." This change in the NCIC required a change in the State's Collect System used by the department of public safety in order for this department to fully access and use NCIC 2000. The parties' agreement was premised, in part, on the defendant's response to a Request for Proposal ("RFP") issued by the department of information technology. The RFP "required that the [Collect System] be revised to meet NCIC 2000 encryption requirements. The RFP also required that the [Collect System] be revised to provide, at a minimum, all of the functionality and efficiency of the existing [Collect System] and also include additional new functions." Second Substitute Complaint, ¶ 10. As part of the parties' contract, the defendant agreed to: build the revised Collect System, provide certain products necessary for this purpose (a Pyramid XN2 web browser and a Pyramid XMR message switch), complete the work pursuant to a work schedule, and test the revised system to ensure that it complied with the requirements of the agreement. Second Substitute Complaint, ¶¶ 12, 16, 17, 18, 25. These allegations clearly establish that the parties' agreement was predominantly for labor and materials and not for the purchase of goods.

The defendant argues that the plaintiff cannot claim that the parties' agreement involved a contract for labor and materials because any such claim would be inconsistent with the second count of the complaint alleging a breach of the implied warranty of fitness. The defendant explains this position as follows. In an earlier filing, the defendant requested the plaintiff to revise the second count as initially pleaded because the count failed to identify the goods at issue. The defendant claimed that this specification was necessary in order for the plaintiff to make a claim for breach of implied warranty under the UCC. Without expressly conceding or addressing the defendant's legal position concerning the UCC, the plaintiff agreed to revise the complaint, and did revise the complaint, to indicate that the goods or materials supplied by the defendant were the Pyramid XN2 web browser and the Pyramid XMR message switch software programs. According to the defendant, this revision represents a concession on the part of the

plaintiff that the implied warranty claim asserted in the second count is premised on the UCC. Based on this reasoning, the defendant insists that the plaintiff cannot now assert a claim for breach of warranty that is presumably governed by the UCC in the second count, and, at the same time, assert a claim for negligent misrepresentation that is not governed by the UCC in the third count. There are numerous, obvious flaws with the defendant's reasoning.

**\*9** First, the second count claiming breach of implied warranty makes no reference to the UCC.[FN10] There are cases recognizing or addressing the general rule that common-law contract claims for breach of implied warranty exist and may be asserted separately from the provisions of the UCC. See generally *Cacace v. Morcaldi,* 37 Conn.Supp. 735, 739-40, 435 A.2d 1035 (Appellate Session 1981) (discussing implied warranty claim of service contract as part of consideration of statute of limitations); *Milau Associates, Inc. v. North Avenue Development Corp.,* 42 N.Y.2d 482, 488, 368 N.E.2d 1247, 398 N.Y.S.2d 882 (1977) (discussing circumstances in which cases have implied "warranty of fitness to transactions which in essence contemplated the rendition of services"); see also Uniform Commercial Code § 2-313, comment (4) (2003 Amendment) (warranty sections of this Article "[are] not designed in any way to disturb those lines of case law which have recognized that warranties need not be confined to [sales] contracts within the scope of this Article"). Consequently, as pleaded, both the second and third counts may be premised on common-law principles.

> FN10. The operative claim of the second count reads as follows: "Because the MAXIMUS COLLECT System did not meet the requirements of the agreement and did not work, Maximus breached the implied warranty of fitness for a particular purpose." Second Substitute Complaint, Second Count, ¶ 51.

Moreover, although the defendant is correct that a contract cannot be governed by both the UCC and the common law of contracts; see *Bead Chain Mfg. Co. v. Saxton Products, Inc.,* 183 Conn. 266, 270, 439 A.2d 314 (1981); this rule applies to the legal theory of any actual judgment or recovery and not to the legal sufficiency of separately pleaded causes of action. The law is well established that a plaintiff may,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2009 WL 1142570 (Conn.Super.), 68 UCC Rep.Serv.2d 650, 47 Conn. L. Rptr. 642
**(Cite as: 2009 WL 1142570 (Conn.Super.))**

in good faith, plead in the alternative, even if separate counts assert inconsistent allegations or theories of recovery. See Practice Book § 10-25 ("The plaintiff may claim alternative relief, based upon an alternative construction of the cause of action"); see generally *Dreir v. Upjohn Co.,* 196 Conn. 242, 245, 492 A.2d 164 (1985) ("Under our pleading practice, a plaintiff is permitted to advance alternative and even inconsistent theories of liability against one or more defendants in a single complaint"). Consequently, even if the defendant were correct and the second count is premised on the UCC and the third count is not, the rules of practice do not preclude such alternative pleading. The court, however, does not reach a definitive decision about the legal sufficiency or appropriate characterization of the second count. The motion to strike is directed to the third count, not the second count.

In summary, the court concludes that the economic loss rule as recognized by the Supreme Court in *Flagg Energy Development Corp. v. General Motors Corp., supra,* 244 Conn. at 126, 709 A.2d 1075, applies to cases involving the UCC. Because the allegations of the complaint indicate that the contract between the parties involved a services contract, and not a sales contract governed by the UCC, the economic loss doctrine is inapplicable. Consequently, the defendant's motion to strike must be denied.

*CONCLUSION*

**\*10** Therefore, the defendant's motion to strike the third count of the plaintiff's second substitute complaint is denied.

So ordered this 1st day of April 2009.

Conn.Super.,2009.
State v. Maximus, Inc.
Not Reported in A.2d, 2009 WL 1142570 (Conn.Super.), 68 UCC Rep.Serv.2d 650, 47 Conn. L. Rptr. 642

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.