| | |
|---|---|
| **SIKORSKY AIRCRAFT CORPORATION and HELICOPTER SUPPORT, INC.,** | |
|            **Plaintiffs,** | **CIVIL ACTION NO.** |
|   -against- | **3:10-CV-00954 (CSH)** |
| **LLOYDS TSB GENERAL LEASING (NO. 20) LIMITED,** **COUGAR HELICOPTER INC.,** **CERTAIN UNDERWRITERS AT LLOYDS OF LONDON**       **SUBSCRIBING TO POLICY NO.**       **AZ00787808, including LLOYDS**       **SYNDICATES 570, 609, 0318 MSP, 1084**       **CSL, 5000 TRV, 5555 ED and 1209 XL,** **ALLIANZ GLOBAL RISKS US INSURANCE COMPANY,** **WESTPORT INSURANCE CORPORATION,** **GLOBAL AEROSPACE UNDERWRITING MANAGERS,** **GCAN INSURANCE COMPANY,** **UNDERWRITERS AT LLOYDS PER CATLIN CANADA, INC., AIG AVIATION, INC.,** | |
|            **Defendants.** | |

**RULING ON DEFENDANTS' MOTION TO DISMISS**
**PLAINTIFFS' THIRD AMENDED COMPLAINT**

HAIGHT, Senior District Judge:

This action for declaratory relief arises out of the crash of a helicopter into international

high seas waters of the Atlantic Ocean during a flight between St. John's, Newfoundland, Canada

and an offshore oil production facility. The lead plaintiff, an American company, had contracted

with a Canadian company to build the helicopter and sell it to that Canadian company. Plaintiff

and an affiliate seek declarations that the named defendants, the Canadian buyer's successors in interest, subsequent helicopter users, and hull insurers covering the helicopter against loss, cannot sue plaintiffs in contract or tort, in Canada or anywhere other than Connecticut, for damages caused by the crash. Plaintiffs ask this Court to adjudicate the rights and liabilities of the parties, and to enjoin the defendants from proceeding against plaintiffs in Canadian courts or elsewhere in the world. Plaintiffs assert that this Court has subject matter jurisdiction under (1) diversity of citizenship and (2) the admiralty law of the United States. They invoke Rule 57, Fed. R. Civ. P., and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

The lead plaintiff filed the instant action in this Court for declaratory relief on June 16, 2010. On June 24, 2010, the defendants in this case filed an action against the plaintiffs and the Canadian Ministry of Transport in the Supreme Court of Newfoundland and Labrador, Canada, asserting claims sounding in tort and breach of contract for damages caused by the helicopter crash.

Defendants herein now move this Court to decline to exercise jurisdiction over the plaintiffs' declaratory judgment action, and to dismiss the action under Rule 12(b)(1), Fed.R.Civ.P., for lack of subject matter jurisdiction. The lead defendant also moves to dismiss the action against it under Rule 12(b)(2), for lack of personal jurisdiction. Plaintiffs resist these motions.

## I.  BACKGROUND

### A.  <u>The Third Party Complaint's Factual Allegations</u>

According to plaintiffs' Third Amended Complaint ("TAC") [Doc. 20], whose well-pleaded factual allegations must be accepted on this motion, Plaintiff Sikorsky Aircraft

Corporation ("Sikorsky") is a Delaware corporation with its principal place of business in Connecticut. TAC ¶ 1. Sikorsky builds helicopters and sells them to those desiring to buy them. On January 29, 2004, Sikorsky and CHC Helicopter Corporation ("CHC"), a Canadian corporation, entered into an S-92 New Helicopter Sales Agreement, contract no. 92I003038 ("the 2004 Sales Contract"), whereby CHC agreed to buy from Sikorsky 12 new S-92 helicopters. TAC ¶¶ 16-17.

The 2004 Sales Contract provided that Sikorsky would present to CHC all S-92s at Sikorsky's facility in Connecticut for inspection, acceptance, delivery and title transfer; CHC was entitled to a test flight for each helicopter before taking delivery; CHC would evidence its acceptance of a helicopter by executing a Certificate of Helicopter Acceptance; the contract would be interpreted in accordance with the plain English meaning of its terms and construed under Connecticut law; notices would be sent to Sikorsky at its Stamford, Connecticut office; the U. S. Federal Aviation Administration ("FAA") would grant certificates for the helicopters, which would be manufactured in accordance with FAA regulations; and Sikorsky would train CHC's pilots at a Sikorsky facility in Florida. TAC §§ 18-25.

The 2004 Sales Contract contained an express limited warranty, a disclaimer of implied warranties, and an exclusion of certain other remedies. TAC ¶ 26. On November 10, 2005, Sikorsky and CHC agreed to amend the 2004 Sales Contract so that the 2004 express warranty began to run on "final acceptance of the Completion Services by the Customer." TAC ¶ 27.

Apparently the first helicopter built for delivery under the 2004 Sales Contract was designated model S-92A and bore serial number 920048. This is the aircraft involved in the crash forming the subject matter of this action. I will refer to it hereafter as "the Helicopter." On

October 27, 2006, Sikorsky, CHC and the lead Defendant in this action, Lloyds TSB General

Leasing (NO.20) Limited ("Lloyds 20"), signed a Novation Agreement ("the 2006 Novation").

Lloyds 20 is a company incorporated under the laws of England and Wales, with a registered

office in London, U.K.  The 2006 Novation recited the agreement of these three parties that

Lloyds 20 would buy the Helicopter from Sikorsky "in place of CHC" in order that CHC

Helicopters International, Inc. ("CHII") could hire the Helicopter from Lloyds 20 under the terms

of a hire purchase agreement to be entered into between Lloyds 20 and CHII.  TAC ¶¶ 3, 30.  The

2006 Novation further provided  that Lloyds 20 would "assume the rights and liabilities of CHC"

under the 2004 Sales Contract with respect to the Helicopter; perform the obligations of CHC

under that contract; be "bound by the terms" of that contract "in every way" as if Lloyd's 20 had

been a party to the 2004 Sales Contract with respect to the Helicopter "as the buyer as at the date

it was executed"; and Lloyds 20 appointed CHC as its agent to perform all obligations and

exercise all Lloyds 20's rights under the 2004 Sales Contract, other than the obligation to pay the

purchase price, the right to take title to the Helicopter, and any rights that CHII would perform on

behalf of Lloyd's 20.  TAC ¶¶ 31-34.

On October 27, 2006, Lloyds 20 and CHII, a Canadian company, signed a Hire Purchase

Agreement for the Helicopter which characterized Lloyds 20 as the owner of the Helicopter and

recited that the Helicopter was the subject of the 2004 Sales Contract between CHC and

Sikorsky.  TAC ¶¶ 35-37.

On March 13, 2007, CHII and Defendant Cougar Helicopter Inc. ("Cougar"), a Canadian

company with its principal place of business at St. John's International Airport, Newfoundland

and Labrador, signed an Aircraft Lease General Terms Agreement for the Helicopter which

provided that CHII would make available to Cougar the benefit of all Sikorsky's warranties with respect to the repair or remedy of any defect in the Helicopter to the extent permitted to do so. On the same date, CHII and Cougar signed an Aircraft Specific Lease the Agreement which recited that Lloyds 20 was the owner of the Helicopter, and required Cougar to fix and maintain a nameplate in the aircraft's cockpit or cabin stating that the Helicopter was owned by Lloyds 20, leased to CHII, and operated by Cougar. TAC ¶¶ 4, 38-42.

On March 31, 2007, pursuant to the 2004 Sales Contract, Cougar executed for and on behalf of Lloyds 20 a Certificate of Completion Services Acceptance with respect to the Helicopter, certifying that the aircraft had completed 10.7 flight hours and accepting delivery under the contract in Connecticut. On April 26-27, 2007, Sikorsky and CHC reaffirmed by amendment that the 2004 Sales Contract, except as modified therein, remained in full force and effect, unaffected by any other agreement. TAC ¶¶ 43-44.

On March 12, 2009, while on a flight from St. John's, Newfoundland to an offshore oil production facility, the Helicopter crashed into the Atlantic Ocean, over 25 miles offshore. At that time, Cougar was operating the Helicopter as a lessee under a lease from CHII. The Helicopter, which had logged 2,173 flight hours, became a total loss. Lloyds 20 and Cougar made claims against a number of companies and syndicates of underwriters which had insured the Helicopter against loss or damage. These entities are included as Defendants in this action. Their names appear in the caption after that of Defendant Cougar Helicopter Inc. I refer to them collectively as "the Insurers." The policy covering the Helicopter to which the Insurers subscribed bore number AZ007808 (hereafter "the Policy"). The Insurers paid Lloyds 20 $21,751,127.00 and Cougar $1,698,873.00 in respect of damage to the Helicopter, and became

subrogated to the rights of those insureds arising out of the crash.  TAC ¶¶ 45-52.

I will quote *verbatim* ¶¶ 53 and 54 of the Third Amended Complaint:

"53.  Prior to Sikorsky filing its first complaint in this Court, defendants Lloyds 20 and Cougar threatened to bring suit against Sikorsky, in contract and in tort, in a Canadian court to recover damages arising out of the Accident.

"54.  After Sikorsky filed its complaint in this Court against Lloyds 20 and Cougar, defendants Lloyds 20 and Cougar and their hull insurers brought suit against Sikorsky and HSI in the Supreme Court of Newfoundland and Labrador by filing their Statement of Claim in that court."

I will refer to this suit commenced by Defendants against Sikorsky as "the Canadian action," and to the Supreme Court of Newfoundland and Labrador, where the suit was filed and is pending, as "the Canadian Court."

"HSI" is a reference to Helicopter Support, Inc., a Sikorsky affiliate and second-named Plaintiff in the captioned case in this Court.  HSI was charged with supplying parts and services to  purchasers of Sikorsky products such as the Helicopter.  Defendants included HSI as a defendant in their  Canadian action against Plaintiffs, which they filed on June 24, 2010, eight days after Plaintiffs filed the captioned action for declaratory relief on June 16.  On September 10, 2010, Defendants filed a notice in the Canadian action, discontinuing their claim against HSI.  Ex. A to Declaration of Stephen R. Stegich, attorney for Defendants [Doc. 35].

B.     **The Parties' Claims as Asserted in Their Pleadings**

The Helicopter's crash has resulted in two legal proceedings: (1) the Defendants' action in the Canadian Court against Sikorsky for property damage, and (2) Plaintiffs' action in this

Court against Defendants for declaratory relief. It is necessary to consider in further detail the claims asserted in these actions. While Plaintiffs filed their declaratory action in this Court shortly before Defendants filed their Canadian action, I begin with the claims in the Canadian action because it is transparently clear – indeed, Plaintiffs acknowledge in a fair reading of ¶¶ 53-54 of their TAC, quoted *supra* – that the declaratory action is *au fond* a proactive defensive effort by Sikorsky to avoid litigation against Sikorsky in Canada.

### 1. *Defendants' Action Against Sikorsky in the Canadian Court*

The Defendants in this action, Lloyds 20, Cougar and the Insurers, commenced their Canadian action against Sikorsky, HSI and the Canadian Minister of Transport by filing a Statement of Claim dated June 24, 2010 in the Canadian Court.[1] A copy appears as Ex. B to the Stegich Declaration. On this motion I am concerned only with Sikorsky, since Defendants have discontinued the Canadian action against HSI, and counsel appearing in support of or opposition to this motion are not instructed by the Minister.

Defendants filed an Amended Statement of Claim ("ASC") in the Canadian action on September 21, 2010, Ex. C to Stegich Declaration, which names only Sikorsky and the Minister as defendants. The ASC, which is the operative pleading in the Canadian action, alleges that at the time of the crash the Helicpter was carrying 16 passengers and two crew members. All but

---

[1] "Statement of Claim" is the phrase customarily used in English law to denote the initial pleading in a civil action. The synonymous noun "Complaint" is used in what a distinguished British judge has referred to as "the revolting colonies", albeit in a flattering fashion. "Whatever self regard my country may have had at its imperial zenith at the turn of the century, the defining moment in the development of the Western World was the loss of the 13 revolting colonies in 1776." Remarks of Hon. Sir David Steel, Admiralty Judge of the United Kingdom, *Report of the Maritime Law Association of the United States*, Doc. No. 744 (October 15, 1999) at 11701.

one passenger died in the action, and the Helicopter was destroyed.  ASC ¶ 8.[2]  Defendants'

theory of the case is that the crash was caused by the total loss in flight of lubricant in the main

gearbox ("MGB").  Defendants allege that "Sikorsky knew or should have known that the design

of the S-92 MGB and its related lubrication system posed an unreasonably high risk of failure

and that a resulting loss of lubrication could cause a catastrophic loss of the Helicopter."  ASC ¶

22.

Defendants' claims against Sikorsky, all sounding in tort,[3] allege "breach of duty,

negligence, gross negligence, negligent misrepresentation, recklessness and wilful misconduct,"

ASC ¶¶ 88, and fraudulent  misrepresentation "to buyers and operators" of the Helicopter with

respect to "the airworthiness and flight safety of the S-92," ASC ¶ 90.  The specifications of fault

are lengthy.  I need not recount them in deatil.  It is sufficient for present purposes to say that

Defendants charge Sikorsky with faulty design of the Helicopter and its lubrication system;

misrepresentations to buyers and operators about  the possibility of a complete loss of lubrication

in the MGB and the Helicopter's dry-run capacity in the unlikely event of such a failure; and

misrepresentions to buyers and operators about FAA approvals of certain changes Sikorsky had

made in manuals concerning MGB emergency procedures.  Various Defendants assert against

Sikorsky claims for general and special compensatory damages and punitive damages.

---

[2]  Defendants state in their briefs without contradiction that all death and injury claims resulting from the crash have been disposed of.  Accordingly, the instant case is concerned only with property and insurance subrogation claims.

[3]  The only claim sounding in contract Defendants asserted in their Canadian action was against HSI (First Statement of Claim).  Defendants subsequently discontinued the Canadian action against HSI in its entirety.  Accordingly, as explained in text,  this opinion for the most part refers to the Sikorsky interests as "Sikorsky" in the singular.

Sikorsky applied in the Canadian Court for an order to stay the Canadian action, on the grounds that (1) the court lacked subject matter jurisdiction over Defendants' claims against Sikorsky, and (2) alternatively, and assuming *arguendo* the existence of such jurisdiction, the Canadian Court should decline to exercise it under the doctrine of *forum non conveniens* in favor of this Court, which is bound in certain respects to apply the law of the State of Connecticut. Defendants opposed Sikorsky's application, which came on for hearing before the Hon. Richard D. LeBlanc, *Justice*. In a comprehensive opinion dated December 29, 2010 [Doc. 56-1], Justice LeBlanc gave his Reasons for a Judgment which denied Sikorsky's application in its entirety. I quote the penultimate paragraph of those Reasons:

> Based upon my finding that Sikorsky has attorned to this court's jurisdiction in this matter and, in any event, my conclusion that this court has "territorial" or "assumed" jurisdiction over the claim being made by the Plaintiffs and, further, this court being unwilling to decline jurisdiction on the basis of the *forum non conveniens* doctrine, the present application of Sikorsky must be dismissed with costs to the Plaintiffs.

[Doc. 56-1] at ¶ 119.[4]

## 2. *Plaintiffs' Action Against Defendants in This Court*

In their action in this Court for declaratory relief against Defendants Lloyds 20, Cougar, and the Insurers, Plaintiffs request that the Court (i) adjudicate the rights and liabilities of the parties as to all damage claims arising out of the accident; (ii) declare that Plaintiffs never had any liability to Defendants Lloyds 20 and Cougar and their Insurers, in contract or tort, for

---

[4] While the Canadian Court's rejection of Sikorsky's application has relevance to this Court's resolution of some issues in the case at bar, my opinion neither expresses nor intimates a view with respect to the merits of the Canadian Court's reasoning and conclusions based upon Canadian and English law, except to note admiration at the felicity of its expression. I base this opinion upon the laws of the United States and Connecticut, as I comprehend them.

damage claims arising out of the accident; and (iii) enjoin those Defendants from proceeding against Plaintiffs in Canada or anywhere else except this Court for damages or other relief arising out of the accident.

Defendants move in the alternative that the Court dismiss the action for lack of jurisdiction, subject matter or personal, or in the alternative, that the Court in its discretion decline to exercise such jurisdiction as may exist.

## II. DISCUSSION

A.  **Standard of Review**

In this action for declaratory relief, Sikorsky invokes the Declaratory Judgment Act of the United States ("DJA"), which reads in pertinent part: "In a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). In the balance of this opinion, I will refer to "Sikorsky" in the singular rather than to "Plaintiffs" in the plural. The other named Plaintiff is HSI. Defendants' September 21, 2010 notice in their Canadian action recites that they "wholly discontinue" their sole claim, for breach of contract, against HSI. Presumably that is a discontinuance with prejudice under Canadian practice. It follows that there is no present "actual controversy" between HSI and Defendants, a prerequisite for relief under the DJA.

To obtain relief under the DJA, a plaintiff must show that the underlying case falls within the subject matter jurisdiction of the district court. If it does, the court has discretion whether to grant or deny the relief. A district court's determination of the existence *vel non* of subject matter jurisdiction is reviewed by the court of appeals *de novo*. The district court's decision to

grant or deny declaratory relief is reviewed for abuse of discretion. *Dow Jones & Company, Inc.*

*v. Harrods Ltd.*, 346 F.3d 357, 359 (2d Cir. 2003). I discuss the questions of subject matter

jurisdiction and judicial discretion in turn.

## B.     <u>Jurisdiction</u>

Because "the operation of the Declaratory Judgment Act is procedural only," *Aetna Life*

*Ins. Co. of Hartford, Conn. v. Haworth*, 300 U/S. 277, 240 (1937), "the requirements of

jurisdiction – the limited subject matter which alone Congress had authorized the District Courts

to adjudicate – were not impliedly repealed or modified" by the statute. *Skelly Oil Co. v. Phillips*

*Petroleum Co.*, 399 U.S. 667, 672 (1950). "[T]he declaratory judgment statute does not confer

jurisdiction on a district court," and "a complaint seeking a declaratory judgment is to be tested,

for purposes of the well-pleaded complaint rule, as if the party whose adverse action the

declaratory judgment plaintiff  apprehends had initiated a lawsuit against the declaratory

judgment plaintiff." *Fleet Bank, N.A. v. Burke*, 160 F.3d 883, 886 (2d Cir. 1998).

In the case at bar, Sikorsky's TAC alleges two bases for subject matter jurisdiction:

diversity of citizenship and admiralty. I consider them separately.

## C.     <u>Diversity of Citizenship Jurisdiction</u>

### 1.  *Allegations*

Sikorsky's TAC includes these jurisdictional allegations:

Plaintiff Sikorsky is a company incorporated under the laws of Delaware and has  its

principal place of business in Stratford, Connecticut.  ¶ 1.

Defendant Lloyd's TSB General Leasing (No. 20) Limited is a company incorporated

under the laws of England and Wales and has "its registered office" in London, England.  ¶ 3.

¶ 5 of the TAC alleges in its entirety:

> Defendant Certain Underwriters at Lloyd's of London (comprised of LLOYDS Syndicates 570, 609, MSF Pritchard Syndicate 318, 1084 CSL, 5000 TRV, 5555 QBE Underwriting Llimited and XL London Market Limited 1209), were at all times relevant hull insurers under policy no. AZ007808 (hereinafter "hull insurer").

Defendant Allianz Global Risks US Insurance Company is a Canadian corporation with its principal place of business in Toronto, Canada, and was a hull insurer under the Policy. ¶ 6.

Defendant Westport Insurance Corporation is a Canadian corporation with its principal place of business in Toronto, Canada, and was a hull insurer under the Policy. ¶ 7.

Defendant Global Aerospace Underwriting Managers (Canada) Ltd. is a Canadian corporation with its principal place of business in Markham, Ontario, Canada, and was a hull insurer under the Policy. ¶ 8.

Defendant GCAN Insurance Company is a Canadian corporation with its principal place of business in Toronto, Canada, and was a hull insurer under the Policy. ¶ 9.

Defendant Catlin Canada Inc. is a Canadian corporation with its principal place of business in Toronto, Canada, and was a hull insurer under the Policy. ¶ 10.

Defendant AIG Aviation Inc. is a company incorporated under the laws of the State of Georgia, USA, with its principal place of business in Atlanta, and was a hull insurer under the policy. ¶ 11.

From these alleged facts, Sikorsky's TAC concludes that the Court has diversity jurisdiction under 28 U.S.C. § 1332 because "[n]one of the defendants is a citizen of the same state as the plaintiffs and the matter in controversy exceeds the sum of $75,000.00, exclusive of

interest, attorney's fees and costs." ¶¶ 12, 13.

**2.** *Analysis*

For purposes of federal subject matter jurisdiction based upon diversity of citizenship, "citizenship" in respect of a corporate party is defined by 28 U.S.C. § 1332(c)(1), which provides in pertinent part that "a corporation shall be deemed to be a citizen of any State by which it has been incorporated and of the State where it has its principal place of business."  The statute also provides that jurisdiction exists if the requisite amount is in controversy in a civil action between "citizens different States," 1332(a)(1), or "citizens of a State and citizens or subjects of a foreign state," § 1332(a)(2), without defining "citizenship" in respect of a foreign corporation.

Sikorsky drafts its TAC on the apparent assumption that the same sort of two-location corporate citizenship applies to the foreign companies in this case, and for the most part alleges that structure adequately.  But I need not pursue this question further.  Assuming without deciding that the TAC sufficiently alleges the citizenship of the Canadian companies for diversity purposes, the pleading fails to pass muster in respect of the Defendant Certain Underwriters at Lloyds, tersely described in ¶ 5 of the TAC.

That paragraph alleges that the hull insurers of the Helicopter under the Policy included "Certain Underwriters at LLOYDS of London (comprised of LLOYDS Syndicates," bearing specified numbers or names.  One Lloyd's Syndicate bore number 609.

Lloyd's Syndicates are familiar fixtures on the London insurance market.  They frequently come to the attention of American  courts.  "Lloyd's began as a coffee house," the Second Circuit had occasion to observe in *E.R. Squibb & Sons, Inc. v. Accident & Casualty Insurance Co.*, 160 F.3d 925, 929 (2d Cir. 1998) ("*Squibb I*"), "but has developed into one of the

world's leading markets for insurance. This market, however, operates in accordance with age-old customs that are, to say the least, unusual in American business law."

Under those customs, described in *Squibb I* at 160 F.3d 929, from which this paragraph of this opinion is derived, the individual underwriters of Lloyd's insurance are anonymous and commonly referred to only as "Names." An insurance policy from Lloyd's, like those at bar, is typically subscribed to by hundreds of Names. Defendant Lloyd's Syndicate 609, one of those, is also one of the subgroups of insurers subscribing to the Policy covering the Helicopter in the case at bar. While a syndicate's Names invest in a percentage of the policy risk, they do not manage their own investments. Instead, each syndicate appoints one of its Names (who is usually an insurance broker) to represent the collective interests of the Names in that syndicate. This person is known as the "lead underwriter." The rewards of a Lloyd's investment can be great, but each Name is exposed to unlimited liability, measured by his or her share of the loss on a policy that the Name (together with other Names in the syndicate) has underwritten. When, as here, litigation over a Lloyd's policy occurs, only one Name (the lead underwriter disclosed on the policy) is ordinarily sued.[5] Nevertheless, all the Names subscribing to that policy are, under the Lloyd's standard form, liable for their several shares of any adverse judgment against the Lloyd's underwriters.

These are well-established principles of English insurance practice. I assume, despite the sketchiness of the pleadings and briefs of counsel on the point, that they apply to the Lloyd's Syndicates sued as purported defendants by Sikorsky in its action for declaratory relief. The

---

[5] Sikorsky's TAC does not name any individual in respect of any defendant alleged to be a member of a Lloyd's syndicate it sues, including Syndicate 609.

question presented by the case at bar is one of American procedural law: specifically, how is the citizenship of a Lloyd's syndicate determined for purposes of diversity of citizenship under 28 U.S.C. § 1332(a)?

That question must be considered in the light of established principles of diversity jurisprudence. In the case at bar, Sikorsky is the party invoking diversity jurisdiction, in order to bring its claims against Defendants within this Court's subject matter jurisdiction. "The party seeking to invoke jurisdiction under 28 U.S.C. § 1332 bears the burden of demonstrating that the grounds for diversity exist and that the diversity is complete." *Herrick Company, Inc. v. SCS Communications, Inc.*, 251 F.3d 315, 322-23 (2d Cir. 2001) (citation and internal quotation marks omitted). That burden falls upon Sikorsky, the proponent of diversity jurisdiction, and it matters not what labels may be affixed upon the American and Canadian actions or the order of their filings (particularly when only eight days apart). "[D]iversity of citizenship should be distinctly and positively averred in the pleadings, or should appear with equal distinctness in other parts of the record." *Leveraged Leasing Administration Corp. v. Pacificorp Capital, Inc.*, 87 F.3d 44, 47 (2d Cir. 1996) (citation and internal quotation marks omitted). "Diversity jurisdiction requires that all of the adverse parties in a suit be completely diverse with regard to citizenship," *Handelsman v. Bedford Village Associates Limited Partnership*, 213 F.3d 48, 51 (2d Cir. 2000) (citation and internal quotation marks omitted), a precondition which is satisfied "only if there is no plaintiff and no defendant who are citizens of the same State." *Wisconsin Department of Corrections v. Schacht*, 524 U.S. 381, 388 (1998).

The requirement of complete diversity draws a bright jurisdictional line. The number of

both plaintiffs and defendants in a given case may be Legion. [6]  However, if the hordes of

plaintiffs and hordes of defendants include among their ranks a single plaintiff and a single

defendant whose citizenships are not diverse, diversity jurisdiction is destroyed as to all parties

and the case cannot proceed on that jurisdictional basis.  A stark Second Circuit example of that

reality is found in *Squibb I*, 160 F.3d 925, and its companion decision after remand, *E.R. Squibb*

*& Sons, Inc. v. Lloyd's & Companies*, 241 F.3d 154 (2d Cir. 2001) ("*Squibb II*").  In the *Squibb*

cases, the Second Circuit laid down the rules for applying diversity of citizenship jurisdictional

principles to Lloyd's syndicates and their member Names, rules to which the Court of Appeals

apparently still adheres.  The question arises in the case at bar because the Defendants have

submitted two sworn declarations of a witness competent to testify to the facts which tend to

show that one of the Name underwriters in Lloyd's Syndicate 609, a T.S. Lovell, was at the time

of the filing of this action and remains a citizen of Litchfield, Connecticut.[7]  Lovell is accordingly

---

[6]  The use of that word for naming purposes is attributed in *Mark* 5:9 to the unclean spirit
(not a litigant) challenged to identify himself: "My name is Legion; for we are many."  In biblical
times, "a legion, a major unit in the Roman army, consisted of four thousand to six thousand
men."  *New Oxford Annotated Bible* (1994) at p. 54 n.5.1-43.

[7]  The witness referred to in text is Sally Dunning, a United Kingdom resident, where she
is employed by the Corporation of Lloyd's in Lloyd's Market Services, "which provides services
for Syndicate Members in relation to their underwriting at Lloyd's of London," Supplemental
Declaration dated October 20, 2010 in support of Defendants' motion to dismiss Sikorsky's
action [Doc. 45] at ¶ 1.  Defendants submitted an earlier Declaration by Dunning, dated July 21,
2010 [Doc.35, Ex. E]; the Supplemental Declaration amplifies and clarifies that earlier
submission.  The Lloyd's unit employing Dunning "maintains all relevant information on the
Lloyd's Member Syndicates, including Names and residences of Syndicate Members." [Doc.45]
at ¶ 3.  Dunning was tasked with reviewing Lloyd's records with respect to all Syndicates
subscribing to the Policy "for purposes of determining the residence of all Members of said
Syndicates."  *Id*. at ¶ 5.  That search led Dunning to T.S. Lovell and Lovell's address in
Litchfield, Connecticut.  *Id.* at  ¶ 6.  Dunning further identifies Lovell as a member of "Syndicate
609 of Atrium Aviation Consortium."  *Id*., ¶ 7.

non-diverse with Sikorsky, a Connecticut corporate citizen.  In that circumstance, the Second

Circuit's *Squibb* decisions (which unaccountably neither side cites or discusses in the briefs of

counsel) govern the proceedings in this Court.

In *Squibb I*, the Second Circuit was confronted with a declaratory action brought by

Squibb, an American pharmacological company, against "a host" of domestic and foreign

primary and excess  insurers "seeking indemnification for product liability claims arising out of

the use" of the drug DES. 160 F.3d at 928.  After a jury trial before Judge Martin, the District

Court entered a judgment in Squibb's favor.  A group of insurers appealed.  The Court of

Appeals began its opinion with these  seemingly exasperated words:

> Although this case has been litigated in federal court for sixteen
> years, the existence of diversity jurisdiction pursuant to 28 U.S.C.
> § 1332 has not been established.  This is due to the presence in the
> suit of "Certain Underwriters at Lloyd's of London" ("Lloyd's").
> Accordingly, we vacate the judgment and remand to the district
> court for further proceedings on the jurisdictional issue.

*Id*.  The diversity problem was injected by Squibb's inclusion in its complaint of one Haycock, "a

British subject, who was named  as 'representative underwriter representing certain underwriters

at Lloyd's [of] London, all being underwriters who subscribed the policies of insurance issued to

the  plaintiff and upon which the plaintiff brings the present action.'"  *Id*.

The *Squibb I* court noted that while the insurers' appeal in that case was pending, another

Second Circuit panel decided *Advani Enterprises, Inc. v. Underwriters at Lloyds*, 140 F.3d 157

(2d Cir. 1998), which "raised, but did not decide, the difficult questions involved in determining

how  the Lloyd's underwriters should be analyzed for purposes of the requirements of diversity

jurisdiction." *Squibb I*, 160 F.3d at 928.  The *Squibb* court undertook to resolve those questions,

17

identified "[t]he first question we must therefore decide is whether only the Lloyd's representative lead underwriter needs to meet the diversity requirement or whether each and every Name represented (i.e. each name subscribing to the Lloyd's policy at issue in the case) must be of diverse citizenship," *id*. at 930, and ruled on that issue:

> We hold that when a Lloyd's lead underwriter is sued in a representative capacity (but not in a class action) each and every Name whom the lead underwriter represents must be completely diverse. But we also hold that when a Lloyd's name (including a lead underwriter) is properly sued only in an individual capacity, it is that Name's characteristics, both as to citizenship and jurisdictional amount, that are determinative for jurisdictional purposes.

160 F.3d at 939. "All other issues in this case we decline to decide and remand to the district court . . . in an attempt to salvage federal jurisdiction, if jurisdiction can be saved by means of the alternatives we have presented and within the limits set by the relevant statutes and holdings of the Supreme Court." *Id.* at 940.

On remand, District Judge Martin took evidence and fashioned a theory which did indeed salvage diversity jurisdiction. The Second Circuit accepted his reasoning that continuing the suit against a Lloyd's syndicate lead underwriter in an individual, not a representative, capacity would not unfairly prejudice the other "Names," since under Lloyd's contracts and rules a judgment against a lead underwriter alone is binding upon and must be honored by absent Names, who are bound to share the policy liability. *Id*. at 161. Accordingly, such a case preliminarily falls within and is sanctioned by the second of the two quoted holdings from *Squibb I*: suing a lead underwriter "only in an individual capacity." However, I say "preliminarily" because in *Squibb II* the Second Circuit made it clear that the lead underwriter, upon whose shoulders alone rested

18

the burden of salvaging diversity jurisdiction, must personally satisfy the requirements of diverse citizenship and a $75,000 amount in controversy. *Id.* at 162. If the lead underwriter meets those criteria, the district court may exercise diversity subject matter jurisdiction, *if but only if* the pleadings are recast so that, in the case of a Lloyd's syndicate, the lead underwriter, sued in his individual capacity, "will be the sole Name present as a defendant." *Id.*

I apply these Second Circuit rules, strangely unmentioned in the briefs of counsel, to the case at bar. It is immediately apparent that complete diversity jurisdiction over Sikorsky's declaratory judgment action is neither pleaded by Sikorsky in its TAC nor established by the record. Under the Second Circuit's decisions in *Squibb*, to salvage diversity jurisdiction where plaintiff Sikorsky and a Name in Lloyd's Syndicate 609 are both Connecticut citizens, Sikorsky is required to allege the identity of that syndicate's lead underwriter, sue that lead underwriter in his/her/its *individual* capacity, and allege that the lead underwriter *personally* satisfies the diversity jurisdiction requirements of diverse citizenship and amount in controversy (at least $75,000). The only TAC allegations relevant to the Lloyd's Syndicate Defendants (including 609), found in ¶ 5, do not even attempt to satisfy these pleading requirements.

Neither do Sikorsky's briefs address these post-*Squibb* factors. Its main brief [Doc. 38] at 30 casts the Defendant Insurers as having "taken on the burden of proving that one Member of Syndicate 609 is a resident of the State of Connecticut,"[8] and dismisses Sally Dunning's first declaration concerning the Litchfield, Connecticut residence of Syndicate 609 "Name" underwriter T.S. Lovell as "rank hearsay," leading to the argument that "[s]ince Ms. Dunning's

---

[8] It is so well established as to require no citation of authority that for diversity purposes an individual's citizenship (there can be only one) controls, not a residence (there can be several).

affidavit is hearsay and no exception [to the hearsay rule] has been satisfied, defendants have not lodged a proper objection to plaintiff's allegation of diversity of citizenship." That argument overlooks the settled rule that Sikorsky, the proponent of diversity jurisdiction, bears the burden of pleading and proving it. The Insurers, who do not wish to litigate the Helicopter crash in Connecticut and vehemently proclaim their preference for Canada, obviously do not have the burden of showing that an unwanted jurisdiction does not exist: the shoes of pleading and proof are on Sikorsky's feet. Within the context of diversity jurisdiction, and measured by *Squibb*, Sikorsky has accomplished neither.

That said, I add that the Insurers have the right to submit evidentiary material calling into reasonable question Sikorsky's barebones allegations of complete diversity of citizenship. They have done so with the two Dunning declarations; and any arguable defects in the first are cured by the second. *See* fn. 7, *supra*. If there was any doubt about Lovell's Connecticut citizenship, it was not too far for Sikorsky's lead counsel to travel from Hartford to Litchfield to establish facts necessary for Sikorsky to plead and prove complete diversity, and counsel had the duty to do so.

On this record, I conclude that this Court's subject matter jurisdiction over Plaintiff Sikorsky's action against the Defendants for relief under the Declaratory Judgment Act cannot be based upon the parties' complete diversity of citizenship.

**D.      Admiralty Jurisdiction**

The United States Constitution provides in Article III, Section 2 that the federal judicial power shall extend "to call cases of admiralty and maritime jurisdiction . . . " The statutory implementation in 28 U.S.C. § 1333(1) provides that the federal district courts shall have exclusive jurisdiction, exclusive of State courts, of : "Any civil case of admiralty or maritime

20

jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled."[9] The Constitution's use of the conjunctive "and" suggests that "admiralty" and "maritime" are synonyms for the same jurisdiction. The statute's use of the disjunctive "or" suggests that there are two jurisdictions. Such nuances need not concern us in the case at bar. I shall simply refer to admiralty jurisdiction and admiralty law.[10]

American admiralty case law recognizes and distinguishes between actions based in contract and in tort. While a maritime contract and a maritime tort both fall within admiralty jurisdiction, the boundaries between maritime and non-maritime contracts and torts are not precise. For example, it is generally accepted (if not fully understood) that a contract to build a vessel is non-maritime, but once she is launched and sailing the navigable waters a contract to repair or supply her is maritime in nature. I need not further plumb that mystery because the claims Defendants assert against Sikorsky in the Canadian action sound solely in tort, and it is the character of those claims that determines this Court's subject matter jurisdiction under the Declaratory Judgment Act. In addition to the cases previously cited, see *Public Service Commission of Utah v. Wycoff Co., Inc.*, 344 U.S. 237, 242-243 (1952) ("Where the complaint in an action for declaratory judgment seeks in essence to assert a defense to an impending or

---

[9] The "saving to suitors" proviso § 1331(1) is derived from comparable language in the Judiciary Act of 1789, one of the earlier statutes enacted by the new Nation forged from the previously revolting colonies. See *Yamaha Motor Corp. U.S.A. v. Calhoun*, 516 U.S. 199, 207 n.5 (1996). The proviso's primary purpose was to enable plaintiffs to sue in State courts to obtain any remedies which English common law (not admiralty law) would have conferred upon them prior to the Revolution.

[10] The jurisprudence created by federal courts sitting in admiralty is sometimes referred to as "general maritime jurisdiction" and "general maritime law." The parties use those phrases in their briefs. This opinion uses the synonymous phrases "admiralty jurisdiction" and "admiralty law."

threatened state court action, it is the character of the threatened action, and not of the defense, which will determine whether there is federal-question jurisdiction in the District Court."). Substitute "Canadian action" for "state court action" (and there is no principled reason not to), and this principle the Supreme Court articulated in *Wycoff* applies squarely to the case at bar.

Accordingly, I focus upon the character of the present nominal Defendants' claims they assert in the Canadian Court against Sikorsky, the nominal Plaintiff in this Court. No extended discussion is necessary because the parties agree that tort claims arising out of the Helicopter crash would be cognizable under American admiralty law in a federal district court such as this one. [11] While in earlier times American admiralty law was limited to the affairs of vessels which traversed the navigable waters of the world, aircraft, including helicopters, now routinely do so. Decisions of the Supreme Court extend admiralty jurisdiction to an aircraft which had been flying over navigable waters before crashing into those waters, provided that the tortious conduct complained of "bear[s} a significant relationship to traditional maritime activity." *Executive Jet Aviation v. City of Chicago*, 409 U.S. 249, 268 (1972); *see also Grubart v. Great Lakes Dredge & Dock Co*, 513 U.S. 527, 533-535 (1995).

In *Preston v. Frantz*, 11 F.3d 357, 359 (1993), the Second Circuit held that wrongful death claims following a helicopter crash into the high seas on a flight from Connecticut to Nantucket Island fell within admiralty jurisdiction because the helicopter "'was engaged in a function traditionally performed by water-borne vessels: the ferrying of passengers' from the

---

[11] Apparently such tort claims would not fall within the maritime law of Canada. They are cognizable instead under the Canadian general law of negligence. *See* Declaration of Norman J. Whalen, Q.C., a Canadian attorney, attached as [Doc. 44-1] to Defendants' Reply Brief [Doc. 44].

mainland over the high seas to an island." (citing and quoting *Offshore Logistics, Inc. v. Tallentire*, 477 U.S. 207, 219 (1986) (deaths resulting from helicopter crash into high seas while ferrying passengers from offshore oil platform to shore justified invocation of admiralty jurisdiction).

No wonder, then, that the parties agree that if Defendants had sued Sikorsky in this Court for tortious behavior related to the Helicopter crash, American admiralty law would have furnished some measure of subject matter jurisdiction. I use the qualifying phrase "some measure" because the parties do not agree upon the scope of that admiralty jurisdiction. Sikorsky appears to argue in its briefs that admiralty jurisdiction could be expanded to include any contract claims Defendants might have against Sikorsky arising out of the Helicopter crash, or that the Court could utilize pendent jurisdiction under 28 U.S.C. § 1367 and adjudicate contract claims together with the tort claims falling within its original jurisdiction. The Defendants do not accept these expanded concepts of admiralty jurisdiction.[12]

However, in the view I take of the case, I do not need to further parse these subsidiary questions. It is sufficient for me to conclude, as I do, that unlike diversity of citizenship, Sikorsky properly invokes American admiralty jurisdiction as applicable to the tort claims Defendants assert against it in the Canada action. This is an essential element in an action for declaratory relief. As the Supreme Court held in *Wycoff*, 339 U.S. at 671, "the operation of the Declaratory Judgment Act is procedural only." An applicant for declaratory relief must

---

[12] This part of the exercise is somewhat surreal, since one is asked to decide what claims Defendants could assert against Sikorsky in this Court, a forum the Defendants strenuously wish to avoid and to which they would be brought only under protest. But the analysis is necessary for declaratory judgment purposes, given the rule in *Wycoff* and its progeny.

demonstrate the district court's jurisdiction, and "'jurisdiction' means the kind of issues which give right of entrance to federal courts. Jurisdiction in this sense was not altered by the Declaratory Judgment Act." *Id*.

**E.      This Court's Discretionary Retention of Sikorsky's Declaratory Judgment Action**

Sikorsky having demonstrated that American admiralty law would provide this Court with at least partial subject matter jurisdiction over the claims Defendants assert against Sikorsky in the Canadian action, the remaining question is whether this Court should in the proper exercise of its discretion retain Sikorsky's declaratory judgment action, or decline to retain it in favor of the pending Canadian action.

The district courts' wide discretion in retaining declaratory judgment actions within their subject matter jurisdiction is well established. In *Green v. Mansour*, 474 U.S. 64, 72 (1985), the Supreme Court stated generally:

> The Declaratory Judgment Act of 1934 permits a federal court to declare the rights of a party whether or not further relief is or could be sought, and we have held that under this Act declaratory relief may be available even though an injunction is not. But we have also held that the declaratory judgment statute is an enabling Act, which confers a discretion on the courts rather than an absolute right upon the litigant. The propriety of issuing a declaratory judgment may depend upon equitable considerations, and is also informed by the teachings and experience concerning the functions and extent of federal judicial power.

(citations and internal quotation marks omitted). In *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995), the Supreme Court prefaced its application of the abuse of discretion standard of review by noting: "Since its inception, the Declaratory Judgment Act has been understood to confer on federal courts *unique and substantial discretion* in deciding whether to declare the rights of

litigants." (emphasis added).

In *Dow Jones & Company, Inc. v. Harrods Limited*, 346 F.3d 357, 359 (2d Cir. 2003), the Second Circuit stressed the language in the Declaratory Judgment Act, 28 U.S.C. § 2201(a)(1), that "[i]n a case of actual controversy within its jurisdiction" a district court "*may* declare the rights and other legal relations of any interested party seeking such declaration" (emphasis added by the court of appeals), and continued: "Courts have consistently interpreted this permissive language as *a broad grant of discretion* to district courts to refuse to exercise jurisdiction over a declaratory action that they would otherwise be empowered to hear." (citing cases) (emphasis added).

*Dow Jones* listed factors which should guide a district court's exercise of that discretion, factors the Second Circuit restated and adhered to in *The New York Times Company v. Gonzalez,* 459 F.3d 160, 167 (2d Cir. 2006). In *Gonzalez,* the Second Circuit said that in *Dow Jones*

> we outlined five factors to be considered *before* a court entertains a declaratory judgment action: (i) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; (ii) whether a judgment would finalize the controversy and offer relief from uncertainty; (iii) whether the proposed remedy is being used merely for procedural fencing or a race to res judicata; (iv) whether the use of a declaratory judgment would increase friction between sovereign legal systems or improperly encroach on the domain of a state or foreign court; and (v) whether there is a better or more effective remedy.
>
> We review a district court's application of the *Dow Jones* factors only for abuse of discretion.

(emphasis added). These are the factors that I will apply to Sikorsky's action for declaratory relief.

I begin the analysis with two observations that implicate more than one factor. First, the factors are fact-intensive. Each case presents its own particular facts. The briefs of counsel are replete with selective citations to earlier cases. Sikorsky favors cases where the trial court exercised jurisdiction over a declaratory action and granted declaratory relief; Defendants prefer cases where the court declined to exercise declaratory jurisdiction. Because each case presents its own circumstances to which the *Dow Jones* factors must be applied, the precedential value of one case to another is inherently limited. The situation is akin to that presented by a marine salvor's action for a salvage award, where an admiralty court in fixing the amount of the award must weigh certain factors such as values, risks, and the degree of the salvor's success. The Second Circuit said in *B.V. Wijsmuller v. United States*, 702 F.2d 333, 339 (2d Cir. 1983): "The intelligent guess which an admiralty court must make can seldom be guided by dependable precedent since salvage cases are rarely alike." (citations and internal quotation marks omitted).

Second, a circumstance of cardinal importance affecting all the *Dow Jones* factors is the litigation pending in the Trial Division of the Supreme Court of Newfoundland and Labrador. Justice LeBlanc has rejected Sikorsky's application to block that action in favor this Court, and I am scarcely in a position to predict that Sikorsky's noticed appeal from that judgment, if pressed, will succeed. Sikorsky's legal liabilities, defenses, and related rights and obligations, whether sounding in tort or in contract, can be fairly and fully adjudicated in the Canadian Court. To the extent that Sikorsky claims the web of contracts entered into by various parties in respect of the Helicopter immunizes it from or reduces its exposure to tort liability, or entitles Sikorsky to indemnification or contribution from any or all of the Defendants in this Court and Plaintiffs in the Canadian Court, the Canadian Court is competent to consider and decide those claims. The

declaration of Mr. Whalen, Q.C., attests that the Canadian Court "is a court of general jurisdiction" with "jurisdiction to hear and determine claims in tort and contract," ¶ 6; proceedings before the Canadian Court are conducted in English, and civil proceedings are almost always heard by a judge sitting alone without a jury, ¶¶ 11, 12; and

> Under Canadian law, parties are free to enter into contracts containing clauses which prescribe and limit warranty obligations, remedies in the event of breach, and liability. All courts in Canada, including the Trial Division of the Supreme Court of Newfound and Labrador, will enforce such contractual provisions unless the Court determines that to do so would be "unconscionable."

These principles are entirely familiar to advocates appearing in American federal or state courts.

I turn to the *Dow Jones* factors as they apply to this case, and begin with the third and fourth of the five, because of their central relevance to this case.

Those factors militate against this Court granting Sikorsky declaratory relief if the proposed remedies sought are "being used merely for procedural fencing or a race to res judicata" (iii); and "the use of declaratory judgment would increase friction between sovereign legal systems or improperly encroach on the domain of a state or foreign court" (iv). Viewing the case at bar in the light of these factors, one perceives immediately that the case is a paradigmatic one for declining Declaratory Judgment Act jurisdiction that American procedural (diversity) and substantive (admiralty) law might otherwise bestow.

The Helicopter fell into the sea on a flight between St. John's, Newfoundland and an offshore oil platform. The disaster did not occur in Canadian territorial waters because the Helicopter fell 35 or 36 miles off the coast of Newfoundland and Labrador, *see* Justice LeBlanc's Reasons for Judgment [Doc. 56-1] at ¶ 7, but the *lex loci* is not determinative of the propriety of

Sikorsky's action for declaratory relief. The Canadian action was brought by a host of Canadian and U.K. companies or syndicates, and one American company (AIG). These plaintiffs in Canada (defendants here) were the owners, operators, and insurers of the Helicopter at the time of the aircraft's operations from a base in Newfoundland and Labrador. Justice LeBlanc concluded that the cause of action against Sikorsky, as framed by the plaintiffs in the Canadian action before him, "is one in tort and not contract," and that Sikorsky's alleged tortious conduct occurred sufficiently "within the province" of Newfoundland and Labrador to render Sikorsky subject to the Canadian Court's jurisdiction. Reasons for Judgment, at ¶¶ 77, 80. Justice LeBlanc denied Sikorsky's motion to dismiss the Canadian action against it and remand all parties to this Court to resolve all issues between them, on the asserted ground that "Connecticut is the most convenient forum for the Plaintiffs' claim to be adjudicated." *Id.*, ¶ 1. Sikorsky relies heavily, in both courts, on certain contractual provisions in respect of jurisdiction, liability and governing law. As for such defenses and rights Sikorsky may have under the contract it signed with CHC, later assumed by Lloyds 20 under the 2006 Novation Agreement, Justice LeBlanc said in his Reasons: "While contractual defenses may well be pleaded by Sikorsky in response, this, in my opinion, cannot somehow take away from the true or actual scope and content of the [tort] claim put forward by the Plaintiffs." Reasons, ¶77. And, as for any contractual defense or claim asserted by Sikorsky based upon the 2004 Sales Agreement between Sikorsky and CHC, and the Novation Agreement between CHC, Lloyds 20 and Sikorsky (which, by the way, provided that the forum for determining any litigation suit or claim arising out of it was England), Justice LeBlanc further said: "While that agreement may well have to be interpreted pursuant to the laws of England, I do not see this court as being any less appropriate to deal with this than the court in Connecticut. If Connecticut law applies,

28

that is a factor that would be considered to Sikorsky's benefit on this issue." *Id*, ¶ 112.

The plain meaning of this analysis by Justice LeBlanc is that Sikorsky may assert in the Canadian Court, and that Court would carefully consider, whatever defenses or claims available to Sikorsky based upon the contracts relating to the Helicopter and its use, or principles of tort. Justice LeBlanc's Reasons for Judgment furnish a specific example of the procedures and powers of Canadian trial courts generally described in the Whalen declaration, quoted *supra.*     I do not presume to intimate any view by this Court as to the soundness of the Canadian Court's reasoning. That is not relevant to the task which the parties pose for this Court.  The present point is that if this Court grants the declaratory and injunctive relief for which Sikorsky prays, a considerable number of Canadian and English companies and underwriters[13] who prefer to press their claims against Sikorsky in the Canadian trial court situated in Newfoundland and Labrador, where the Helicopter had its base,  from or to which it was proceeding when tragedy struck, and where a number of key fact witnesses reside, would be told by this Court that they cannot continue in the Canadian Court of their choice, or any other court in the world except this one.  In these circumstances, the following questions arise.

*Quaere*: To use the phrasing of *Dow* factor (iv): Would a declaration by this Court granting Sikorsky that relief increase friction between the sovereign legal systems of the United States and Canada, or improperly encroach on the domain of the Canadian Court as recently defined by Justice LeBlanc in his Reasons for Judgment denying Sikorsky's application for comparable relief?  Both sub-questions, which really answer themselves, must be answered in the

---

[13]   And one American: I do not forget T.S. Lovell of Litchfield, Connecticut, and Lloyds Syndicate No. 609, to which he has lent his Name.

affirmative. They strongly counsel against the Court's retention of Sikorsky's declaratory action.

*Further Quaere*: To use the phrasing of *Dow* factor (iii): Are Sikorsky's proposed declaratory and injunctive remedies being used merely for procedural fencing or a race to res judicata?

The first question, posed by factor (iii), must be answered in the affirmative. Sikorsky admits as much in ¶¶ 53-54 of its TAC, quoted *supra*. It is clear that Sikorsky's counsel drew up the declaratory action papers because "Lloyds 20 and Cougar threatened to bring suit against Sikorsky, in contract and in tort, in a Canadian court to recover damages out of the Accident." ¶ 53. If these parties had never uttered that threat, or never filed an unthreatened Canadian action, Sikorsky would never have filed this declaratory action.

I do not reproach Sikorsky for having done so. There is a pejorative flavor to the *Dow* factors' phrases "procedural fencing" and "a race to res judicata." "Forum shopping" is another popular phrase, invariably uttered with a disapproving sneer by opposing counsel. However, it may be counsel's duty to utilize legal devices or remedies which might be thought to work to the client's advantage, such as a Connecticut manufacturer of a helicopter involved in a fatal crash who thinks it is advantageous to defend itself in Connecticut rather than in Canada. But the trial judge always has a different duty: to consider all the particular circumstances in a case and decide whether retaining or declining declaratory jurisdiction is right, just, fair and equitable to all the litigants, whatever their strategic or tactical jurisdictional preferences. I have said that these cases are fact-intensive and of limited precedential value, but on occasion a statement of principle emerges from the case law which mirrors the case at bar and is persuasive, such as this one: "Courts take a dim view of declaratory plaintiffs who file their suits mere days or weeks before

the coercive suit filed by the natural plaintiff and who seem to have done so for the purpose of acquiring a favorable forum." *Innovation Ventures, L.L.C. v. CB Distrib., Inc.*, 652 F.Supp.2d 841, 844 (E.D. Mich. 2009) (citation and internal quotation marks omitted). *Dow* factor (iii) must be answered in the affirmative, and counsels strongly against the Court's retention of Sikorsky's declaratory action.

Factors (i) and (ii) focus together upon whether the requested declaratory judgment will serve "a useful purpose" by "clarifying or settling the legal issues involved," or "would finalize the controversy and offer relief from uncertainty." The quoted phrase appears only in the first factor, but its spirit informs both. There are cases where a declaratory judgment's utility and benign purpose are manifest. In the world of liability insurance, for example, litigation between a purported insured and its insurer frequently begins with an application by the insured for a judicial declaration that the policy covers the underlying incident and the insurer must defend and indemnify the insured; or an application by the insurer for a declaration of non-coverage and freedom from obligation to the insured (who would then turn out to be the *not* insured). Judicial resolution of that threshold issue at that early stage is highly useful and beneficial to all interests concerned, including the third party who sues on an injury claim against the insured, previously threatened or not, and wonders if funds will be available to satisfy a judgment if obtained.

The case at bar is entirely different. The Canadian action, while at a preliminary stage, is firmly in place in a court of competent and appropriate jurisdiction as the result of Justice LeBlanc's judgment which, if not disturbed on appeal, provides a forum for adjudication of claims and defenses in tort and in contract that any party, including Sikorsky, may raise in its

pleadings.[14]  Were this Court to grant Sikorsky its prayed-for declaratory relief, that would not serve "a useful purpose" in "settling the legal issues involved" in this significant and complex international litigation, or "finalize the controversy and offer relief from uncertainty."  Precisely the opposite is true.  If this Court issued a judgment forcing all the litigation here and enjoining the Defendants from suing Sikorsky anywhere else, the Defendants would presumably appeal to the Second Circuit.  The underlying case would then be tied up in parallel appeals before appellate courts of Canada and the United States for periods of time  uncertain in duration but at all too certain increased legal expense for all concerned.  Such a declaratory judgment would not settle legal issues, but preserve or create them; not finalize the controversy and relieve uncertainty, but prolong controversy and aggravate uncertainty.  These are fruits not of a useful and productive purpose for implementation of the rule of law among nations and their citizens, but a counterproductive purpose when viewed in that broader context, motivated by a tactical advantage perceived by one party.

For these reasons, *Dow* factors (i) and (ii) militate against this Court's retaining jurisdiction  over Sikorsky's action for declaratory relief.

Lastly, I come to *Dow* factor (v), which poses the question "whether there is a better or more effective remedy."  It is a broadly stated factor which embraces, explicitly or by implication, all the others.  In the particular circumstances of this case, one must contrast the remedies available to the litigants in the Canadian Court and in this Court.  The declaratory judgment

---

[14]  In this regard, the practices and procedures of the Canadian Court and this Court need not be precisely the same, so long as the substance of the parties' claims, defenses and remedies may be asserted and will be fairly considered in both courts.  The Whalen declaration and the Justice LeBlanc's reasoning satisfy me that this is so in Canada.  I like to think, and believe, that it is so in this Court as well.

prayed for by Sikorsky would pass the test of propriety only if it is clear that the declaratory process in this Court offers to all litigants remedies that are clearly "better or more effective" than those available to them in the case proceeding in the Canadian Court. I use the phrase "all litigants," not just Sikorsky, because the Supreme Court has cautioned that "[t]he propriety of issuing a declaratory judgment may depend upon equitable considerations," *Green v. Mansour*, 474 U.S. 72, and the Chancellor in Equity must consider the legitimate interests of all, parties or not, who are affected by the case.[15] Sikorsky has failed entirely to demonstrate that this Court furnishes better or more effective remedies than the Canadian Court. The opposite is true.

I need not discuss *Dow* factor (v) at length because what I have said about the others conclusively demonstrates the impropriety of granting Sikorsky's requested declaratory relief. To do so, I would have to abuse my discretion in fundamental ways. Instead, and in the exercise of my discretion, I decline to retain jurisdiction in this case, and GRANT the Defendants' motion to dismiss it.[16]

### III. CONCLUSION

For the foregoing reasons, the Defendants' motion to dismiss Plaintiff Sikorsky's third amended complaint based upon the Declaratory Judgment Act is GRANTED. The Clerk of the

---

[15] In the case at bar, I am concerned only with parties. Sikorsky has transformed the Plaintiffs in the Canadian action into the Defendants in this one.

[16] As noted in text, Defendant Lloyds 20 also moves to dismiss Sikorsky's complaint as against it for lack of personal jurisdiction. I do not reach that issue in this opinion, which assumes without deciding that all subsidiary issues should be decided in Sikorsky's favor (personal jurisdiction, sufficiency of service of process, the expanded boundaries of admiralty jurisdiction, pendent jurisdiction), and conclude nonetheless that granting declaratory relief would constitute an abuse of discretion and an impropriety. These other issues can be revisited if this Court's decision on the core question is reversed by the Court of Appeals.

Court is directed to dismiss the action without prejudice to the merits of the underlying disputes, and to close the case.

It is SO ORDERED.

Dated:  New Haven, Connecticut
        April 1, 2011


                                        /s/ Charles S. Haight, Jr.
                                        CHARLES S. HAIGHT, JR.
                                        SENIOR UNITED STATES DISTRICT JUDGE